**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 0:25-cv-62575-WPD**

SCOTT SCHAAF and
YEIDY MONTERO,

      Plaintiffs,

v.

NEXO CAPITAL, INC. and
ANTONI TRENCHEV,

      Defendants.

                                  /

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT [D.E. 22]

LAW OFFICE OF CHRISTOPHER HUNT, PLLC
146 Second Street North, Suite 310
Saint Petersburg, FL, 33701
Telephone: (888) 784-HUNT
Fax: (727) 683-9476

Christopher Hunt, Esq
Florida Bar No.: 1035597
Telephone: (727) 401-4665
christopher@chrishuntlegal.com
*Counsel for Plaintiffs*

TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

ARGUMENT ......................................................................................................................2

I.  The Complaint Is Not a Shotgun Pleading..................................................................2

II.  The Court Has Personal Jurisdiction Over Trenchev ................................................3

    A.  Federal Law Independently Establishes Jurisdiction..................................................3

    B.  Florida's Long-Arm Statute Also Confers Jurisdiction ..............................................5

    C.  Trenchev's Declaration Is Not Credible ....................................................................5

III.  The CEA Claims Are Not Time Barred and State a Claim.......................................7

    A.  The Cause of Action Did Not Arise Until 2026 ..........................................................7

    B.  Standing ..................................................................................................................9

    C.  Actual Delivery......................................................................................................16

    D.  Aiding and Abetting ..............................................................................................16

    E.  Count III States a Claim—Westlake Is Inapposite..................................................17

IV.  The RICO Claims State a Claim and Are Timely......................................................17

    A.  Statute of Limitations............................................................................................17

    B.  PSLRA Bar ............................................................................................................18

    C.  Enterprise..............................................................................................................19

    D.  Pattern of Racketeering Activity ............................................................................20

    E.  Causation ..............................................................................................................20

    F.  Conspiracy ............................................................................................................22

V.  The Fraud Claims Are Timely and Adequately Pleaded...........................................22

    A.  Statute of Limitations............................................................................................22

    B.  Particularity Under Rule 9(b) ................................................................................22

    C.  Reliance—And Presumption for Omissions ...........................................................22

    D.  Puffery Defense Fails ............................................................................................23

    E.  Multiple Independent Fraud Theories....................................................................23

    F.  Contract-Authorized Defense Is Circular................................................................23

VI.  The FDUTPA Claim States a Claim ........................................................................23

VII.  The Civil Theft Claim States a Claim......................................................................24

    A.  The Purported Contract Is Void or Unenforceable..................................................24

    B.  Felonious Intent ...................................................................................................25

    C.  Fungibility ...........................................................................................................25

VIII.  Defendants Are Not Entitled to Attorney's Fees..................................................25

CONCLUSION ...................................................................................................................25

TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Affiliated Ute Citizens of Utah v. United States*,
　　406 U.S. 128 (1972)........................................................................................22

*Bansal v. TD Ameritrade, Inc.*,
　　2024 U.S. Dist. LEXIS 101701 (S.D. Fla. 2024).............................................17

*Bastias v. United States Att'y Gen.*,
　　158 F.4th 1188 (11th Cir. 2025) ......................................................................12

*BDI Capital, LLC v. Bulbul Investments LLC*,
　　446 F. Supp. 3d 1127 (N.D. Ga. 2020) ............................................................12

*Boyle v. United States*,
　　556 U.S. 938 (2009)........................................................................................19

*Brooks v. Blue Cross &amp; Blue Shield of Fla., Inc.*,
　　116 F.3d 1364 (11th Cir. 1997)........................................................................20

*Browning v. Fla. Hometown Democracy, Inc., PAC*,
　　29 So. 3d 1053 (Fla. 2010)..............................................................................23

*Burke v. Napieracz*,
　　674 So. 2d 756 (Fla. 1st DCA 1996).................................................................25

*Cada v. Baxter Healthcare Corp.*,
　　920 F.2d 446 (7th Cir. 1990)..............................................................................9

*CFTC v. American Precious Metals, LLC*,
　　845 F. Supp. 2d 1279 (S.D. Fla. 2012) ............................................................11

*CFTC v. 20/20 Trading Co.*,
　　2011 U.S. Dist. LEXIS 60860 (C.D. Cal. 2011)...............................................11

*CFTC v. Binance Holdings Ltd.*,
　　No. 1:23-cv-01599 (N.D. Ill.) .....................................................................10, 15

*CFTC v. Hunter Wise Commodities, LLC*,
　　749 F.3d 967 (11th Cir. 2014)..........................................................................11

*CFTC v. McDonnell*,
　　287 F. Supp. 3d 213 (E.D.N.Y. 2018) ..............................................................11

*CFTC v. Monex Credit Co.*,
　　931 F.3d 966 (9th Cir. 2019)........................................................................13, 16

*Cory v. Aztec Steel Bldg., Inc.*,
　　468 F.3d 1226 (11th Cir. 2006).........................................................................3

*Cress v. Nexo Capital, Inc.*,
　　No. 3:23-cv-00882 (N.D. Cal.) ................................................................6, 14, 18

*Davis v. Powertel, Inc.*,
　　776 So. 2d 971 (Fla. 1st DCA 2000)................................................................23

*Denson v. Stack*,
　　997 F.2d 1356 (11th Cir. 1993)........................................................................25

*Fagan v. Nexo Capital, Inc.*,
　　No. 4:24-cv-00466 (E.D. Tex.) ....................................................................4, 5, 9

*First Nat'l Monetary Corp. v. CFTC*,

677 F.2d 522 (6th Cir. 1982)................................................................................11

*Galstaldi v. Sunvest Cmtys. USA, LLC*,
637 F. Supp. 2d 1045 (S.D. Fla. 2009) ...............................................................24

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016)................................................................................19

*Grasta v. First Union Sec.*,
358 F.3d 840 (11th Cir. 2004)...............................................................................9

*Harris v. Gonzalez*,
789 So. 2d 405 (Fla. 4th DCA 2001) ..................................................................15

*Holmberg v. Armbrecht*,
327 U.S. 392 (1946) ..............................................................................................9

*In re Amaranth Nat. Gas Commodities Litig.*,
587 F. Supp. 2d 513 (S.D.N.Y. 2008)....................................................................3

*Internet Solutions Corp. v. Marshall*,
557 F.3d 1293 (11th Cir. 2009)..............................................................................7

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) ............................................................................................17

*Kolski v. Kolski*,
731 So. 2d 169 (Fla. 3d DCA 1999) ...................................................................24

*Kousisis v. United States*,
605 U.S. 114 (2025)..............................................................................................20

*Levy v. BASF Metals Ltd.*,
917 F.3d 106 (2d Cir. 2019)...................................................................................8

*Licht v. Watson*,
567 F. App'x 689 (11th Cir. 2014) ......................................................................18

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) ..................................................................................11, 12

*Mansur v. Nexo Financial, LLC*,
No. 2022-007953-CA-01 (Fla. 11th Cir.) .............................................................6

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
288 F.3d 1264 (11th Cir. 2002)..............................................................................6

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)...............................................................................................9

*Messieh v. Binance Holdings Ltd.*,
No. 8:22-cv-00156 (C.D. Cal.) ...................................................................3, 4, 8, 9

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)................................................................................21

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2008)...........................................................................22

*Nexo Capital Inc. v. Shulev*,
[2023] EWHC 1646 (Comm)..................................................................................6

*Oldfield v. Pueblo De Bahia Lora, S.A.*,
558 F.3d 1210 (11th Cir. 2009)..............................................................................4

*People v. Nexo Inc.*,
(N.Y. Sup. Ct.) ....................................................................................................10

*Pilkington v. United Airlines*,
    112 F.3d 1532 (11th Cir. 1997)..................................................................................18

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
    842 So. 2d 773 (Fla. 2003)........................................................................................24

*Rosh Chodesh II Ltd. P'ship v. Wimpfheimer*,
    2025 WL 641300 (S.D.N.Y. 2025).............................................................................18

*Ray v. Spirit Airlines, Inc.*,
    836 F.3d 1340 (11th Cir. 2016)..................................................................................22

*Schenek v. FSI Futures, Inc.*,
    1998 WL 603462 (S.D. Fla. 1998).............................................................................23

*Sec. Investor Prot. Corp. v. Vigman*,
    764 F.2d 1309 (9th Cir. 1985).....................................................................................4

*Strategic Income Fund, LLC v. Spott*,
    305 F.3d 1293 (11th Cir. 2002).....................................................................................2

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007).....................................................................................19

*United States v. Estepa*,
    998 F.3d 898 (11th Cir. 2021)....................................................................................20

*Weiland v. Palm Beach Cnty. Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015).....................................................................................2

*Westlake v. Abrams*,
    575 F. Supp. 495 (S.D.N.Y. 1983).............................................................................17

*Wu v. Bitfloor, Inc.*,
    460 F. Supp. 3d 418 (S.D.N.Y. 2020)..........................................................................7

Statutes

    7 U.S.C. § 2(c)(2)(D) ........................................................................................ passim

    7 U.S.C. § 13c(a)......................................................................................................16

    7 U.S.C. § 23(a) ..................................................................................................11, 12

    7 U.S.C. § 25............................................................................................................10, 11

    18 U.S.C. § 1343 ...................................................................................................1, 20

    18 U.S.C. § 1962(c)–(d).....................................................................................2, 19, 22

    18 U.S.C. § 1964(c)...................................................................................................17

    Fla. Stat. § 501.204 ..................................................................................................23

    Fla. Stat. § 772.11(1)................................................................................................25

    Fla. Stat. § 812.014 ..................................................................................................24

Rules

    Fed. R. Civ. P. 4(k)(2)................................................................................................4

    Fed. R. Civ. P. 9(b) ............................................................................. passim

    Fed. R. Civ. P. 12(b)(2)..............................................................................................3

    Fed. R. Civ. P. 12(b)(6)..............................................................................................1

*Case No. 0:25-cv-62575-WPD*

## **INTRODUCTION**

Defendants ask this Court to dismiss a complaint supported by 24 exhibits, internal Nexo records, regulatory findings, and evidence of a fraud scheme now under investigation in multiple countries. This Court has jurisdiction under four independent bases. A sister court has upheld the RICO, fraud, and civil theft claims against this same defendant on substantially similar facts, and a second court has sustained CEA claims on structurally parallel facts. The motion should be denied.

