# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN CRESS,

          Plaintiff,

    v.

NEXO CAPITAL INC.,

          Defendant.

Case No. 23-cv-00882-TSH

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

Re: Dkt. No. 94

## I.    INTRODUCTION

Plaintiff John Cress filed this action against Defendants Nexo Financial LLC, Nexo Financial Services Ltd., Nexo AG, Nexo Capital, Inc., and Antoni Trenchev, Nexo's CEO (collectively, "Defendants"), alleging the Nexo parties fraudulently induced him to take out loans collateralized by millions of dollars in digital assets, which were ultimately sold by the Nexo parties. ECF No. 1. Nexo Capital, Inc. ("Nexo") is the only remaining defendant in the case. ECF No. 37 at 7. Pending before the Court is Nexo's Motion to Dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 94 ("Mot."). For the reasons stated below, the Court **DENIES** the motion.[1]

## II.    BACKGROUND

### A.    Factual Background

Cress, a resident of San Francisco, California, began purchasing cryptocurrency in 2014 and transferred his crypto-assets to Nexo in 2021 to earn passive returns on his assets. Second Am. Compl. ("SAC") ¶¶ 8, 20–21 (ECF No. 88). Nexo, a Cayman Islands corporation with its

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 6, 16.

United States District Court
Northern District of California

principal place of business in London, England, issued credit to Cress that was collateralized by Cress's digital assets. *Id.* ¶¶ 1, 9.

Antoni Trenchev is the Co-Founder, Managing Partner, and Chief Executive Officer of Nexo. *Id.* ¶¶ 55, 207–08. Nexo conducts its affairs with several individuals and business entities (the "Related Persons").[2] *Id.* ¶ 207. "For example, Nexo contracts with NDS EOOD to provide employees from its operation." *Id.* ¶ 212. One employee provided by NDS EOOD, Hristiyan Hristov, informed Cress that he would be Cress's "dedicated relationship manager." *Id.* ¶¶ 23, 212. "Nexo and the Related Persons collectively operate and maintain the Nexo website and offer the Nexo services advertised on that website and through the Nexo whitepaper." *Id.* ¶ 208.

Overall, Cress alleges that Nexo fraudulently induced "him to take out loans collateralized by millions of dollars in digital assets, which were ultimately sold ('liquidated') by Nexo." *Id.* ¶ 1. Cress further alleges that Nexo and the Related Persons (the "Nexo Enterprise") engaged in a scheme of "maximizing profits by fraudulently concealing commissions, fees, and profits it takes from its customers in digital asset trades and transactions and the 'liquidation' of its customers' digital assets." *Id.* ¶ 210.

### 1. Nexo's Services

Digital assets include cryptocurrency, such as Bitcoin ("BTC") Ether ("ETH"), and USDC (a USD stable coin). *Id.* ¶¶ 20–21, 86. Since April 2018, Nexo has maintained a website through which customers can use their digital assets as collateral, held in their "Credit Line Wallet," to borrow fiat currency, such as U.S. Dollars. *Id.* ¶ 15. Beginning in October 2020, Nexo also offered customers interest-bearing accounts ("Earn Account") on deposited digital assets through a "Savings Wallet," which serves as back-up collateral. *Id.* ¶¶ 15, 21.

A customer can borrow as much cash as they want if they maintain a particular loan-to-

---

[2] The Related Persons include Nexo's "directors, employees, and agents, along with Nexo Services, LLC, Nexo Inc., Nexo Financial LLC, Nexo Services UAB, Nexo Global Investments LLC, Nexo MENA Holding Ltd., Nexo Services S.r.l., Nexo Payments Limited, Nexo Clearing and Custody Ltd., Nexo Finance Limited, AFS Holding Ltd., AFS Advance Financial Solutions Ltd., Nexo Markets Ltd., Nexo Bank Inc., NPEM Ltd., Nexo AG, NDS EOOD, MIRASTAR EOOD, Nexo Financial Services LTD, Nexo Trading Inc., Nexo Financial Services Inc., Nexo Services Ltd, Nexo Payments, Inc., Antoni Trenchev, and Kosta Kantchev." SAC ¶ 207.

United States District Court
Northern District of California

value ("LTV") ratio—the ratio between the amount of cash they have borrowed and the value of the collateral in their Credit Line Wallet. *Id.* ¶ 16. The value of the collateral fluctuates with the price of the digital assets held as collateral. *Id.* If a customer's LTV ratio rises above a certain threshold, to bring the LTV ratio back in line Nexo will transfer assets from the Savings Wallet to the Credit Line Wallet and/or automatically sell (liquidate) the collateral. *Id.* ¶ 17. Customers may also use their borrowed fiat currency to purchase additional digital assets, which in turn provide additional collateral for the loan. *Id.* ¶ 18.

Nexo has a "VIP Relationship Program" for customers whose accounts have grown to a certain point. *Id.* ¶ 23. Nexo offers services through its OTC Desk to members of the VIP Program, which include executing purchase orders for members to purchase digital assets ("OTC transactions"). *Id.* ¶¶ 26, 52–54.

### 2. Nexo's Advertising

"Nexo advertises borrowing interest rates as low as zero percent." *Id.* ¶ 34. In order to receive more favorable interest rates on borrowing as well as the Earn Account, Nexo requires customers to purchase "NEXO Tokens" and maintain 10% of their portfolio balance in NEXO Token, "which Nexo concedes are securities under U.S. law." *Id.* ¶¶ 34–35, 42.

In its VIP Program brochure, Nexo states that participants in the VIP Relationship Program: 1) "get a response from the support team in 2 hours, 24/7," and receive a "dedicated relationship manager" and "direct phone number availability"; and 2) can utilize certain "OTC services," which included Nexo's "Liquidation Relief Program," described as a "service in the event of a market crash to recover your liquidated assets[.]" *Id.* ¶¶ 24, 26. The brochure also states that for "[p]urchases of large quantities of cryptocurrency," customers will "get institutional rates for amounts larger than $100,000." *Id.* ¶ 117. Further, Nexo advertises that VIP members will receive "OTC services with some of the best rates on the market." *Id.*

"Throughout 2020 and early 2021, Nexo publicly advertised that it did not charge any fees for any services on its platform, including transactions." *Id.* ¶ 53. For example,

> a. On or about March 15, 2020, Nexo posted on its blog: 'No fees: Banks also tend to charge all sorts of fees for their services, whereas Nexo adheres to a #ZeroFees policy. There are no additional costs

3

associated with our services.'

b. On or about June 24, 2020, Nexo posted on its blog: 'No minimum contribution requirements and transactions at #ZeroFees.'

c. On or about February 19, 2021, Nexo posted on its blog: 'Under our #ZeroFees policy you can make unlimited free-of-charge fiat withdrawals, crypto and fiat transfers into your Nexo Wallet, and credit line withdrawals. Nexo does not charge any credit line, origination, forex, and exchange fees.'

d. In March 2021, Nexo's customer account page advertised 'no hidden fees.'

e. Nexo's Whitepaper also advertises 'No Hidden Fees.'

*Id.*; *see* Declaration of Ian S. Shelton ("Shelton Decl.") (ECF No. 94-1), Exs. 1 (ECF No. 94-2) (Nexo Whitepaper), 2 (ECF No. 94-3) (Nexo Blog Post on March 15, 2020), 3 (ECF No. 94-4) (Nexo Blog Post on June 24, 2020), 4 (ECF No. 94-5) (Nexo Blog Post on February 19, 2021); Declaration of Max Ambrose ("Ambrose Decl.") (ECF No. 95-1), Ex. 1 (ECF No. 95-2) (Screenshot of Cress's Nexo Account Page from March 24, 2021).

In a March 26, 2021, "Ask Me Anything" ("AMA"), Trenchev states, "There is no concept of hidden fees at Nexo. We pioneered #ZeroFees and we are proud to be transparent about all charges we make." SAC ¶ 55; *see* Ambrose Decl., Exs. 2, 3 (ECF Nos. 95-3, 95-4) (AMA Transcripts).

### 3. The Parties' Relationship

Cress alleges the following events. In March 2021, Cress decided to transfer Bitcoin and Ether he had accumulated on Coinbase, a cryptocurrency exchange, to his Nexo Savings Wallet in order to earn passive returns through Nexo's interest-bearing Earn Account. SAC ¶ 21.

On March 15, 2021, Hristov emailed Cress and told him that he was eligible for Nexo's "VIP Relationship Program." *Id.* ¶ 23. Hristov emailed Cress on March 17, 2021, attaching the VIP Program brochure advertising the benefits of the VIP Relationship Program. *Id.* ¶ 24.

On March 23, 2021, Cress emailed Hristov asking how much interest the Bitcoin he posted as collateral would "be earning and if all the interest was applied to the monthly loan payment, how short would the payments be and is that ok?" *Id.* ¶¶ 27–28. Hristov responded: "You will be earning 5% annually on the Bitcoin which you used as collateral. Keep in mind that the interest

United States District Court
Northern District of California

rate will be paid out daily in BTC, so you will benefit from the potential upside in the Bitcoin price." *Id.*

On March 24, 2021, Cress and Nexo "executed a Cryptocurrency Purchase Agreement ('CPA'), which provided that [Cress] could 'submit a Purchase Order to Nexo' and Nexo 'shall have ten minutes (the "Review Period") to confirm such Purchase Order via email after which Review Period such Purchase Order shall be deemed to be rejected and expired.'" *Id.* ¶ 57. Under the CPA, the Purchase Order reflects the Purchase Price of the digital assets. *Id.* ¶¶ 57–60. "The CPA does not state that Nexo will charge any fees or take any profits in connection with fulfilling Purchase Orders under the CPA. Nor did Nexo inform [Cress] that it would charge any fees or take any profits from his purchases of digital assets." *Id.* ¶ 61.

