# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

BRETT  MESSIEH AND DREW LEE, INDIVIDUALLY AND          :
ON BEHA;F OF ALL OTHERS SIMILARLY SITUATED,            :
                                                       :
                                    **Plaintiffs,**    :          **20-cv-3232 (ALC)**
                                                       :
              -against-                                :          <u>**ORDER AND**</u>
                                                       :          <u>**OPINION DENYING**</u>
                                                       :          <u>**MOTION TO**</u>
**HDR GLOBAL TRADING LIMITED,** ET AL.                 :          <u>**DISMISS**</u>
                                                       :
                                                       :
                                    **Defendants.**    x

-------------------------------------------------------------------

**ANDREW L. CARTER, JR., District Judge:**

Plaintiffs bring claims for Deceptive Device and Fraudulent Course of Business under 7 U.S.C.

§§ 9(1), 25(a)(1)(B), (C)(iv), and Rule 180.1; Manipulative Device and Contrivance under

7 U.S.C. §§ 9(1), 25(a)(1)(D)(i) and Rule 180.1; Price Manipulation under 7 U.S.C. §§ 9(3),

25(a)(1)(D)(ii); Principal-Agent Liability under 7 U.S.C. § 2(a)(1)(B) (Against HDR, Shine,

ABS, ADR Services, and 100x); Aiding and Abetting under 7 U.S.C. § 13c(a)(Against the

Individual Defendants).

All of these claims relate to cryptocurrency traded on the BitMEX platform, trades Plaintiffs

characterize as swaps, labeled as futures by Defendants, illustrating the complexities involved in

attempting to shoehorn new investment vehicles into rubrics employed with traditional securities

or commodities.  Plaintiffs claim that since the trades constitute swaps, section 2(i) of the CEA

means that the limits on extraterritoriality under Section 22 of the CEA don't apply. This

argument fails.  However, Plaintiffs have sufficiently alleged a domestic transaction, overcoming

1

the hurdle of extraterritoriality, and, contrary to Defendant's assertions, have also sufficiently pleaded their claims, which are timely. The motion to dismiss is DENIED.

## PROCEDURAL HISTORY

The original complaint was filed on April 23, 2020. It was amended on February 12, 2021. Plaintiffs filed a Second Amended Complaint on March 21, 2023; Defendants moved to dismiss under Rule 12(b)(6) on May 2; Plaintiffs filed an opposition on June 13; Defendants filed a reply on June 30. On March 8, the Second Circuit issued an opinion in *Williams v. Binance*, No. 22-972, 2024 U.S. App. LEXIS 5616 (2d. Cir. March 8, 2024), providing clarity regarding many of the issues raised by Defendants in their motion to dismiss. That day, I ordered the parties to file letters regarding how, if at all, that decision affected the issues here. Both parties filed letters on March 15. The case is fully briefed.

## FACTUAL BACKGROUND

The facts are taken from the SAC, and for purposes of this motion, presumed to be true. Plaintiffs bring suit on behalf of a putative class of investors who purchased Bitcoin and Ehtereum products from BitMEX's exchange since February 28, 2016. SAC ℙ 1.

Defendant HDR Global Trading Limited ("HDR") launched in 2014; its name is an acronym of the last names of Defendants Hayes, Delo, and Reed. HDR is the owner of the trading platform called BitMEX and operated BitMEX out of an office in Manhattan. SAC ℙ18. HDR is incorporated in the Seychelles, with its principal office located in Providence Mahé,Seychelles. *Id*.

2

Defendant ABS Global Trading Limited ("ABS") is a Delaware corporation created in 2017 and wholly owned by HDR; its name derives from the first names of its founders, Defendants Arthur Hayes, Ben Delo, and Sam Reed. According to public records, it is headquartered in Hong Kong. It is registered to do business in New York.

ABS is responsible for technical aspects of the BitMEX platform, including security services and implementing the user interface traders use to buy and sell products. SAC ⁋ 19.

Defendant 100x Holdings Limited ("100x") is a holding company incorporated by Hayes, Delo, and Reed in Bermuda. In July 2020, on the BitMEX website, Hayes "introduc[ed]" 100x, announcing that "100x will become the new holding structure for HDR Global Trading and all our other assets, including the BitMEX platform." SAC ⁋ 18-22.

BitMEX is a large crypto-asset exchange, conceived to serve Wall Street institutional investors.  But since for the first 6 months, no one came to the platform, BitMEX switched its focus to retail traders, offering 100X leverage trades, 20 times higher than the common ratio in trading. SAC ⁋ 2, 5-6.  BitMEX automatically liquidates customer's contracts when their values fall at or below a level specified by BitMex.  When BitMEX liquidates a contract, BitMEX seizes all of the investor's remaining collateral for the contract. SAC ⁋ 6-7. BitMEX routinely profits from these liquidations, placing these profits in an Insurance Fund. BitMEX may withdraw the money in the Insurance Fund for any reason it chooses, at any time. SAC ⁋6- 7.