The fraud is straightforward. Nexo profited by maximizing liquidations of customer collateral—extracting a concealed 5% tax on every liquidation event. To feed this cycle, Nexo's "Help Center" contacted customers after liquidation, posing as assistance to recover losses, but in reality funneling them into additional illegal leveraged transactions. Customers never knew they held leveraged positions: the platform displayed what appeared to be ordinary Bitcoin holdings, with nothing indicating that collateral was locked or that any leverage existed. Each "recovery" product was just more leverage, creating a repeating cycle of liquidation, outreach, and re-leveraging designed to extract maximum fees from the same victims.

This is the first private action to identify that Nexo's products are illegal off-exchange leveraged retail commodity transactions subject to the Commodity Exchange Act. No other plaintiff in any Nexo litigation—Cress, Fagan, Jeong, Vera, Littrell, Hanson, Coleman III, Coleman IV, or Mansur—has identified this theory, despite years of active litigation, because Defendants deliberately disguised the products as "loans," conducted them through private email channels outside the platform, and never disclosed them in their Terms and Conditions—evidencing awareness they were unlawful. The 24 exhibits attached to the TAC independently establish every element of the fraud.

Defendants devote their jurisdictional argument entirely to disputing Trenchev's Florida contacts. But CEA claims require only minimum contacts with the United States as a whole, RICO's nationwide service provision independently establishes jurisdiction, and Rule 4(k)(2) reaches any foreign defendant with aggregate U.S. contacts. Trenchev signed consent orders with regulators in all 50 states. He cannot avoid answering for this fraud, and this Court has both the authority and the obligation to hold him accountable for his fraudulent scheme.

The CEA claims are timely. The cause of action did not arise until the DFPI's January 2026 consent order prompted Plaintiffs to discover that the transactions required CFTC registration. The TAC was filed five weeks later.

*Case No. 0:25-cv-62575-WPD*

Defendants' motion rests partly on Trenchev's declaration—but as shown below, every material public statement Trenchev has made about Nexo has been contradicted by his own conduct, his own prior sworn testimony, or independent evidence. Defendants destroyed his emails thirteen days after receiving Plaintiffs' preservation demand. The motion lacks merit.

## ARGUMENT

### I. The Complaint Is Not a Shotgun Pleading

Defendants characterize the TAC as a "kitchen-sink pleading." It is not. The TAC does not meet any of the four categories identified in *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015).

Each count is separately numbered and identified. Allegations are organized chronologically by transaction: Help Center (¶¶ 43–48), Bloomberg interview (¶¶ 49–53), VIP Program (¶¶ 59–64), Portfolio Booster (¶¶ 65–70, 79–92), and Liquidation Relief Program (¶¶ 76–78). Each transaction specifies employee names (Georgiev, Dinca), specific dates, dollar amounts, and exhibit citations. The incorporation of common factual allegations across counts is standard pleading practice. *Strategic Income Fund, LLC v. Spott*, 305 F.3d 1293, 1295 n.9 (11th Cir. 2002). The TAC's references to "Defendants" collectively are proper where co-principals are alleged to have acted in concert—and Defendants' claim that "the only allegation specific to Trenchev is a Bloomberg interview" is flatly false. The TAC alleges Trenchev-specific conduct mapped to each claim: (1) operational control over all U.S.-facing products (¶ 12)—CEA aiding and abetting under 7 U.S.C. § 13c(a); (2) personally broadcasting false regulatory statements into Florida on Bloomberg (¶¶ 49–53)—wire fraud predicates for RICO and direct fraud; (3) personally signing multistate consent orders covering Florida (¶¶ 14, 31)—both jurisdictional contacts and knowing participation in the regulatory concealment scheme; (4) personally benefiting through equity ownership and compensation from the scheme (¶ 16)—RICO "person" liability under 18 U.S.C. § 1962(c); (5) making false fee representations in a public AMA session (¶ 99(f))—an independent Rule 9(b)-pleaded predicate act; and (6) supervising day-to-day business activities including "compliance-related operations and customer-facing messaging" (¶ 157(b))—directly connecting Trenchev to the fraudulent "#ZeroFees" marketing and misleading liquidation warning emails. Trenchev knows exactly what he is accused of in each count.

### II. The Court Has Personal Jurisdiction Over Trenchev

2

*Case No. 0:25-cv-62575-WPD*

Defendants argue Trenchev has "no connection to Florida." The TAC pleads the opposite. Jurisdiction over Trenchev is independently established on multiple grounds, the strongest of which do not depend on Florida-specific contacts at all.

**A. Federal Law Independently Establishes Jurisdiction Over All Ten Counts.** Defendants' entire jurisdictional challenge is premised on Trenchev's alleged lack of contacts with Florida. But for the federal claims—six of ten counts—that is the wrong framework. Three independent federal bases establish jurisdiction, and supplemental jurisdiction extends to the remaining state-law claims.

First, for CEA claims, the relevant forum is the United States—not Florida. Under the Commodity Exchange Act, "the relevant personal jurisdiction test is specific jurisdiction, and the relevant forum is the United States as a whole." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008). In *Messieh v. HDR Global Trading Ltd.*, No. 1:20-cv-03232-ALC (S.D.N.Y. Apr. 3, 2024), the court applied this framework to deny a motion to dismiss for lack of personal jurisdiction over a foreign co-founder of a crypto exchange who—like Trenchev—designed key platform systems, marketed to U.S. customers, supervised U.S.-facing operations, and co-founded a U.S.-incorporated entity intertwined with the alleged wrongdoing. Indeed, the defendant co-founder conceded this framework, acknowledging that under the CEA, "the relevant personal jurisdiction test is specific jurisdiction, and the relevant forum is the United States as a whole." Delo Br. at 8–9; *In re Amaranth*, 587 F. Supp. 2d at 526. Defendants have not addressed this standard—but it is settled law that the opposing party in the leading crypto CEA case did not even attempt to dispute. Under the CEA's national-contacts framework, jurisdiction over Trenchev is independently established for Counts I–IV.

Second, RICO's nationwide service of process provision. RICO's nationwide service provision, 18 U.S.C. § 1965(b), independently supports jurisdiction. Nexo Capital transacts business in this District (TAC ¶¶ 23–27), satisfying § 1965(a). Once one defendant anchors the case, § 1965(b) authorizes service on Trenchev as a co-defendant. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997); *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006). When a federal court exercises personal jurisdiction under RICO's nationwide service provision, the relevant due process inquiry shifts from the Fourteenth Amendment to the Fifth Amendment—and the question becomes whether the defendant has minimum contacts with the United States as a whole, not with any particular state. *Republic of Panama*, 119 F.3d at 947. Trenchev's contacts with the United States are overwhelming.

3

*Case No. 0:25-cv-62575-WPD*

Moreover, "the reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved." *Atlantica Holdings, Inc. v. BTA Bank JSC*, 2015 WL 144165, at *5 (S.D.N.Y. Jan. 12, 2015). Courts have applied this standard and found jurisdiction reasonable over foreign crypto co-founders on comparable facts. See *Messieh v. HDR Global Trading Ltd.*, No. 1:20-cv-03232-ALC (S.D.N.Y. Apr. 3, 2024) (denying PJ dismissal of foreign co-founder; "Delo has not made a compelling showing of unreasonableness"); *Fagan*, slip op. at 20 (finding exercise of jurisdiction over Trenchev "comports with traditional notions of fair play and substantial justice").

Third, Federal Rule of Civil Procedure 4(k)(2). Rule 4(k)(2) provides that for claims arising under federal law, a court may exercise personal jurisdiction over a defendant who "is not subject to jurisdiction in any state's courts of general jurisdiction" if "exercising jurisdiction is consistent with the United States Constitution and laws." Trenchev is a Bulgarian citizen residing in the United Arab Emirates. Trenchev Decl. ¶¶ 4–5. He is not subject to general jurisdiction in any U.S. state. Rule 4(k)(2) therefore applies, and the relevant inquiry is whether Trenchev has sufficient aggregate contacts with the United States as a whole—not merely Florida—to satisfy due process. *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 n.22 (11th Cir. 2009).