Prior to taking out his first loan with Nexo, Cress emailed Hristov to request options for purchasing additional Bitcoin with a Nexo loan secured by digital assets. *Id.* ¶¶ 36–40. Hristov sent Cress options for purchasing Bitcoin. *Id.* ¶ 36. These options all required that Cress purchase NEXO Tokens, but did not reflect the cost of the NEXO Tokens in the LTV ratio and liquidation numbers provided by Hristov. *Id.* By not accounting for the NEXO Tokens, Hristov understated the riskiness of the potential loans. *Id.*

Cress had not previously considered purchasing NEXO Tokens; to allay Cress's concerns, Hristov told Cress that "the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals with American citizens who are also certified, accredited investors." *Id.* ¶¶ 37, 39. "This statement was untrue as Nexo has never registered the NEXO Token with the SEC." *Id.* ¶ 39. Nexo's Terms and Conditions of Token Sale—which were never provided to Cress—state that "the offer and sale of this security instrument has not been registered under the U.S. Securities Act of 1933 . . . or under the securities laws of certain states." *Id.* ¶ 108. In 2020, the SEC contacted Nexo regarding the NEXO Token and informed Nexo that its marketing materials falsely state that Nexo is "SEC-compliant." *Id.* ¶ 110. In April 2021, a customer contacted Nexo after learning from the SEC that the Nexo was not registered with the SEC, stating "Nexo falsely stated on it's [*sic*] website it is SEC Compliant." *Id.* ¶ 109.

Based on the representation that the NEXO Token was registered with the SEC and

5

"Nexo's requirement that [Cress] purchase the NEXO Tokens to obtain favorable borrowing rates," Cress proceeded to take out a loan to purchase BTC and Nexo Tokens. *Id.* ¶ 40. On March 26, 2021, Cress took out a $5.4 million loan collateralized by his digital assets through Nexo's OTC Desk. *Id.* ¶¶ 32, 62–63. Nexo did not execute Cress's order until March 27, 2021. *Id.* ¶ 64. That day, Hristov sent an internal email to Nexo's payments team reflecting that Nexo profited $86,000 from Cress's OTC transaction. *Id.* ¶ 64. "In addition to the profits retained by the OTC Desk, Nexo's records reflect that it sold [Cress] the NEXO Token at a 134.3% markup and took an additional $680,627 profit on the transaction." *Id.* ¶ 65. Nexo had never disclosed to Cress that it would take these substantial profits on his asset purchases. *Id.* ¶ 66. Later that same day, Hristov emailed Cress and "lied to [Cress] regarding the price at which it acquired BTC and NEXO. Hristov also lied to [Cress] in representing that the OTC team had purchased NEXO Tokens when in fact it was selling those tokens itself and taking a massive undisclosed profit." *Id.*

Cress then borrowed $7.45 million more through loans in March and April 2021. *Id.* ¶ 32. On March 30, 2021, Cress sent $4.3 million to Nexo's OTC Desk to purchase BTC and NEXO Tokens. *Id.* ¶ 68. Nexo did not execute Cress's order until over twenty-four hours later. *Id.* ¶ 70. When Hristov emailed Cress the statement for this OTC transaction, the "prices were significantly higher than those at which [Cress] could have acquired these assets on a retail exchange." *Id.* ¶ 71. "Once again, Nexo sold [Cress] its own NEXO Token at an astronomical 134.4% markup, taking an undisclosed profit of $817,243." *Id.* ¶ 72.

On April 14, 2021, Cress sent $2.15 million to Nexo's OTC Desk to purchase BTC and NEXO Tokens. *Id.* ¶ 74. On "April 14, 2021, Nexo unilaterally took $102,125 from what should have been deposited as [Cress's] loan collateral as part of his April 14 OTC transaction," as a "portfolio booster." *Id.* ¶ 76. Cress "never once discussed a portfolio booster with Nexo, let alone assented to one." *Id.* Nexo did not execute Cress's order until April 16, 2021. *Id.* ¶ 75. Nexo lied to Cress about this transaction—its "records show that it acquired the NEXO Token for $1.27 and resold it to [Cress] at a 184.1% markup, taking an undisclosed $214,508 profit." *Id.*

On May 2, 2021, Cress sent $1 million to Nexo's OTC Desk to purchase ETH. *Id.* ¶ 77. Nexo did not execute Cress's order until May 3, 2021. *Id.* Cress asked Nexo to detail the total

6

amount that was spent and the price per token, stating

> [i]f I'm calculating correctly, I sent $1,000,000 and if that only purchased 312 ETH, that means the price was $3,205 . . . Those numbers seem impossible because ETH never reached a price of $3,205. I can't be paying more than a price where ETH ever traded.

*Id.* Nexo responded, stating that this cost included "the 0.5% cost of execution through the NEXO OTC desk and what the partner OTC desk charged for the transaction which is estimated around ~0.5% as well." *Id.* ¶ 78. Nexo had never previously informed Cress of any fees associated with purchases through the OTC desk. *Id.* "Nexo's internal emails state that the OTC desk took a profit of 8,000 USDT and .7513 ETH. The internal email from Octavian Dinca reflects that Nexo purchased the ETH for $3,171.57, but provided it to the 'customer' at $3,203.60." *Id.* ¶ 79.

In taking out the collateralized loans, Cress relied upon Nexo's representations regarding its responsiveness and Liquidation Relief Program because the digital asset market is highly volatile, and he believed these benefits reduced the risk of losing his digital assets to liquidation. *Id.* ¶ 29. Cress also relied upon Nexo's representation that his collateral would earn interest because it helped to offset any interest he would pay on his loans. *Id.* ¶ 30. Finally, Cress "relied upon Nexo's representations regarding its OTC Desk and its zero-fee policy in choosing to utilize Nexo's OTC Desk to purchase millions of dollars in digital assets collateralized by [Cress's] BTC and ETH." *Id.* ¶ 54.

Nexo's internal documents show that Nexo was aware that its OTC Desk was a sham designed to defraud customers. *Id.* ¶ 80. An internal memo states: "We tell customers Nexo does not charge commission on the [OTC] transaction[s], while in fact we do." *Id.* The memo notes that the "problems with the set up" include that "[o]ften, when the customer sees the result of the trade he feels misled in regards to what costs he is facing," and "[s]ince the pricing of the deal is not transparently communicated in advance to the customer, the [Account Manager]s waste a significant amount of time post the execution timing when to report the deal to the customer so we can justify the commission we add up[.]" *Id.* Further, internal memos state that Nexo's OTC sales of NEXO Tokens are priced "3-5% over the spot price," and BTC and ETH sales are priced "1-3% over the spot price." *Id.* ¶ 81.

7

Cress's purchase of NEXO Tokens dramatically increased the likelihood that Cress's assets would be liquidated as NEXO Tokens are far more volatile than Bitcoin. *Id.* ¶ 44. As a result, when the crypto market experienced downside volatility, the value of Cress's collateral decreased more sharply than it would have if he had only been holding Bitcoin. *Id.* This, in turn, increased Cress's LTV more rapidly, resulting in the liquidation of his assets. *Id.* In essence, Nexo sold Cress "a complex and highly risky leveraged long of a bundle of digital assets, including its NEXO Token security (the 'Leveraged Investment Instrument')." *Id.* ¶ 46.

By May 23, 2021, the price of NEXO Tokens sank, causing the partial liquidation of Cress's digital assets. *Id.* ¶ 50. Nexo liquidated "millions of dollars' worth of [Cress's] more stable USDC, BTC, and ETH holdings," but left Cress holding Nexo Tokens. *Id.* ¶¶ 51, 86. Nexo's VIP brochure explicitly states that it will provide customers notice and opportunity to furnish additional collateral prior to liquidating the assets, but Nexo provided Cress no warnings. *Id.* ¶¶ 26, 152. In addition,

> Nexo profited from these liquidations, taking a substantial fee on each liquidation—thus leaving [Cress's] account more susceptible to further liquidations. These liquidation fees were not disclosed to [Cress]. Moreover, Nexo credited [Cress] thousands of dollars less per BTC liquidated than the prevailing market price on reputable exchanges.

*Id.* ¶ 87.

On June 21 and 22, 2021, the price of NEXO Tokens plunged, resulting in the liquidation of nearly all of Cress's digital assets. *Id.* ¶ 50. Nexo

> profited from these liquidations, once again, taking a substantial undisclosed fee on each liquidation. Moreover, Nexo credited [Cress] thousands of dollars less per BTC liquidated than the prevailing market price on reputable exchanges.

*Id.* ¶ 90.

Nexo's internal documents reveal that it actively sought to conceal these liquidation fees from Cress and its other customers, stating

> WE SHOULD NEVER, UNDER ANY CIRCUMSTANCES MENTION THERE IS A LIQUIDATION TAX. Most of you have probably worked on cases, in which the customer is disputing the

8

United States District Court
Northern District of California

amount received as part of the liquidation, claiming it is smaller than it should be. *Id.* ¶ 92. "The same document then provides instructions to 'convince them there is no mistake,' which include withholding information on the 'tax which we SHOULD NEVER mention. That's why, we should also not mention the sell price[.]'" *Id.* "Nexo has not provided any records or evidence showing that it actually sold any of the digital assets it claims to have 'liquidated,' much less the sale price received for those assets." *Id.* ¶ 93.

On June 22, 2021, Cress emailed Hristov regarding the Liquidation Relief Program. *Id.* ¶ 97. Nexo informed him under the Program he could take out a new loan from Nexo to repurchase his liquidated assets from Nexo. *Id.* In sum, Cress ultimately suffered millions of dollars in losses because of Nexo's misrepresentations when he was liquidated of substantially all his digital assets. *Id.* ¶ 4.

**B.    Procedural Background**

Cress filed this case on February 27, 2023, alleging five causes of action: (1) Fraudulent Inducement of Contract (against all Nexo Defendants); (2) California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")) (against all Nexo Defendants); (3) Unregistered Offer and Sale of Securities (Cal. Corp. Code §§ 25110, 25503) (against all Defendants); (4) Unregistered Offer and Sale of Securities (Cal. Corp. Code §§ 25110, 25504) (against Trenchev); and (5) Fraud in the Offer and Sale of Securities (Cal. Corp. Code §§ 25401, 25504.1) (against all Defendants). ECF No. 1.