"BitMEX manipulated its systems and the market to benefit themselves at the expense of their customers." *Id.* "BitMEX had an Insider Trading Desk, staffed by at least three employees with God Access to customer accounts.  Plaintiffs claim that BitMEX lied to customers, inducing

3

them to believe that certain information was private, but BitMEX used this information, allowing BitMEX to determine which market movements would liquidate the highest number of customers, subsequently making strategic trades to produce those movements." SAC ¶ 3.

"BitMEX hid the Insider Trading Desk from customers until April 30, 2018, under pressure from an independent analyst. After revealing the existence of this desk, BitMex's general counsel and outside counsel resigned. BitMEX claimed that it would serve a neutral market-making role, but continued to trade secretly against its customers, using burner accounts." SAC ¶ 4.

In addition, BitMEX frequently blocked customers from trading in their accounts, blaming it on technical glitches and limitations. "But insider trading accounts created by the Insider Trading Desk were immune from lockouts that plagued regular customers, giving BitMex a trading advantage it used against its customers." SAC ¶ 11.

Furthermore, BitMex manipulated prices of referenced assets on other exchanges, causing manipulation of its own derivatives, by strategically timing trades when those exchanges were vulnerable to manipulation. SAC ¶ 12.

BitMex's workforce was located in the U.S., and it solicited purchases from U.S. customers. SAC ¶ 62. BitMEX knew that 20-30 percent of its users were based in the U.S. SAC ¶ 61.[1]

Since its inception, BitMEX has flouted financial regulators worldwide by operating as an unregistered exchange. SAC ¶ 58.

---

[1] Although in 2017, BitMex purported to prevent U.S. customers from accessing its service, BitMex knew that U.S. customers were using anonymous emails and passwords, and VPN networks to circumvent BitMex;s system that prevented new accounts made using a U.S. IP address. SAC ¶ 61-63.

## LEGAL STANDARDS

When resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citations omitted). Thus, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

Additionally, "[a]lthough the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015).

## DISCUSSION

### 1. Plaintiffs Have Pleaded a Domestic Transaction.

Since section 22 of the CEA, the section awarding a plaintiff a private right of action, does not apply in an extraterritorial fashion, a private litigant must satisfy Section 22's domestic

5

requirements, by alleging a domestic transaction. *Loginovskaya*, 764 F. 3d 266, 272-274 (2d. Cir. 2014).

In order to sufficiently allege the existence of a domestic transaction, plaintiffs must allege facts indicating that title was transferred, or irrevocable liability was incurred, in the United States. Id.

A domestic transaction occurs if title was transferred in the United States or if irrevocable liability was incurred in the United States. *Binance* at 21-24. Plaintiffs do not claim that title was transferred in the United States, so the question is whether irrevocable liability was incurred in the United States.

The *Binance* court noted that irrevocable liability is not something that must happen only once; it may occur in more than one transactional step and in multiple locations. *Binance* at 13. ("We have recognized, however, that irrevocable liability may attach in "more than one location," *Fed. Hous. Fin. Agency*, 873 F.3d at 156, and at more than one time, see *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 68 (2d Cir. 2018), because there is always more than one side to any given transaction.")

*Binance* involved a defendant disclaiming any physical location. In Binance, the exchange itself was the defendant. That is not the case here, but *Binance* is instructive. Like Binance, BitMex is not a foreign-registered exchange, it is not registered anywhere.

At the pleading stage, irrevocable liability has been plausibly pleaded when the securities (or commodities) were matched in the United States, or if Terms of Use were entered into in the

6

United States, or if customers residing in the United States placed purchase orders from the United States. *Binance* 21-24.

Here Plaintiffs have alleged that U.S. customers not only entered into Terms of Use Agreements from within the United States, but also purchased the tokens from the United States. Moreover, Plaintiffs allege that the Insider Trading Desk, the desk that caused liquidations of Plaintiffs' holdings, operated from Manhattan.[2]

Therefore, the plaintiffs have plausibly alleged, at this stage of the litigation, that one of the steps where irrevocable liability was incurred happened in the U.S.[3]

> 2) Plaintiff Lee's Claims Are Not Time Barred.

A claim under the CEA must be brought "not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). A claim accrues when the plaintiff discovers his or her "CEA injury." *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 109 (2d Cir. 2019); accord *In re Merrill*, 2021 WL 827190, at *6. "A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Levy*, 917 F.3d at 109 (citation omitted). Although a plaintiff doesn't need to know that every element of a claim has been satisfied, the plaintiff must know

---

[2] In addition, although the SAC doesn't specifically mention the location of servers, since BitMEX operates–at least in part– from the U.S. and many employees resided in the U.S., it is possible that the securities were matched on servers in the U.S.