Trenchev's aggregate U.S. contacts are overwhelming: he personally appeared on Bloomberg Television making statements broadcast nationwide to U.S. investors (TAC ¶¶ 49–53) and personally signed consent orders with regulators in Texas, Washington, and California covering all 50 states (TAC ¶¶ 14, 31)—and in Washington, Trenchev was named individually as a respondent, not merely as a corporate representative, personally submitting to state regulatory jurisdiction. He directed U.S.-facing products serving thousands of U.S. customers and personally benefitted through equity ownership in a company deriving substantial revenue from U.S. transactions (TAC ¶¶ 12, 16, 29). These contacts far exceed the minimum required for due process under the national-contacts analysis. See *Sec. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1316 (9th Cir. 1985) (aggregate national contacts sufficient where no single state has general jurisdiction).

Rule 4(k)(2) applies to all of Plaintiffs' federal claims—both the CEA counts (arising under 7 U.S.C. § 25) and the RICO counts (arising under 18 U.S.C. § 1964(c)). Thus, even if Florida-specific contacts were deemed insufficient under the state long-arm statute, Trenchev's extensive,

4

purposeful contacts with the United States as a whole independently support this Court's exercise of personal jurisdiction.

Supplemental Jurisdiction Over State-Law Claims. Once the Court has personal jurisdiction over Trenchev for the federal CEA and RICO claims under any of the three bases above, it has supplemental jurisdiction over the state-law claims (Counts VII–X) pursuant to 28 U.S.C. § 1367, because they arise from the identical nucleus of operative facts—the same transactions, the same misrepresentations, the same liquidation events. Defendants' jurisdictional challenge therefore fails as to all ten counts.

**B. Florida's Long-Arm Statute Also Confers Jurisdiction.** Even under the Fourteenth Amendment, jurisdiction is independently proper under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a). Specific Jurisdiction. Florida's long-arm statute confers jurisdiction over any person who "[o]perat[es], conduct[s], engage[s] in, or carr[ies] on a business or business venture in this state." Fla. Stat. § 48.193(1)(a)(1). Trenchev's conduct independently satisfies three subsections: § 48.193(1)(a)(1) (operating a business venture targeting Florida residents); § 48.193(1)(a)(2) (committing a tortious act within Florida through solicitation of Florida-based customers); and § 48.193(1)(a)(6) (causing injury within Florida arising from solicitation directed at Florida). The TAC alleges that Nexo—under Trenchev's direction—solicited Florida residents, entered regulatory consent orders covering Florida, and caused financial injury to Florida domiciliaries. TAC ¶¶ 9–15.

These are specific acts directed at specific audiences including Florida residents. In *Fagan v. Nexo Capital, Inc.*, No. 4:24-cv-00466 (E.D. Tex. Aug. 25, 2025), applying Texas's long-arm statute, the court found that Trenchev exercised "effective day-to-day control" of Nexo and was "responsible for supervising day-to-day business activities of the Nexo Group companies" including "ensuring compliance with applicable legislation, rules, and regulations." *Fagan*, slip op. at 18. Those factual findings—which Baker McKenzie litigated and lost—apply with equal force under Florida's long-arm statute, where Trenchev's operational control over Nexo's U.S.-facing business satisfies § 48.193(1)(a)(1) (operating a business venture in Florida), his solicitation of Florida customers through Bloomberg and the VIP program satisfies § 48.193(1)(a)(2) (committing a tortious act in Florida), and the financial injury to Florida domiciliaries satisfies § 48.193(1)(a)(6) (causing injury in Florida arising from solicitation directed at Florida).

**C. Trenchev's Declaration Is Not Credible.** Trenchev's declaration claiming he "had no knowledge of" the liquidations is irrelevant—Plaintiffs' jurisdictional theory rests on his direction

5

of the enterprise, not mechanical involvement in each liquidation. When a plaintiff establishes a prima facie case of jurisdiction, a defendant's self-serving declaration does not defeat jurisdiction at the pleading stage. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002). Even on its own terms, the declaration is selective: the declaration is silent on Trenchev signing consent orders with Texas, Washington, and California regulators, and silent on the Bloomberg statements.

The declaration is further undermined by Trenchev's contradictory sworn statements across cases. In *Jeong v. Nexo Financial*, No. 5:21-cv-02392 (N.D. Cal. 2021), Trenchev declared under oath that Nexo Capital's principal place of business was the "United Kingdom." In this case, his declaration states it is the "Cayman Islands." D.E. 12-1. In *Cress v. Nexo Capital*, No. 3:23-cv-00882 (N.D. Cal. Feb. 2026, DE 102-2), he claims UAE residency—after earlier declarations identified him as a UK resident. A declarant who changes where he lives and where his company is headquartered depending on which forum he seeks to avoid is not credible on any of his sworn statements. The contradictions extend beyond residency. In the same Jeong declaration, Trenchev swore that Nexo Financial LLC was "adequately capitalized to meet [its] ongoing operational and financial obligations" and had "paid [its] own taxes." Jeong, Doc. 27-1, ¶ 22. Yet in three subsequent declarations filed in *Mansur v. Nexo Financial*, No. 2022-007953-CA-01 (Fla. 11th Cir.), Trenchev swore that "Nexo Financial LLC has not yet commenced business operations." An entity cannot simultaneously be a taxpaying operational entity and have "not yet commenced business operations." Trenchev's credibility is further compromised by the Shulev proceedings, in which Bulgarian authorities raided Nexo's offices and recovered eight of the nine cryptocurrency assets Trenchev had accused his co-founder of stealing—and where a UK court has scheduled a trial to determine whether Trenchev procured the underlying judgment by fraud. *Nexo Capital Inc. v. Shulev*, [2023] EWHC 1646 (Comm) ¶¶ 21, 27, 266. Conflicts between the parties' evidence must be resolved in Plaintiffs' favor at the prima facie stage. *Meier*, 288 F.3d at 1269.

The pattern of false statements is pervasive. Trenchev told Bloomberg that "no one has ever lost access to their accounts or lost money with Nexo"—while Mansur's account had been frozen since September 2019. In the same interview, he claimed Nexo had "always conducted [its] business… as if [it] were a traditional institution, applying for all the licenses"—while holding no CFTC registration and subsequently being fined by California and subjected to enforcement actions in all 50 states. He represented Nexo as "licensed and regulated" while unregistered. He

advertised "#ZeroFees" while charging 184% markups and a hidden 5% liquidation tax. He described the Portfolio Booster as "not a loan" in a public AMA—then treated it as a loan for liquidation. He swore Nexo Financial was operational in one case and non-operational in the next. And when confronted, he destroyed his emails. Every public statement this Court is asked to credit has been contradicted by Trenchev's own conduct.

The spoliation evidence is particularly damning. Plaintiffs sent a formal preservation demand to Trenchev's personal email address on November 21, 2022. Nexo replied, confirming receipt. TAC ¶ 120. Yet just thirteen days later, on December 4, 2022, Trenchev implemented auto-deletion of all his emails on a 30-day rolling basis—and continued adding deletion rules during active litigation. *Cress*, DE 99 at 2, DE 106. He also implemented company-wide Slack deletion on a 4-day retention cycle. A self-serving declaration claiming "no knowledge of" Florida contacts deserves no weight when the declarant destroyed the very communications that would test that claim. *Internet Solutions Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009).

**III. The CEA Claims Are Not Time Barred and State a Claim**

**A. The Cause of Action Did Not Arise Until 2026.** Defendants argue the CEA's two-year statute of limitations bars the claims because Plaintiffs' injuries occurred in 2020 and 2021. This misstates the law. The limitations period runs from "the date the cause of action arises," 7 U.S.C. § 25(c)—not from the date of injury. In a market manipulation case, the relevant inquiry "is not when a plaintiff sold a contract or commodity at a loss, but rather when a plaintiff should have discovered that some market participant fraudulently distorted the relevant market, thereby causing the loss." *Wu v. Bitfloor, Inc.*, 460 F. Supp. 3d 418, 427 (S.D.N.Y. 2020). Defendants would convert the CEA's limitations period into a statute of repose measured from the trading loss—but that is not what § 25(c) says. A CEA cause of action does not "arise" until the plaintiff knows or through reasonable diligence should know the facts giving rise to the claim. The critical question is not when Plaintiffs lost money but when they discovered—or could have discovered—that the transactions were illegal leveraged retail commodity transactions offered by an unregistered entity in violation of the Commodity Exchange Act.

The CEA claims rest not on the fact of liquidation but on the fact that Defendants' products were illegal off-exchange leveraged retail commodity transactions offered by an unregistered entity—facts affirmatively concealed through: (1) representations as a "licensed and regulated digital assets institution" (TAC ¶¶ 39, 62–63); (2) lending terminology concealing leveraged commodity nature (TAC ¶ 114); (3) instructions to "NEVER UNDER ANY CIRCUMSTANCES

7

MENTION THERE IS A [LIQUIDATION] TAX" (TAC ¶ 106); (4) falsely reasserting to Plaintiffs' counsel that Nexo was "licensed and regulated" in response to a demand letter (TAC ¶ 35, Exhibit 2); (5) the DFPI's January 16, 2026 consent order revealing that Nexo lacked a California lending license—which prompted Plaintiffs to investigate all of Defendants' licensing and registration claims. That investigation revealed Nexo Capital held no Money Services Business registration in Florida (TAC Exhibit 4) and was not registered with the CFTC in any capacity (TAC ¶ 35, Exhibit 3). Only then did Plaintiffs discover that the transactions were leveraged commodity transactions subject to the CEA.