On May 15, 2023, Defendants moved to dismiss the original Complaint pursuant to Rule 12(b)(2) and Rule 12(b)(6). ECF No. 19. On October 10, 2023, the Court granted in part and denied in part Defendants' motion. ECF No. 26. The Court dismissed all claims against all Defendants, except Nexo, for lack of personal jurisdiction. *Id.* at 7–15. The Court denied Defendants' motion as to Cress's first claim for fraudulent inducement of contract, finding his allegations plausible at the motion to dismiss stage. *Id.* at 15–21. As to the UCL claim, the Court granted Defendants' motion to the extent it was based on Nexo's alleged deceptive conduct in the sale of the NEXO Token and Cress's Nexo Earn Account, and also to the extent it is based on Nexo's advertised interest rates being available only to customers who maintain 10% of their

9

portfolio balance in the NEXO Token or on Nexo's alleged failure to provide Cress notice before liquidating his assets. *Id.* at 24–25. As to Cress's third claim under California Corporations Code sections 25110 and 25503, the Court granted Defendants' motion, finding Cress had not plausibly alleged the existence of a non-exempt, unregistered security. *Id.* at 31. The Court also dismissed Cress's state law securities fraud claim, except as to the single alleged misrepresentation that the NEXO Token was registered with the Securities and Exchange Commission ("SEC") as a security. *Id.* at 33. The Court granted Cress leave to amend. *Id.*

On November 10, 2023, Cress filed his First Amended Complaint ("FAC"), re-pleading the same five causes of action. ECF No. 29. Defendants again moved to dismiss pursuant to Rule 12(b)(2) and Rule 12(b)(6). ECF No. 32. On June 25, 2024, the Court granted in part and denied in part Defendants' motion. ECF No. 37. The Court granted Defendants' request to dismiss all Defendants, except Nexo, without leave to amend. *Id.* at 7. The Court granted Defendants' motion as to the UCL claim for the same reasons articulated in the Court's first dismissal order. *Id.* at 8. As to Cress's claims under California Corporations Code sections 25110 and 25503, the Court granted Defendants' motion to the extent it was based on the Earn Account and Leveraged Investment Instrument but denied Defendants' motion to the extent the claim was based on the NEXO Token. *Id.* at 8–13. The Court also dismissed Cress's state law securities fraud claim, except as to the single alleged misrepresentation that the NEXO Token was registered with the SEC as a security. *Id.* at 13. The Court denied Cress leave to amend his dismissed claims. *Id.* at 8, 10, 13.

On July 23, 2024, Nexo filed an answer to the FAC. ECF No. 45. Nexo filed an amended answer to the FAC on August 13, 2024. ECF No. 50. On September 30, 2025, Cress sought leave to amend the FAC "to add additional misrepresentations as the basis for his fraudulent inducement claim, and add causes of action for fraudulent omission, common law fraud, civil theft, civil RICO, and breach of contract." ECF No. 76. The Court granted Cress leave to amend the FAC on October 30, 2025. ECF No. 86.

On October 30, 2025, Cress filed the operative Second Amended Complaint ("SAC"). ECF No. 88. Cress alleges ten causes of action in the SAC under federal law and California state

10

law: (1) Fraudulent Inducement; (2) California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")); (3) Unregistered Offer and Sale of Securities (Cal. Corp. Code §§ 25110, 25503); (4) Fraud in the Offer and Sale of Securities (Cal. Corp. Code § 25401); (5) Fraud; (6) Civil Theft (Cal. Penal Code § 496(C)); (7) Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(C)); (8) Violations of RICO, Conspiracy to Violate 1962(C)) (18 U.S.C. § 1962(D)); (9) Fraudulent Omission; and (10) Breach of Cryptocurrency Purchase Agreement. SAC ¶¶ 139–264. Cress seeks, *inter alia*, damages including treble and punitive damages. *Id.* at 47.

On December 5, 2025, Nexo filed the instant Motion to Dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 94 ("Mot."). On January 2, 2026, Cress filed an Opposition. ECF No. 95 ("Opp."). On January 15, 2026, Nexo filed a Reply. ECF No. 96 ("Reply").

### III.   LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim. A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (cleaned up). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Twombly*, 550 U.S. at 555 (citation omitted).

In considering a motion to dismiss, the court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *accord Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). However, "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (cleaned up). A court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Courts have broader discretion in denying motions for leave to amend after leave to amend has already been granted. *See Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016) ("[W]hen the district court has already afforded a plaintiff an opportunity to amend the complaint, it has wide discretion in granting or refusing leave to amend after the first amendment, and only upon gross abuse will its rulings be disturbed.") (cleaned up); *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is particularly broad.") (cleaned up).

## IV.   DISCUSSION

Nexo moves to dismiss Cress's fraudulent inducement and UCL claims (Claims 1 and 2) "to the extent they are predicated on the new allegations regarding 'some of the best rates on the market' and OTC fees." Mot. at 34. Nexo further moves to dismiss Cress's fraud, civil theft, RICO, RICO conspiracy, fraudulent omission, and breach of the CPA claims (Claims 5–10) for failing to state a cognizable claim. *Id.* Cress contends that the Court should deny Nexo's Motion in its entirely because he plausibly alleges that Nexo misrepresented its fees then concealed those fees, and Nexo's Motion improperly asks the Court to decide fact-intensive questions. Opp. at 1.

In sum, the Court concludes that Cress alleges cognizable fraudulent inducement, UCL, fraud, civil theft, RICO, RICO conspiracy, fraudulent omission, and breach of the CPA claims.

Therefore, dismissal of Claims 1–2 and 5–10 is not warranted.

## A. Requests For Judicial Notice

### 1. Nexo's Request

Nexo requests the Court take judicial notice of four documents:

> 1. Nexo's Whitepaper, at Bates number NEXO-0017900.
>
> 2. A March 15, 2020, Nexo blog post, *available at* https://nexo.com/blog/why-nexobank-loans-vs-selling-crypto-vs-crypto-backed-credit.
>
> 3. A June 24, 2020, Nexo blog post, *available at* https://nexo.com/blog/earn-on-crypto-is-here.
>
> 4. A February 19, 2021, Nexo blog post, *available at* https://medium.com/nexo/nexos-loyaltyprogram-now-features-free-crypto-withdrawals-9e346cd4b134.

Mot. at 13 n.2; *see* Shelton Decl., Exs. 1–4. Nexo argues that judicial notice is appropriate because "the SAC explicitly cites to" the documents, and Cress "relies on them as the bases for his claims." Mot. at 13 n.2. The Court therefore construes Nexo's request for judicial notice also as a request for incorporation by reference. Cress does not respond to Nexo's request. *See generally* Opp.

Normally, when adjudicating a motion to dismiss brought pursuant to Rule 12(b)(6), the Court's consideration of extra-pleading materials is limited and matters outside of the pleading cannot be considered without converting the motion into a motion for summary judgment. *See* Fed. R. Civ. P. 12(b)(6), 12(d). However, there are two exceptions—the incorporation-by-reference doctrine and judicial notice. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Under the Federal Rules of Evidence, the Court may take judicial notice of matters that are (1) generally known within the trial court's territorial jurisdiction; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

Under the doctrine of incorporation-by-reference, the Court may consider a document not attached to the complaint provided the complaint "necessarily relies" on the document or contents

13

thereof, the document's authenticity is uncontested, and the document's relevance is uncontested. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *see United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."). "The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Ritchie*, 342 F.3d at 908.

Here, the Court agrees that it is appropriate to incorporate by reference the four documents requested by Nexo. Cress does not contest the authenticity or relevance of the documents, and the Court agrees that the SAC and Cress's claims necessarily rely upon the Nexo Whitepaper and Nexo blog posts. *See* SAC ¶ 53. Therefore, the Court considers the documents incorporated for purposes of this Motion and assumes their contents are true for purposes of this Motion. *Ritchie*, 342 F.3d at 908.

Accordingly, the Court **DENIES** Nexo's request for judicial notice but **GRANTS** Nexo's request to incorporate by reference the Nexo Whitepaper and Nexo blog posts from March 15, 2020; June 24, 2020; and February 19, 2021.

### 2. Cress's Request

In response to Nexo's argument that Cress did not attach a copy of an alleged advertisement to support his claim, Cress attaches a copy of one document to his Opposition:

> A screenshot of Cress's Nexo Account Page from March 24, 2021, that Cress produced to Nexo in discovery on January 30, 2025, at Bates number CRESS-00001382.

Opp. at 2:7–16; *see* Ambrose Decl., Ex. 1. Cress also attaches two additional documents to his Opposition:

> 1. The English (auto-generated) YouTube transcript of the March 26, 2021, "Monthly AMA March 2021 - # AskAntoni" Ask-MeAnything video on YouTube, *available at* https://www.youtube.com/live/fz_oyZo7Jxg?si=HoF9VRh_qhLaPjLV&t=708.

> 2. A summarized, non-verbatim transcript of the March 26, 2021,

14

United States District Court
Northern District of California

"Monthly AMA March 2021 - #AskAntoni" (i.e., AMA Video with Antoni Trenchev) that was posted to Nexo's website on March 29, 2021.

Opp. at 8:2–16; *see* Ambrose Decl., Exs. 2, 3. The Court construes Cress's attachment of the three documents as a request for incorporation by reference. Nexo does not indicate that it opposes incorporating these documents for purposes of its Motion. *See generally* Reply.

Here, the Court finds that it is appropriate to incorporate by reference the Nexo Account Page and AMA transcripts as Cress's SAC and claims necessarily rely on these documents. *See* SAC ¶¶ 53, 55. Nexo does not contest the authenticity or relevance of the documents. Therefore, the Court considers the documents incorporated for purposes of this Motion and assumes their contents are true for purposes of this Motion. *Ritchie*, 342 F.3d at 908.

Accordingly, the Court **GRANTS** Cress's request to incorporate by reference the Nexo Account Page and AMA transcripts.

## B.     Fraudulent Inducement And UCL Claims (Claims 1 And 2)

Cress alleged claims for fraudulent inducement and violation of the UCL in his FAC; these claims survived dismissal. *See* ECF No. 26 at 15–25. In his SAC, Cress alleges that Nexo made false promises to induce him "to take out loans from Nexo and utilize its OTC trading desk to purchase digital assets." SAC ¶ 142. Cress alleges new facts to support these two claims: (1) Nexo falsely promised Cress "the best rates on his OTC purchases"; and (2) Nexo falsely advertised that it "did not charge any fees on digital asset purchases or any other hidden fees." SAC ¶¶ 53, 111–18, 140–42, 153–54.

Nexo requests that the Court dismiss Cress's Fraudulent Inducement and UCL claims (Claims 1 and 2) "to the extent they are predicated on the new allegations regarding 'some of the best rates on the market' and OTC fees." Mot. at 34. Nexo argues that this is warranted because (1) "Cress's allegations do not establish a misrepresentation sufficient to support a fraudulent inducement claim"; and (2) "Cress fails to plead the alleged affirmative misrepresentations with particularity." *Id.* at 26:11–27:28.