[3] Although pleading a domestic transaction is necessary, it is not sufficient. Plaintiffs must also allege domestic conduct related to a violation of a substantive provision of the CEA. *Prime Int'l Trading Ltd. v. BP P.L.C.*, 937 F. 3d 94, 105 (2d Cir. 2019). Here, the same conduct alleged by Plaintiffs that satisfies a domestic transaction supports a finding that the alleged substantive violations of the CEA are domestic, not extraterritorial. If CEA § 2(i) applies to private actions–it may not– and modifies substantive provisions of the CEA applying to swaps, Plaintiffs easily establish that the "conduct had a direct and significant connection to, and effect on U.S. commerce." CEA § 2(i).

that she has been defrauded. "A plaintiff has discovered an injury under the CEA when 'circumstances would have suggested to a person of ordinary intelligence the probability that he had been defrauded.'" *Levy* 2017 WL 2533501 at *5 (S.D.N.Y. June 9, 2017) (citation omitted).

Since Lee did not know he was defrauded when he suffered his earlier losses, blaming them initially on natural market forces, Lee's earlier liquidations are timely because he lacked actual or constructive notice that he had been defrauded until less than two years before he filed suit.

> 3)      Plaintiffs Adequately Pleaded A Deceptive or Manipulative Device.

Defendants claim that Plaintiffs have failed to plead material misstatements or omissions with sufficient particularity. This argument fails.

In this Circuit "a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI*, 493 F.3d at 102. For a deceptive device claim based on fraudulent omissions within the meaning of CFTC Rule 180.1(a)(2) and (3) the SAC must allege a material omission of fact. *Lentell v. Merrill Lynch & Co.* 396 F.3d 161, 177 (2d Cir. 2005); *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1056–57 (N.D. Ill. 2016).

Plaintiffs sufficiently plead several affirmative misstatements and omissions. Here are a few affirmative misrepresentations pleaded by plaintiffs:

> Falsely assuring customers that certain trading information could be "hidden" when traders "don't want to inform the market of their trading intentions," and further that it does not give "preferential treatment" to any "customers," when.

8

in fact, BitMEX gave the Insider Trader desk access to the purportedly hidden information. SAC ¶¶ 10, 77–78, 118–20, 209.

Falsely placing blame for BitMEX's manipulative server lockouts on exogenous technical causes, including by claiming that BitMEX used commercially reasonable efforts to prevent customer lockouts on the BitMEX hardware issue with our cloud service provider," and that another lockout was caused by "two DDOS attacks." Id. ¶¶ 157, 204- 208.

Defendants used these misrepresentations to "induce[] current and potential BitMEX customers to use the platform and thereby generate further fees for BitMEX, winning trades for BitMEX, and liquidations of trading positions, in a repeating cycle of ill-gotten gains for Defendants and harm to Plaintiffs and the Class." Id. ¶¶ 208–209.

Throughout the SAC, Plaintiffs sufficiently described the roles of each of the Defendants. Although these allegations must be pleaded with particularity, there is no requirement that they be pleaded with subatomic specificity, particularly prior to discovery.

Plaintiffs have also adequately alleged omissions, including the following:

Failure to disclose that BitMEX insiders had "God Access"

Failure to disclose the Insider Trading Desk.

Failure to disclose that BitMEX manipulated the prices of Bitcoin and Ethereum on U.S.-based third-party reference exchanges

9

Failure to disclose that it intended to use customer lockouts during large market moves in order to increase liquidations.

Defendants' undisclosed "God Access" to customer information made their disclosures materially misleading because customers reasonably understood that "Hidden Orders" would be hidden from other market participants, rather than from other market participants except BitMEX, which would take advantage of that information to profit at its customers' expense.

BitMEX's omission regarding the Insider Trading Desk misled customers into believing that BitMEX was not operating against their interests. Even after BitMEX disclosed the existence of the Insider Trading Desk on April 30, 2018, BitMEX omitted that the desk "enjoys information and technical advantages over BitMEX customers," SAC ¶ 207. such as the ability to "trade against BitMEX customers during the lockouts," SAC ¶ 208.

BitMEX's failure to disclose that it manipulated the prices of Bitcoin and Ethereum on the U.S.-based third-party reference exchanges, tricked customers into believing that BitMEX was not actually working against them by making its own trades profitable and forcing customer liquidations. SAC ¶¶ 207.

Plaintiffs allege that BitMEX never disclosed that it intended to use customer lockouts during large market moves in order to increase liquidations, including through its Insider Trading Desk, and that these lockouts were avoidable. SAC¶¶ 100–13, 149–58, 208. Defendants "failed to disclose the frequency of system overloads, their relationship to volatility, their selective effect on only certain kinds of transactions, or the likelihood that they would harm customers to BitMEX's benefit." SAC¶ 110.

4) Defendants' Other Arguments Are Without Merit.

Defendants also claim that plaintiffs fail to adequately plead actual damages, a claim for CEA

price manipulation, principal-agent or aiding and abetting liability. These arguments and the

Defendants' remaining arguments are without merit.

CONCLUSION

Defendants' motion is DENIED.

**SO ORDERED.**

**Dated: April 3, 2024**
**New York, New York**

   **/s/ Andrew L. Carter, Jr.**
**ANDREW L. CARTER, JR.**
**United States District Judge**

11