Plaintiffs could not have discovered the CEA violations through reasonable diligence. The violations depend on a legal determination that the transactions constitute "leveraged retail commodity transactions" under 7 U.S.C. § 2(c)(2)(D) and that the offeror was required to register with the CFTC. The entire scheme was designed to ensure customers believed they were dealing with a licensed lender, not an unregistered commodity dealer. Defendants cite *Levy v. BASF Metals Ltd.*, 917 F.3d 106 (2d Cir. 2019), for the proposition that a CEA claim accrues upon discovery of injury. The defendants in Messieh made this identical Levy argument—and the court denied the motion. Applying Levy's own framework, Judge Carter held that a plaintiff must know he was defrauded, not merely that he lost money: "Since Lee did not know he was defrauded when he suffered his earlier losses, blaming them initially on natural market forces, Lee's earlier liquidations are timely because he lacked actual or constructive notice that he had been defrauded." Messieh, slip op. at 21. Schaaf's position is stronger: he did not merely fail to detect hidden manipulation on a crypto exchange—he was affirmatively told by Defendants that the transaction was a loan from a licensed lender. But unlike the plaintiff in Levy—an attorney who knowingly traded platinum futures on NYMEX and suffered an obvious market loss—Plaintiffs here had no reason to know they were in a CEA-regulated transaction at all. Defendants disguised it as a loan from a licensed lender, and no amount of "reasonable diligence" would have revealed the CEA violation when the defendant was actively misrepresenting the nature of the product. Defendants may suggest that Plaintiffs could have searched the CFTC's public NFA BASIC database at any time—but that argument presupposes what Nexo's concealment prevented: the realization that the product was a commodity transaction requiring CFTC registration in the first place. A consumer who believes he has a loan from a licensed lender has no reason to search a commodity futures registry. Nor could Schaaf have discovered the concealed 5% liquidation tax or the OTC markups of up to 184% through any diligence, because Nexo's own employees were directed to deny the

tax's existence (TAC ¶ 106), and the trade confirmations Nexo provided were fabricated to conceal the markups (TAC ¶¶ 57–58, 101). The only records available to Schaaf were the records Nexo designed to deceive him. The strength of the concealment is demonstrated by the fact that no other plaintiff in any Nexo litigation—Cress, Fagan, Jeong, Vera, Littrell, Hanson, Coleman III, Coleman IV, or Mansur—has ever identified the CEA theory, despite being represented by counsel and actively litigating claims against the same defendant for the same products. If experienced attorneys litigating active Nexo cases did not recognize that these transactions were illegal leveraged commodity transactions requiring CFTC registration, Plaintiffs cannot be charged with constructive knowledge of a violation that the entire legal community failed to detect.

The *Messieh* court further held that a CEA claim cannot accrue "absent a specific transaction" that the plaintiff knew constituted "the alleged underlying violation." Here, the cause of action did not arise until the DFPI's January 16, 2026 consent order prompted Plaintiffs' investigation and ultimate discovery that Defendants were not registered with the CFTC (TAC ¶¶ 35, 121–122). The TAC was filed February 20, 2026—five weeks later and well within the two-year period.

Even if the Court were to find that the cause of action arose at the time of liquidation, fraudulent concealment independently tolls the statute. The doctrine applies where: (1) the defendant concealed the cause of action; (2) the plaintiff could not have discovered it through due diligence; and (3) suit was filed within a reasonable time after discovery. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990); *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946). The TAC alleges all three elements: active concealment through false licensing representations and internal directives to deny the liquidation tax's existence; inability to discover the CEA violations when Defendants were actively misrepresenting the nature of the products; and filing within five weeks of the DFPI action that first revealed the truth.

At minimum, this question cannot be resolved at the pleading stage. *La Grasta v. First Union Sec.*, 358 F.3d 840, 845 (11th Cir. 2004); *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010).

**B. Standing.** Defendants characterize the Portfolio Booster as "simple and immediate cryptocurrency purchase transactions with credit line proceeds." That misrepresents the allegations. Plaintiffs did not take out a loan, receive money, and independently purchase cryptocurrency. Nexo issued a $318,000 "loan" that Plaintiffs never received as spendable funds. Instead, Nexo used those funds to purchase Bitcoin through its own OTC desk, deposited that

Bitcoin directly into Plaintiffs' accounts as locked collateral, added $18,000 in undisclosed fees and a 3% OTC markup through a fabricated trade confirmation, never sent the promised DocuSign agreement, never disclosed the interest rate——Plaintiffs were charged daily interest at an undisclosed percentage they had no way to verify——never disclosed that the assets were locked, and commingled the Booster assets with Plaintiffs' pre-existing credit line collateral so that neither product could be distinguished on the platform. TAC ¶¶ 68–70, 83, 89–94, 106, 111–114. That is not a "simple purchase." It is a leveraged commodity transaction executed, financed, custodied, and liquidated by the dealer—precisely the structure Congress targeted in § 2(c)(2)(D). Plaintiffs' characterization is independently confirmed by the New York Attorney General, who concluded that Nexo "offered and sold… both securities and commodities." *People v. Nexo Inc.* (N.Y. Sup. Ct.), Compl. ¶ 3. Nexo's own marketing materials confirm the leveraged nature of the product: the Portfolio Booster brochure describes it as designed to "grow your crypto holdings" by "leveraging part of your portfolio" with leverage ratios "between 10% and 200%." Notably, Defendants' own Credit Terms do not mention the "Portfolio Booster" anywhere—the product was created and executed entirely outside any written agreement, through private VIP emails with no DocuSign, no disclosed terms, and no regulatory disclosure. TAC ¶¶ 83, 111–114.

Standing exists under two independent provisions of § 25(a)(1).

*First, § 25(a)(1)(B).* Section 2(c)(2)(D) of the CEA explicitly provides that leveraged retail commodity transactions are subject to sections 4(a), 4(b), and 4b "as if" they were contracts of sale for future delivery. 7 U.S.C. § 2(c)(2)(D)(iii). The statute does not suggest or imply this treatment—it commands it. Section 25(a)(1)(B), in turn, provides a private right of action for any person who "deposited with or paid to" a defendant "money, securities, or property" in connection with an order or transaction that violated section 4(b) or 4b. Plaintiffs deposited hundreds of thousands of dollars in digital assets with Defendants. TAC ¶¶ 139–145. The transactions violated sections 4(a) and 4(b) because they were leveraged retail commodity transactions conducted off-exchange, by an unregistered entity, without any statutory exemption. The chain is mechanical: § 2(c)(2)(D) makes the trading provisions applicable "as if" these were futures contracts; Defendants violated those provisions; § 25(a)(1)(B) gives Plaintiffs a cause of action for those violations. The CFTC has repeatedly applied § 2(c)(2)(D) to treat leveraged retail cryptocurrency transactions as subject to the CEA, imposing over $5 billion in penalties. See *In re BFXNA Inc. d/b/a Bitfinex*, CFTC Docket No. 16-19 (2016); *CFTC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. 2023). Section 25 is in the same chapter. The "as if" treatment is either comprehensive or it is nothing.

10

***Second, § 25(a)(1)(C)(ii).*** Standing independently exists under § 25(a)(1)(C)(ii), which provides a private right of action for any person who purchased "a contract subject to section 23 of this title." Section 23(a), in turn, prohibits any person from offering or entering into "any transaction for the delivery of any commodity under a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract." 7 U.S.C. § 23(a) (emphasis added). By its plain terms, this prohibition applies to all commodities—not merely the precious metals addressed in subsection (b). Indeed, the Sixth Circuit has confirmed that "with respect to most commodities such contracts are illegal. 7 U.S.C. § 23(a)." *First Nat'l Monetary Corp. v. CFTC*, 677 F.2d 522, 527 (6th Cir. 1982). Section 23(b) creates a narrow exemption permitting registered persons to offer leverage contracts only in silver, gold, and platinum. The fact that Congress exempted only precious metals means leverage contracts in all other commodities—including digital assets—remain prohibited under Section 23(a) with no exemption path available.

The Portfolio Booster is a leverage contract within the meaning of Section 23(a). Nexo's own VIP brochure described it as a way to "grow your crypto holdings by leveraging part of your portfolio" (TAC ¶ 83, Exhibit 14), the product one-pager offered up to 200% leverage on deposited assets, and execution involved margin monitoring with LTV-based liquidation thresholds (TAC ¶¶ 89–92). Bitcoin is a commodity. *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967 (11th Cir. 2014). On March 17, 2026, the CFTC joined the SEC in a commission-level interpretive release officially classifying Bitcoin as a "digital commodity" and confirming that it will "administer the Commodity Exchange Act consistent with the interpretation." Release Nos. 33-11412; 34-105020 (Mar. 17, 2026). A standardized leverage contract in Bitcoin therefore falls within Section 23(a)'s prohibition on leverage contracts in "any commodity," and Plaintiffs who purchased such a contract have standing under § 25(a)(1)(C)(ii).