"California law distinguishes between fraud in the 'execution' or 'inception' of a contract and fraud in the 'inducement' of a contract." *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th

15

394, 415 (1996). Fraud in the inducement "occurs when the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable.*" *Id.* (emphasis in original) (cleaned up). Under California law, the "elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004).

Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203. The UCL's "purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 320 (2011). "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The UCL's coverage is "sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (cleaned up).

Each prong of the UCL is a separate and distinct theory of liability. *In re Tobacco II Cases*, 46 Cal. 4th 298, 311 (2009); *accord Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). The UCL's fraud prong covers "claims of deceptive advertisements and misrepresentations." *In re Tobacco II Cases*, 46 Cal. 4th at 311–12.

Here, the Court concludes that Cress alleges cognizable fraudulent inducement and UCL claims against Nexo based on his allegations regarding Nexo's rates and fees. Accordingly, the Court **DENIES** Nexo's motion to dismiss Cress's Fraudulent Inducement and UCL claims (Claims 1 and 2) to the extent they are predicated on the statement "some of the best rates on the market" and OTC fees.

### 1.    Misrepresentations

Nexo argues that Cress's new allegations do not establish misrepresentations because (1) the allegation that "Nexo falsely represented 'some of the best rates on the market' is non-

actionable puffery"; and (2) the "allegation—that Nexo misrepresented its fees about OTC transactions and liquidations—does not point to any specific statement that Nexo does not charge fees for OTC transactions or liquidations." Mot. at 26:23–27:9. Cress contends that (1) Nexo's representation regarding rates is an "actionable misrepresentation of fact because it asserts a specific, measurable attribute of the service: price"; and (2) the "SAC identifies specific, unqualified statements" regarding Nexo's fees. Opp. at 6:8–8:1.

A misrepresentation can occur through "false representation, concealment, or nondisclosure." *Robinson*, 34 Cal. 4th at 990. "False representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997) (cleaned up).

"[T]o be actionable, a misrepresentation must be of an existing fact, not an opinion or prediction of future events." *Brakke v. Econ. Concepts, Inc.*, 213 Cal. App. 4th 761, 769 (2013). Thus, if an assertion "is merely a statement of opinion—mere 'puffing'—[a defendant] cannot be held liable for its falsity." *Hauter v. Zogarts*, 14 Cal. 3d 104, 111 (1975). "A representation is an opinion if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value or other matters of judgment." *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 606–07 (2014) (cleaned up). "Whether a statement is nonactionable opinion or actionable misrepresentation of fact is a question of fact for the jury." *Furla v. Jon Douglas Co.*, 65 Cal. App. 4th 1069, 1081 (1998).

Here, the Court finds that Cress pleads sufficient facts to plausibly allege that Nexo made misrepresentations regarding its rates and fees. First, the parties disagree over whether Nexo's alleged statement that it provided "some of the best rates on the market" constitutes inactionable puffery. Mot. at 26:23–27:9; Opp. at 6:8–8:1. The Court need not decide the issue at this stage. Cress alleges that Nexo knew its rates were worse than those through retail transactions because it took fees above the spot price and its internal documents state that Nexo falsely tells customers it does not charge commission. Opp. at 7:5–23 (citing SAC ¶¶ 67, 80–82). Because Cress plausibly alleges that Nexo did not honestly believe that it offered "some of the best rates," even assuming,

United States District Court
Northern District of California

*arguendo*, that the statement regarding rates is an opinion, it can still give rise to liability. *See People v. Webb*, 74 Cal. App. 4th 688, 694 (1999) ("A dishonest opinion expressed to one entitled to rely upon it is actionable deceit. It is false pretense to take the property of another by force of an opinion asserted in bad faith and with a design to mislead. A statement of opinion may also support fraud liability where the statement is based on facts known by the speaker to be nonexistent, or where the speaker has knowledge of facts, not warranting the opinion.") (cleaned up). Therefore, the Court declines to dismiss Claims 1 and 2 to the extent they are based on Cress's allegation regarding rates.

Second, the parties disagree over whether Cress identifies an affirmative statement by Nexo that it does not charge fees on OTC transactions and liquidations. Cress points to five Nexo advertisements between 2020–21 where Nexo states, "No fees," "#ZeroFees," and "No Hidden Fees." Opp. at 8:2–16 (citing SAC ¶¶ 53–55). Cress further points to an "Ask Me Anything" (AMA) on March 26, 2021, where Trenchev, Nexo's CEO states, "There is no concept of hidden fees at Nexo. We pioneered #ZeroFees and we are proud to be transparent about all charges we make." *Id.* (citing SAC ¶ 55; Ambrose Decl., Exs. 2–3). Nexo argues that these advertisements do not state that Nexo "does not charge fees for OTC transactions or liquidations"; instead, they are "about different services for which Nexo did not charge fees." Mot. at 27:5–9. According to Nexo, four of the ads relate to Nexo's Credit Line Product, Earn Interest Product, or Loyalty Program, not OTC fees or liquidations. *Id.* at 13:16–14:16 (citing Shelton Decl., Exs. 2–4). Cress counters that (1) he was charged fees through Nexo's Credit Line because his OTC transactions were purchased through the Credit Line, and (2) Nexo's ads were not limited to certain services because Nexo "represented most of its entire platform had no fees." Opp. at 2:17–4:3. Taking Cress's allegations as true, it is plausible that Nexo's ads, stating "no fees" are charged, represent that Nexo does not charge fees on OTC transactions or liquidations when Nexo in fact does charge fees. This is sufficient to plausibly allege a misrepresentation at the pleadings stage. *Cf. Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1166–67 (2018) (explaining "there is no protection for literal falseness" contained within a label). Therefore, the Court declines to dismiss Claims 1 and 2 to the extent they are based on Cress's allegation regarding fees.

18

Nexo's argument that Cress cites "to generalized allegations which are not relevant to Cress's individual claim" is unavailing. Reply at 5:1–5. Nexo takes issue with the Trenchev AMA because Cress "signed the [CPA] two days before the alleged public AMA." *Id.* But Cress's claims are not cabined to the CPA—Cress alleges that he was fraudulently induced to take out loans and engage in OTC transactions. SAC ¶¶ 139–43. Thus, the AMA on March 26, 2021, could plausibly serve as a misrepresentation for Cress's transactions on and after that date. *See* SAC ¶¶ 62, 68, 74, 77.

### 2. Particularity Under Rule 9(b)

Nexo argues that Cress's "vague allegations . . . lack the specificity required by Rule 9(b)." Mot. at 27:10–28. Cress contends that his new allegations comply with Rule 9(b) because "the SAC pleads who made the statements, what was said, when and where it was said, and how it misled Cress." Opp. at 7:24–11:4.

Under the Federal Rules of Civil Procedure, where a plaintiff asserts a claim sounding in fraud, the plaintiff must "state with particularity the circumstances regarding fraud or mistake." Fed. R. Civ. P. 9(b). A claim sounds in fraud if the plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). The context surrounding the fraud must "be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns*, 567 F.3d at 1124 (cleaned up). Thus, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (cleaned up).

Here, the Court finds that Cress pleads sufficient facts to allege his fraudulent inducement and UCL claims with the requisite particularity. Nexo argues that Cress's claims do not comply with Rule 9(b) because "he relies solely on generic ads and does not identify which specific misrepresentations he viewed, heard, or read—or that he relied upon them at all when transacting with Nexo." Reply at 4:3–6:1. The Court disagrees. Cress alleges that Nexo (the "who") induced Cress to take out loans and engage in OTC transactions (the "what") on the dates Nexo publicly advertised (the "when") through Nexo's website, marketing materials, and CEO (the "where")

19

"that it did not charge any fees for any services on its platforms, including transactions" (the "how"). SAC ¶¶ 53–56, 139–43; *see* Opp. at 7:24–8:16. This is all that Rule 9(b) requires. *Vess*, 317 F.3d at 1106; *cf. Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1263 (N.D. Cal. 2022) ("These allegations are specific enough to give Roblox notice of how Doe believes it defrauded her.").

Nexo's arguments to the contrary are unavailing. First, Nexo is incorrect that Cress does not plead viewing or relying on the advertisements with specificity. Mot. at 27:10–28. Cress alleges that he "relied upon Nexo's representations regarding its OTC desk and its zero-fee policy in choosing to utilize Nexo's OTC Desk to purchase millions of dollars in digital assets collateralized by [Cress's] BTC and ETH." SAC ¶ 54. Nexo complains that this paragraph does not elaborate on what advertisements or statements Cress saw or when he saw them. Mot. at 27:10–28. But the paragraph immediately follows Cress's allegations detailing five Nexo ads. SAC ¶ 53. The Court must draw all reasonable inferences in Cress's favor. *Iqbal*, 556 U.S. at 678. The allegations give rise to a reasonable inference that Cress viewed and relied on all the ads prior to taking out loans or executing OTC transactions. Second, Nexo's assertion that "at least two referenced advertisements are from 2020—about a year before Cress's involvement with Nexo" is immaterial. Mot. at 27:10–28. While that may be relevant to a justifiable reliance analysis—an element that Nexo does not challenge for these claims—it has no bearing on a Rule 9(b) analysis. Finally, Nexo vaguely attacks Cress's specificity regarding liquidation fees. *Id.* Cress alleges that around the time of his liquidations, Nexo emailed him that it "may initiate small partial loan repayments automatically (without any penalty or added fees)." Opp. at 10:21–11:1 (citing SAC ¶ 116). The Court agrees with Cress that this "is a concrete representation about fees associated with liquidation mechanics." *Id.* Therefore, Cress's fraudulent inducement and UCL claims comply with Rule 9(b).

## C.     Fraud Claim (Claim 5)

Cress alleges that Nexo falsely stated that "[t]he NEXO token is registered with the SEC as a security." SAC ¶¶ 106–07, 182–92. Nexo argues that Cress's Fraud claim (Claim 5) fails because he "fails to plausibly allege causation, scienter, and reasonable reliance." Mot. at 31:1–33:27.

20

Again, a California fraud claim requires five elements: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson*, 34 Cal. 4th at 990.

Here, the Court concludes that Cress alleges a cognizable fraud claim against Nexo. Accordingly, the Court **DENIES** Nexo's motion to dismiss Cress's Fraud Claim (Claim 5).