Courts that have limited Section 23's scope to the precious metals covered by 17 C.F.R. Part 31 did so by deferring to the CFTC's own 1984 regulatory interpretation under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). See *CFTC v. American Precious Metals, LLC*, 845 F. Supp. 2d 1279, 1284–87 (S.D. Fla. 2011); *CFTC v. 20/20 Trading Co.*, 2011 U.S. Dist. LEXIS 60860 (C.D. Cal. 2011).

The Supreme Court has since overruled Chevron in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), holding that "courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and that "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."

11

Id. at 2273. The Court explained that "statutory ambiguity is not a reliable indicator of actual delegation of discretionary authority to agencies," id. at 2274, and that a court must identify the "best reading" of the statute—"the reading the court would have reached" if no agency were involved, id. at 2266. An agency's regulatory choice to limit its own enforcement—here, the CFTC's 1984 decision to define "leverage contract" narrowly in Part 31—cannot override the plain text of the statute it administers. See *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 785 F. Supp. 3d 785 (S.D. Cal. 2025) (post-Loper Bright, striking agency regulation that imposed narrower requirements than broad statutory language; agency "interpretation must align with the statutory text and cannot impose limitations not contemplated by Congress"). The CFTC's 1984 regulations addressed only those commodities that existed at the time. Cryptocurrency did not exist in 1984. Congress addressed this problem in Dodd-Frank by writing § 2(c)(2)(D) to regulate the structure of leveraged retail transactions—not the identity of the underlying commodity—ensuring that the prohibition would reach new commodities as they emerged. The absence of digital assets from Part 31 reflects a historical impossibility, not a statutory exclusion. The Eleventh Circuit has confirmed that, post-Loper Bright, courts must conduct a de novo analysis of statutory interpretation, considering agency interpretations only to the extent they are persuasive. *Bastias v. United States Att'y Gen.*, 158 F.4th 1188, 1203 (11th Cir. 2025). With Chevron deference no longer available, this Court must independently interpret Section 23(a). The text says "any commodity." The CFTC now confirms Bitcoin is a commodity. The reading this district already called "plausible" is the reading this Court should independently adopt. Moreover, the CFTC itself has abandoned the narrow regulatory posture on which those prior holdings relied: in December 2025, the CFTC withdrew its interpretive guidance on leveraged retail cryptocurrency transactions as "outdated," 90 Fed. Reg. 58149 (Dec. 16, 2025), and on March 17, 2026, the CFTC classified Bitcoin and fifteen other digital assets as "digital commodities" subject to its jurisdiction.

The only case to address § 25(a)(1)(C)(ii) in the context of cryptocurrency—*BDI Capital, LLC v. Bulbul Investments LLC*, 446 F. Supp. 3d 1127, 1136 (N.D. Ga. 2020)—is distinguishable. BDI involved a spot purchase of Bitcoin on an exchange with no leverage, no margin, and no standardized contract. The court's three-sentence analysis of (C)(ii) never addressed Section 23(a)'s "any commodity" language, never cited American Precious Metals, and predated the Supreme Court's overruling of Chevron in Loper Bright by four years. This case presents the question BDI never analyzed: whether a leveraged, dealer-financed, standardized cryptocurrency transaction falls within the scope of Section 23(a) as independently interpreted by the Court. Courts

12

following BDI have consistently limited its holding to spot market purchases. See *Cox v. CoinMarketCap OpCo LLC*, 2026 U.S. Dist. LEXIS 31371 (D. Ariz. 2026) (reiterating that spot cryptocurrency purchases do not satisfy § 25). That limitation confirms BDI does not reach leveraged transactions like the Portfolio Booster.

Defendants' position is also internally inconsistent. In Section VII of their motion, Defendants argue that the Credit Terms constitute a valid, enforceable contract authorizing liquidation. They cannot simultaneously argue that no "contract" exists for purposes of Section 23 standing while relying on those same Credit Terms as an enforceable contract in their defense. Moreover, Nexo's own reply to Plaintiffs' demand letter described the Portfolio Booster as "an OTC service which is safeguarded by a separate agreement which for business reasons has never been signed"—an admission that a contract was intended but never provided to Plaintiffs. TAC ¶ 26.

Count II is properly brought under § 25(a)(1)(D) because Defendants manipulated effective prices through concealed markups of 1% to 184%, fraudulent trade confirmations, and a hidden 5% liquidation tax. TAC ¶¶ 57–58, 101, 106–107. Defendants argue that Count II fails because Plaintiffs do not allege market-wide price manipulation, citing *BMA LLC v. HDR Glob. Trading Ltd.* That case involved wash trading on a derivatives exchange—a market manipulation claim requiring proof of market impact. Count II is not a market manipulation claim. It is a fraud claim under the fraud prong of Rule 180.1(a)(1)–(3), which prohibits "any device, scheme, or artifice to defraud," "any untrue or misleading statement of a material fact," and "any act, practice, or course of business, which operates … as a fraud or deceit." 17 C.F.R. § 180.1(a). The CFTC modeled Rule 180.1 on SEC Rule 10b-5 and stated that a violation may exist "regardless of whether the conduct in question was intended to create or did create an artificial price." 76 Fed. Reg. 41,398, 41,399 (July 14, 2011). The Ninth Circuit confirmed in *CFTC v. Monex Credit Co.*, 931 F.3d 966, 975 (9th Cir. 2019), that fraud-only claims are actionable under § 6(c)(1): "When Congress places 'or' between two words, we assume that Congress intended the two terms as alternatives." The fabricated trade confirmations, the hidden 5% tax with internal directives to "NEVER … MENTION" its existence, and the undisclosed OTC markups are textbook Rule 180.1 fraud. Count II of the TAC expressly cites Rule 180.1 and quotes its three fraud prongs verbatim. TAC ¶ 140. It then alleges eight specific acts of fraud in connection with commodity transactions. TAC ¶ 141(a)–(h). Defendants ignore this entirely, applying only the market manipulation standard from a wash-trading case to a claim that is clearly labeled as fraud.

13

Defendants' implicit premise—that these transactions were conventional loans exempt from CEA regulation—is refuted by their own CEO's public statements. On March 26, 2021, in a publicly broadcast AMA session, Trenchev personally described the Portfolio Booster as "an OTC service that combines financing and execution" and expressly stated that the resulting overdraft "is not a loan or credit line that the client can operate with." *See* Nexo Blog, "Your March Ask-Antoni-Anything, Recapped," Mar. 29, 2021; *Cress v. Nexo Capital, Inc.*, No. 3:23-cv-00882-TSH, DE 95-4 at 5–6 (filed Jan. 2, 2026). Trenchev further confirmed that the customer's account was subject to "margin calls, and liquidation threshold at 83.3%." *Id.* These are not the words of a lender describing a loan. "Margin calls" is the vocabulary of commodity and futures trading—the precise regulatory domain of the CFTC. Trenchev's own description maps directly onto the statutory definition of a leveraged retail commodity transaction under 7 U.S.C. § 2(c)(2)(D): a financed transaction in a commodity, offered to retail customers, on a leveraged or margined basis, where actual delivery does not occur within 28 days. Every element is present in his own words. Defendants cannot simultaneously tell the public that the Portfolio Booster "is not a loan" while telling this Court that these transactions are exempt because they are loans.

Nexo's own materials confirm the leveraged nature of these transactions. In January 2022, Nexo launched the "Nexo Booster" on its platform—explicitly excluding U.S. residents. Yet the Portfolio Booster, offered privately to U.S. VIP clients via email, operated on the same leveraged mechanics: financed purchases, margin monitoring, and automatic liquidation. TAC ¶¶ 54–58. The distinction proves Nexo knew leveraged products required regulatory compliance and deliberately circumvented it by moving the U.S. version off-platform and out of regulators' view—paralleling Binance's "VIP Handling" evasion that resulted in a $4.3 billion settlement. Every product in Nexo's VIP brochure was an illegal off-exchange transaction: the Portfolio Booster and Liquidation Relief Program were the same leveraged structure under different names—both financed Bitcoin purchases using customer collateral with automatic liquidation thresholds. The Zero Interest Loan was a derivative with a "Safeguard Price" and "Cash-out Price" whose payoffs depended entirely on Bitcoin's price at maturity—the defining feature of an option contract. None of these products appeared on Nexo's website or in its Terms and Conditions because Defendants knew they could not withstand regulatory scrutiny.

The CFTC has imposed billions in penalties against platforms offering structurally identical products. In *In re BFXNA* Inc. d/b/a Bitfinex, CFTC Docket No. 16-19, 2016 WL 3137612 (June 2, 2016), the CFTC found that holding customer Bitcoin in omnibus wallets

14

controlled by the platform did not constitute actual delivery. In *In re Coinflip*, Inc. d/b/a Derivabit, CFTC Docket No. 15-29 (Sept. 17, 2015), the CFTC established that operating a facility for leveraged commodity transactions without registration violates § 2(c)(2)(D). *In re Payward* Ventures, Inc. d/b/a Kraken, CFTC Docket No. 21-20 (Sept. 28, 2021), paid $1.25 million for offering leveraged crypto to U.S. retail customers, and *CFTC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. 2023), resulted in $4.3 billion in penalties after Binance deliberately routed U.S. customers through "VIP Handling" to evade compliance—the same off-platform evasion pattern Nexo employed.