### 1. Causation

Nexo argues that "Cress fails to plausibly allege causation because the liquidation damages he seeks are untethered from the alleged false representation regarding the SEC status of the NEXO token." Mot. at 31:11–32:20. Cress contends that Nexo "improperly seeks a merits determination on causation and the scope of recoverable damages." Opp. at 15:25–16:17.

"A plaintiff asserting fraud by misrepresentation is obliged to establish a complete causal relationship between the alleged misrepresentations and the harm claimed to have resulted therefrom." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1062 (2012) (cleaned up). "[T]here are two causation elements in a fraud cause of action. First, the plaintiff's actual and justifiable reliance on the defendant's misrepresentation must have caused him to take a detrimental course of action. Second, the detrimental action taken by the plaintiff must have caused his alleged damage." *Id.*

"Under California law, a party asserting fraud must establish that its damages are the 'proximate' or 'legal' result of the fraudulent conduct." *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 869–70 (2007). Thus, "[d]eception without resulting loss is not actionable fraud. Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the representations must be shown." *Id.* at 870 (cleaned up). "Causation is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation." *Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656, 666 (2001).

"Because of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for predictability about the cost of contractual

relationships, fraud plaintiffs may recover out-of-pocket damages in addition to benefit-of-the-bargain damages." *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 646 (1996) (cleaned up). Moreover, "[p]unitive damages are recoverable in those fraud actions involving intentional, but not negligent, misrepresentations." *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1241 (1995).

Here, the Court finds that Cress pleads sufficient facts to plausibly allege that Nexo's false representation regarding the NEXO Token's SEC status caused his alleged damages. Nexo challenges causation as it relates to damages—it argues that Cress's damages are "limited to losses associated with the NEXO Token." Mot. at 31:11–32:20; Reply at 10:25–11:11. Cress alleges that Nexo's false statement about the NEXO Token's SEC status induced him to purchase the Token, the Token's poor performance contributed substantially to the decrease in value of his collateral which led to liquidation of his assets, and he suffered millions of dollars in losses from the liquidation. SAC ¶¶ 4, 37–40, 49–50; *see* Opp. at 16:10–17. In other words, he alleges distinct damages resulting from a causal chain that began with Nexo's false SEC status statement. This is all that is required at the pleadings stage. *OCM*, 157 Cal. App. 4th at 870. Nexo's reliance on the Court's prior order regarding Cress's securities claims is misplaced. *See* Mot. at 31:18–32:11 (citing ECF No. 26). Nexo asserts that because the Court held that Cress could only seek damages associated with the losses on the NEXO Token, Cress is limited to those losses here. *Id.* While it is true that the Court concluded that Cress could not recover for damages beyond losses on a security itself, this was in the context of Cress's claim under California statutory law. *See* ECF No. 26 at 26 ("The Court agrees with Nexo that this is not a harm or loss for which there is a remedy available under Cal. Corp. Code § 25503."). Damages on a California securities claim are calculated as the difference between the purchase price and the value at disposal *for the security*. Cal. Corp. Code § 25503. To that end, Nexo's argument that Cress cannot "radically expand his damages beyond the NEXO Token" fails. Because public policy favors preventing fraud, a wider range of damages are permitted for a fraud claim than for a securities claim. *Compare All. Mortg.*, 10 Cal. 4th at 1240–41 (explaining out-of-pocket damages, benefit-of-the-bargain damages, punitive damages, and interest are all permitted for fraud claim) *and* Cal. Civ. Code § 3343(a) ("One defrauded in the purchase, sale or exchange of property is entitled to recover the difference

between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction[.]") *with* Cal. Corp. Code § 25503 (permitting loss in value damages for a security); *see* Opp. at 16:1–2. Therefore, Cress sufficiently alleges causation regarding damages at the pleadings stage.

### 2. Scienter

Nexo argues that Cress fails to establish scienter because regarding Nexo's statement that the NEXO token was registered with the SEC, the "Nexo representative did not act with the intent to deceive Cress, but instead to explain why he was asking for Cress's accredited investor certificate." Mot. at 32:21–33:27. Cress contends that he plausibly alleges scienter because Nexo's "statement regarding SEC registration was 'literally false.'" Opp. at 14:12–15:15 (citing ECF No. 26 at 32).

Actual knowledge of a statement's falsity is not required—"[i]f the defendant has no belief in the truth of the statement, and makes it recklessly, without knowing whether it is true or false, the element of scienter is satisfied." *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 415 (1992). Fraudulent intent is a question of fact. *Beckwith*, 205 Cal. App. 4th at 1061.

Here, the Court finds that Cress pleads sufficient facts to plausibly allege that Nexo knew that its statement regarding the NEXO Token's SEC status was false. Cress alleges that Nexo's own Terms and Conditions of Token Sale state that the NEXO Token is not registered with the SEC, a Nexo customer notified Nexo that its website falsely stated that it was SEC compliant, and that the SEC notified Nexo that its marketing materials falsely stated that it was SEC compliant." SAC ¶¶ 108–110. These allegations create a reasonable inference that Nexo knew that the NEXO Token was not registered with the SEC. Nexo insists that its representative "did not act with intent to deceive Cress" when he made the statement regarding SEC status because the second part of the statement shows that Nexo "was only selling the NEXO Token to U.S. accredited investors in an abundance of caution." Mot. at 32:28–33:27. This argument is unpersuasive. A statement is not exempted from liability merely because it is partially true. *See Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 613 (1992) (explaining that if one chooses to speak, "he must

23

make a full and fair disclosure"). Therefore, because Cress plausibly alleges Nexo's actual knowledge of the statement's falsity, scienter is satisfied at the pleadings stage. *Bily*, 3 Cal. 4th at 415.

### 3. Justifiable Reliance

Nexo argues that Cress fails to establish justifiable reliance because the "intent and effect" of Nexo's statement regarding the NEXO token's registration with the SEC "show that it was intended by Nexo, and reasonably understood by Cress, to mean that Nexo was only selling the NEXO token to U.S. accredited investors in an abundance of caution." Mot. at 32:21–33:27. Cress contends that he plausibly alleges this element given that it depends heavily on the facts. Opp. at 15:16–24.

"[A] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Engalla*, 15 Cal. 4th at 977. "After establishing actual reliance, the plaintiff must show that the reliance was reasonable by showing that (1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act; and (2) it was reasonable for the plaintiff to have relied on the misrepresentation." *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1194 (2014) (cleaned up).

"[T]he issue is whether the person who claims reliance was justified in believing the representation in the light of his own knowledge and experience." *Gray v. Don Miller & Assocs., Inc.*, 35 Cal. 3d 498, 503 (1984). However, "[n]egligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent." *All. Mortg.*, 10 Cal. 4th at 1239–40. "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." *Id.* at 1239 (citation omitted).

Here, the Court finds that Cress pleads sufficient facts to plausibly allege that he reasonably relied on Nexo's statement that the NEXO Token was registered with the SEC. The Court previously found that Cress plausibly alleges that this statement is material. ECF No. 26 at 33; *see* Opp. at 15:19–20. As such, an inference exists that Cress actually relied on the statement.

United States District Court
Northern District of California

*Engalla*, 15 Cal. 4th at 977. The only remaining question is whether Cress's reliance was justified. As discussed, Cress plausibly alleges that Nexo knew that the NEXO Token was not registered with the SEC. SAC ¶¶ 108–110. Thus, because Cress plausibly alleges that Nexo internationally misrepresented the Token's SEC status to Cress, Nexo cannot rely on Cress's purported unreasonable reliance on that falsity to defeat his claim on motion to dismiss. *All. Mortg.*, 10 Cal. 4th at 1239–40. Therefore, Cress sufficiently alleges justifiable reliance at the pleadings stage.

### D. Civil Theft (Claim 6)

Cress alleges that "Nexo knowingly received, withheld, concealed, and/or sold [Cress's] property—namely his BTC and ETH—which Nexo obtained by false pretenses, embezzlement, and trick." SAC ¶¶ 193–202. Nexo argues that Cress's Civil Theft claim (Claim 6) fails because (1) "a dispute about fees arising from a voluntary commercial transaction is not 'theft'"; and (2) the claim does not "meet the requirements of Rule 9 regarding the allegedly false statements." Mot. at 24:26–26:10. Cress contends that the claim (1) is cognizable under California law because it alleges "business misconduct involving 'theft by false pretense'"; and (2) complies with Rule 9(b) because it contains detailed allegations regarding Nexo's fraudulent misrepresentations, "and further describes how Nexo's theft was executed and concealed." Opp. at 11:5–12:21.

Section 496(a) of the California Penal Code "defines the criminal offense of what is commonly referred to as receiving stolen property." *Siry Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 346 (2022) (citing Cal. Penal Code § 496(a)). This section provides, in relevant part:

> Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, is subject to incarceration.

*Id.* (cleaned up). Section 496(c) permits a cause of action for civil theft when a violation of section 496(a) has occurred. *Id.* at 346–47 (citing Cal. Penal Code § 496(c)). Subdivision (c) "states that any person who has been injured by a violation of section 496(a) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and

25

reasonable attorney's fees." *Id.* at 347.

"A plaintiff may recover treble damages and attorney's fees under section 496(c) when property has been obtained in any manner constituting theft." *Id.* at 361. "To prove theft, a plaintiff must establish criminal intent on the part of the defendant beyond mere proof of nonperformance or actual falsity." *Id.* at 361–62 (cleaned up). As such, "not all commercial or consumer disputes alleging that a defendant obtained money or property through fraud, misrepresentation, or breach of a contractual promise will amount to a theft." *Id.* at 361.