Nexo's own post-filing conduct confirms the illegality of its prior practices. On February 16, 2026—four days before the TAC was filed—Nexo relaunched its U.S. platform. Conspicuously absent from the relaunch were all leveraged products: the Portfolio Booster, the Help Center leverage transactions, and the Zero Interest Loan. The restructured platform routes transactions through licensed intermediaries including Bakkt. TAC ¶¶ 123–124. A company does not abandon its core products and restructure through licensed intermediaries unless it knows the prior structure was illegal. This is consciousness of guilt in corporate form.

This case presents a question of first impression: whether retail customers who purchased illegal leveraged cryptocurrency transactions have a private right of action under the CEA through § 25(a)(1)(C)(ii). Defendants' motion relies on a Chevron-era interpretive framework that no longer controls. No other private plaintiff in any Nexo litigation has identified this theory—because Nexo deliberately labeled these products as credit lines, conducted them through private email channels outside the platform, and never disclosed them in its Terms and Conditions or on its website—"evidencing awareness they were unlawful." TAC ¶ 3. The CEA theory carries consequences beyond the private right of action: because these transactions violate § 2(c)(2)(D), the underlying agreements are illegal and void ab initio under Florida law, *Harris v. Gonzalez*, 789 So. 2d 405 (Fla. 4th DCA 2001), and any clause purporting to waive class action rights is unenforceable.

The TAC alleges not one but three structurally identical illegal products, each an independent CEA violation. First, the Help Center transactions (TAC ¶¶ 43–48, 54–58): after Schaaf's March 2020 liquidation, Nexo employee Nick Georgiev emailed offering to "reacquire on your behalf" liquidated Bitcoin by purchasing crypto, posting it as "new collateral," and adding "the funds we spent on purchasing the position, net of commissions and program fees" to Schaaf's outstanding loan balance. TAC ¶ 44. That is a leveraged commodity transaction by any definition

15

—financed acquisition, dealer custody, increased debt, margin exposure. Schaaf initially declined but re-engaged after Trenchev's February 2021 Bloomberg statements and executed a Help Center transaction of 1 BTC (approximately $50,000) after declining a larger $190,000 offer. TAC ¶¶ 54–58. Second, the Portfolio Booster (TAC ¶¶ 65–70, 79–92): two $318,000 leveraged transactions across both the Schaaf and Montero accounts, executed through Nexo's OTC desk with fabricated trade confirmations and concealed markups. Third, the Liquidation Relief Program (TAC ¶¶ 76–78): after the major May 2021 liquidation devastated the Montero account, Nexo offered to "recover your liquidated assets"—but the "relief" was itself another leveraged commodity transaction, identical in structure to the Portfolio Booster and Help Center, creating new debt and new liquidation exposure with the Montero account's remaining funds. Schaaf managed both accounts. TAC ¶ 61. Each product independently violates § 2(c)(2)(D). Defendants would need to defeat all three to dismiss the CEA claims, and they have addressed only the Portfolio Booster.

**C. Actual Delivery.** No "actual delivery" occurred. The Bitcoin acquired under the Portfolio Booster was locked as collateral from the moment of acquisition. Plaintiffs could not withdraw, sell, transfer, or use it for any purpose until the $318,000 "loan" was repaid in full. TAC ¶¶ 69, 89–90. Nexo never disclosed this restriction—Plaintiffs received no written terms, no DocuSign, and no explanation that the assets were locked. TAC ¶¶ 83, 111–114. Defendants cite *CFTC v. Monex Credit Co.* for the proposition that actual delivery occurs even when a commodity sits in a third-party depository. The Ninth Circuit held the opposite: delivery to a depository controlled by the dealer does not constitute actual delivery because the customer lacked "possession and control." 931 F.3d 966, 973–74 (9th Cir. 2019). The CFTC's Interpretive Guidance likewise requires the customer to have "possession and control of the entire quantity of the commodity" and the ability to "use the entire quantity freely in commerce." CFTC, Retail Commodity Transactions, 82 Fed. Reg. 60,335 (Dec. 20, 2017). Plaintiffs had neither. The Portfolio Booster assets were further commingled with Plaintiffs' pre-existing credit line collateral on a platform that provided no way to distinguish the leveraged position from the ordinary lending product, ensuring that the true nature of the transaction remained concealed. TAC ¶¶ 92–94.

**D. Aiding and Abetting.** Trenchev was not merely "associated" with Nexo—he was co-founder and Managing Partner exercising operational control (TAC ¶ 12). He personally appeared on Bloomberg making false regulatory statements (TAC ¶¶ 49–53), signed consent orders acknowledging violations (TAC ¶ 14), and participated in public sessions making false fee representations (TAC ¶ 99(f)). During a 2021 public AMA session, Trenchev personally described

16

the product as "not a loan or credit line" with "margin calls and liquidation threshold at 83.3%"—commodity trading terminology that demonstrates personal product knowledge. TAC ¶ 99(f). Defendants cite *Bansal v. TD Ameritrade, Inc.*, 2024 U.S. Dist. LEXIS 101701 (S.D. Fla. June 7, 2024), for the proposition that mere association is insufficient. But Bansal actually denied the motion to dismiss on the aiding-and-abetting claims, finding the allegations of knowledge and substantial assistance sufficient at the pleading stage. Id. at *24–25. The court dismissed the CEA aiding-and-abetting count only on statute-of-limitations grounds, never reaching its merits. Id. at *27. Moreover, the defendant in Bansal was a third-party bank that processed wire transfers for a customer's Ponzi scheme. Trenchev is not a third-party intermediary—he is the co-founder who designed, promoted, and directed the very products at issue. The TAC sets forth six specific categories of personal conduct in TAC ¶¶ 157(a)–(f). This is knowing and intentional assistance, not mere affiliation. For senior officers in a "narrowly defined group," knowledge of core operations is presumed—plaintiffs need not identify each defendant's specific role without discovery. In re *Platinum-Beechwood* Litig., 2019 WL 4934089 (S.D.N.Y. 2019). Trenchev is the co-founder of a two-person leadership structure; he is the narrowly defined group.

**E. Count III States a Claim—Westlake Is Inapposite.** Defendants cite *Westlake v. Abrams*, 575 F. Supp. 58 (N.D. Ga. 1983), for the proposition that no private right of action exists for registration violations. Westlake addressed only implied rights of action under the Curran framework. Plaintiffs here assert an express right under 7 U.S.C. § 25(a)(1), which provides that "[a]ny person . . . who violates this chapter . . . shall be liable for actual damages." Section 6d's registration requirement is part of "this chapter." Congress enacted § 25(a)(1) precisely to eliminate the implied-right guessing game that Curran and Westlake were engaged in. Defendants cite no authority—because there is none—holding that § 25(a)(1)'s express cause of action excludes registration violations. Moreover, Westlake is a 1983 non-binding district court opinion from a different circuit, addressing a different statute (§ 6k, not § 6d), decided before § 25(a)(1) existed.

**IV. The RICO Claims State a Claim and Are Timely**

**A. Statute of Limitations.** The Portfolio Booster transaction occurred March 2021; liquidation occurred May 19, 2021; the complaint was filed May 16, 2025—three days inside the four-year period. Defendants argue the May 2021 liquidation is merely a "continuation" of the March 2020 credit line liquidation, citing *Pilkington v. United Airlines*, 112 F.3d 1532 (11th Cir. 1997), and Lehman. Both cases are inapposite. In Pilkington, airline pilots suffered the same type of harassment from the same source at the same workplace over several years—one continuous

course of conduct producing one continuous injury. In Lehman, the court found the plaintiff "repackaged" a 2007 complaint about the same estate dispute with the same parties. Here, the Portfolio Booster was a separate product that did not exist until March 2021. It was offered through a separate solicitation from Octavian Dinca, executed through a separate OTC desk transaction, governed by separate terms that were never disclosed, and produced a separate injury. Under Pilkington's own test, a new injury must be "unfamiliar, strange, or different" from the original. 112 F.3d at 1538. Two $318,000 leveraged commodity transactions executed through an OTC desk with fabricated trade confirmations and concealed fees are "unfamiliar, strange, and different" from a standard credit line liquidation. Fraudulent concealment tolling independently applies for the same reasons stated in Section III.A above.

**B. PSLRA Bar.** The PSLRA bars RICO claims based on "conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). The TAC's RICO claims are based on commodity fraud, not securities fraud. The predicate acts are wire fraud in connection with leveraged commodity transactions, concealed fees, and fraudulent trade confirmations— regulated by the CEA and CFTC, not securities laws. Defendants cite *Licht v. Watson*, 567 F. App'x 689 (11th Cir. 2014), but that case involved a pump-and-dump stock scheme in which every predicate act furthered "the defendants' overarching scheme to commit securities fraud." Id. at 692. Here, no security was purchased or sold as part of the Portfolio Booster transactions. The overarching scheme is commodity fraud—offering illegal off-exchange leveraged retail commodity transactions while concealing their nature, fees, and risks. Defendants also point to the TAC's Prayer for Relief referencing "securities transactions that the SEC determined were offered in violation of federal law." That language refers to the Earn Interest Product—a separate product the SEC targeted. The RICO predicate acts are based on the Portfolio Booster and credit line transactions, which are commodity transactions under § 2(c)(2)(D). Defendants also cite *Rosh Chodesh II Ltd. P*'ship v. Wimpfheimer, 2025 WL 641300 (S.D. Fla. Feb. 4, 2025), but that case involved direct investment into a securities fund—not leveraged commodity transactions through an OTC desk.