Here, the Court concludes that Cress alleges a cognizable civil theft claim against Nexo. First, Cress's civil theft claim is not precluded under section 496. *See id.* (holding section 496 permits recovery "when property has been obtained in any manner constituting theft"); *see also, e.g., Johnson v. Connie, LLC*, 113 Cal. App. 5th 850, 855 (2025) (permitting plaintiff to bring both breach of contract and section 496 claims based on allegations that defendants illegally increased rent payments). Indeed, Nexo concedes as much in its Reply. *See* Reply at 6:6–7 ("[I]n *Siry Inv., L.P. v. Farkhondehpour*, the California Supreme Court held that § 496(c) can apply in the business context."). Instead, Nexo argues the SAC fails to allege "that Nexo had intent to 'steal' Cress's property." Mot. at 25:22–26:3; Reply at 6:20–7:12. Not so. Cress alleges that Nexo's acquisition of his crypto-assets amounts to theft by false pretenses. SAC ¶¶ 193–202. The offense of theft by false pretenses "requires only that (1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation." *People v. Williams*, 57 Cal. 4th 776, 787 (2013). Cress alleges that Nexo affirmatively represented it charged no fees, secretly took fees it knew it had no right to collect, affirmatively concealed these fees from customers through false transaction confirmations, and acknowledged the concealment in internal documents and communications. Opp. at 11:13–12:21 (citing SAC ¶¶ 52–93, 111–16, 195–202). Collectively, these allegations give rise to a reasonable inference that Nexo "acted not innocently or inadvertently, but with careful planning and deliberation reflecting the requisite criminal intent." *Siry*, 13 Cal. 5th at 362. Therefore, Cress sufficiently alleges the requisite intent to support liability under section 496.

United States District Court
Northern District of California

26

Second, the Court finds that Cress pleads sufficient facts to allege his civil theft claim with the requisite particularity.  Nexo argues that Cress fails to plead false statements with particularity because the "generic advertising identified in the SAC did not discuss OTC fees."  Mot. at 26:4–10; Reply at 7:13–18.  As discussed, Cress's allegations regarding Nexo's misrepresentations about its OTC fees comply with Rule 9(b).  *See supra*, Part IV.B.2; Opp at 11:8–12.  Thus, Cress's civil theft claim complies with Rule 9(b).

Accordingly, the Court **DENIES** Nexo's motion to dismiss Cress's Civil Theft Claim (Claim 6).

## E.      RICO Claim (Claim 7)

Cress alleges that Nexo and the Related Persons committed acts of mail and wire fraud by collectively operating a "systematic scheme to fraudulently charge and conceal substantial fees."  SAC ¶¶ 203–34.  Nexo argues that Cress's RICO claim (Claim 7) fails because (1) it is statutorily barred; and (2) Cress fails to plead the required elements with the requisite specificity.  Mot. at 15:4–24:9.

The Racketeer Influenced and Corrupt Organizations Act (RICO) "provides a private civil action to recover treble damages for injury by reason of a violation of its substantive provisions."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481 (1985) (citing 18 U.S.C. § 1964(c)) (cleaned up).  Overall, "RICO's § 1962 sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate 'a[n] enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.'"  *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 330 (2016) (citing 18 U.S.C. § 1962).

Section 1962(c), RICO's "conduct" prong, states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  A plaintiff must plausibly allege four elements to state a cognizable claim under section 1962(c):  "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima*, 473 U.S. at 496.  "[A] RICO enterprise must engage in, or affect in some

significant way, commerce directly involving the United States." *RJR Nabisco*, 579 U.S. at 334. "In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496.

Here, the Court concludes that Cress alleges a cognizable RICO claim against Nexo. Accordingly, the Court **DENIES** Nexo's motion to dismiss Cress's RICO Claim (Claim 7).

### 1. RICO And Securities Fraud

Nexo argues that "Cress's RICO claims are founded upon allegations of securities fraud and thus, expressly barred under the Private Securities Litigation Reform Act ('PSLRA') and 18 U.S.C. § 1964(c)." Mot. at 15:17–17:12. Cress contends that the RICO claim is not statutorily barred because it "does not depend on Nexo's alleged misrepresentations concerning the NEXO Token" but instead "targets a separate scheme: Nexo's systematic extraction of undisclosed fees through its OTC trading desk and liquidation fees." Opp. at 16:19–18:27.

Section 1964(c) of RICO states, in relevant part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. § 1964(c). The PSLRA "amended RICO so that 'no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.'" *Howard v. Am. Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (quoting 18 U.S.C. § 1964(c)). Thus, securities fraud cannot serve as a predicate act for RICO liability. *Id.* However, where a complaint alleges fraud in connection with the sale of securities, and the sale of securities is "incidental" to alleged wire fraud, the PSLRA does not bar a RICO claim predicated on wire fraud. *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007).

Here, the Court concludes that Cress's RICO claim is not statutorily barred. Nexo argues that because "Cress's RICO allegations are that Nexo charged undisclosed fees on OTC purchases and liquidations," they cannot be separated from his securities claims because they involve

28

transactions that include the NEXO Token. Mot. at 16:1–17:6. Cress counters that in the SAC, he "alleges two different wrongs: a securities misrepresentation concerning the NEXO Token, and a racketeering scheme built on concealed fees and predatory liquidation practices involving all assets on the Nexo platform[.]" Opp. at 17:15–19:3. The key question is whether securities fraud forms the basis of *all* the mail and wire fraud predicate acts alleged by Cress. It does not. As discussed more fully below, Cress need only plausibly allege two predicate acts to survive dismissal. 18 U.S.C. § 1961(5). Contrary to Nexo's assertion, "the sale of alleged securities" is not the gravamen of at least some of Cress's alleged predicate acts. Reply at 11:26–13:4. Cress plausibly alleges that Nexo engaged in multiple acts of fraudulent inducement by using false statements to induce Cress to transact with Nexo. *See supra*, Part IV.B.1. The alleged false statements concerned Nexo's assertion that it did not charge fees on OTC transactions and liquidations, which are unrelated to whether the NEXO Token was registered with the SEC. Opp. at 17:15–20. Cress further alleges—and Nexo does not dispute—that the "alleged liquidations were limited to BTC, ETC, and stablecoins," which are "undisputably not securities." *Id.* at 18:2–6, 23–27. Nexo asserts that because Cress alleges in other claims that "his liquidation losses were caused by the NEXO Token," the acts based on liquidation are barred by the PSLRA—this is unavailing. Mot. at 16:27–17:6. Cress's alleged predicate acts for RICO purposes are that Nexo misrepresented its liquidation fees and then took undisclosed fees on Cress's liquidations—not merely that he lost money on the liquidations. Therefore, at the pleadings stage, because Cress alleges at least two predicate acts that have nothing to do with the NEXO Token, his RICO claim is not statutorily barred. The Court need not decide at this juncture whether any of Cress's predicate acts involve securities fraud.

### 2. Enterprise

Nexo argues that Cress fails to allege the existence of a RICO enterprise because "the SAC does not specify the members of the alleged 'enterprise,' their actions, or the details of their involvement necessary to make the existence of the enterprise plausible or to meet Rule 9(b)'s heightened pleading standard." Mot. at 9:22–10:8, 17:13–21:21. Cress contends that he "pleads a RICO enterprise: an association-in-fact made up of multiple, separately identifiable actors who

operated together over time for a common fraudulent purpose." Opp. at 19:1–20:23.

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). A "person" is defined as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). The definition of a RICO "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* at § 1961(4). "[T]his definition is not very demanding." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007).

"[A]n association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (cleaned up). To plead an association-in-fact enterprise, a plaintiff "must plausibly allege the following three elements: (1) a common purpose, (2) a structure or organization, and (3) longevity necessary to accomplish the purpose." *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 594 (N.D. Cal. 2020) (citing *Boyle*, 556 U.S. at 946). Such an enterprise will be proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

Here, the Court finds that Cress pleads sufficient facts to plausibly allege that Nexo and the Related Persons comprise a RICO enterprise. First, Nexo argues that Cress "fails to plead a RICO defendant distinct from the enterprise." Mot. at 17:23–18:17. Cress alleges that Nexo (the RICO "person"), along with the Related Persons, conducted the affairs of an associated-in-fact enterprise, the Nexo Enterprise (the RICO "enterprise"). SAC ¶¶ 206–07. Cress contends that he satisfies the distinctiveness requirement because the SAC expressly identifies enterprise members that are legally distinct from Nexo and from one another. Opp. at 19:27–20:12. The Court agrees. In analyzing distinctiveness, "the only important thing is that the enterprise be either formally (as when there is a corporation) or practically (as when there are other people beside the proprietor working in the organization) separable from the individual." *United States v. Benny*, 786 F.2d

30

1410, 1416 (9th Cir. 1986) (cleaned up). Cress alleges the members of the Nexo Enterprise include Credissimo (a European FinTech group based in Bulgaria), Trenchev (a Nexo owner and corporate officer), and NDS EOOD (a separate business entity). Opp. at 19:4–13 (citing SAC ¶¶ 207–14). Because Cress plausibly alleges that the members of the Nexo Enterprise are legally and practically distinct from Nexo, he satisfies distinctiveness at the pleadings stage.

Second, Nexo argues that "Cress fails to plead the members' involvement in the enterprise." Mot. at 18:18–20:23; *see* Reply at 13:5–14:4. Cress counters that he "identifies specific enterprise members and their roles beyond Nexo." Opp. at 19:4–26. At the outset, Nexo's assertion that "plaintiffs must meet a rigorous standard to successfully plead [RICO] claims" misstates the law. Mot. at 15:6–7. Indeed, the Supreme Court has rejected calls for heightened burdens of proof. *See Sedima*, 473 U.S. at 492 ("As for stigma, a civil RICO proceeding leaves no greater stain than do a number of other civil proceedings."). And Nexo points to no authority for its proposition that Rule 9(b) requires that Cress "particulariz[e] the roles of each entity or individual" in the Nexo Enterprise. Mot. at 18:19–20, 19:25–28. Cress alleges that the Nexo Enterprise acts for the common purpose of maximizing profits by fraudulently concealing fees from customers—the corporate affiliates work with Nexo to operate the platform, NDS EOOD supplies personnel who carry out the fraud by interacting with customers, and the Nexo owners direct the scheme's execution. Opp. at 19:4–19 (citing SAC ¶¶ 207–14). Moreover, Cress details specific events that illustrate how the Nexo Enterprise operates: Hristov, who was supplied to Nexo by NDS EOOD, emailed false OTC transaction statements to Cress on at least three separate occasions, and Nexo liquidated Cress's assets on at least two separate occasions where it took undisclosed fees on the transactions. SAC ¶¶ 62–79, 84–93, 212. Collectively, these allegations sufficiently describe the Nexo Enterprise's structure and coordination for a common purpose.