In *Cress v. Nexo Financial,* No. 3:23-cv-00882-TSH (N.D. Cal. Feb. 4, 2026), Judge Hixson held that "*Cress*'s RICO claim is not statutorily barred." DE 98 at 28–29. Where the securities involvement is "incidental" to the wire fraud scheme, the PSLRA does not bar the RICO claim. *Swartz v. KPMG LLP,* 476 F.3d 756 (9th Cir. 2007). The PSLRA bar applies per-predicate, not wholesale, and Plaintiffs identify non-securities predicate acts sufficient to sustain the RICO

18

claim. Defendants' reliance on *In re LIBOR*-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666 (S.D.N.Y. 2013) (MTD at 12 n.3), is misplaced—that opinion was vacated on remand, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016), and carries no precedential force.

**C. Enterprise.** The TAC pleads an association-in-fact enterprise consisting of Nexo Capital, Inc., affiliated entities (NDS EOOD in Bulgaria), and individual employees (Georgiev, Dinca, Hristov, and Trenchev). TAC ¶ 164. This is not merely a corporation acting through its employees. The enterprise includes multiple distinct legal entities operating across jurisdictions. The Bulgarian entity NDS EOOD employed personnel who transmitted fraudulent trade confirmations via interstate wires. TAC ¶ 58. This is a classic association-in-fact enterprise. *Boyle v. United States*, 556 U.S. 938, 944–46 (2009).

Binding Eleventh Circuit and Supreme Court authority confirms that the enterprise satisfies the distinctness requirement. Because the enterprise includes entities beyond Nexo Capital Inc.— NDS EOOD, Credissimo, and Trenchev individually—no unity problem exists. Judge Hixson reached the same conclusion in *Cress*, finding that "*Cress* plausibly alleges that the members of the Nexo Enterprise are legally and practically distinct from Nexo" and rejecting the exact *Ray v. Spirit Airlines* argument Defendants advance here. DE 98 at 29–31. The *Cress* court further held that Nexo's argument that the enterprise merely described the corporation "operating its cryptocurrency platform" "falls flat" because "*Cress* does not merely allege that Nexo charged fees and performed liquidations consistent with its primary business purpose—he alleges that Nexo worked with the Related Persons to steal money from customers by operating a fraudulent scheme." DE 98 at 31.

Defendants' enterprise argument is also fatally inconsistent with their own jurisdictional position. In Section I of their motion, Defendants argue that Trenchev is a separate individual with "no connection to Florida" whose contacts should not be attributed to Nexo Capital. MTD at 4–5. But in their RICO section, Defendants reverse course and argue that Trenchev, NDS EOOD, and the affiliated entities are all just Nexo "operating its cryptocurrency platform"—functionally indistinguishable from the corporation itself. MTD at 18–19. Defendants cannot have it both ways. If Trenchev and the affiliated entities are sufficiently separate from Nexo Capital to defeat personal jurisdiction, they are sufficiently distinct to form a RICO enterprise. And if they are so unified with Nexo Capital that no enterprise exists, then Trenchev's contacts are Nexo's contacts and jurisdiction is proper. Either way, Defendants lose.

19

**D. Pattern of Racketeering Activity.** The TAC identifies twelve predicate acts of wire fraud. TAC ¶ 173. Each involves: (1) a specific email communication; (2) from a specific Nexo employee; (3) on a specific date; (4) containing specific false representations; (5) transmitted by interstate wire from Bulgaria to Florida; (6) supported by a specific exhibit. This level of specificity exceeds Rule 9(b) requirements. *Brooks v. Blue Cross* & Blue Shield of Fla., Inc., 116 F.3d 1364, 1380–81 (11th Cir. 1997).

Defendants' predicate-by-predicate objections fail. First, wire fraud does not require that the plaintiff entered into the specific transaction solicited—sending fraudulent offers via interstate wire in furtherance of a scheme to defraud is itself a predicate act. *United States v. Estepa,* 998 F.3d 898, 907 (11th Cir. 2021). Second, the wire communication need not be directed at the specific plaintiff. Trenchev's false statements on Bloomberg Television were transmitted via interstate wire to induce customer trust as part of the ongoing scheme—that satisfies § 1343. Third, promising a DocuSign agreement, never sending it, and then executing two $318,000 leveraged commodity transactions without written terms is fraud by omission, not a mere "failure to give a DocuSign." The deliberate withholding of the agreement concealed the interest rate, the locked-asset restriction, the OTC markup, and the 5% liquidation tax. TAC ¶¶ 83, 111–114.

In *Cress*, Judge Hixson found that *Cress* "plausibly alleges that the Nexo Enterprise engaged in at least two predicate acts of wire fraud," DE 98 at 32–34, applying *Kousisis v. United States,* 605 U.S. 114 (2025): a defendant commits fraud whenever he uses a material misstatement to trick a victim into a contract. That is precisely what happened here. Judge Hixson found open-ended continuity satisfied because the conduct was "part of the Nexo Enterprise's regular way of conducting business." DE 98 at 35. Here, continuity is even stronger: Nexo generated "at least $46 million in liquidation fees since 2019" (TAC ¶ 107), and on November 21, 2022, Nexo's attorneys represented that Nexo operated through entities "having the necessary licenses and regulatory approvals"—continuing the very misrepresentations that form the scheme.

**E. Causation.** Defendants argue that Plaintiffs' losses were caused by market volatility, not racketeering activity. This fundamentally misunderstands the allegations. Plaintiffs do not allege they lost money merely because Bitcoin's price fell. They allege they were fraudulently induced to enter transactions they never would have entered but for Defendants' specific misrepresentations. The causal chain is direct and transaction-specific:

> (1) Schaaf had rejected the initial Help Center offer in April 2020 because he did not understand its true structure (TAC ¶ 46). Only after hearing Trenchev state on national

20

television that Nexo was "regulated" and that "none of us, as a company and our clients, lost any money" did Schaaf re-engage (TAC ¶¶ 52–53). But for that Bloomberg lie, Schaaf would never have gone back to Nexo. Once Trenchev chose to speak publicly about Nexo's regulatory status, he assumed a duty to tell the whole truth. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). His selective statements—touting a "regulated background" and "None of us, as a company and our clients, lost any money" while concealing the 5% liquidation tax and unregistered status—are actionable half-truths.

(2) The fraud followed a repeating cycle. First, Plaintiffs suffered an initial liquidation on their credit line. Nexo's Help Center then contacted Plaintiffs, ostensibly to help recover losses, but instead executed another leveraged commodity transaction. Plaintiffs were then enrolled in the VIP program and offered the Portfolio Booster—yet another leveraged transaction—which led to a second, devastating liquidation. After that liquidation, Defendants offered the Liquidation Relief Program as a VIP benefit to "recover your liquidated assets" (TAC ¶¶ 76–78). But the "relief" was the same leveraged structure under a different name: financed purchases, margin monitoring, and automatic liquidation. Every step of the cycle funneled Plaintiffs into another illegal off-exchange transaction.

(3) The concealed 5% liquidation tax directly reduced Plaintiffs' recoverable collateral, accelerating the liquidation spiral. This was not "market volatility"—it was a hidden fee that shrank the equity cushion on every single liquidation event, making each subsequent liquidation more likely and more devastating. Each of the hundreds of sequential liquidation events on May 19, 2021 imposed an additional 5% tax, compounding the destruction of Plaintiffs' assets (TAC ¶¶ 101, 106). A customer who knew about this tax could have added collateral or repaid the loan before liquidation—but Defendants' internal directive was "NEVER UNDER ANY CIRCUMSTANCES MENTION THERE IS A [LIQUIDATION] TAX."

(4) The undisclosed OTC markups and cross-collateralization further amplified the harm. Plaintiffs were never told their entire portfolio was exposed to liquidation, not just the leveraged portion (TAC ¶¶ 92, 94).

This causal chain is specific and transaction-level—not the "abstract inducement theory" Defendants describe. Each false statement led to a specific transaction that caused specific losses. Unlike *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016), where the alleged injury was attenuated from the predicate acts, the TAC traces a direct line from each misrepresentation to each

transaction to each loss. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). Where manipulation and misrepresentation are part of a single scheme, loss causation need not be independently pled at the motion to dismiss stage. *In re Tether and Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55 (S.D.N.Y. 2021).

**F. Conspiracy.** The RICO conspiracy claim under 18 U.S.C. § 1962(d) is adequately pleaded because the TAC alleges that Trenchev, Nexo Capital, NDS EOOD, and individual employees agreed to conduct the affairs of the enterprise through a pattern of racketeering activity. Judge Hixson denied the identical conspiracy argument in Cress, finding that Cress "pleads a coordinated agreement among Nexo, its specific affiliated entities, and senior executives to implement and carry out a uniform scheme to conceal OTC and liquidation fees." DE 98 at 36.

## V. The Fraud Claims Are Timely and Adequately Pleaded

**A. Statute of Limitations.** Fraudulent concealment tolling applies for the same reasons stated in Section III.A. The correct accrual date is May 19, 2021 (the liquidation date). The complaint was filed May 16, 2025—three days inside the four-year period. The liquidation warning email itself constitutes an independent act of fraud with no limitations problem.