Finally, Nexo argues that "Cress's enterprise allegations boil down to a corporation engaging in its own business and acting through its workers." Mot. at 20:24–21:21. As discussed, Cress alleges that members of the Nexo Enterprise are more than Nexo's workers. As alleged, the Nexo Enterprise is analogous to that in *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.* 431

F.3d 353 (9th Cir. 2005). In *Living Designs*, the Ninth Circuit held that a plausible associated-in-fact enterprise existed where the plaintiff "alleged that the 'person' was DuPont and the 'enterprise' consisted of DuPont, the law firms employed by DuPont, and expert witnesses retained by the law firms." *Id.* at 361. The Ninth Circuit reasoned that "there is no question that law firms retained by DuPont are distinctive entities" and "[t]his is not a situation where the enterprise cannot be either formally or practically separable from the person." *Id.* at 361–62. Similarly, as alleged, the Nexo Enterprise consists of Nexo (a corporation akin to DuPont), NDS EOOD (a separate entity that Nexo contracts with akin to the law firms), and the employees retained by NDS EOOD and supplied to Nexo (akin to the expert witnesses). SAC ¶¶ 207–14. As such, Cress plausibly alleges that the Nexo Enterprise is more than Nexo and its workers. Further, Nexo's argument that Nexo cannot be a distinct entity because Nexo's conduct within the Nexo Enterprise amounts to "operating its cryptocurrency platform" falls flat. Mot. at 21:12–21. Cress does not merely allege that Nexo charged fees and performed liquidations consistent with its "primary business purpose"—he alleges that Nexo worked with the Related Persons to steal money from customers by operating a fraudulent scheme. *Id.* That conduct is not tantamount to primary business activity. Therefore, Cress plausibly alleges the existence of an enterprise at the pleadings stage.

### 3. Pattern Of Racketeering Activity

Nexo argues that Cress fails to plead a valid pattern of racketeering activity because (1) "non-disclosure is not a racketeering activity"; (2) he "fails to plead the predicate acts with specificity"; and (3) he "fails to plead the continuity requirement." Mot. at 21:22–24:9. Cress contends that he meets this element because the SAC alleges a pattern of "repeated, related acts of mail and wire fraud carried out over many years as part of Nexo's regular course of business." Opp. at 20:24–24:5.

Under RICO, a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after [1970] and the last of which occurred within ten years after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Thus, the element has two parts: conduct constituting racketeering activity, and a pattern of qualifying conduct.

32

United States District Court
Northern District of California

"Racketeering activity" includes several indictable offenses listed in the RICO statute, known as predicate acts. *Id.* at § 1961(1); *see Sedima*, 473 U.S. at 495 ("'racketeering activity' consists of no more and no less than commission of a predicate act, § 1961(1)"). Mail and wire fraud are both predicate offenses. 18 U.S.C. § 1961(1); *see id.* at §§ 1341 (Mail Fraud), 1343 (Wire Fraud).

To establish a "pattern" of conduct, the predicate acts must be both "related" and "amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Related acts are "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. . . . Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case." *Id.* at 242.

Here, the Court finds that Cress pleads sufficient facts to plausibly allege that the Nexo Enterprise engaged in a pattern of racketeering activity. First, Nexo argues that "Cress fails to allege wire fraud predicate acts because he identifies no affirmative misrepresentations to him regarding Nexo's OTC and liquidation fees specifically, but instead relies on a non-disclosure theory of liability." Mot. at 22:2–18; Reply at 14:20–15:2. But as discussed, Cress plausibly alleges that Nexo made affirmative misrepresentations regarding its fees. *See supra*, Part IV.B.1.

Second, Nexo argues that Cress fails to comply with Rule 9(b) because he "cannot plead the precise dates of all the Nexo Enterprise's uses of the mail and wire." Mot. at 22 n.8 (quoting SAC ¶¶ 230–31); *see id.* at 22:19–23:17. But Cress is only required to plead two predicate acts. 18 U.S.C. § 1961(5). Cress alleges that the Nexo Enterprise committed acts of mail and wire fraud. SAC ¶ 215. To prove wire fraud, one must show that the defendant "used the wires to execute a 'scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Kousisis v. United States*, 605 U.S. 114, 121

33

(2025) (quoting 18 U.S.C. § 1343). "The prototypical fraudulent-inducement scheme plainly satisfies each of these statutory elements." *Id.* at 123. As discussed, Cress plausibly alleges that Nexo engaged in multiple acts of fraudulent inducement by using false statements to induce Cress to transact with Nexo. *See supra*, Part IV.B.1. Cress further alleges that the Nexo Enterprise concealed its fraud by sending customers fraudulent trade confirmations which omitted any reference to the profits Nexo secretly took. SAC ¶¶ 113–14, 218–21, 242–44. And Cress alleges that the Nexo Enterprise used wires to conduct its scheme when it used emails and the Internet to communicate false statements to customers regarding fees, transmit false trade confirmations, and circulate internal documents that directed how to conceal the fees from customers. Opp. at 21:11–22 (citing SAC ¶¶ 215–34). Therefore, Cress plausibly alleges that the Nexo Enterprise engaged in at least two predicate acts of wire fraud. *See Kousisis*, 605 U.S. at 118 ("Under the fraudulent-inducement theory, a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property[.]").

Nexo further argues that "Cress's alleged wire fraud predicate acts also lack the required specificity" under Rule 9(b) because the "RICO claim improperly groups Nexo and its affiliates without any particularized detail or identification of each entity or individual's role." Mot. at 23:10–17; Reply at 14:19–20. To be sure, alleged predicate acts of wire fraud must meet the particularity requirement of Rule 9(b). *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1530 (9th Cir. 1995). However, at least two of Cress's allegations of wire fraud meet this standard as Cress identifies specific fraudulent communications in the SAC. Opp. at 22:5–7. For example, Cress alleges that on March 27, 2020, Hristov falsely stated to a customer via email that, "Nexo's business model is not generating profits from liquidations"; on March 1, 2021, Hristov sent an email to a customer falsely stating that, "Nexo is not a participant in the trade, we act as a middle man of the deal." SAC ¶¶ 223–24. In addition, Cress alleges that on three specific dates, Hristov emailed Cress transactions statements that stated false asset acquisition prices in order to conceal Nexo's secret profits on the transactions. *Id.* ¶¶ 62–79. In sum, Cress pleads who made the statements, what was said, when and where they were said, and how the statements were misleading—this is all that Rule 9(b) requires. *Vess*, 317 F.3d at 1106. Therefore, Cress alleges at

United States District Court
Northern District of California

least two predicate acts of wire fraud that comply with Rule 9(b).

Finally, Nexo argues that Cress fails to plead continuity. Mot. at 23:18–24:9. Cress counters that he adequately pleads both closed-ended and open-ended continuity. Opp. at 23:13–24:5. Open-ended continuity is "satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *H.J.*, 492 U.S. at 242–43. The Court agrees that Cress satisfies continuity through this avenue. *See* Opp. at 23:20–25. Cress alleges that the Nexo Enterprise engaged in a "systematic scheme to fraudulently charge and conceal substantial fees," told customers that it did not charge fees, produced fraudulent transactional records to conceal the fees, circulated internal documents acknowledging that it lied to customers about fees, and threatens to continue this conduct unless enjoined. SAC ¶¶ 215–220, 232. This is sufficient to establish continuity because it shows that fraudulent conduct was part of the Nexo Enterprise's regular way of conducting business. *See Allwaste*, 65 F.3d at 1529 ("The most logical inference to be drawn, therefore, is that these activities threatened to continue in the future and had become [defendants'] way of doing business."). Nexo argues that Cress cannot show open-ended continuity "in light of Nexo's withdrawal from the U.S. market in 2023." Mot. at 23:25–24:1. This allegation is not present in the SAC; thus, the Court cannot consider it on a motion to dismiss. Therefore, Cress plausibly alleges a pattern of racketeering activity at the pleadings stage.

## F.     RICO Conspiracy Claim (Claim 8)

Cress alleges that Nexo "directed and controlled the affairs of the Nexo Enterprise, was aware of the nature and scope of the Enterprise's unlawful scheme, and they agreed to participate in it." SAC ¶¶ 235–39. Nexo argues that Cress's RICO Conspiracy claim (Claim 8) fails because (1) his substantive RICO claim fails; and (2) he "pleads no non-conclusory allegations of a conspiracy." Mot. at 24:10–25. Cress contends that the allegations in the SAC "plausibly establish assent to a common plan and knowing participation by each conspirator." Opp. at 24:6–13.

Section 1962(d), RICO's "conspiracy" prong, states: "It shall be unlawful for any person

35

to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To establish a violation of section 1962(d), a plaintiff "must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard*, 208 F.3d at 751. Thus, a plaintiff "cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO." *Id.*

Here, the Court concludes that Cress alleges a cognizable RICO conspiracy claim against Nexo. First, because Cress's substantive RICO claim survives, his conspiracy claim does not fail on that account. Second, as discussed, the Court agrees with Cress that he "pleads a coordinated agreement among Nexo, its specific affiliated entities, and senior executives to implement and carry out a uniform scheme to conceal OTC and liquidation fees." Opp. at 24:6–13 (citing SAC ¶¶ 237–38); *see supra*, Part IV.E.2. Therefore, Cress plausibly alleges a RICO conspiracy claim and the pleadings stage.

Accordingly, the Court **DENIES** Nexo's motion to dismiss Cress's RICO Conspiracy Claim (Claim 8).

## G. Fraudulent Omission Claim (Claim 9)

Cress alleges that "Nexo failed to disclose to [Cress] that it would take substantial fees and profits (a) on his OTC transactions and (b) for any liquidation of his assets." SAC ¶¶ 240–49. Nexo argues that Cress's Fraudulent Omission claim (Claim 9) fails because he (1) "does not plausibly allege that Nexo concealed or suppressed any material fact"; (2) does not "establish that Nexo was under a duty to disclose such information to Cress"; and (3) "has not, and cannot, articulate how knowledge of [the liquidation] fees would have changed his actions." Mot. at 28:1–30:4; Reply at 7:19–24.

Under California law, the "required elements for fraudulent concealment are (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would have acted differently if the concealed or suppressed fact was known; and (5) plaintiff sustained damage as a result of the concealment or

36

suppression of the material fact." *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40 (2024).

Here, the Court concludes that Cress alleges a cognizable fraudulent omission claim against Nexo. Accordingly, the Court **DENIES** Nexo's motion to dismiss Cress's Fraudulent Omission Claim (Claim 9).