**B. Particularity Under Rule 9(b).** The TAC identifies: (1) specific false statements: "Licensed and regulated digital assets institution" (Exhibit 5); "regulated background" and "various consumer lending licenses in the U.S." (Trenchev, Bloomberg, TAC ¶ 50); "#ZeroFees" (TAC ¶ 99); "small partial loan repayments . . . without any penalty or additional fees" (TAC ¶¶ 93, 102); trade confirmations reporting inflated prices (Exhibits 9–11); (2) who made them: Trenchev, Nexo Corporate, Georgiev, Dinca; (3) when: February 5, 2021 (Bloomberg); March 26, 2021 (AMA); May 18–19, 2021 (liquidation warning emails); (4) why they were false; (5) how Plaintiffs relied. This meets the "who, what, when, where, and how" required by the Eleventh Circuit. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

**C. Reliance—And Presumption for Omissions.** For fraud by omission, positive proof of reliance is not required. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972) ("positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material"). Since several fraud theories are omission-based (omission of the 83.3% threshold, 5% liquidation tax, OTC markups), reliance is presumed. For affirmative misrepresentations, Plaintiffs plead specific reliance: (a) reliance on the Portfolio Booster email's omission of any liquidation threshold; (b) reliance on the promise of a DocuSign (TAC ¶ 80) that was never sent (¶ 83); (c) reliance on "without any penalty or additional fees"; (d) reliance on "licensed & regulated." For

22

affirmative misrepresentations under the CEA's anti-fraud provisions, reliance is likewise presumed where the misstatement is material. *Schenek v. FSI Futures, Inc.*, 1998 WL 603462 (S.D.N.Y. 1998). The "licensed and regulated" and "#ZeroFees" representations are material as a matter of law.

**D. Puffery Defense Fails.** Defendants characterize the allegations as non-actionable "puffery." This mischaracterizes the allegations. "Without any penalty or additional fees" is not puffery—it is a specific, verifiable factual statement that is demonstrably false. "Licensed & regulated digital assets institution" is a specific factual claim about regulatory status that was provably false. "Might initiate small partial loan repayments" is a specific description of liquidation mechanics—every word of which was false. *Davis v. Powertel, Inc.*, 776 So. 2d 971 (Fla. 1st DCA 2000).

**E. Multiple Independent Fraud Theories.** Even if any single fraud theory were to fail, the others survive independently—the hidden 5% liquidation tax, the undisclosed 83.3% threshold, the DocuSign fraud, the OTC markup fraud, and the false liquidation warning email are each independently sufficient.

Defendants' footnote dismissal of the fraud-in-the-execution theory (MTD at 23 n.5) ignores the TAC's specific allegations. Nexo promised a DocuSign agreement with all Portfolio Booster terms (¶ 80), never sent it (¶ 83), and executed two $318,000 transactions without any written terms (¶ 84)—precisely the scenario where "the instrument may have had no legal existence." *Browning v. Fla. Hometown Democracy, Inc., PAC,* 29 So. 3d 1053, 1058 (Fla. 2010). Defendants' own authority defines the claim Plaintiffs have pleaded.

**F. Contract-Authorized Defense Is Circular.** Defendants' "contract-authorized" defense fails because the contract did not contain the 83.3% threshold applied (TAC ¶ 95), did not authorize the 5% tax (¶ 106), and the DocuSign was never sent (¶ 83). This is addressed in Section VII.

**VI. The FDUTPA Claim States a Claim**

FDUTPA has a lower threshold than common law fraud—no scienter, no reliance, no intent to deceive. *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000). The deceptive practices include "#ZeroFees" representations while charging concealed markups and a hidden 5% liquidation tax, "small partial loan repayments" while executing large, catastrophic single-day liquidations, "licensed and regulated" representations while operating without CFTC registration, and cross-collateralization without disclosure. Each is "likely to mislead consumers acting reasonably under the circumstances." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Rule 9(b) applies only to FDUTPA claims that "sound in fraud," *Galstaldi v. Sunvest*

23

*Cmtys. USA, LLC*, 637 F. Supp. 2d 1045 (S.D. Fla. 2009); the TAC also alleges unfair practices—executing transactions without the promised DocuSign, cross-collateralizing without disclosure—subject only to Rule 8. Judge Hixson sustained analogous state consumer protection claims against Nexo in *Cress*. DE 98 at 37–38.

## VII. The Civil Theft Claim States a Claim

Defendants argue civil theft fails because liquidations were "contractually authorized." This argument assumes the existence of a valid contract—which Plaintiffs expressly dispute. But more fundamentally, what happened here was theft, plain and simple. Defendants promised Schaaf a DocuSign agreement with all the terms of the Portfolio Booster transaction (TAC ¶ 80). That DocuSign was never sent (TAC ¶ 83). Instead, Defendants simply placed the order without Schaaf's informed consent, loaded approximately $300,000 in new debt onto his account at a concealed 6.8% markup while advertising "#ZeroFees," and then liquidated everything—including pre-existing assets that were never part of the leveraged transaction—when the market moved. Defendants did not exercise a contractual right. They took Schaaf's property through deception: they promised a formal agreement, bypassed it, executed a transaction on terms Schaaf never saw or agreed to, and then seized his assets under a liquidation threshold (83.3%) that appeared nowhere in any contract Schaaf ever signed and was never displayed on the platform. Consent obtained through fraud is no consent at all.

**A. The Purported Contract Is Void or Unenforceable.** The TAC alleges multiple independent grounds why no enforceable contract governs the Portfolio Booster transactions: no meeting of the minds (¶ 111), essential terms were unknowable (¶ 112), unilateral discretion rendered the agreement illusory (¶ 113), fraud in the execution (¶ 114), illegality renders the contracts void ab initio (¶ 117), and contracts procured by fraud are unenforceable (¶ 118). *Kolski v. Kolski*, 731 So. 2d 169, 170 (Fla. 3d DCA 1999). As a threshold matter, the Credit Terms that Defendants claim govern do not mention the "Portfolio Booster" at all—the product is not defined, not referenced, and not contemplated anywhere in the agreement. Defendants cannot claim contractual authorization for a transaction their own terms do not address.

Specifically, the Credit Terms authorized liquidation to "rebalance" LTV ratios. They did not authorize: (i) the imposition of a concealed 5% liquidation tax on every liquidation event (TAC ¶ 106); (ii) hundreds of sequential micro-liquidation events in a single day designed to maximize fee extraction (TAC ¶ 101); (iii) liquidation of pre-existing Bitcoin and Ethereum holdings that were deposited before the Portfolio Booster (TAC ¶¶ 92–94); or (iv) cross-collateralization of

24

Plaintiffs' entire portfolio without disclosure or consent (TAC ¶ 94). Exceeding the scope of contractual authority is theft, not contract performance. *Burke v. Napieracz*, 674 So. 2d 756 (Fla. 1st DCA 1996).

**B.   Felonious Intent.** Defendants' internal directive to "NEVER UNDER ANY CIRCUMSTANCES MENTION THERE IS A [LIQUIDATION] TAX" (TAC ¶ 106) and instruction to "convince them there is no mistake" when customers noticed discrepancies (TAC ¶ 5) are direct evidence of intent to deceive. Judge Hixson in Cress denied the identical civil theft dismissal argument, finding that the allegations "give rise to a reasonable inference" that Nexo acted with "careful planning and deliberation reflecting the requisite criminal intent." DE 98 at 25–26.

**C. The Property Was Identifiable and Defendants' Argument About Fungibility Fails.** Defendants argue cryptocurrency is fungible, but each Bitcoin transaction is recorded on a public immutable ledger and Defendants' own platform tracked individual balances and LTV ratios. The Cress court rejected this identical argument. DE 98 at 25–26.

**VIII. Defendants Are Not Entitled to Attorney's Fees—And Their Demand Warrants Scrutiny**

Defendants request attorney's fees under Fla. Stat. § 772.11(1), asserting that the civil theft claim lacks "substantial legal or factual support." This demand is meritless.

The civil theft claim is supported by 24 exhibits, internal directives to "never, under any circumstances mention there is a liquidation tax," and $46 million in concealed fees platform-wide. *Denson v. Stack*, 997 F.2d 1356 (11th Cir. 1993), reversed a § 772.11 fee award, holding the determination requires substantive review impossible at the 12(b)(6) stage. Moreover, just 44 days before filing this motion, Judge Hixson in *Cress* denied the identical argument by the same defense counsel, finding "careful planning and deliberation reflecting the requisite criminal intent." DE 98 at 25–26. A claim reflecting criminal intent cannot simultaneously lack "substantial legal or factual support."

**CONCLUSION**

Defendants' motion fails on every ground. Plaintiffs respectfully request that this Court deny the Motion in its entirety, or in the alternative, grant leave to amend and conduct jurisdictional discovery.

25

*Case No. 0:25-cv-62575-WPD*

Respectfully submitted this 3rd Day of April, 2026

/s/ Christopher Hunt
Christopher Hunt, Esq.
Florida Bar No. 1035597
146 Second Street North, Suite 310
Saint Petersburg, FL 33701
Telephone: (727) 401-4665
christopher@chrishuntlegal.com
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 3, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either by transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Christopher Hunt