### 1. Concealment

Nexo argues that Cress does not establish the concealment element because the advertisements Cress references "all relate to non-OTC transactions or services." Mot. at 28:16–25. Cress contends that "Nexo makes no argument that Cress failed to allege a pure omission." Opp. at 13:61–1.

"Concealment is a species of fraud or deceit." *Stofer v. Shapell Indus., Inc.*, 233 Cal. App. 4th 176, 186 (2015). Whether a defendant concealed or suppressed a material fact is a question of fact. *Id.* at 188.

Here, the Court finds that Cress pleads sufficient facts to plausibly allege that Nexo concealed or suppressed a material fact. Nexo's argument focuses on whether Cress alleges an affirmative misrepresentation. Mot. at 28:16–25; *see* Reply at 7:27–8:3 ("Nexo never made a false representation to Cress about fees on OTC cryptocurrency purchases or forced liquidations."). But as Cress points out, Nexo does not dispute that Cress alleges a pure omission. Opp. at 13:61–1. Cress alleges that Nexo had exclusive knowledge of its fees for OTC transactions and liquidations and that Nexo actively concealed these fees from Cress "by sending him fraudulent trade confirmations which omitted any reference to the profits Nexo took at [Cress's] expense." SAC ¶¶ 113–14, 242–44. This is sufficient to allege concealment at the pleadings stage.

### 2. Duty To Disclose

Nexo argues that Cress does not establish the duty to disclose element because (1) Nexo was not under an obligation to correct statements because it "never made any direct representations to Cress that there were no fees on his specific OTC transactions or liquidations"; (2) Nexo was not Cress's fiduciary; and (3) there is no "other basis to impose a duty to disclose on Nexo." Mot. at 28:26–30:4. Cress contends that he adequately pleads "four independent bases for a duty to disclose." Opp. at 12:22–13:18.

United States District Court
Northern District of California

"A duty to disclose a material fact can arise if (1) it is imposed by statute; (2) the defendant is acting as plaintiff's fiduciary or is in some other confidential relationship with plaintiff that imposes a disclosure duty under the circumstances; (3) the material facts are known or accessible only to defendant, and defendant knows those facts are not known or reasonably discoverable by plaintiff (i.e., exclusive knowledge); (4) the defendant makes representations but fails to disclose other facts that materially qualify the facts disclosed or render the disclosure misleading (i.e., partial concealment); or (5) defendant actively conceals discovery of material fact from plaintiff (i.e., active concealment)." *Rattagan*, 17 Cal. 5th at 40. "All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances. Such a transaction must necessarily arise from direct dealings between the plaintiff and the defendant; it cannot arise between the defendant and the public at large." *Id.* at 41 (cleaned up).

Here, the Court finds that Cress pleads sufficient facts to plausibly allege that Nexo had a duty to disclose. Cress asserts that Nexo had a duty to disclose because it actively concealed its fees from Cress. Opp. at 13:6–11. The Court agrees—"active concealment" is indeed a basis for a duty to disclose. *Rattagan*, 17 Cal. 5th at 40. As discussed, Cress alleges that Nexo actively concealed its fees from Cress "by sending him fraudulent trade confirmations which omitted any reference to the profits Nexo took at [Cress's] expense." SAC ¶¶ 113–14, 242–44. Thus, even if true, Nexo's argument that it "was under no obligation to disclose its OTC fees in advance of the transactions" falls flat. Mot. at 30:2–4. Cress alleges that for several transactions, he received emails from Nexo *after* the transactions that incorrectly reflected the price at which Nexo acquired assets because Nexo secretly took profits on these transactions, as depicted by internal Nexo emails. SAC ¶¶ 62–83. Cress further alleges that Nexo never disclosed liquidation fees to Cress and distributed internal documents that instructed, "We should never, under any circumstances mention there is a liquidation tax." *Id.* ¶¶ 84–93 (emphasis omitted). Contrary to Nexo's assertion, this is sufficient to allege that Nexo actively concealed its OTC and liquidation fees from Cress. *See* Reply at 8:9–11 ("The SAC has a passing reference to alternative theories of agency, but both the SAC and Cress's opposition make it clear that the only well-plead basis for

38

Cress's claim is fiduciary duty."). Therefore, Cress sufficiently alleges that Nexo had a duty to disclose its fees/profits on Cress's OTC transactions and liquidations.

### 3. Reliance

Nexo argues that Cress does not allege how knowledge of the liquidation fees "would have changed his actions." Mot. at 28:14–15. Cress contends that he adequately alleges that he would have acted differently had he been aware of the liquidation fees. Opp. at 13:19–14:4.

For a fraudulent omission claim, "it is not logically impossible to prove reliance on an omission." *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993). However, "[o]ne need only prove that, had the omitted information been disclosed one would have been aware of it and behaved differently." *Id.*

Here, the Court finds that Cress pleads sufficient facts to plausibly allege reliance regarding the liquidation fees. Cress alleges that he would not have used Nexo's services had he known about Nexo's "secret profits and fees" because, *inter alia*, the liquidation fees left Cress's "account more susceptible to further liquidations." SAC ¶¶ 87, 240–44. As such, contrary to Nexo's assertion, Cress *does* explain how knowledge of the liquidation fees would have changed his actions. Mot. at 28:14–15. Moreover, Cress's allegation that Nexo's internal documents state that customers should never be made aware of the "liquidation tax" creates a reasonable inference that Nexo concealed its fees because customers would change their behavior if they knew about the fees. Opp. at 14:2–4 (citing SAC ¶ 92). Therefore, Cress sufficiently alleges reliance regarding the liquidation fees.

### H. Breach of Cryptocurrency Purchase Agreement Claim (Claim 10)

Cress alleges that Nexo breached the Cryptocurrency Purchase Agreement ("CPA") by (1) "failing to timely execute [Cress's] cryptocurrency purchase orders as required"; "charging [Cress] undisclosed fees in the execution of cryptocurrency purchases"; and (3) "liquidating the digital assets it sold to Cress despite its promise to deliver them free from 'any and all Liens.'" SAC ¶¶ 250–64. Cress further alleges that Nexo "breached the implied covenant of good faith and fair dealing inherent in the CPA." *Id.* Nexo argues that Cress's Breach of CPA claim (Claim 10) fails because he "fails to allege any specific terms of the CPA that Nexo has breached." Mot. at

39

30:5–27. Cress contends that the claim "is based on concrete contractual provisions and duties." Opp. at 24:14–25:25.

To prevail on a breach of contract claim under California law, a plaintiff must prove "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). "Implicit in the element of damage is that the defendant's breach *caused* the plaintiff's damage." *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1352 (2009) (emphasis in original). Whether a party breached a contract is a question of fact. *Locke v. Warner Bros.*, 57 Cal. App. 4th 354, 365 (1997).

Under California law, "[t]he covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*" *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000) (emphasis in original). "Just what conduct will meet this criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990). "[A] breach of the covenant of good faith and fair dealing is prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act." *A.L. v. Pleasanton Unified Sch. Dist.*, No. 22-cv-03036-CRB, 2023 WL 5209718, at *3 (N.D. Cal. Aug. 14, 2023) (cleaned up). Whether the covenant has been breached is a question of fact. *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 509 (2001).

To prevail on an implied covenant claim, a plaintiff must show: "(1) the plaintiff and the defendant entered into a contract; (2) the plaintiff did all or substantially all of the things that the contract required him to do or that he was excused from having to do; (3) all conditions required for the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the defendant's conduct harmed the plaintiff." *Chou v. Charles Schwab & Co.*, No. 21-cv-06189-LB, 2022 WL 1127384, at *6 (N.D. Cal. Mar. 22, 2022).

Here, the Court concludes that Cress alleges a cognizable breach of CPA claim against

Nexo. First, Nexo does not challenge Cress's claim to the extent that it is based on Nexo's promise to liquidate his assets free from liens. SAC ¶ 260; *see* Mot. at 30:5–27; Opp. at 25:2–25. Therefore, dismissal of the claim is not warranted to the extent it is predicated on this allegation.

Second, Nexo argues that "[n]othing in the CPA guarantees execution of such manual purchase orders in a specific amount of time, or at a specific price, and without fees or profit." Mot. at 30:6–15; Reply at 15:3–7. This is incorrect—Cress alleges that under the CPA, Nexo had ten minutes to confirm the order. Opp. at 24:21–25:1 (citing SAC ¶ 57). Nexo next argues that Cress "does not plead any specifics about the confirmations of his OTC transactions." Mot. at 30:6–15. This is also incorrect—Cress alleges that his OTC orders were not executed or confirmed until days after he placed them. Opp. at 24:21–25:1 (citing SAC ¶¶ 57–79). Therefore, Cress plausibly alleges a breach of the CPA claim based on Nexo's failure to execute his purchase orders within ten minutes.

Finally, Nexo argues that "[n]othing in the CPA prevents Nexo from charging fees on its OTC transactions." Mot. at 30:16–27; Reply at 15:8–13. Cress contends that by secretly charging fees, Nexo breached the implied covenant of good faith and fair dealing by violating "the spirit and reasonable expectations of the contract." Opp. at 25:2–21. Nexo responds that to invoke the implied covenant, Cress must identify an express provision of the CPA that precludes Nexo from charging OTC fees. Reply at 15:8–13. However, as Cress points out, a "breach of a specific provision of the contract is not necessary to a claim for breach of the implied covenant of good faith and fair dealing." Opp. at 25:8–10 (quoting *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (cleaned up)). Cress alleges that Nexo's secret OTC fees interfered with his right to receive the benefit of obtaining purchased assets at the price set in the purchase order, as promised under the CPA. *Id.* at 25:2–7 (citing SAC ¶¶ 59–61). Under Cress's theory, in charging more than the purchase price, Nexo frustrated Cress's right to obtain the assets at the prevailing market price. *Id.* at 25:8–21 (citing SAC ¶¶ 258–59). Therefore, Cress plausibly alleges a breach of the implied covenant claim based on Nexo's charging undisclosed fees on OTC transactions. *See Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 396 (2001) ("overcharging violated the covenant of good faith and fair dealing implied in the sales

41

agreement").

Accordingly, the Court **DENIES** Nexo's motion to dismiss Cress's Breach of CPA Claim (Claim 10).

**V. CONCLUSION**

For the reasons stated above, the Court **DENIES** Nexo's Motion to Dismiss.

**IT IS SO ORDERED.**

Dated: February 4, 2026

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California

42