# EXHIBIT 4



Neutral Citation Number: [2023] EWHC 1646 (Comm)

Case No: CL-2020-000392

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**KING'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane,
London, EC4A 1NL

Date: 03/07/2023

**Before** :

**THE HONOURABLE MR JUSTICE HENSHAW**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **NEXO CAPITAL INC** | **Claimant** |
| - and - | |
| **GEORGI SHULEV** | **Defendant** |
| - and - | |
| **KOSTA KANTCHEV**<br>**ANTONI TRENCHEV** | **Part 20 Defendants** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**David Quest KC** (instructed by **Eversheds Sutherland (International) LLP**) for the
**Claimant**
**Rumen Cholakov** (instructed by **Squire Patton Boggs (UK) LLP**) for the
**Defendant**
The Part 20 Defendants did not appear and were not represented.
Hearing dates: 3 and 4 April 2023
Draft judgment circulated to the parties: 27 June 2023

# Approved Judgment
- - - - - - - - - - - - - - - - - - - -

**Mr Justice Henshaw:**

(A) INTRODUCTION ........................................................................................................ 3

(B) BACKGROUND ......................................................................................................... 4

    (1) The parties ........................................................................................................ 4

    (2) Mr Shulev's departure from Nexo and ensuing negotiations ............................ 4

    (3) Progress of the Bitmex Account dispute .......................................................... 6

    (4) The Settlement Agreement ............................................................................... 7

    (5) Post Settlement Agreement events on 1 July 2021 .......................................... 12

    (6) Resumed hearing on 2 July 2021 ..................................................................... 15

    (7) Events between the July 2021 hearing and the April 2022 hearing .................. 17

    (8) The April 2022 hearing and the July 2022 Judgment ...................................... 20

    (9) Mr Shulev's Defence and Counterclaim .......................................................... 25

    (10) Further evidence leading up to the April 2023 hearing .................................. 28

(C) PRINCIPLES ............................................................................................................. 35

    (1) Summary judgment and striking out ................................................................ 35

    (2) Issue estoppel .................................................................................................. 37

    (3) Affirmation ...................................................................................................... 39

(D) BITMEX ACCOUNT: NEXO'S DAMAGES CLAIM ........................................... 40

    (1) Nexo's claim .................................................................................................... 40

    (2) Clause 4 of the Settlement Agreement ............................................................. 40

    (3) Proposed claims to rescind the Settlement Agreement ..................................... 41

        (a) Duress ......................................................................................................... 42
        (b) Misrepresentation ....................................................................................... 43

    (4) Proposed claim for the tort of intimidation ...................................................... 55

    (5) Contemplated application to set aside the July 2022 Judgment ....................... 56

    (6) Alleged reliance on Mr Hofmeyr QC's observations ....................................... 58

    (7) Quantum of Bitmex Account claim under Settlement Agreement .................... 59

(E) NEXO'S CLAIMS TO THE 9 ASSETS .................................................................... 66

(F) MR SHULEV'S COUNTERCLAIMS AGAISNT NEXO ........................................ 70

    (1) Claims relating to Founder Tokens ................................................................... 70

    (2) Alleged unlawful means conspiracy ................................................................. 71

(G) CONCLUSION .......................................................................................................... 72

## (A) INTRODUCTION

1.      The Claimant *("Nexo")* applies for summary judgment against the Defendant, *("Mr Shulev")* and/or to strike out all or part of his Defence and Counterclaim insofar as it relates to Nexo.

2.      Nexo is a Cayman Islands company incorporated in February 2018.  It is part of the Nexo group of legal entities which operate the cryptocurrency-backed lending platform "*nexo.io*", cryptocurrency exchange and wallets.

3.      Mr Shulev was co-founder of the Nexo group, a former Managing Partner of Nexo and claims to be one of its beneficial owners.  He ceased to be a director in September 2019, when Nexo's board resolved to terminate his appointment.

4.      Various disputes arose between Nexo and Mr Shulev, one of which concerned entitlement to an account ("*the Bitmex Account*"), containing bitcoin, opened in Mr Shulev's name on the cryptocurrency derivatives exchange and trading platform operated by HDR Global Trading Limited ("*HDR*").  HDR was the original claimant in this action, which it commenced as stakeholder proceedings in order to resolve Mr Shulev's and Nexo's competing claims to the Bitmex Account and its contents.

5.      On the first day of the substantive hearing before Mr Stephen Hofmeyr QC (sitting as a Deputy High Court Judge) in the stakeholder proceedings, Nexo, Mr Shulev and certain related parties made a settlement agreement dated 1 July 2021 ("*the Settlement Agreement*") in order to resolve the dispute over the Bitmex Account and certain other disputes.

6.      However, disputes almost immediately arose about the interpretation of, and compliance with, the Settlement Agreement.  Mr Hofmeyr QC directed that those matters be addressed at a further hearing, which ultimately came before me in April 2022, leading to a judgment handed down (following certain further submissions from Mr Shulev) on 1 July 2022 ("*the July 2022 Judgment*").  I determined certain matters, as set out in more detail below.  I directed that statements of case be served with regard to outstanding matters, and that the action proceed as a Part 7 claim with Nexo as the claimant and Mr Shulev as the defendant.

7.      Statements of case were served, and Mr Shulev sought permission from the Court of Appeal to appeal from the July 2022 Judgment (later refused on 27 January 2023).  Nexo on 4 October 2022 issued the present application, seeking summary judgment on its claims, the striking out of Mr Shulev's Defence and summary judgment in Nexo's favour on Mr Shulev's Counterclaim.  Nexo alleges that Mr Shulev failed to comply with his obligations under the Settlement Agreement by not taking, on a timely basis, specified steps in relation to the Bitmex Account, and by failing to transfer certain other cryptoassets ("*the Nine Assets*") to Nexo.  Nexo also argues that the claims made against it in Mr Shulev's Counterclaim are inconsistent with the Settlement Agreement and/or otherwise have no realistic prospect of success.

8.      Between January and March 2023 certain events in Bulgaria, where Nexo is based, led to the production of a fifth witness statement from Mr Shulev dated 2 April 2023.  I decided to admit that statement in evidence on the first day of the hearing before me on

3

3-4 April 2023, for the reasons set out in a separate ruling given on 3 April 2023. Nexo nonetheless elected to continue with its applications.

9. Mr Shulev submits, in outline, that summary judgment and/or strike-out should not be granted because he has a realistic prospect of succeeding on arguments which include claimed rights to rescind the Settlement Agreement for duress or misrepresentation, a claim for the tort of intimidation, a proposed application to set aside the July 2022 Judgment in light of the new evidence, and triable issues arising from the new evidence about who had and has control of the Nine Assets.

10. For the reasons set out below, and after careful reflection, I have concluded that I should not accede to Nexo's applications. At least some parts of Mr Shulev's proposed case have a realistic prospect of success, such that summary judgment or strike-out would not be appropriate on those matters. Further, the dispute (viewed as a whole) involves interlocking agreements, facts and issues, whose relationship and implications remain fully to be explored. Although not without hesitation, I have come to the view that the case as a whole must proceed to trial.

## (B) BACKGROUND

### (1) The parties

11. Nexo is in the business of trading cryptoassets and lending against them. Mr Shulev was a director and senior employee of Nexo until he was removed from those positions by the board in September 2019.

12. Nexo holds and operates cryptocurrency trading accounts with several other exchanges apart from Bitmex, including Kraken, Binance and Huobi. On Nexo's case, some of those accounts were opened in the name of Nexo itself and some in the names of individual employees, including Mr Shulev, but they were and are all treated by Nexo and its employees as corporate accounts and used to hold and trade corporate assets.

### (2) Mr Shulev's departure from Nexo and ensuing negotiations

13. On 13 September 2019, Nexo's board resolved to terminate Mr Shulev's appointment as a director; and access to his corporate email was immediately withdrawn, as well as access to the Bitmex Account. On 14 September 2019, Mr Shulev made an unsuccessful attempt to access the Bitmex Account from his home IP address. On 15 September 2019, Mr Shulev contacted HDR asking to change his email address recorded with them "*as I am no longer the owner of georgi@nexo.io and I believe that the funds from my account could be stolen*". At about the same time, Nexo contacted HDR warning it that Mr Shulev might attempt to "*siphon away funds*". In response, HDR froze the Bitmex Account and, in due course, commenced the present action as a stakeholder claim under CPR Part 8 and Part 86.

14. There were negotiations between the parties from late 2019 to early 2021, the subject-matter of which included the Bitmex Account. Mr Shulev asserted that the Bitmex Account, which he had opened in his own name while a director of Nexo, was a personal account rather than a Nexo corporate account. He said the credit balance (about 880 bitcoin), or some of it, belonged to him. Nexo maintained that it was a corporate account which belonged to Nexo. In addition, Mr Shulev asserted a right as a founder of Nexo

to receive cryptoasset tokens issued by Nexo, and a right to beneficial ownership of Nexo Inc, the Nexo group holding company.

15. The question of whether Mr Shulev also retained control of certain other cryptoassets belonging to Nexo also entered into the negotiations, though there remains controversy about the timing and nature of this element of the discussions. I outline this controversy here only because it has an indirect bearing on the significance of Mr Shulev's late evidence about the discovery of the Hardware Ledger device to which I refer later and what, if any, light that evidence sheds on the question of control of the Nine Assets.

16. As noted in § 48 of the July 2022 Judgment, a draft of the Settlement Agreement bearing the date February 2020 referred to a list of "*Assets*" including various digital assets wallets and their contents. Recital E to the draft stated that *"[s]ince September 13, 2019 Georgi Dimitrov Shulev has not returned to Nexo the documentation and assets of the latter, which are still in his possession, including but not limited to ... Cash and digital assets, as well as digital assets wallets, including but not limited to*" specified wallets and their contents, along with "*Accounts with financial institutions, and assets therein*", and a long list of non-crypto assets such as computers, software, marketing information, office equipment and credit/debit cards. The specified digital wallets/assets included:

    i)    a Binance Chain Wallet ending "q39" "*and all cryptoassets therein*";

    ii)   a Stellar Chain Wallet ending "YWO" "*and all cryptoassets therein*"

    iii)  an ETH Wallet ending "CEb" "*and all cryptoassets therein*"; and

    iv)   a BTC Wallet ending "6eo" "*and all cryptoassets therein*".

    All of these were included within the definition of "*Assets*".

17. The ETH Wallet with address ending Ceb contained the 45,232,012 Nexo tokens that were transferred to Nexo on 1 July 2021, as I mention later, as well as at least four of the Nine Assets: namely, 895 BNB, 26,068 USDC, 1,057 Tether and 4.54076 Ethereum.

18. Mr Shulev said in his fourth witness statement (dated 3 February 2023) that the February 2020 draft Settlement Agreement was the first time anything relating to the Nine Assets was mentioned. According to his second witness statement (dated 26 July 2021) "*Mr Trenchev [Nexo's Managing Director] kept on adding not a list of Assets, but of digital addresses, bank account details and physical addresses under Clause 3, which did not make sense ... To me, this seemed like a misleading trap and I have shared this concern of mine multiple times with Mr Trenchev over direct meetings, phone conversations and emails*." Mr Shulev said, in that witness statement and in his submissions before me in April 2022, that the assets he had actually envisaged handing over were various types of confidential and price-sensitive information (see §§ 47, 49 and 50 of the July 2022 Judgment).

19. Mr Trenchev stated, in his fifth witness statement (dated 4 October 2021), that he had been involved in settlement discussions with Mr Shulev since late 2019, and as part of

those discussions assisted in drafting a settlement agreement.   As to the February 2020 draft settlement agreement, Mr Trenchev stated:

> "In this draft settlement agreement, at paragraph E of the recitals, we specifically listed out the Binance Chain Wallet, the Stellar Chain Wallet, the ETH Wallet and the BTC Wallet that Mr Shulev was to return to Nexo as part of the settlement terms. Although the February Agreement was never signed, Mr Shulev was aware that Nexo wanted these wallets to be returned to Nexo. Mr Shulev retains access to two other wallets and the corresponding balances, the XRP Chain Wallet and the Additional BTC Wallet."

20.    Different definitions of "*Assets*" were included in subsequent drafts of the Settlement Agreement, in June 2021, which did not refer specifically to the particular assets mentioned above.   For example, a draft dated 30 June 2021 (two days before the Settlement Agreement) defined *"Assets"* thus:

> "Assets - wallets, accounts, accounts' credentials, seed phrases, private keys, documents, materials, files, any form of communication, including emails;
>
> USDT - (USD Tether) - ERC20 USDT tokens issued by Tether Limited (tether.to/) representing 1:1 value of the US dollar and available on the Ethereum blockchain network, Ethereum Contract:  …ec7 https://etherscan.io/token/0 ... ec7
>
> NEXO Token - the official ERC20 NEXO token issued by Nexo Capital Inc (nexo.io) and available on the Ethereum blockchain network;   Ethereum   Contract:   ...   206 https://etherscan.io/token/...206Dig"

(Throughout this judgment I have redacted cryptoasset addresses, replacing all but the last three digits with "...".)

### (3) Progress of the Bitmex Account dispute

21.    In the meantime, the Bitmex Account dispute proceeded towards a hearing.  At a CMC on 15 February 2021, Moulder J directed a hearing of the claim and settled a list of issues for determination, including:

    i)      which of Nexo and Mr Shulev is entitled to operate and control the Account?

    ii)     which of Nexo and Mr Shulev is legally entitled to the credit balance on the Account of 880.4308 bitcoin?

22.    Moulder J ordered that those issues be determined "*on the basis of the written evidence filed, without oral evidence (including cross-examination)*".  That reflected an agreement in correspondence between the parties to that effect, aimed at resolving their dispute rapidly and efficiently. The agreement to dispense with oral evidence and cross-examination did not involve any concession by any party as to the weight to be attached

to the witness statements and did not affect the standard of proof in respect of disputed facts.

23. The hearing was listed before Mr Stephen Hofmeyr QC on 1 July 2021.

**(4) The Settlement Agreement**

24. Shortly after 1pm on 1 July 2021, the day of the hearing before Mr Hofmeyr QC, the parties signed the Settlement Agreement. The Settlement Agreement was made between Mr Shulev, Nexo and ten other companies affiliated with Nexo (these being defined together as the "*Other Nexo Companies*").

25. The key provisions of the Settlement Agreement were these:

> "1. The Parties agree that for the purpose of this Agreement the terms below will have the following meaning:
>
> …
>
> **Assets** - wallets,  accounts, accounts' credentials, seed phrases, private keys, documents, materials, files, any form of communication, including emails;
>
> 2. Upon the acceptance of the terms set forth herein and the digital signing by the Parties of this Agreement via DocuSign, which will be deemed legally binding, Mr Shulev will undertake the actions below and will receive from Nexo a total of $1,000,000.00 in USDT and NEXO Tokens, in 5 installments during the next 30 months, under the agreed terms and conditions, as follows: (i) first installment of $400,000.00 in USDT; (ii) second installment of $50,000.00 in USDT; (iii) third installment of $250,000.00, $125,000.00 of which in USDT and $125,000.00 of which in 62 500 NEXO Tokens, calculated on the basis of an exchange price of the NEXO Token of $2.00; (iv) fourth installment of $50,000.00 in USDT; (v) fifth installment of $250,000.00, $125,000.00 of which in USDT and $125,000.00 of which in 62 500 NEXO Tokens, calculated on the basis of an exchange price of the NEXO Token of $2.00.
>
> 3. After the successful receipt of any requested Assets by Nexo, confirmed by Nexo without any objections to the type, amount or value of the Assets, Nexo will transfer the First installment (i) under Section 2 to Mr Shulev's indicated digital wallet address indicated below before 1 July 2021, 12:30 am BST.
>
> …
>
> 4. Mr Shulev and Nexo will jointly inform before 1 July 2021, 12:30 am BST BitMEX/HDR Global Trading Ltd. that the disputed BitMEX/ HDR Global Trading Ltd. account will be

released to Nexo and Mr Shulev will waive any rights and claims as to the operational, legal and beneficial ownership of the account and the assets within it.

5. Nexo and Mr Shulev will undertake to inform before 1 July 2021, 12:30 am BST Eversheds Sutherland LLP, RPC LLP, HDR Global Trading Ltd. and the High Court of Justice Queen's Bench Division Commercial Court Royal Courts of Justice that the dispute has been settled amicably and that all proceedings shall cease with immediate effect.

…

7. Subject to successfully closing the BitMEX Dispute, Mr Shulev undertakes to ensure, declare, warrant, acknowledge and confirm that he does not hold any residue Assets in his possession.

8. The second installment under Section 2 (ii) will be made by Nexo no longer than 7 days after the fulfilment of the terms under Sections 1-7, Mr. Shulev's signing of a Confidentiality and Non-Disparagement Agreement with the Nexo Companies and any other legal entity belonging to the Nexo Group ("**Confidentiality Agreement**"), … a Release of Claims Agreement with Kosta Kalinov Kantchev, the Nexo Companies and any other legal entity belonging to the Nexo Group, whereby Mr Shulev undertakes to declare, warrant and confirm that he does not have any rights, shareholding, title, interest, present or future claims and demands in any form to/in the Nexo Companies or the Other Companies, both as defined therein ("**Release of Claims Agreement**"), as well as Mr Shulev's full disclosure before the Nexo Companies of all the information concerning the Nexo Companies and the Nexo Group, including but not limited to its management, employees, products or services, which has been communicated by him with any third party, regardless of the reason therefor and of whether this information has had the effect of disparaging, defaming, or discrediting as to the Nexo Companies' or the Nexo Group's reputation, goodwill and commercial interests.

…

10. All the installments under this Agreement shall be due and payable by Nexo only under the condition that up to the payment date Mr Shulev has duly complied with this Agreement, including the declarations, warranties and obligations under Sections 7 and 8 hereof, the Confidentiality Agreement and the Release of Claims Agreement. For the avoidance of doubt, the Parties agree that in case of Mr Shulev's breach of this Agreement, including the declarations, warranties and obligations under Sections 7 and 8 hereof, the Confidentiality

Agreement and the Release of Claims Agreement, he will not be entitled to receive any future installments under Section 2 from Nexo, and Mr Shulev further waives any right to claim such installment or any related compensation, damages or payment in this regard, and undertakes to fully indemnify Kosta Kalinov Kantchev and/or the Nexo Companies, and/or any other legal entity belonging to the Nexo Group, as the case may be, for all the damages suffered as a result of the relevant breach.

11. The Parties agree that this Agreement shall be governed by the laws of the England and Wales. Should Nexo cease payments for reasons other than those listed in Section 10, Mr Shulev would no longer be bound to the penalty, warranties and obligations under Section 8 and shall have the right to sue Nexo for compensation and damages in the courts of England and Wales. …

12. This Agreement is legally binding and is a full and final settlement of any and all claims each Party hereto may have against the other, except for the claims arising out of a breach of its terms or such that the Nexo Companies and/or Kosta Kalinov Kantchev, and/or any other legal entity belonging to the Nexo Group, or Mr Shulev may have to each other by virtue of the Confidentiality Agreement and the Release of Claims Agreement.

…

14. If, at any time, a provision of the present Agreement is declared unlawful, invalid or unenforceable in any manner with respect to any applicable law, the lawfulness, validity and enforceability of the remaining provisions of the Agreement shall not be affected thereby. The Parties shall replace the unlawful, invalid or unenforceable provision with a provision that is as consistent with the original content as possible."

26.     As set out above, clause 8 of the Settlement Agreement envisaged a Confidentiality Agreement and a Release of Claims Agreement being executed subsequently. However, they were in fact signed, via the online document execution system DocuSign, at the same time as the Settlement Agreement. Mr Shulev's evidence is that that was forced upon him by Nexo because Mr Trenchev of Nexo set up the DocuSign process so as to make it impossible to insert his electronic signature into the Settlement Agreement without also doing so for the other Agreements. He has stated he did not wish to execute them, or intend to be bound by them, at least at that stage, and further that they were misrepresented to him. In his second witness statement, dated 26 July 2021, he said this:

"16. When it comes to the validity of the Confidentiality Agreement and the Release of Claims Agreements, I do believe it is worthwhile mentioning that the latter two have been introduced to me three hours prior to the hearing, while I was

preparing for the hearing and reviewing the Settlement Agreement in parallel. Beyond having multiple concerns over their content, the fact that they were unilateral and that I could not consult a lawyer, Mr Trenchev had extended a threat to sign the Agreements "now or never" an hour prior to the hearing while not giving me the option to sign them separately when they were actually due under Clause 8. On a few occasions as shared below, Mr Trenchev had also comforted me that the Agreements were standard, they were made bilateral and there were clauses that protect me, which does not seem to be the case. I do believe signing the two Agreements under the mentioned circumstances gives rise to more legal issues than they solve and thus they should be deemed void.

17. In that regard, an email sent by me on 30 Jun at 15:30 (Sofia Time) … states the following

> "...I am attaching a version (of the Settlement Agreement) with amendments, and definitely, there is no way we include clauses whose compliance depends on the signing of non-existent agreements (Confidentiality Agreement and Release of Claims Agreement). The confidentiality clause is more than sufficient and stable in terms of clarity and motivation not to be violated and it is fair for it to be bilateral. I hope for our 2 years of working together you have seen that I value fairness in a relationship more than creating a mess for myself and the people around me. However, reciprocity in that regard hasn't been demonstrated from your side and respectively I insist that the clause should be made bilateral."

18. On 30 July at 9:16 (Sofia time), one day before the hearing, regardless of my request to make the Confidentiality Agreement and Release of Claims Agreement bilateral, Mr Trenchev had sent a unilateral version of the latter, stating

> "...They are standard templates signed by thousands of people around the world. Nothing for you to worry about here…"

19. On July 1, at 9:22 (Sofia time), three hours before the hearing, Mr Trenchev had agreed to amend the latter two agreements to be made bilateral and claimed they were. I communicated it did not seem this way, to which on Jul 1, at 10:11 (Sofia time) … Mr Trenchev ensured me they are bilateral and that I am protected:

> "It is all bilateral, Joro. The release (referring to the Release of Claims Agreement) is more specific, because we do not have ownership of you, you do not have intellectual property, etc…There are clauses that protect you, read carefully."

20. Given the pressure to prepare for the hearing as a litigant in person, it has been extremely challenging to review if the Second Defendant had indeed been implementing the changes that have been negotiated over emails. On a few occasions, while I was reviewing yet another version, I was receiving emails that the same version had been amended in Docusign not indicating where the change had been executed. …

21. On Jul 1 2021, at 11:36 (Sofia time) …, an hour before the hearing the pressure to sign the Agreement was further enforced via a threat by Mr Trenchev sent in an email stating:

"Watch after your baby and woman (referring to my fiancé[e] who is 8 months pregnant) with cash in your pocket, and not with negative equity. I don't know if you realise how close you are to the abyss (referring to previously made threats over emails and phone calls); in order to stop the case and for you to not pay 210 000 pounds to BitMEX we need to receive the stuff before stopping it, which needs to happen now. Don't worry about us - we will be fine. However, I'm not so sure about you, the people around you and any startups, which are about to potentially take off (I presume referring to the project I am working on and/or that my fiance is working on). Do the right thing, it's now or never".

…

23. Despite my best intentions to solve the dispute between the Second Defendant and myself outside the court after two years of negotiation attempts, on the basis of the evidence listed above, it is my belief the Agreements, specifically the Confidentiality Agreement and Release of Claims Agreement signed on Jul 1 2021 should be deemed void and unenforceable due to the misleading motives behind clauses (also brought forward during the hearing) that prevent the Agreement from serving its true purpose and that have been signed by me in the absence of any independent legal advice under threat and incredible time pressure exerted by the Second Defendant.

24. Should the Agreements be deemed enforced, however, below I present my evidence for complying with Clause 3 and for Nexo breaching the same clause. The consequences of the breach are also elaborated on the following paragraphs."

27. Subsequently, in his fourth witness statement (dated 3 February 2023) Mr Shulev has stated that other threats were made to him, going beyond commercial pressure, during the lead-up to execution of the Settlement Agreement. He states that, for example, Mr Trenchev called him and, to the best of Mr Shulev's recollection, said words to the following effect:

11

> "Joro [Mr Shulev], we know that Boryana [Mr Shulev's fiancée] is pregnant. As you know she already has problems [in reference to investigations into her business affairs] and this is only the beginning. We will not give up. You know Kosta [Mr Kantchev] very well. You know who we are and that we have the money. You know how things are done in Bulgaria. Our patience is already over, so if you do not agree to sign the agreement I would not be very calm about your family and yourself."

### (5) Post Settlement Agreement events on 1 July 2021

28. The key events immediately following signature of the Settlement Agreement at lunchtime on 1 July 2021 were as follows.

29. At 1.19pm (UK time), shortly after signature, Mr Trenchev of Nexo sent an email to Mr Shulev stating:

> **"Regarding: request for Assets under Settlement Agreement dated July 1, 2021**
>
> Dear Mr. Shulev,
>
> On the grounds of Section 3 of the Settlement Agreement dated July 1, 2021 (the "Agreement"), concluded between you, on the first side, Nexo Capital Inc. ("Nexo"), on the second side, and NEXO FINANCIAL LLC, NEXO AG, NPEM LTD., Nexo Services OÜ, Nexo Inc., Nexo Payments Limited, Nexo Clearing and Custody LTD, Nexo Financial Services LTD and Nexo Finance Limited (the "Other Nexo Companies"), on the third side, Nexo and the Other Nexo Companies jointly referred to as the "Nexo Companies", we hereby request that you immediately transfer the following Assets to the Wallet Addresses and Bank Accounts, and/or deliver them to the Address, as indicated below, according to the relevant type of the Asset:

| Type of Asset: | Wallet Address: |
| --- | --- |
| BTC | ...QpG |
| ETH/ERC20 | ...de0 |
| BNB/BEP2 | ...jk5 |
| TRX | ...qJW |
| XRP | ...PZQ |
| XLM | ...ROZ |
| EOS | ...xep |
| LTC | ...4Q2 |

12

BCH   ...1PM

**Type of Asset: Seed phrases and private keys**

(for security reasons to be sent after sending all NEXO ERC-20 Tokens, as described above)

First 12 words of Seed Phrases and/or 50% of private key characters to be sent by email to: katerina@nexo.io

Second 12 words of Seed Phrases and/or 50% of private key characters to be sent by email to: antoni@nexo.io

**Type of Asset: Bank Account:**

Fiat Currency Beneficiary: Nexo Capital Inc.

     IBAN: …

     BIC: TRYULT21

     Bank: Transactive Systems UAB

**Type of Asset: Address:**

Physical Assets 41 Arsenalski Blvd., fl. 1, Sofia 1421, Bulgaria
(Equipment, Computers, Documents, Ledger Devices, etc.)"

30. In his fourth witness statement, Mr Trenchev stated that the nine cryptocurrency wallets thus listed in the email were wallets to which he was asking Mr Shulev to provide access (via the seed phrases or private key characters). However, in his fifth witness statement, Mr Trenchev explained that the nine wallets listed in this email were in fact the Nexo wallets into which Nexo wished Mr Shulev to transfer nine specific values of cryptocurrency of different types. Indeed, it appears from the text of the body of the email that Mr Trenchev had intended but omitted to list "*the following Assets*", which were requested to be transferred "*to the Wallet Addresses ... as indicated below, according to the relevant type of the Asset*" i.e. to the wallet addresses listed in the email.

31. About a minute later, at 1.20pm, Mr Trenchev emailed Mr Shulev saying (as variously translated):

"Send first the Nexo tokens, then sent the 24 words according to the instructions above, then we transfer the first installment, we inform the court and we will figure the rest of the assets later."

or

> "First, Nexo tokens, and then give the 24 words according to the instructions above, then we are releasing you the 1st Tranche from the SJS."

32. 45,232,012 Nexo tokens ("**the Nexo Tokens**"), with a value of approximately US$61.4 million, were then deposited into a new wallet, and at 1.36pm an email was sent to Mr Trenchev from "*fill5645@protonmail.com*" containing the seed phrases needed to access that wallet.

33. At 1.30pm (UK time), Mr Trenchev sent Mr Shulev an email asking *"what is this address where you sent your [wallet address stated]"*. It appears from Mr Trenchev's evidence that he had not expected the assets to be placed in a new wallet, and was asking Mr Shulev to explain the purpose of this new wallet address.

34. Despite Mr Trenchev's statement in his email of 1.20pm quoted in § 31 above, Nexo did not pay the first instalment to Mr Shulev following receipt of the seed phrases for the wallet containing the Nexo Tokens. Instead shortly afterwards, at 2.03pm (UK time), Mr Trenchev sent a further asset request to Mr Shulev, requiring that he also deliver to Nexo the Nine Assets:

> "Regarding: request for Assets under Settlement Agreement dated July 1, 2021
>
> Dear Mr. Shulev,
>
> On the grounds of Section 3 of the Settlement Agreement dated July 1, 2021 (the "Agreement"), concluded between you, on the first side, Nexo Capital Inc. ("Nexo"), on the second side, and NEXO FINANCIAL LLC, NEXO AG, NPEM LTD., Nexo Services OÜ, Nexo Inc., Nexo Payments Limited, Nexo Clearing and Custody LTD, Nexo Financial Services LTD and Nexo Finance Limited (the "Other Nexo Companies"), on the third side, Nexo and the Other Nexo Companies jointly referred to as the "Nexo Companies", we hereby request that you immediately transfer the following Assets to the Wallet Addresses and Bank Accounts, and/or deliver them to the Address, as indicated below, according to the relevant type of the Asset:
>
> 22,149.15781817 BNB BEP-2
>
> 22,149.15781817 BNB BEP-2
>
> 4204099.6210063 XLM
>
> 4.54076107 ETH
>
> 895 BNB ERC-20
>
> 26,068 USDC
>
> 1,057 USDT

14

8,822,654.672306 XRP

7.77370630 BTC

9.55555439 BTC


| Type of Asset: | Wallet Address: |
|---|---|
| BTC | ...QpG |
| ETH/ERC20 | ...de0 |
| BNB/BEP2 | ...jk5 |
| TRX | ...qJW |
| XRP | ...PZQ |
| XLM | ...ROZ |
| EOS | ...xep |
| LTC | ...4Q2 |
| BCH | ...1PM" |

35.     This email thus asked Mr Shulev to transfer to Nexo ten particular cryptocurrency values, though Mr Trenchev's evidence is that he included the first/second item (BNB BEP2) twice by mistake.  He intended to request nine cryptocurrency values, being the Nine Assets, whose total value was approximately £10 million.  Mr Trenchev's evidence is that these were further assets, in addition to the Nexo Tokens, that belonged to Nexo but which Mr Shulev was holding.

36.     Mr Shulev did not transfer the Nine Assets, and in subsequent emails each party complained that the other had not complied with the Settlement Agreement.  Mr Shulev suggested that *"[m]ore than the requested is fulfilled"*, and that Nexo had failed to comply with its obligations.  Mr Trenchev countered that the agreement required Mr Shulev to return not only the Nexo Tokens but also any requested assets; after that, Nexo would pay Mr Shulev the money.  Mr Shulev replied that Nexo was in breach of clause 3 (payment of first instalment), but that *"[i]f there is a transfer to me with the first instalment, I will sign and continue with the performance under the clauses."*

**(6) Resumed hearing on 2 July 2021**

37.     The parties came back before the court for a further short hearing on 2 July 2021 to discuss the effect of the settlement.

38.     In relation to the Bitmex Account, Mr Shulev took the position that the obligation to give the joint notification to HDR under clause 4, releasing the Bitmex Account to Nexo, was conditional on Nexo having first complied with its obligations under clause

3 to pay Mr Shulev the first instalment.  The judge, Mr Hofmeyr QC, said about Nexo's submission to the contrary:

> "That is a particularly unattractive, if I may say so, submission for a party to be making because the overall intention of the agreement is quite clear, as I read it, and the concern that the court has is that a party could potentially be, it could be said, seeking to steal a march on that by seeking to press one particular aspect of the agreement whilst other aspects remain unresolved….
>
> …As I say, what Mr. Shulev wants is to be certain that he is going to get the money that has been promised to him under this agreement. If he gets that money or at least the first instalment, he is entirely happy to release the account. The key thing is that one should not go ahead of the other so that a march can be stolen and that is as I see it."

39.    In an attempt to break the apparent deadlock, Nexo made an open offer at the hearing that Mr Shulev could simply deduct the amount of the first instalment due to him from the assets requested by Nexo (rather than transferring all the assets first as envisaged by clause 3).

40.    I concluded in the July 2022 Judgment that clause 3 makes clear that the contractual order of events was first for Mr Shulev to transfer the requested assets to Nexo, and then for Nexo to pay the first instalment; and, in any event, that clause 4 was a freestanding obligation.

41.    Mr Shulev also appeared to indicate at the 2 July 2021 hearing that he was unwilling to transfer the Nine Assets requested by Nexo without having security for the later instalments due to him under the Settlement Agreement.  He told the court:

> "what I wanted to say is the way that I will be guaranteed the parity of my compensation, which is of the amount of $1m and not the $400,000, that would be paid upon the settlement agreement being complied with, then I will be happy to proceed and find a solution which is reasonable for everyone to resolve the dispute. But transferring the entire amount of the assets at the moment to Nexo and simply sharing the comfort of only being able to receive part of the compensation after Nexo not complying with the agreement as a first step on their side, does not provide me with comfort that they will comply and provide the rest of the settlement"

The judge observed that:

> "the difficulty is that when you signed the settlement agreement you took the risk that Nexo would not be able to pay you the difference between $400,000 and $1m and that was a matter that you were going to be able to enforce against them by bringing a claim on the settlement agreement, and to ask now for security

16

for the full $1m rather than just $400,000, again subject to hearing arguments from everybody, seems to me to be asking for more than you are entitled to."

42.    Mr Shulev has subsequently suggested, in his fourth witness statement (dated 3 February 2023) (§ 247) that there was a misunderstanding between him and the judge: Mr Shulev was referring in this exchange only to the Bitmex Account, and he did not recall that the judge was talking about the Nine Assets.  It is true that, shortly after the exchange quoted above, Mr Shulev told the court that in his view he had already "*more than complied with*" what he and Nexo had agreed "*in terms of the current stage of this settlement agreement*".  However, it seems from the transcript that the exchange concerned "*requested assets*" within § 3 of the Settlement Agreement that Nexo claimed Mr Shulev had failed to hand over.

43.    After discussion with the parties, the court allowed HDR to exit the proceedings by ordering it to hold the balance on the Bitmex Account as stakeholder and directing it to transfer the balance (after a deduction in relation to its costs) to such address as might be ordered by the court.

44.    As to the dispute between Nexo and Mr Shulev, the court ordered a further hearing with a time estimate of one day for determination of the two issues concerning the Account set out in paragraph 21 above, and the following additional issues:

i)      Are the Settlement Agreement, and the Confidentiality Agreement and Release of Claims agreement deriving from it, binding and enforceable agreements or are they void for uncertainty, mistake, frustration or otherwise?

ii)     Subject to (i) above, what is the true construction and effect of clauses 3, 4, 8 and 11 of the Settlement Agreement?

iii)    Subject to (i) and (ii) above, have those clauses been complied with or breached, and if so in what respect and what are the consequences of that?

45.    The court granted permission for the parties to file further evidence in relation to the new issues, which they did.

**(7) Events between the July 2021 hearing and the April 2022 hearing**

46.    Nexo's solicitors on 9 July 2021 repeated the open offer to permit Mr Shulev to deduct the first instalment from the transfer of the assets:

"We are instructed to re-iterate our client's open offer (first made openly in court at the hearing on 2 July 2021) that you deliver all the Assets to our client and, prior to their delivery, deduct from the Assets the sum equivalent of $400,000 USDT as payment of the first instalment of your compensation under the Settlement Agreement.  We enclose a copy of our client's notice to you requesting return of the Assets dated 1 July 2021, which we are instructed that you have only partly complied with. In any event, our client is able to evidence that it is the owner of the Assets, notwithstanding that you accepted during the hearing on 2 July

17

2021 that you continue to withhold the Assets from our client despite receiving the notice to return them.

Alternatively, as proposed by our Counsel during the hearing on 2 July 2021, our client would be willing to give an undertaking to the Court that it will transfer the sum of $400,000 USDT upon receipt of the Assets.  For your understanding, a breach of an undertaking to court is a criminal offence. To breach an undertaking is very serious and, in doing so, Nexo would open itself to criminal proceedings. Given the severity of the consequences of breach, Nexo would not give an undertaking unless it fully intended to comply with the same. This should provide you with sufficient security to resolve the current impasse."

47.     On 13 July 2021, Mr Shulev made a counter-offer stating:

"Following the court's suggestion, I am willing to deposit any residue Assets as per clause 7 at an escrow agent, while Nexo deposits my entire compensation with the same agent. The escrow agent would demonstrate to Nexo the deposited Assets and they shall be passed on to them, while my compensation would be transferred to me in full unconditionally and not pending on Nexo's frivolous read on follow up clauses such as the disclosure ask in clause 8.  The escrow agent would then inform the court that both parties have settled and agree to close the BitMEX dispute."

Thus, whilst Mr Shulev did not explicitly accept here that he had control over the assets requested in Mr Trenchev's email of 2.03pm on 1 July 2021, i.e. the Nine Assets, he did envisage that there were some assets to be transferred, and he did not suggest that the Nine Assets were outside his control.  Mr Shulev suggests in his fourth witness statement (§ 248) that, whilst Nexo's solicitors were referring in their 9 July letter to the Nine Assets, Mr Shulev himself *"was referring to the sensitive information that Nexo wanted"*.  Based on the language of the two letters that seems unlikely, but even if Mr Shulev did mean to refer to something other than the Nine Assets which were the subject of Nexo's solicitors' letter, he made no suggestion that he lacked control over the Nine Assets.

48.     On 16 July 2021, Nexo asked for further details of the counter-offer, including Mr Shulev's proposals for an escrow agent.  Mr Shulev did not respond until 4 March 2022, when he said that Nexo's offer was "*fundamentally impossible to execute*" and that he understood that an escrow arrangement was not acceptable to Nexo.  Nexo's solicitors responded on the same day reiterating that its original offer continued to be open for acceptance, and repeating Nexo's request for Mr Shulev's escrow proposals, saying "*please do not presume that this proposal is not acceptable to our client*".

49.     The parties also served further evidence during this period.  Mr Trenchev in his fourth witness statement (16 July 2021) said:

> "In drafting the Settlement Agreement, we intended the phrase "any requested assets" to mean all assets that are the property of Nexo, but to which Mr Shulev retains access. I do not believe that Mr Shulev has disputed that any of the Assets belong to Nexo and I believe he confirmed that to Mr Hofmeyr QC during the hearing. I believe it to be clear that the scope of this provision is limited to assets over which Nexo rightfully owns. Nexo does not seek to deprive Mr Shulev of any of his personal property; only to recover property that belongs to it but that Mr Shulev has withheld for close to two years now, resulting in us incurring significant cost and missed revenue."

50. This was followed by Mr Shulev's second witness statement (dated 26 July 2021). I have quoted in § 18 above what Mr Shulev said about the introduction of digital addresses, as opposed to lists of specific assets, into drafts of the Settlement Agreement. He referred to Mr Trenchev's email of 2.03pm on 1 July 2021, requesting the Nine Assets, as an attempt "*to request more and different Assets deliverable to them than what has been negotiated before signing the Agreement with the goal to deem the clause not complied with by me*". Mr Shulev did not, though, state in this witness statement that the Nine Assets were outside his control or already in Nexo's control.

51. Mr Trenchev in his fifth witness statement (dated 4 October 2021) said about the Nine Assets:

> "4. … the nine values of cryptocurrency requested are as follows:
>
> 22,149.15781817 BNB BEP-2 (Binance Token)
>
> 4,204,099.6210063 XLM (Lumen)
>
> 4.54076107 ETH (Ethereum token)
>
> 895 BNB ERC-20 (Ethereum token)
>
> 26,068 USDC (USD Coin)
>
> 1,057 USDT (Tether)
>
> 8,822,654.672306 XRP (Ripple)
>
> 7.77370630 BTC (Bitcoin)
>
> 9.55555439 BTC (Bitcoin)"

> "6. The cryptocurrencies outlined at paragraph 4 above are held in six wallets to which Mr Shulev has retained access, despite being wallets used exclusively for corporate purposes by Nexo. Nexo seeks the return of theses wallets and the balances held within them. The addresses of the wallets where the balances are held are as follows:
>
> Binance Chain Wallet: ...q39

*[fn] With a balance of 22,149.15781817 BNB.*

Stellar Chain Wallet: ...YWO

*[fn] With a balance of 4,205,185.6210063 XLM.*

XRP Chain Wallet: ...Lyk

*[fn] With a balance of 8,822,654.672306 XRP.*

ETH Wallet: ...CEb

*[fn] With balances of 4.540761069732669882 ETH; 895 BNB; 26,068 USDC and 1,057 USDT amongst others with negligible values.*

BTC Wallet: ...oo1

*[fn] This is one of three parent wallet addresses to the wallet with ID ...J8J. The other parent addresses are ... ...mEa (with a balance of 7.7737243 BTC) and ...kUt.*

Additional BTC Wallet: ...RPk

*[fn] With a balance of 9.55555439 BTC.*

7. The balances of the wallets are publicly available online, immutably recorded on the Blockchain.  I have been shown screenshots of the balances of the wallets."

52. Mr Trenchev explained in some detail how the above balances had come to be in the wallets listed above, by transfers from wallets held by Nexo.  As part of the explanation, he said the transfer of cryptocurrencies into the Binance Chain, Stellar Chain and ETH Chain wallets had come from wallets held by Nexo counterparties (parties who deposit cryptocurrencies with Nexo in return for its services).  The XRP and BTC wallets were not counterparty deposits but swap and OTC transactions.  Mr Trenchev said he believed the reason why there had been no recent transactions in the wallets was that Mr Shulev knew they were not his own personal funds.

53. Mr Shulev did not serve evidence in response to Mr Trenchev's fifth witness statement.

**(8) The April 2022 hearing and the July 2022 Judgment**

54. The issues that Mr Hofmeyr QC had directed came before me for hearing on 5 April 2022, with Mr Shulev representing himself.  Mr Shulev had been advised by solicitors, Stephenson Harwood, for some months during the period leading up to the hearing before Mr Hofmeyr QC on 1-2 July 2021, but then represented himself from 12 June 2021 until shortly after the April 2022 hearing.

55. During the April 2022 hearing, Mr Shulev said he was not in possession of the Nine Assets and did not know what they referred to.  Nexo pointed out in the course of the hearing that the documents indicated that at least four of the nine cryptocurrency values

20

in question (895 BNB, 26,068 USDC, 1,057 Tether and 4.54076 Ethereum) were present in the same wallet (ETH wallet ending CEb) as the 45,232,012 Nexo Tokens that Mr Shulev had transferred to Nexo on 1 July 2021. Print-outs of the wallet contents showed both the presence of those other assets and the transfer out of the Nexo Tokens on 1 July 2019. Nexo accordingly submitted that Mr Shulev must have had access to that wallet in order to transfer the Nexo Tokens (and, indeed, that Mr Shulev had chosen to transfer the Nexo Tokens themselves, rather than giving Nexo access to the wallet as a whole, in order to retain control of those other assets).

56. In response to that submission, Mr Shulev appeared to deny that he had transferred the Nexo Tokens. In a post-hearing note dated 13 June 2022, Mr Shulev took the same position: not denying that the Nexo Tokens were transferred, but denying that it was he who made the transfer. Based on the evidence before me, I rejected that contention, for the reasons given in §§ 89-93 of the July 2022 Judgment.

57. I concluded in the July 2022 Judgment that:

i) pursuant to clause 4 of the Settlement Agreement, Mr Shulev and Nexo were jointly obliged, and had been since the Settlement Agreement was signed, to inform HDR that the Account would be released to Nexo and that Mr Shulev waived any rights and claims as to its operational, legal and beneficial ownership and the assets within it;

ii) under clause 3 of the Settlement Agreement, it remained necessary for Mr Shulev to transfer to Nexo the nine cryptoassets listed in Mr Trenchev's email of 14.03 (2.03pm) UK time – the Nine Assets – in order to be entitled to the first instalment provided for in clause 2 of the Settlement Agreement, provided that Mr Shulev could obtain payment of the first instalment by deducting it from the assets transferred; and

iii) Nexo had not to date ceased making payments for reasons other than those set out in clause 10; the second sentence of clause 11 had therefore not yet come into operation.

58. I also found that, had the matter not already been resolved between the parties by the Settlement Agreement, I would have concluded that Nexo was entitled to the Bitmex Account and its contents.

59. In reaching the conclusions referred to in § 57 above, I made *inter alia* the following findings:

i) Mr Shulev intended to open the Bitmex account on Nexo's behalf and to hold Nexo assets (July 2022 Judgment § 111). He owed to Nexo the duties of an agent to his principal, including a duty to act on Nexo's instructions and to hold the Bitmex Account and its contents as fiduciary for Nexo (§ 112).

ii) Nexo had title to the cryptoassets in the Bitmex Account, alternatively it could (if necessary) follow its title into those assets and recover them as owner (§ 113).

iii) "*Assets*", as used in clause 3 of the Settlement Agreement, meant assets in relation to which Nexo put forward a *bona fide* claim that they were corporate

assets, to which Mr Shulev had had access while working at Nexo, and which remained at least to some degree in Mr Shulev's possession or control, and included assets requested after the Settlement Agreement had been concluded (§§ 54 and 55).

iv)   The Nine Assets were such assets belonging to Nexo and Mr Shulev had access to or control of them (§ 93).

v)   Nexo was entitled to request the Nine Assets, or the necessary access to and/or control over them, from Mr Shulev pursuant to clause 3 of the Settlement Agreement (§ 93).

vi)   Such a request was contained in Nexo's email of 2.03pm on 1 July 2021, and Mr Shulev was obliged to comply with it by providing Nexo with the means to access and use the Nine Assets, subject to deduction of the value of the first instalment due to Mr Shulev under clause 2 of the Settlement Agreement (§ 93).

vii)   Clause 4 was a freestanding obligation, not dependent on performance of or compliance with clause 3 (§ 59).  The dispute about the Bitmex account had been settled by the Settlement Agreement, on terms that, among other things, required Mr Shulev to renounce any claimed interest in the account (§ 59).

60.   Nexo submits that those findings were necessary for the determination of the questions before the court, giving rise to issue estoppels, and that Mr Shulev is precluded from now disputing them (cf *Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd* [2013] UKSC 46 § 17).

61.   As to Mr Shulev's contentions of misrepresentation and duress in relation to the Release of Claims Agreement and the Confidentiality Agreement, and their link to the Settlement Agreement, I made the following statements which it is convenient to set out together in one place for ease of reference:

> "38.   It is common ground that, although clause 8 envisaged the Confidentiality Agreement and Release of Claims Agreement being executed subsequently, they were in fact signed, via the online document execution system DocuSign, at the same time as the Settlement Agreement.  Mr Shulev's evidence is that that was forced upon him by Nexo because Mr Trenchev of Nexo set up the DocuSign process so as to make it impossible to insert his electronic signature into the Settlement Agreement without also doing so for the other Agreements.  He says he did not wish to execute them, or intend to be bound by them, at least at that stage, and further that they were misrepresented.
>
> 39.   Mr Shulev suggested in his evidence that the Confidentiality Agreement and Release of Claims Agreement, and potentially also the Settlement Agreement, were void or unenforceable.  It is necessary to set out some paragraphs of his second witness statement in full in order to understand his position:

*[quotation from §§ 16-24 of Mr Shulev's second witness statement: see § 26 above]*

…

42.     In his written and oral submissions before me, Mr Shulev took the position that (as it was put in his skeleton argument) *"the [Settlement] Agreement should be determined as valid as it resolves the BitMex Account dispute, but breached by Nexo …, whereas the Confidentiality and Release of Claims Agreements …, as they are, are invalid for misrepresentation, sharp practices, waiver beyond reason, duress, amongst other … and should be rectified to waive only any claims over the BitMex Account and signed when they are due under Clause 8"*.

43.     Making allowance for the fact that Mr Shulev appears, now, as a litigant in person, I understand Mr Shulev not to be taking the position that the Settlement Agreement as a whole (which includes provisions about the Release of Claims Agreement and the Confidentiality Agreement, including the gist of their contents) is voidable for duress or misrepresentation; or, at least, that he is not purporting, and has not purported, to rescind it for misrepresentation or to have it set aside on the ground of duress.  (I observe that if the Agreement were to be rescinded or set aside, then Mr Shulev's condition entitlements to payments under clause 2 would of course fall away with it.)

44.     On the other hand, Mr Shulev did not expressly disclaim any argument that the Settlement Agreement itself, whilst binding, was induced by misrepresentation (relating, for example, to the contents of the Release of Claims Agreement for which it made provision); and he referred to the Settlement Agreement as a "Trojan horse" used to obtain the wide release of claims set out in the Release of Claims Agreement.  As I indicate later, I have concluded that such issues as arise between the parties connected with the Release of Claims Agreement and Confidentiality Agreement cannot properly be resolved on this occasion.  It is therefore unnecessary to decide at this stage whether it would be open to Mr Shulev to advance any claim that the Settlement Agreement itself, insofar as it makes provision for those two further agreements, can be impugned on the grounds of misrepresentation or duress; nor on what basis any damages for misrepresentation might be assessed even if such a claim were to succeed.  I make no findings on any of those matters.

45.     The upshot for present purposes is that both parties were content to proceed on the basis that the Settlement Agreement itself, or at least the Agreement as a whole, is valid and binding.  As discussed below, there did remain an issue about whether clause 3 is sufficiently clear to be enforceable, as well as disputes

23

about the effect of certain other provisions of the Agreement, and I deal with those matters next.

…

64.     In his skeleton argument and oral submissions, Mr Shulev submitted that the second part of clause 8 does not oblige Mr Shulev to execute the Release of Claims Agreement, but merely makes that a condition for his receipt of the second instalment under clause 2(ii).   As noted earlier, Mr Shulev contends that he was induced to sign the Release of Claims Agreement by a combination of misrepresentation and duress.

65.     This particular aspect of clause 8 was not argued in any detail before me, and does not seem to have been raised prior to Mr Shulev's skeleton argument.   As indicated in section (F) below, I do not consider the misrepresentation and duress issues relating to the Release of Claims Agreement to be properly capable of resolution without oral evidence, possibly further disclosure, and fuller argument.   Insofar as it might be suggested that clause 8 (read in the context of the Settlement Agreement as whole, including clauses 10 and 11) might mean that Mr Shulev was/is positively obliged to execute the Release of Claim Agreement, that issue is in my view best determined as part of the same process.   The same applies to any argument that Mr Shulev's agreement to the relevant portion of clause 8 was itself affected by any form of misrepresentation or duress.

…

115.     As noted earlier, Mr Shulev considers that the Settlement Agreement has been used as "a Trojan horse to show intention to resolve the BitMEX dispute, but has ultimately aimed at receiving a signature on a very wide Release of Claims Agreement … that is a supplementary Agreement due only under Clause 8, that waives any claims that I might have to the BitMEX dispute and my entire shareholding at the Nexo Group which is valued at more than $339 million".   He contends that Nexo made a misrepresentation to the effect that the Release of Claims Agreement and Confidentiality Agreement were "standard templates signed by thousands of people around the world" containing "Nothing for you to worry about"; and that his signature of those agreements was also induced by duress.   He notes that Mr Trenchev's witness statements do not address the issues relating to these agreements, despite the court having identified issues to be resolved in relation to them.

116.     Mr Shulev accordingly said in his skeleton argument that:

24

> "… I argue that the Agreement should be determined as valid as it resolves the BitMex Account dispute, but breached by Nexo …, whereas the Confidentiality and Release of Claims Agreements …, as they are, are invalid for misrepresentation, sharp practices, waiver beyond reason, duress, amongst other … and should be rectified to waive only any claims over the BitMex Account and signed when they are due under Clause 8."

> 117.   As I hinted during the hearing, I do not consider that the court has adequate material, including evidence, submission and possibly disclosure, fairly to determine these issues at present, and it is possible (though I leave the point open) that they would require oral evidence in order to resolve them.  They will have to be held over for resolution on a future occasion if the parties are unable to reach agreement."

62.   On 28 July 2022, I gave consequential directions (a) to HDR to use reasonable endeavours to transfer the balance on the Bitmex Account (after deducting its costs) to Nexo; and (b) to Nexo to file and serve Particulars of Claim in respect of claims that it wished to make against Mr Shulev for delivery of the Nine Assets and for damages for breach of the Settlement Agreement.  Mr Shulev was represented by leading counsel (Mr Salter QC) at this particular hearing.  I declined to make an order, sought by Nexo, that Mr Shulev transfer to Nexo the Nine Assets less assets worth 400,000 USDT reflecting the first instalment under the Settlement Agreement.

63.   The balance on the Bitmex Account was released to Nexo on 17 August 2022.

64.   Mr Shulev was refused permission to appeal by me and by the Court of Appeal.  In relation to a complaint on behalf of Mr Shulev that findings should not have been made about control of the Nine Assets, Males LJ said:

> "The question whether the applicant had control of the nine assets was within the scope of the issues ordered to be determined. It was not suggested by the applicant that this issue could not be determined fairly because disclosure or oral evidence (including expert evidence) was required. Accordingly the judge was entitled to reach a conclusion on the evidence before him, which is what he did. The judge gave reasons for his decision and an appeal on this question of fact would not have any real prospect of success."

### (9) Mr Shulev's Defence and Counterclaim

65.   Pursuant to the directions mentioned above, Nexo served Particulars of Claim on 9 August 2022.  It claims:

i)   damages for Mr Shulev's breach of the obligation under § 4 of the Settlement Agreement to inform HDR that the Bitmex Account should be released to Nexo, measured by reference to the fall in market value of the bitcoin in the Bitmex Account from 8 July 2021 (allowing HDR seven days after the Settlement

25

Agreement to make a transfer to Nexo) to 8 August 2022 (the day before the service of the Particulars of Claim), amounting to US$7,902,680.39; and

ii) specific performance of Mr Shulev's obligation to transfer the Nine Assets, and/or an order to transfer them pursuant to Nexo's proprietary claim to them, alternatively damages based on their value on 1 July 2021 (since when their value has fallen), amounting to US$14,227,674, plus interest since 1 July 2021 at a commercial rate.

66. Mr Shulev, by now represented by solicitors again, on 20 September 2022 served a Defence and Counterclaim prepared by leading and junior counsel (Mr Salter QC and Mr Cholakov). In the Defence and Counterclaim, Mr Shulev among other things:

i) took issue with a number of the conclusions reached about the Settlement Agreement in the July 2022 Judgment, noting that Mr Shulev had sought permission to appeal from it;

ii) complained that Nexo had sought to extend the scope of the original stakeholder proceedings as part of a conspiracy, directed by Mr Trenchev and Mr Kantchev, to misappropriate Mr Shulev's shareholding and ownership of the Nexo group;

iii) repeated his claim that it was not he who had transferred the Nexo Tokens to Nexo on 1 July 2021;

iv) stated that the email address *fill5645@protonmail.com*, from which the seed phrases for the Nexo Tokens were sent to Nexo on 1 July 2021, was not one he owned or to which he had access;

v) alleged that:

a) Mr Trenchev and/or Mr Kantchev had set up a "*Hardware Ledger*" (a physical device similar to a USB stick) and provided it to Mr Shulev when he was working for Nexo;

b) possession of the Hardware Ledger and its passcode gave access to the cryptoassets wallets which had been set up on it;

c) setting up the wallets on the Hardware Ledger required access to the seed phrases for those wallets;

d) the seed phrases could also be used to recreate and access the wallets if the Hardware Ledger were lost;

e) the wallets set up on the Hardware Ledger included a BTC wallet ending J8J (referred to in § 51 above), from which Mr Shulev had been able to transfer 2,880 BTC on 13 September 2019 (the day he left Nexo) on Mr Kantchev's request; and also the ETH wallet ending CEb (referred to in §§ 16, 17, 51 and 55 above) from which the Nexo Tokens were transferred to Nexo on 1 July 2021 and which also contained some other of the Nine Assets;

26

f) however, Mr Shulev left the Hardware Ledger at Nexo's offices when he left Nexo on 13 September 2019 and has not had access to it since;

g) Mr Shulev additionally had the 'private key' for the BTC wallet ending J8J referred to above, because it was a special wallet frequently used for deals, but not for the ETH wallet ending CEb. Consequently, once he left the Hardware Ledger with Nexo on 13 September 2019, he had no means of accessing the BTC wallet ending CEb;

h) as a result, he could not have effected the transfer of the Nexo Tokens to Nexo on 1 July 2021 and had no control over those of the Nine Assets as remained in that wallet; and

i) the Nine Assets had been under the control of Nexo and/or Mr Trenchev and/or Mr Kantchev since 13 September 2019 and remained under their control;

vi) stated that Mr Shulev had not sought to dispute my finding as to the ownership of the Bitmex Account, due to my independent finding that it belonged to Nexo irrespective of the Settlement Agreement, *"without prejudice to his position that he was not obliged to take any action in respect of the Bitmex Account pursuant to clause 4 of the Settlement Agreement"*;

vii) alleged that Nexo breached its obligation to pay the first instalment due under the Settlement Agreement, and Mr Shulev was thereby released from any obligation under § 4 to notify HDR that the Bitmex Account could be released to Nexo; as a result, Mr Shulev was not in breach of the Settlement Agreement and/or Nexo was not entitled to seek any damages in relation to the Bitmex Account;

viii) stated that if Nexo were entitled to damages in relation to the Bitmex Account:

a) damages should be assessed not at 8 July 2021, but instead at either 17 September 2019, when the Bitmex Account was frozen, or the date on which such damages are assessed;

b) in any event, the value of the assets in the Bitmex Account diminished as a result of Nexo's own failure to mitigate its losses by failing to agree that US$14,286,912 worth of XBTZ19 bitcoin futures contracts set to expire on 27 December 2019 should be rolled over, with the result that those contracts lapsed and realised a loss of BTC 549.66845246. Nexo refused to authorise the execution of the rollover on 24 December 2019 after Mr Shulev had sent instructions to HDR that the rollover take place on 23 December 2019; Nexo could have continued to roll over the futures contracts even while the account was frozen, such that it would have avoided or mitigated the losses alleged; and

c) further or in any event, Nexo would have retained the assets in the Bitmex Account, which would have fluctuated accordingly;

ix)     denied Nexo's claim to the Nine Assets, for the reasons outlined above; adding, in any event, that:

a)     specific performance is inappropriate, and damages would be an adequate remedy as there is nothing unique about the Nine Assets;

b)     it is not admitted that the market value of the Nine Assets has fallen since 1 July 2021;

c)     it is denied that the correct valuation date of the Nine Assets is 1 July 2021; and

d)     it is denied that Nexo would not have retained the Nine Assets since 1 July 2021; and

x)     pleaded counterclaims against Nexo (which I discuss later), as well as against Mr Trenchev and Mr Kantchev as Defendants to the Counterclaim.

67.    Neither the Defence nor the Counterclaim alleges that the Settlement Agreement is void or voidable on the grounds of duress or misrepresentation.  On the contrary, § 7.3 of the Defence denies that the Settlement Agreement has the effect that Nexo alleges; § 14.4 alleges that Nexo has failed to pay the first instalment due under the Settlement Agreement "*and as such is in breach of the Settlement Agreement*"; and § 16.1 similarly alleges that Nexo "*breached the obligation to make payment of the first instalment to Mr Shulev under the Settlement Agreement, such that Mr Shulev was released from any obligation under clause 4 of the Settlement Agreement*".

68.    Nexo served a Reply on 4 October 2022, but no Defence to Counterclaim, as Nexo had applied for summary judgment in relation to the Counterclaim.  In relation to the Hardware Ledger, Nexo pleaded in Reply § 6(d) that:

i)     a hardware wallet is a physical device that securely stores one or more network addresses and their associated private keys;

ii)     Nexo provided Mr Shulev with a "Ledger"-brand hardware wallet while he was a director to enable him to manage cryptoassets belonging to Nexo;

iii)     the hardware wallet contains the private key for, amongst others, [ETH wallet] 0x0…ceb, where the Nine Assets are located, and where the Nexo tokens were also located until Mr Shulev transferred them to Nexo's wallet 0x4…ee3;

iv)     Mr Shulev set up the hardware wallet himself. Nexo has no separate record of the private keys stored in the wallet, nor does it have the seed phrases necessary to recreate them; it does not therefore have control over the ceb address; and

v)     Mr Shulev did not return the hardware wallet to Nexo when he ceased to be a director. Nexo believes that it remains in his possession or control.

**(10) Further evidence leading up to the April 2023 hearing**

69.    On 3 February 2023 Mr Shulev made his fourth witness statement, in response to Nexo's present application.  Among other things this confirmed the case set out in his

Defence about the Hardware Ledger and the *fill5645@protonmail.com* email of 1 July 2021.  Mr Shulev also set out, in §§ 212 of his fourth witness statement, the threat which he said was made to him on 16 June 2021, quoted in § 27 above; and in § 213 he referred to Mr Trenchev's email of the morning of 1 July 2021, quoted in § 26 above (quoted paragraph 21).

70.   Mr Shulev stated that the Bulgarian police had recently raided Nexo's offices in Bulgaria and reportedly found at least six ledger devices.  He added:

> "264.  On Thursday 12 January 2023 it became public that the Bulgarian National Investigation Service (NSI), the national investigation agency of Bulgaria for serious crimes and cooperation in international investigations, and the Bulgarian Prosecutor's Office (among other law enforcement agencies) had launched a formal investigation into Nexo and its business, as they raided Nexo's offices in Bulgaria, and made arrests of certain of its personnel.

> 265. The allegations made against Nexo and its staff have been announced to include organised crime, money laundering, financing terrorism, breach of international sanctions, and fraud.

> 266. A reputable financial newspaper in Bulgaria, "Capital", reported on 18 January 2023 that KK and AT are two of the four people charged, with KK apparently being suspected as the "organizer of the possible 'criminal group'". The two further individuals arrested, KM and Mr Trayan Nikolov (the Claimant's COO), have been set bail. I believe that KK and AT may presently be the subject of international arrest warrants, having not been present in Bulgaria at the time of the NSI raids and initial arrests. The authorities announced that the Bulgarian border control data shows AT and KK were still in Bulgaria, but AT then announced he was living in the Middle East, thereby apparently admitting that he left Bulgaria illegally.

> 267. Capital also [has] reported that the Bulgarian investigation is being conducted with assistance from the UK's National Crime Agency ("NCA").

> 268. In short, I understand that KK, AT, KM and MR Nikolov are charged variously with forming an organised crime group related to money laundering, unlicensed banking activities, tax and computer crimes, money laundering, financing of terrorism, terrorist organisations and terrorist individuals, breaching the global sanctions against Iran and Russia, and siphoning funds for personal uses.

> 269. Given my public association with Nexo and its business, most recently in large part as a result of the press reporting on these English High Court proceedings between me and Nexo, since 12 January 2023 I have been invited to answer questions

29

> of the Bulgarian investigators, with whom I am cooperating. I have not been arrested, accused, or charged with any crimes."

71.   Mr Trenchev filed a short witness statement in response (his seventh witness statement, dated 17 March 2023) in relation to the alleged threats and the process by which Mr Shulev had to sign the Release of Claims and Confidentiality Agreements at the same time as the Settlement Agreement.  In relation to the alleged threats he said:

> "Whilst I engaged with Mr Shulev during these settlement negotiations, I did not threaten him at any point with physical violence (if that is the suggestion) or otherwise. Whilst I do not accept the exact words ascribed to me in paragraph 212 or Mr Shulev's square bracketed commentary to the email referred to in paragraph 213, what Mr Shulev alleges to be 'threats' in paragraphs 212 and 213 are nothing more than tough negotiations under time pressure, given we were trying to resolve this matter at the same time as the hearing was ongoing before Stephen Hofmeyr KC."

In relation to the signature of the documents on 1 July 2021, Mr Trenchev said:

> "8. Once finalised, I circulated the Agreements using a Docusign envelope [page 17]. Mr Shulev received an email which had a click-through marked "Review Document".  Upon clicking "Review Document", Mr Shulev had the opportunity to review and to apply his signature to each of the Agreements and return the envelope to us by clicking "Finish".  Mr Shulev applied his own signature first and then Mr Kantchev and I applied our signatures to execute the Agreements on behalf of the various entities. At pages 18 to 19 is a certificate of completion from Docusign in relation to the Agreements. As can be seen from the certificate, Mr Shulev was re-sent the Agreements at 2:04pm Bulgarian time (4:04am Pacific time). Mr Shulev had the opportunity to review and consider the Agreements for over an hour before he signed them at 3:16pm Bulgarian time (5:16am Pacific time). Mr Kantchev and I signed shortly after. Once completed, Docusign automatically sent the executed copies of the Agreements to all parties.

> 9. At paragraphs 222 and 223, Mr Shulev states that he was unable to finalise the Agreements unless he signed them all.  This is correct.  Clause 8 of the Settlement Agreement envisaged that the RoCA [Release of Claims Agreement] and Confidentiality Agreements were to be entered into before Mr Shulev obtained his second instalment of $50,000 USDT … .  Given that all the conditions to receiving the first instalment should have taken place on 1 July 2021, it made sense that all the Agreements were signed together, which should have allowed the second instalment to be paid to Mr Shulev within the following seven days (i.e. by 8 July 2021).  I do not know why Mr Shulev should object or be surprised by this. The signing of the RoCA and

30

Confidentiality Agreements was required to allow him to receive his second instalment (which presumably he wanted) as is clearly stated in clause 8 of the Settlement Agreement.

10. Mr Shulev says that he understood that he should only sign the Settlement Agreement, and that the RoCA and Confidentiality Agreements were contingent on performance of the Settlement Agreement. If that were the case, Mr Shulev should have refused to sign the Agreements, and not completed the Agreements by returning them to us via Docusign.  In actual fact, at that time, Mr Shulev agreed to the compensation that was offered to him, and freely entered into the Agreements to allow that compensation to be paid to him upon the terms agreed.  I do not feel that it is right that Mr Shulev should be able to renege on what he agreed under the Agreements on 1 July 2021."

72.  Mr Ward of Nexo's solicitors filed a witness statement the same day dealing with certain other issues.  In relation to the Hardware Ledger, Mr Ward said:

"23. Nexo has repeatedly stated that it does not have access to the Ledger or the wallets contained therein.  It further does not have the seed phrases required to access the Ledger or the wallets therein remotely, and has been asking Mr Shulev for the seed phrases for some years now.

24. It remains, as it has done throughout the course of these proceedings, Nexo's position that Mr Shulev has access to the seed phrases required to operate the wallets containing the Nine Assets. This position is supported by the transfer of assets from one of those wallets as set out at paragraphs 25 to 28 below.  In any event Mr Shulev was found to be in control of the Nine Assets within the [July 2022] Judgment."

73.  Paragraphs 25-28 of Mr Ward's witness statement deal with the transfer of the Nexo Tokens to Nexo on 1 July 2021.  He made the point in § 25 that the sending of the email enclosing the seed phrases from the ProtonMail email account "*fill5645@protonmail.com*" aligned perfectly with the correspondence that was happening between Nexo and Mr Shulev.  In particular, at 15:21 Mr Trenchev emailed Mr Shulev asking for the Nexo Tokens and seed phrases to be sent.  At 15:26 seed phrases were sent from ProtonMail account "*fill5645@protonmail.com*" which provided access to a newly created wallet (where the Nexo Tokens were deposited).  Then at 15:30 Mr Trenchev emailed Mr Shulev asking what the new wallet was, to which the seed phrases related.

74.  There were further developments very shortly before the hearing before me on 3 April 2023.  On 31 March 2023 Mr Ward filed a third witness statement, stating that between 14:05 and 15:16 BST that day, seven of the Nine Assets were transferred out of their respective wallets to apparently newly created wallets.  He set out details of the transfers, which related to the wallets and amounts set out in § 51 above apart from the two BNB balances in the Binance Chain and ETH wallets referred to there.

31

75.     Finally, on 2 April 2023 Mr Shulev filed a fifth witness statement in which he stated *inter alia*:

> "8. On the same day when Nexo's offices and other premises were raided and searched, I was contacted by the Bulgarian National Investigation Service (the "NIS") and summoned for questioning at the NIS' offices, as I am one of Nexo's co-founders.  Since then, over the past two months I have continued to attend interviews with the NIS and upon their request I have assisted with their investigation by providing information related to the Nexo group.  I have not been charged with any offences and am not considered a suspect or person of interest in this investigation.
>
> 9. Following taking legal advice in Bulgaria, on 21 March 2023 I filed an official request to provide voluntarily the PIN Code [to the Hardware Ledger, which Mr Shulev said he still remembered] to the investigators so that they might use it to attempt to open any of the hardware ledger devices seized from Nexo.
>
> 10. On the following day (22 March 2023), an investigator from the NIS contacted me, requesting that I submit the PIN Code in a sealed, signed envelope. I then visited the offices of the NIS later that day, where I answered questions about my possession of the PIN Code. I then submitted the PIN Code to the investigator in a securely sealed envelope, under the investigator's instructions and protocol. As part of my voluntary submission, I requested to be informed in writing if the provided PIN Code had managed to open any of the hardware ledger devices seized by the NIS.
>
> 11. On 29 March 2023, the NIS contacted me and asked me to attend their offices where I was handed an official letter (GS5/2-5) which stated that the PIN Code did unlock a piece of physical evidence that had been seized during the raid on Nexo, which at this time I presumed was one of the hardware ledgers. I was also notified that I would receive further information in the next stage of the prosecution.
>
> 12. On 31 March 2023, I was contacted once again by the NIS office. I therefore once again visited their offices in person and this time I received a certificate (GS5/6-9) which stated that the PIN Code had been used by the NIS to unlock a hardware crypto wallet seized during the search of Nexo's offices and associated locations on 12 January 2023.  It also stated that crypto wallets/addresses had been found on the now unlocked hardware wallet, and these included:
>
> XRP – ...Lyk (**the "Lyk Wallet"**)

XLM – ...DF3

XLM – ...YWO **(the "Ywo Wallet"**)

13. The Lyk Wallet and the Ywo Wallet are two of the Nine Assets. I therefore believe that the hardware ledger seized by the NIS and unlocked with the PIN Code is the Hardware Ledger.

14. When I enquired orally with the NIS investigators if there were any other crypto addresses which were discovered on the seized hardware device, the investigators shared that the experts were still looking but appeared also to have found Ethereum assets but had not yet accessed them at that stage. I therefore assume that they also found the Ethereum wallet that was present on the Hardware Ledger: ...CEb (**the "CEb Wallet"**).  I remind the Court that the CEb Wallet is the wallet from which the Nexo Tokens were transferred on 1 July 2021.

15. I was also informed by the investigators that they would be seeking urgent orders from the Bulgarian courts to seize all assets accessible from the Hardware Ledger.  In order not to tip-off Nexo and jeopardise this process, I have delayed serving this evidence for as long as reasonably possible ahead of the hearing on 3-4 April 2023.

16. I remind the Court that I have never known or been given the seed phrases that could be used to reconstitute the wallets contained on the Hardware Ledger (and enable the use and/or ability to move the assets accessible through it independently of the device itself), which would have been required prior to the device being set-up in the first place prior to it being handed over to me. For this reason, I believe these seed phrases are held by Mr Trenchev or Mr Kantchev (**the "Seed Phrases"**).  I am not aware whether Nexo, Mr Trenchev, Mr Kantchev or any other third party still has access to the Seed Phrases, but I myself do not and nor does anyone on my behalf.

17. As already evidenced in Ward 3, on 31 March 2023 multiple transfers occurred from the crypto addresses containing the Nine Assets (the "Transfers"). …

18. I remind the Court that the table included in the schedule to the sealed version of the Order of Henshaw J secured by Nexo on 28 July 2022 set out the following information in respect of the nature, amount and location of the Nine Assets [which corresponded to the list referred to in § 51 above].

19. Given that the Hardware Ledger is in the possession of the NIS and I am unaware of the location of the Seed Phrases, I believe that the Transfers were most likely made by or on behalf of the NIS using the Hardware Ledger but I do not rule out the

33

possibility of any of them being done by or on behalf of Nexo using the Seed Phrases if they had become aware of the prosecutor's activity. …

20. The fact that the Hardware Ledger was found by the NIS during the raids on Nexo's business offices and related premises and locations on or around 12 January 2023 is incontrovertible proof that:

20.1. Nexo has since 13 September 2019 retained possession of the Hardware Ledger and the Nine Assets, and the Nexo Tokens contained on it (or in the case of the Nexo Tokens, contained on it until 1 July 2021). Nexo dishonestly, consciously, and deliberately hid this material fact from the Court in order to procure Henshaw J's judgment by fraud.

20.2. The transfer of the Nexo Tokens on 1 July 2021 from the CEb Wallet was a sham orchestrated dishonestly, consciously, and deliberately by or on behalf of Nexo in furtherance of the Nine Assets Conspiracy and in order to deceive the English High Court that I had possession or control of the Nine Assets when in fact those assets were at all material times possessed or controlled by Nexo.

20.3. Nexo knowingly presented false and dishonest evidence to the English High Court that I had transferred the Nexo Tokens, when this transfer was in fact made by or on behalf of Nexo. In furtherance of this fraud, Nexo consciously and deliberately hid the fact and nature of the Proton Email, which I believe was sent from an anonymous email address by or on behalf of Nexo for this very purpose. Nexo also consciously and deliberately hid the fact and existence of the Hardware Ledger until its Reply dated 4 October 2022.

21. Therefore, the Judgment of Henshaw J dated 1 July 2022 was procured by fraud and I intend to apply to rescind the Judgment.

22. Further, the evidence provided in these proceedings by Mr Trenchev now has been proven to be deliberately misleading and dishonest, false, and completely unreliable.

23. The following particular statements verified by a statement of truth made by Mr Trenchev on behalf of Nexo are contemptuous as they were false and dishonest lies, made knowingly, consciously, and deliberately without any honestly held belief as to their truth by Mr Trenchev and in furtherance of the Nine Assets Conspiracy as pleaded in the Counterclaim: …"

76. Mr Shulev exhibited copies of the letters dated 29 and 31 March 2023, to which he referred, from the Prosecutor's Office of the Republic of Bulgaria. The second of these stated, in translation:

34

"We, the undersigned, Violeta Valcheva and Svetoslav Vasilev - Investigators at the National Investigation Service, do hereby certify that the PIN Code provided by you has been used to get access to a hardware crypto wallet, which was seized at the search conducted on 12/01/2023 at company addresses of NEXO under Pre-trial Proceedings No. 79/2022 by the docket of the National Investigation Service, Prosecutor Case No. 20208/2022 by the Docket of the Sofia Prosecutor's Office on which the following public addresses were found:

XRP – ...Lyk

XLM – ...DF3

XLM – ...YWO

This is issued to serve Mr. Georgi Shulev, residing in Sofia, [address stated], only and solely before THE HIGH COURT OF JUSTICE, London in proceedings No. CL-2020-000392, as by receiving this Certificate, he shall be under the obligation not to disclose the information contained therein elsewhere."

77.    As noted earlier, I decided to admit Mr Shulev's fifth witness statement in evidence on the first day of the hearing before me on 3-4 April 2023, after hearing argument, for the reasons set out in a separate ruling.  I asked how Nexo wished to proceed.  Counsel for Nexo indicated that Nexo wished to proceed with its application on the basis that no inference would be drawn against it from the absence of a response to Mr Shulev's fifth statement.  Counsel for Mr Shulev responded that the court would be invited to draw an inference if Nexo did not respond.  Nexo elected to continue with its applications.

## (C) PRINCIPLES

### (1) Summary judgment and striking out

78.    As regards the test for summary judgment, it is sufficient for present purposes to refer to CPR 24.2 and the Court of Appeal's judgment in *The LCD Appeals* [2018] EWCA Civ 220.  CPR 24.2 provides as follows:

"The court may give summary judgment against a claimant or defendant on the whole of a claim or on a particular issue if –

(a) it considers that –

(i) that claimant has no real prospect of succeeding on the claim or issue; or

(ii) that defendant has no real prospect of successfully defending the claim or issue; and

(b) there is no other compelling reason why the case or issue should be disposed of at a trial."

79.   In *The LCD Appeals* the Court of Appeal set out the following considerations applicable to summary judgment applications, taken from passages in *Easyair Ltd v Opal Telecom Ltd* [2009] EWHC 339 (Ch) and *Swain v Hillman* [2001] 1 All ER 91 at 94:

   i)   the court must consider whether the claimant has a "*realistic*" as opposed to a "*fanciful*" prospect of success: *Swain v Hillman* [2001] 1 All ER 91;

   ii)   a "*realistic*" claim is one that carries some degree of conviction. This means a claim that is more than merely arguable: *ED & F Man Liquid Products v Patel* [2003] EWCA Civ 472 § 8;

   iii)   in reaching its conclusion the court must not conduct a "*mini-trial*": *Swain v Hillman*;

   iv)   this does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court.  In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents: *ED & F Man Liquid Products v Patel* § 10;

   v)   however, in reaching its conclusion the court must take into account not only the evidence actually placed before it on the application for summary judgment, but also the evidence that can reasonably be expected to be available at trial: *Royal Brompton Hospital NHS Trust v Hammond (No 5)* [2001] EWCA Civ 550;

   vi)   although a case may turn out at trial not to be really complicated, it does not follow that it should be decided without the fuller investigation into the facts at trial than is possible or permissible on summary judgment.  Thus the court should hesitate about making a final decision without a trial, even where there is no obvious conflict of fact at the time of the application, where reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case: *Doncaster Pharmaceuticals Group Ltd v Bolton Pharmaceutical Co 100 Ltd* [2007] FSR 3;

   vii)   on the other hand, it is not uncommon for an application under Part 24 to give rise to a short point of law or construction and, if the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, it should grasp the nettle and decide it.  If it is possible to show by evidence that although material in the form of documents or oral evidence that would put the documents in another light is not currently before the court, such material is likely to exist and can be expected to be available at trial, it would be wrong to give summary judgment because there would be a real, as opposed to a fanciful, prospect of success.  However, it is not enough simply to argue that the case should be allowed to go to trial because something may turn up which would have a bearing on the question of construction: *ICI Chemicals & Polymers Ltd v TTE Training Ltd* [2007] EWCA Civ 725; and

36

viii)     a judge in appropriate cases should make use of the powers contained in Part 24. In doing so, he or she gives effect to the overriding objective as contained in Part 1. It saves expense; it achieves expedition; it avoids the court's resources being used up on cases where this serves no purpose; and it is in the interests of justice. If the claimant has a case which is bound to fail, then it is in the claimant's interest to know as soon as possible that that is the position: *Swain v Hillman* [2001] 1 All ER 91 § 94.

80.    As to striking out:

i)     The court may strike out a statement of case if it appears to the court that it discloses no reasonable grounds for bringing the claim (CPR 3.4(2)(a)). The claim (or part of it) should be struck out if the facts alleged, even if true, do not disclose any legally recognisable claim against the defendant (3APD paragraph 1.4(3)).

ii)    The court will strike out a statement of case where it is an abuse of the court's process (CPR 3.4(2)(b)).

### (2) Issue estoppel

81.    Mr Shulev cited the classic statement of Dixon J in *Blair v Curan* [1939] 62 CLR 464 (High Court of Australia) that issue estoppel can apply in relation to issues that were "*necessarily established as the legal foundation or justification of its conclusion*", such that "*nothing but what is legally indispensable to the conclusion is thus finally closed or precluded*". That statement was quoted by the editors *of Spencer Bower and Handley on Res Judicata* (5th ed., 2019) at some length, and considered with apparent approval by the Court of Appeal in *Kirin-Amgen Inc. & Another v Boehringer Mannheim GmbH & Another* [1997] FSR 289.

82.    The issue must form "*a necessary ingredient in a cause of action*" (*Arnold v National Westminster Bank PLC* [1991] AC 93, 105D-E (Lord Keith), cited by Lord Sumption JSC in *Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd (formerly Contour Aerospace Ltd)* [2014] AC 160 § 20. Facts that have been found, but are <u>not</u> necessary to the judgment, can be disputed in subsequent proceedings: see *Thoday v Thoday* [1964] P 181, 198 per Diplock LJ:

> "But 'issue estoppel' must not be confused with 'fact estoppel', which, although a species of 'estoppel in pais', is not a species of estoppel per rem judicatam. The determination by a court of competent jurisdiction of the existence or nonexistence of a fact, the existence of which is not of itself a condition the fulfilment of which is necessary to the cause of action which is being litigated before that court, but which is only relevant to proving the fulfilment of such a condition, does not estop at any rate per rem judicatam either party in subsequent litigation from asserting the existence of or non-existence of the same fact contrary to the determination of the first court. It may not always be easy to draw the line between facts which give rise to 'issue estoppel' and those which do not, but the distinction is important and must be borne in mind."

37

See also *Spencer Bower* (supra) § 8.21, indicating that issue estoppel can arise only where the issue in the second action can be asserted beyond all possible doubt to be identical with those raised in the previous action (citing Lord Maugham in *New Brunswick Rly Co v British and French Trust Corporation* [1939] AC 1, 20).

83.     There may be special circumstances in which issue estoppel will not bar further proceedings. An example arose in *Arnold*, where the question at issue was whether in operating a rent review clause under a lease, the tenants were bound by the construction given to the very same clause by Walton J in earlier litigation between the same parties over the previous rent review. The Court of Appeal had subsequently, in other cases, cast doubt on Walton J's construction, and the House approached the matter on the footing that the law had changed since the earlier litigation. Lord Keith (with whom the other members of the Appellate Committee agreed) said:

> "There is room for the view that the underlying principles upon which estoppel is based, public policy and justice, have greater force in cause of action estoppel, the subject matter of the two proceedings being identical, than they do in issue estoppel, where the subject matter is different." (p108G-H)

and

> "In my opinion your Lordships should affirm it to be the law that there may be an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result." (p109B)

84.     As a result, the House of Lords in *Arnold* decided that the rejection of Walton J's construction of the rent review clause in the subsequent case law was a materially altered circumstance that warranted rearguing the very point that he had rejected.

85.     After citing the above passages, Lord Sumption in *Virgin Atlantic* stated that (so far as issue estoppel is concerned) *Arnold* is authority for the proposition that:

> "Except in special circumstances where this would cause injustice, issue estoppel bars the raising in subsequent proceedings of points which (i) were not raised in the earlier proceedings or (ii) were raised but unsuccessfully. If the relevant point was not raised, the bar will usually be absolute if it could with reasonable diligence and should in all the circumstances have been raised." (§ 22(3))

86.     Mr Shulev suggested that in *King v Stiefel* [2021] EWHC 1045 (Comm) §§ 275-276, Cockerill J recognised, *obiter*, that such "*special circumstances*" could arise where a litigant was not legally represented.  Cockerill J said:

> "275. All that remains is the question of "special circumstances which would cause injustice". This was not specifically relied upon by Mr Newman, but Ms Addy QC for Primekings very properly drew this point to my attention in paragraph 47 of her skeleton. It is a point to which I have given considerable thought.

> 276. There seem to me to be two arguments which might have been enunciated on behalf of the Kings in this regard. The first is that I should regard there as being special circumstances because Mr King was not legally represented at the detailed assessment hearing and he had to attend by phone. It was said in Mr Newman's skeleton as noted above that the Kings were "doing their best to simplify the assessment under COVID conditions".

> 277. However Mr King's skeleton for the assessment seems to undercut both these points. …"

87.     In my view, the most that can be taken from this passage is that Cockerill J was willing to contemplate the possibility that special circumstances might exist where a litigant was unrepresented and believed that he/she had some reason not to raise a point.  There is no wider principle disapplying ordinary rules and principles to litigants in person as such: cf. *Notting Hill Finance v Sheikh* [2019] EWCA Civ 1337, concerning whether a litigant in person should have been allowed to raise new points on appeal, where the Court of Appeal applied Lord Sumption's statement in *Barton v Wright Hassell* [2018] UKSC 12 § 18 that the court's rules and procedures apply to all parties, and the fact that a party is unrepresented can at most have a limited effect in increasing the weight to be given to some other, directly relevant, factor.

88.     The decision whether a claim or defence should be struck out pursuant to the *Henderson* principle or as an abuse of process requires:

> "a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case focusing attention to the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before." (*Johnson v Gore Wood & Co* [2002] 2 AC 1, 31D-E (per Lord Bingham)

### (3) Affirmation

89.     Affirmation is a bar to rescission, which applies both to duress and misrepresentation. Affirmation requires (i) knowledge by the affirming party both of the relevant facts, which gives rise to the election and of the right to rescind or avoid and (ii) an unequivocal election (*Peyman v Lanjani* [1985] Ch 457).  Knowledge is frequently inferred from the access to legal advice (*Moore Large & Company Limited v Hermes*

*Credit And Guarantee PLC* [2003] EWHC 26 (Comm) §§ 98-103 (Colman J)). Unequivocal conduct by a party ignorant of the truth is not a binding affirmation even though he could have discovered the true position (O'Sullivan and others, "*The Law of Rescission*" (3rd ed., 2023) at §§ 23.24–23.26).  The burden of pleading and proving affirmation, including that the party entitled to rescind knew of their legal rights, is on the party alleging affirmation (*Moore Large* at § 102; "*The Law of Rescission*" at §§ 23.110–23.112).

90.    A claim to enforce contractual rights does not involve affirmation if it is made as an alternative to a plea for rescission ("*The Law of Rescission*" at § 23.83 citing *Clough v The London and North Western Railway Company* [1871] LR 8 Ex 26, 38 and *Coastal Estates Pty Ltd v Melevende* [1965] VR433 (Full Ct) 440, 450).  This includes pleading a contractual defence by a party free to later plead rescission (*ibid*., citing *Involnert Management Inc v Aprilgrange Limited* [2015] 2 Lloyd's Rep 289: underwriters defending claim on insurance policy; contractual defences pleaded while investigations into non-disclosure and misrepresentation were ongoing).

## (D) BITMEX ACCOUNT: NEXO'S DAMAGES CLAIM

### (1) Nexo's claim

91.    Nexo claims damages on the basis that:

> "The consequence of the declarations and findings set out above is that Mr Shulev breached clause 4 of the Settlement Agreement by refusing to inform HDR that the Bitmex Account should be released to Nexo and that he would waive any rights and claims as to the operational, legal and beneficial ownership of it and the assets within it.  Further, Mr Shulev thereby caused Nexo, the rightful owner of the asset, to be deprived of access to it." (Particulars of Claim § 15)

92.    The relevant part of Nexo's Prayer for relief seeks "*Damages for breach of clauses 3 and 4 of the Settlement Agreement*".

93.    The claim is thus based on the Settlement Agreement.

### (2) Clause 4 of the Settlement Agreement

94.    As set out in section (B)(9) above, Mr Shulev in his Defence does not dispute my finding as to the ownership of the Bitmex Account, due to my independent finding that it belonged to Nexo irrespective of the Settlement Agreement, "*without prejudice to his position that he was not obliged to take any action in respect of the Bitmex Account pursuant to clause 4 of the Settlement Agreement*".

95.    Mr Shulev alleges in his Defence that Nexo breached its obligation to pay the first instalment due under the Settlement Agreement, and Mr Shulev was thereby released from any obligation under § 4 to notify HDR that the Bitmex Account could be released to Nexo; as a result, Mr Shulev was not in breach of the Settlement Agreement and/or Nexo is not entitled to seek any damages in relation to the Bitmex Account.

96.   However, I have already rejected that argument in §§ 58-60 of the July 2022 Judgment. After quoting the observations of Mr Hofmeyr QC quoted in § 38 above, I said:

> "59.      However, clause 3 makes clear that the relevant order of events is first for Mr Shulev to transfer the requested Assets to Nexo, and then for Nexo to pay the first instalment.  As I conclude later, Mr Shulev has not yet transferred all of the requested Assets.  In any event, clause 4 is in my view a freestanding obligation.  The dispute has been settled by the Settlement Agreement, on terms that among other things require Mr Shulev to renounce any claimed interest in the Account.  That was and is the case regardless of whether either party has complied with other obligations arising under the Settlement Agreement, including clause 3.  That view is reinforced by the statement in clause 12 that the Settlement Agreement is in full and final settlement of any claims between the parties (except for claims for breach of the agreement itself or the Confidentiality or Release of Claims Agreements).  Moreover, it can hardly be the case that Mr Shulev can, by failing to effect timely transfer of the requested Assets, delay the required notification to HDR under clause 4 and hence Nexo's ability to get access to the Account.
>
> 60.      It follows that Mr Shulev and Nexo are jointly obliged, and have been since the Settlement Agreement was signed, to inform HDR that the Account will be released to Nexo and that Mr Shulev waives any rights and claims as to its operational, legal and beneficial ownership and the assets within it.  …"

The Court of Appeal refused permission to appeal from that conclusion.

### (3) Proposed claims to rescind the Settlement Agreement

97.   In his skeleton argument, Mr Shulev asserts that he is entitled to seek rescission of:

i)      the Settlement Agreement, the Release of Claims Agreement and the Confidentiality Agreement, on the grounds of duress;

ii)     the Settlement Agreement on the ground of misrepresentation;

iii)    the Release of Claims Agreement and the Confidentiality Agreement, on the grounds of misrepresentation; and

iv)     the Release of Claims Agreement and the Confidentiality Agreement, on the grounds of unconscionable bargain.

98.   It is necessary to address only (i) and (ii) above for the purposes of the present application.

*(a) Duress*

99.    The alleged duress arises from Mr Trenchev's alleged threats on 16 June and 1 July 2021, referred to earlier, which are pleaded in § 57 of Mr Shulev's Defence in the context of Mr Shulev's conspiracy claims.  Mr Shulev refers to *Al Nehayan v Kent* [2018] EWHC 333 (Comm), where duress sufficient to found a claim for the tort of intimidation took the form of physical threats (§§ 214-216).

100.   Mr Shulev notes that in § 65 of the July 2022 Judgment I said that I did not consider the misrepresentation and duress issues relating to the Release of Claims Agreement to be properly capable of resolution without oral evidence, possibly further disclosure, and fuller argument.  Mr Shulev goes on to say in his skeleton argument:

> "Nexo complains in its skeleton argument that with respect to the Settlement Agreement, duress and misrepresentation have not been pleaded in Mr Shulev's Defence (§28a).  Mr Shulev does deny that the Settlement Agreement has the effect Nexo alleges [Defence and Counterclaim, §7.3, A/2/13].  At that time, Mr Shulev was not aware of the position Nexo will take with respect to the Release of Claims and Confidentiality Agreement, which was only made clear by the Application and was expecting to take a position on all three documents in its Reply to the Defences to Counterclaim.  To the extent the Court finds Mr Shulev has real prospects of success to rescind the Settlement Agreement on the basis of duress and/or misrepresentation, Mr Shulev can of course amend his Defence and Counterclaim to include it there, rather than in his Reply if that would be most efficient.  ..." (§ 17)

101.   I note, first of all, that the denial in Defence § 7.3 that the Settlement Agreement has the effect that Nexo alleges does not come close to an allegation that the Settlement Agreement is voidable (or has been avoided) for duress.  Any such claim would need to be pleaded in the Defence, because Nexo's claims as set out in the Particulars of Claim are expressly based on the Settlement Agreement.

102.   Mr Shulev failed to plead any such allegation in his Defence and Counterclaim: to the contrary, he expressly relied on the Settlement Agreement in the averments referred to in § 67 above.  Moreover, those averments were not put forward alongside an alternative case for rescission: no such case was pleaded.  Further, by the time of his Defence and Counterclaim Mr Shulev was aware of the facts underlying his proposed claim based on duress, and indeed he pleaded in that statement of case the threats said to underlie the duress claim.  Nexo would therefore appear to have a good argument that Mr Shulev affirmed the Settlement Agreement with knowledge of the alleged duress.

103.   I am conscious of the need for caution when seeking to decide an affirmation issue on a summary judgment application, and have in mind the observations of Cockerill J in *Leeds City Council v Barclays Bank* [2021] EWHC 363 (Comm) at §§ 164 ff.  Cockerill J contrasted the case before her with *Moore Large* itself (cited in § 89 above):

> "In *Moore Large* the affirmation was said to have taken place actually within the defence in the action, at a time when solicitors

> had long since been retained, and when counsel had drafted the defence itself. It was therefore a case where no even remotely tricky question of knowledge arose. There were lawyers retained charged with dealing with the dispute between the parties. The point made about evidence of the advice received arose after the party in question had failed to disclose such advice even at trial."
> (§ 204)

104.    The issue in the present case arises on a summary judgment application rather than at trial.  However, as I have noted, the facts underlying the prospective duress claim are pleaded in Mr Shulev's Defence itself, prepared by leading and junior counsel, and the affirmation is also contained in the Defence itself.

105.    Mr Shulev makes the point that Nexo's Reply did not include a Defence to Mr Shulev's Counterclaim (because Nexo was applying for summary judgment), so Nexo's statements of case did not rely on the Settlement Agreement or the Release of Claims Agreement as a defence to the Counterclaim.  Mr Shulev was expecting to take a position on all three documents in its Reply to Nexo's Defence to Counterclaim.

106.    However, as regards the duress ground, Mr Shulev did not need to await Nexo's position regarding Mr Shulev's Counterclaim.  There is no apparent reason why any claim that Mr Shulev was entitled to rescind the Settlement Agreement for duress could not be pleaded in the Defence, regardless of what position Nexo might take in relation to the Release of Claims Agreement or the Confidentiality Agreement.  Any such right to rescission needed to be exercised and to be pleaded in Mr Shulev's Defence.  As a result, I would have been willing to grant summary judgment on the duress argument.

*(b) Misrepresentation*

Mr Shulev's case

107.    Mr Shulev's proposed misrepresentation claim is put in the following way in his submissions:

i)      The clear intention of the parties, reflected in clause 8 of the Settlement Agreement, was for "*the ownership claim*" to be released only in the Release of Claims Agreement and not in the Settlement Agreement.

ii)     Clause 12 of the Settlement Agreement states:

> "This Agreement is legally binding and is a full and final settlement of any and all claims each Party hereto may have against the other, except for the claims arising out of a breach of its terms or such that the Nexo Companies and/or Kosta Kalinov Kantchev, and/or any other legal entity belonging to the Nexo Group, or Mr Shulev may have to each other by virtue of the Confidentiality Agreement and the Release of Claims Agreement".

iii)   Clause 8 of the Settlement Agreement (quoted more fully in § 25 above) refers to:

> "a Release of Claims Agreement with Kosta Kalinov Kantchev, the Nexo Companies and any other legal entity belonging to the Nexo Group, whereby Mr Shulev undertakes to declare, warrant and confirm that he does not have any rights, shareholding, title, interest, present or future claims and demands in any form to/in the Nexo Companies or the Other Companies, both as defined therein ("Release of Claims Agreement")"

iv)   Nexo's reading of clause 12 would render clause 8 and, to a large extent, the entire Release of Claims Agreement, superfluous.

v)   First, even on Nexo's reading, clause 12 would release only Nexo and not Mr Kantchev and Mr Trenchev (who are not parties to the Settlement Agreement). Nexo's reading is absurd, because it would suggest that Mr Shulev has compromised his ownership claim not with the owners of Nexo, but with Nexo itself, which is effectively the property over which he contests ownership.

vi)   Secondly, unlike clause 8, which specifically links the ownership claim to the Release of Claims Agreement, clause 12 makes no mention of ownership, but instead expressly carves out any claims "*by virtue*" of the Release of Claims Agreement.  The natural meaning of "*by virtue of*", therefore, is to encapsulate all matters that are otherwise within the ambit of the Release of Claims Agreement, i.e. the ownership claim.  What clause 12 actually says, therefore, is that it excludes the ownership claim.

vii)   Thirdly, the Release of Claims Agreement itself makes reference to clause 8 being an undertaking that Mr Shulev enter into the Settlement Agreement: recital B to the Release of Claims Agreement refers to the Settlement Agreement "*by virtue of Section 8 whereof Mr Shulev undertook to enter into a Release of Claims Agreement with Mr Kantchev, the Nexo Companies and any other legal entity belonging to the Nexo Group, and to declare, warrant and confirm certain circumstances*".

viii)   The only proper construction, therefore, is that clause 12 did not operate as a general release, but only as a release with respect to the object of the Settlement Agreement – the "*BitMEX Dispute*", which is defined in clause 6 of the Settlement Agreement; while all other disputes are excluded from the clause 12 release, including disputes relating to the ownership, which are disputes "*by virtue of*" the Release of Claims Agreement.

ix)   In the alternative:

> "to the extent that Court finds Nexo is correct on its alleged construction and Clause 12 operates as a general release, such that it precludes the Counterclaim independently of the Release of Claims Agreement, Mr Shulev submits that he entered into the Settlement Agreement in reliance on the representation that the Settlement Agreement will not release any claims between Mr

> Shulev and Nexo in respect of Mr Shulev's ownership claim (the
> "**No Release Representation**").  The No Release Representation
> arises as an implied representation resulting from (i) the express
> contractual term of Clause 8 of the Settlement Agreement, which
> specifically provides that this release will be contained
> separately, and (ii) an express representation by words and/or
> conduct in the context of the pre-contractual negotiations arising
> out of Mr Trenchev having, according to Mr Shulev's evidence,
> "*shared multiple times with me during the negotiations that the
> other two Agreements were contingent, so I believed I had proof
> of those two not being enforceable just yet.*" … (the
> "**Contingency Representation**")"

and that he is entitled to rescind the Settlement Agreement as a result, alternatively to claim damages for misrepresentation.

Effect of clauses 8 and 12 of Settlement Agreement

108.    Beginning with the question of construction of clauses 8 and 12 of the Settlement Agreement, which underlies points (i)-(viii) above, I would not accept Mr Shulev's submissions about their meaning.  Clause 12 provides for a settlement of all claims between Mr Shulev, on the one hand, and Nexo and the "*Other Nexo Companies*" (as defined) on the other, subject only to the exception for "*the claims arising out of a breach of its terms or such that the Nexo Companies and/or Kosta Kalinov Kantchev, and/or any other legal entity belonging to the Nexo Group, or Mr Shulev may have to each other by virtue of the Confidentiality Agreement and the Release of Claims Agreement*".  The natural meaning of claims "*by virtue of*" the Confidentiality Agreement and the Release of Claims Agreement is claims arising under those agreements, i.e. for breach of them: not claims that are settled pursuant to those agreements.  That view is also consistent with the fact that the Confidentiality Agreement does not settle claims at all: the only claims that the parties could have "*by virtue of*" that agreement are claims for breach of its terms; and it is logical to approach the reference in clause 12 to the Release of Claims Agreement in the same way.

109.    There is no inconsistency between (a) the above interpretation of clause 12 and (b) the portion of clause 8 which envisages the parties entering into a Release of Claims Agreement "*whereby Mr Shulev undertakes to declare, warrant and confirm that he does not have any rights, shareholding, title, interest, present or future claims and demands in any form to/in the Nexo Companies or the Other Companies*".  As Mr Shulev implies in the submission recorded in § 107.v) above, the most obvious parties to a settlement of ownership claims would be Mr Shulev and Mr Kantchev/Mr Trenchev, rather than Mr Shulev and Nexo itself.  It is unclear what ownership claims, as such, would be expected to arise against Nexo itself, and indeed the part of Mr Shulev's Counterclaim headed "*Claims relating to the ownership of the Nexo group*" sets out claims against Mr Kantchev and Mr Trenchev but not Nexo.  Even if ownership claims could have been envisaged against Nexo, that would simply mean there was to that limited extent an overlap between clause 12 of the Settlement Agreement and the Release of Claims Agreement.  The possibility of such an overlap does not require a radical reinterpretation of clause 12 of the kind Mr Shulev suggests – limiting it to settlement of the Bitmex Account dispute - or, in my view, any other kind of restriction on the scope of clause 12.

Basis of proposed alternative misrepresentation claim

110.    If the foregoing is correct, then Mr Shulev now suggests that he has a claim to rescind the Settlement Agreement for misrepresentation by Nexo as to its scope.

111.    Insofar as any such claim is said to derive from clause 8 itself, it has no realistic prospect of success.  If clause 8 does not limit clause 12 in the way Mr Shulev submits, then it cannot amount to a representation to the effect that clause 12 is so limited.

112.    Insofar as the misrepresentation claim is based on representations said to have been made by Mr Trenchev, the evidence on which it is mainly based appears to be the following passages from Mr Shulev's fourth witness statement.  In order to give the full flavour of this passage (whose style is at times diffuse) it is necessary to set out it at some length:

> "198. The draft settlement agreement was never accompanied by any drafts of a Release of Claims or Confidentiality Agreement. Drafts of these documents were in fact only provided to me for the first time mere hours before the 1 July hearing was due to commence, and only after I had said I would not sign a settlement agreement that depends on signing other Agreements that do not exist yet. AT [Mr Trenchev] had responded claiming that the agreements were standard agreements, signed by thousands of people worldwide. In reality, just an hour or so before the hearing, I was still negotiating over the main part of the settlement agreement while prepping for the hearing itself, so I definitely did not have sufficient time to look over anything new let alone two entirely new agreements. At the time I was also lacking proper legal advice as I was acting in person.
>
> 199. It is crucial to understand that I was ambushed by Nexo with the language of the Settlement Agreement, Release of Claims Agreement, and Confidentiality Agreement. The last draft that I had reviewed was sent to me by Nexo on 22 June 2021 …, to which I responded with a different draft on my form on 30 June 2021 …, but this was ignored without any engagement and I was then simply sent their form again on 1 July 2021 …. I had no real time to review this at all and was under immense pressure to prepare for the hearing itself. Not just that, but I [was] also served for the first time with drafts of the Release of Claims Agreement and Confidentiality Agreement that morning.
>
> …
>
> 201. It was also clear to me during the negotiations that the understanding between me and Nexo was that the settlement agreement terms operated consecutively, with no stand-alone clauses as was to be subsequently argued by Nexo. Proof of Nexo's understanding and agreement as to the conditional structure of the Agreement was communicated to me by AT in an email from 30 June 2021 sent at 0021:16 (Sofia time), where

46

he commented on the changed sequence of the execution of the agreement:

> " ... the sequence of clauses 6, 7 and 8 are changed in a way that doesn't make sense and we're moving them as they were."

202. If the clauses of the settlement agreement were not conditional on each other, then their sequence would not have been of any importance, as any clause would be valid and enforceable no matter their order in the Settlement Agreement. However, as stated by AT, this was not the case and the clauses were thus mutually understood to be contingent on the compliance with other clauses.

203. During this period, I was also being put under a great deal of pressure not only to prepare for the forthcoming High Court hearing as a litigant in person, but also increasing pressure applied directly by Nexo to sign a settlement agreement. As noted, alongside such an agreement I was also being pushed to agree the terms of a Confidentiality Agreement and Release of Claims Agreement that I did not see until practically the last minute.

204. What was also making things more difficult was that it was particularly hard work to keep checking whether Nexo had in fact implemented changes that had been negotiated over emails. I even recall that on a few occasions, while I was reviewing yet another version that had been sent to me, I was receiving emails that the same version had again been amended in DocuSign but not indicating where the change had been made. Nexo's approach was chaotic and I believe deliberately pressured and urgent, and yet at the same time they repeatedly represented to me things were straightforward and I need not worry, but I did need to sign as soon as possible.

205. On 30 June at 21:16 (Sofia time), mere hours before the first trial hearing, and regardless of my request to make the terms of any Confidentiality Agreement and Release of Claims Agreement, that I was still yet to see, bilateral, AT had again sent me a version of the settlement agreement that still spoke in unilateral terms, stating

> "...They are standard templates signed by thousands of people around the world. Nothing for you to worry about here..."

206. This was in response to an email I had sent on 30 Jun at 15:30 (Sofia Time) stating the following

> "...I am attaching a version (of the Settlement Agreement) with amendments, and definitely, there is no way we include clauses whose compliance depends on the signing of non-

47

*existent agreements (Confidentiality Agreement and Release of Claims Agreement). The confidentiality clause is more than sufficient and stable in terms of clarity and motivation not to be violated and it is fair for it to be bilateral. I hope for our 2 years of working together you have seen that I value fairness in a relationship more than creating a mess for myself and the people around me. However, reciprocity in that regard hasn't been demonstrated from your side and respectively I insist that the clause should be made bilateral."*

207. As to the Confidentiality Agreement and the Release of Claims Agreements, the first time I ever saw these was around one hour prior to the hearing on 1 July 2021, while I was preparing for the hearing and reviewing the Settlement Agreement in parallel. I had numerous concerns over their content, in particular the fact that they were still unilateral, but at this time I was a litigant in person and thus unable to consult a lawyer.

208. On 1 July, at 09:22 (Sofia time), less than an hour before the scheduled High Court hearing, AT had finally agreed to amend the Confidentiality Agreement and Release of Claims Agreement to be made bilateral …

209. Skimming through them, I saw that both the Confidentiality Agreement and the Release of Claims Agreements were still unilateral and I communicated this concern, but also given the time pressures I did not focus too much on negotiating the finer details of them as I knew under the terms of the settlement agreement they were due to be signed later and therefore we could finalise them later.

210. In reply, on Jul 1, at 10:11 (Sofia time), AT assured me they are bilateral and that I am protected:

> *"It is all bilateral, Joro. The release [referring to the Release of Claims Agreement] is more specific, because we do not have ownership of you, you do not have intellectual property, etc. There are clauses that protect you, read carefully."*

211. Alongside such matters, I also distinctly recall that the various emails and calls from Nexo were also typically accompanied by subtle threats towards me and my then 8-months pregnant fiancee. This meant that the pressures on me during this time was not just commercial pressure, with what I perceived to be also the receipt of threats from Nexo to sign a deal.

…

48

221. As I opened the settlement agreement, I signed it and clicked on finish, but the button was inactive. Then it became apparent that the Agreement had been sent in a pack with the other two agreements that I had only been sent a mere hour or so before, and I could not sign the first Agreement without signing the other two. Once again Nexo's approach was designed to mislead me, as upon signature I was provided with a DocuSign package which was set up so that when executed it not only signed the settlement agreement, but also the Confidentiality and Release of Claims agreements, neither of which I had yet finally approved and certainly were not required to be signed at this point per the terms of the Settlement Agreement, which stated in Clause 8 on its proper construction that these agreements would be signed after the execution of the Settlement Agreement. Therefore, I did not intend to approve my signature on these documents on this date, and certainly I did not intend for my signatures to be taken as binding from that date.

222. I realised this issue when I saw it, so I tried to fill just the first document, yet the way the document was set-up was that it did not allow me to continue without putting my signature everywhere. However, knowing and being assured by AT by the way, in which he approached the sequencing of the clauses in the Settlement Agreement that the further agreements were contingent, and that those agreements get activated much later, I finished the document so that the first agreement could be sent through. However, it has always been my absolute clear understanding that I signed just the first document, and the latter two are contingent on the first agreement. To do otherwise would run contrary to the terms of the Settlement Agreement we had negotiated and agreed, and suggests I have given up all of my claims and agree to keep confidentiality without first receiving something in return under the Settlement Agreement.

223. To my understanding the agreement was clear that they were due to be agreed and signed much later, and after the Settlement Agreement, as otherwise I would be releasing my claims over the Account and be bound by the Confidentiality Agreement and Release of Claims Agreement without receiving any compensation, which did not and still does not make sense. AT had shared multiple times with me during the negotiations that the other two Agreements were contingent, so I believed I had proof of those two not being enforceable just yet. Unfortunately, in a later phone conversation after Nexo had refused to meet their obligations under Clause 3 of the Settlement Agreement, their scheme became clear; AT had said to me that "*it doesn't matter that we have not transferred you the first instalment, you have signed the documents and the waiver so we do not owe you anything, but you have waived rights over the Account*".

49

224. However, not being aware of Nexo's proposed future re-interpretation of this aspect of the settlement, as well as their argument around Clause 4, the Settlement Agreement between Nexo and myself was signed.

225. The case was very clearly focused on the Bitmex account and so <u>I was entirely anchored to the idea that whatever agreement we signed would be related to that account only, and there is no way we could or would be signing an agreement that waived my rights over the company</u>. Indeed, the reason behind settling for US$lm to be paid in instalments, and for that to be a condition upon my release of the Bitmex account, was because this is what I believed I was owed roughly in terms of my vested Nexo tokens which I had been locked from. We had dedicated 112,500,000 tokens dedicated to team members vested every 6 months for 4 years. Roughly speaking I had thought, after dilution, I was likely entitled to around 35% of the tokens, and % of them had vested by 13 Sep 2019."

(my emphasis)

<u>Meaning of alleged representations</u>

113. Nexo submits that Mr Shulev's complaint, as indicated at §§ 221-224 quoted above in particular, is simply that the Settlement Agreement, the Confidentiality Agreement and the Release of Claims Agreement were presented to him on the morning of the hearing of the stakeholder proceedings, for execution as a package; and that he therefore had to execute all of them simultaneously under time pressure, whereas he wanted to sign the Settlement Agreement first and the Release of Claims Agreement and Confidentiality Agreement later, after receipt of the first instalment of the settlement payment.

114. On that basis, Nexo points out that it was then, and is now, ready to pay the first instalment in accordance with clause 3 of the Settlement Agreement, i.e. against the transfer by Mr Shulev of the Nine Assets in his control. Although clause 3 strictly requires Mr Shulev to go first, Nexo agreed at the time to allow Mr Shulev to deduct or retain the first instalment from the Nine Assets, to avoid a futile debate about sequencing. Thus, it was only Mr Shulev's wrongful refusal to transfer the Nine Assets that ever stood in the way of payment (and it is only that which stands in the way now).

115. In effect, therefore, Nexo submits that even if there was a representation that the Release of Claims Agreement would be effective only once Mr Shulev had received the first instalment due to him under the Settlement Agreement, it was immaterial because he would recoup that instalment from the transfer he was required to make of the Nine Assets.

116. Even on that basis, Nexo's response as outlined above depends on the premise that Mr Shulev had control of the Nine Assets (or at least some of them). For the reasons given in section (E) below, I have now concluded that that issue must proceed to trial.

117. In addition, I am not sufficiently sure that Mr Shulev's evidence is limited in the way Nexo suggests to treat this as a point that can be decided summarily. One reading of

50

Mr Shulev's evidence (having regard *inter alia* to the passages I have underlined above) is that he was led to believe not only:

(a) that the Release of Claims Agreement would not require to be signed until after prior clauses of the Settlement Agreement had been complied with; but also

(b) that the Release of Claims Agreement was a standard agreement; and/or

(c) that merely by signing the Settlement Agreement he was not necessarily committing to signing the Release of Claims Agreement (for which he would have needed more time) or to waive any claims to ownership of companies in the Nexo group.

118. A representation to the effect of (b) would arguably have been false, particularly if meant and understood as meaning that the Release of Claims Agreement was merely a standard form adjunct to a settlement of the Bitmex dispute. A representation to the effect of (c) may also have been false. There is an unresolved question about whether clause 8 of the Settlement Agreement – or clause 8 read with the wording in clause 2 to the effect that Mr Shulev would "*undertake the actions below*" – meant that once he had signed the Settlement Agreement, Mr Shulev was also contractually obliged to sign the Release of Claims Agreement (see §§ 64 and 65 of the July 2022 Judgment). It is notable that recital B to the Release of Claims Agreement itself records clause 8 of the Settlement Agreement as containing an undertaking by Mr Shulev to enter into the Release of Claims Agreement:

> "A settlement agreement was concluded between Mr Shulev and the Nexo Companies on July 1, 2021 (the "Settlement Agreement"), by virtue of Section 8 whereof Mr Shulev undertook to enter into a Release of Claims Agreement with Mr Kantchev, the Nexo Companies and any other legal entity belonging to the Nexo Group, and to declare, warrant and confirm certain circumstances"

That might support the view that any representation to the effect that signing the Settlement Agreement did not commit Mr Shulev to giving up ownership-related claims was false, albeit that it also gives rise to issues about whether Mr Shulev (who presumably at least read the Release of Claims Agreement) relied on any such representation. That would be a matter for trial, as would potential issues about whether the alleged representation (if made) was of a legally relevant character, and whether (if false) it was made wilfully, negligently or innocently.

Whether Release of Claims Agreement binding in any event

119. It is true that any misrepresentation about the effect of the Settlement Agreement on ownership claims against Nexo might well be irrelevant – given that Mr Shulev also signed the Release of Claims Agreement – unless he is able to impugn the Release of Claims Agreement on the grounds of misrepresentation and/or duress. I expressly left those matters unresolved in the July 2022 Judgment (§ 65). Nexo invites me now to conclude that there is no basis, given Mr Shulev's evidence, on which the Release of Claims Agreement could be avoided. In addition to the points discussed earlier about Mr Shulev's evidence, Nexo submits that:

i)      There was an obvious advantage to Mr Shulev in signing the Release of Claims and Confidentiality Agreements as soon as possible: by doing so, he triggered payment to him of the second instalment pursuant to clause 8 of the Settlement Agreement.

ii)     "*Door of the court*" negotiations necessarily put the parties under time pressure (which is why they are often successful) but here there was an obvious and reasonable alternative if Mr Shulev was unhappy with what was being offered to him.  A transaction can only be avoided for economic duress if it is shown that there was no reasonable alternative to giving in to it: *Pakistan International v Times Travel* [2023] AC 101.  He could simply have continued with the hearing and presented his (false) case that the Bitmex Account belonged to him.  That was presumably what he was intending to do if Nexo had not made a settlement offer; and it is what he in fact did (at the adjourned hearing in April 2022) after the settlement fell apart.

iii)    Moreover, if it is not open to Mr Shulev now to set aside the Settlement Agreement, he cannot set aside the other parts of the settlement package: see *Marme Inversiones 2007 SL v Natwest Markets Plc* [2019] EWHC 366 §§ 335–338.

120.    Although there is some force in those submissions, I do not consider it right to determine, on a summary basis, that Mr Shulev has no realistic prospect of impugning the Release of Claims Agreement.  Aside from the alleged representation referred to above that the Release of Claims Agreement was in some way a 'standard' agreement, Mr Shulev also seeks to advance a case of duress in relation to the Release of Claims Agreement, arising in particular from the threats said to have been made on 16 June and 1 July 2021, that arguably goes well beyond normal commercial pressure.  Whether the alleged threats were made, and whether Mr Shulev had a reasonable alternative in the circumstances to giving in to them, can only properly be determined at trial.  Unlike the position in relation to the Settlement Agreement, it is not suggested that Mr Shulev has at any stage affirmed the Release of Claims Agreement.

Proposed misrepresentation claim unpleaded

121.    A significant point against Mr Shulev is that his proposed misrepresentation argument in relation to the Settlement Agreement is unpleaded, despite Nexo having made clear from the outset of the present application that it regarded the Settlement Agreement as having settled all of Mr Shulev's counterclaims against Nexo.  Nexo's summary judgment application dated 4 October 2022 (the same date as its Reply) made clear Nexo's position that Mr Shulev's Counterclaim was barred by the settlements reached in the Settlement Agreement and the Release of Claims Agreement:

> "pursuant to CPR 24.2, the Part 20 Claimant, Georgi Shulev, has no real prospect of succeeding on the Counterclaim, and there is no other compelling reason why the case should be disposed of at a trial as a result of the terms of a Settlement Agreement and a Release of Claims Agreement both dated 1 July 2021 between the Defendant/Part 20 Claimant and the Claimant/Part 20 Defendant."

Mr Shulev's Counterclaim, as discussed below, includes a claim against Nexo for its part in an alleged unlawful means conspiracy designed to deprive Mr Shulev of his alleged ownership of 33.92% of the Nexo group. Nexo's application was issued and served six months before the April 2023 hearing, and there were solicitors on the record for Mr Shulev throughout this period.

122. Mr Shulev's essential answer is the one quoted in § 100 above in the context of duress. There is a potential distinction between the position in relation to the proposed duress and misrepresentation claim. I have already noted that by the time of his Defence, Mr Shulev knew, and indeed pleaded, the facts on which any duress claim would be based. As regards misrepresentation, the falsity of any misrepresentation about whether the Settlement Agreement committed Mr Shulev to sign the Release of Claims Agreement, or otherwise to give up claims relating to ownership of the Nexo group, could perhaps be said to have become apparent only after Nexo relied on it as having such an effect on the present application. That argument might well fail, in circumstances where Mr Shulev has been in a position to take advice about the legal effect of the Settlement Agreement for some considerable time now. In addition, Mr Shulev could have applied to amend his Defence once Nexo did make its position clear in the context of the present application.

123. Nonetheless, I would be reluctant to dispose of this point (on which a great deal may turn) on a summary basis. Mr Shulev's witness statements, taken at face value, provide some basis on which a misrepresentation claim might be based, as explained above, and he has through counsel made clear an intention to plead it. I would not accept that there is any absolute rule that summary judgment can properly be refused only on the basis of a pleaded ground, even where a Defence has already been pleaded. I note in this regard (and respectfully agree with) the observations of Johnson J in *Mischon de Reya v RJI (Middle East)* [2020] EWHC 1670 (QB) §§ 51-60. If Mr Shulev has a realistic prospect of obtaining permission to amend, and of succeeding on the mooted misrepresentation argument, or if there is some other compelling reason for the case to proceed to trial, then it would not be appropriate to grant summary judgment.

Affirmation of Settlement Agreement

124. It is arguable that Mr Shulev has affirmed the Settlement Agreement by his Defence and Counterclaim, the position he has taken in his fourth witness statement and/or given the lapse of time since he has known the necessary facts regarding the proposed misrepresentation claim. However, resolution of the affirmation issue in this particular context (unlike the duress argument considered earlier) would involve deciding precisely what facts Mr Shulev needed to know in order to exercise the claimed right to rescission, and whether it can reliably be inferred (from the availability of legal advice) that he knew them. Was it, for example, necessary for Mr Shulev to know that Nexo relied on the Settlement Agreement as settling all of his Counterclaims, or was it sufficient that he knew and can be inferred to have taken advice on the terms and effect of clauses 8 and 12 of the Settlement Agreement in general terms? These questions go well beyond the scope of the arguments canvassed before me at the April 2023 hearing and are unsuitable for summary judgment in my view.

125. If Mr Shulev had affirmed the Settlement Agreement, a misrepresentation claim might nonetheless sound in damages (depending on the state of mind with which the representation was made), reflecting any loss arising from entry into the Settlement

Agreement, in relation to both the Bitmex Account claim and the other claims between the parties.

Issue estoppel

126.   Nexo submits that Mr Shulev is issue estopped from alleging that the Settlement Agreement can be impugned on the ground of misrepresentation.  It points out that the court on 2 July 2021 specifically directed the enforceability of the Settlement Agreement as an issue for consideration and determination at the April 2022 hearing. Nexo notes that in § 8 of the July 2022 Judgment I recorded that it became common ground that the Settlement Agreement was binding; and refers to my comments in §§ 43 and 44 (quoted in § 61 above).  Further, my order dated 28 July 2022, following the July 2022 Judgment, recited that the court "*reserve[ed] for subsequent determination any issues relating to the validity and effect of a release of claims agreement and a confidentiality agreement signed by Mr Shulev and Nexo on 1 July 2021*" but made no such reservation in relation to the Settlement Agreement.  Nor did Mr Shulev raise duress or misrepresentation as a ground of appeal (and his grounds of appeal were settled by counsel).

127.   However, the final portion of § 44 of the July 2022 Judgment, quoted above, expressly refrained from deciding whether it would be open to Mr Shulev to advance any claim that the Settlement Agreement itself, insofar as it makes provision for the Release of Claims Agreement or the Confidentiality Agreement, can be impugned on the grounds of misrepresentation; or on what basis any damages for misrepresentation might be assessed even if such a claim were to succeed.  I also addressed the link between the Release of Claims Agreement, the Settlement Agreement and any related misrepresentation argument in §§ 64 and 65 of the July 2022 Judgment, also quoted in § 61 above.

128.   Accordingly, the July 2022 Judgment expressly refrained from making findings as to any misrepresentation claim concerning the Settlement Agreement and, in particular, the extent to which it required Mr Shulev to enter into the Release of Claims Agreement. It is therefore well arguable that Mr Shulev is not issue estopped.  Nexo may yet be entitled to argue that it would be an abuse of process for Mr Shulev now to allege that the Settlement Agreement is voidable for misrepresentation (or, possibly, that he can claim damages for misrepresentation) on the basis that he could and should have advanced any such argument in the April 2022 hearing.  However, that is a potentially fact sensitive issue unsuitable in my view for summary determination.

Bitmex Account claim independent of Settlement Agreement

129.   Finally, Nexo points out that even if Mr Shulev did retain any right to rescind the Settlement Agreement, that would still leave Nexo's claim in respect of the Bitmex Account essentially intact.  Mr Shulev no longer contests that the Bitmex Account and its contents belonged to Nexo.  Even if Nexo were unable to rely on its claim under § 4 of the Settlement Agreement, it would be entitled to assert the proprietary claim that (in the July 2022 Judgment) I found it to have in respect of the assets in the Bitmex Account.  (Strictly speaking, Nexo might require permission to amend to add an alternative claim on that basis, but that would be in consequence of the amendment Mr Shulev would have to make in order to claim rescission.)

130.   However, rescission of the Settlement Agreement might affect the quantum of the Bitmex Account claim.  If the claim is framed in contract, for breach of the Settlement Agreement, then as set out in section (D)(7) below, the appropriate measure of damages would be the fall in value of the Bitcoin in the Bitmex Account from 8 July 2021 to 17 August 2022.  If, on the other hand, the claim is based on Nexo's proprietary claim to the assets in the Bitmex Account, then the starting date would *prima facie* be some time in September 2019, when Mr Shulev left Nexo and the Bitmex Account was frozen. The Bitcoin market price was lower then than in July 2021.  It is arguable that Nexo would nonetheless be entitled to recover the lost increase in value between September 2019 and July 2021 by way of consequential damages, on the basis that Mr Shulev continued wrongly to deprive Nexo of the ability to use the account during that period (cf the position in conversion, where such damages are recoverable: see Clerk & Lindsell on Torts, 23rd ed., § 16-97 citing *The Playa Larga* [1983] 2 Lloyd's Rep. 171 and *Scheps v Fine Art Logistic Ltd* [2007] EWHC 541 (QB)).  However, this issue was not argued before me, and it would be inappropriate to seek to determine it summarily.

Conclusion

131.   For these reasons, I have reached the conclusion that I should not determine Mr Shulev's proposed misrepresentation claim against him on a summary basis.

**(4) Proposed claim for the tort of intimidation**

132.   Mr Shulev submits that if the Settlement Agreement (and/or the Release of Claims Agreement and Confidentiality Agreement) cannot be rescinded, Mr Shulev has real prospects of recovering damages in an amount equal to the loss suffered as a result of entering into the Agreements.  Mr Shulev refers again to *Al Nehayan v Kent,* where Mr Kent had been induced by duress to enter into a Framework Agreement and promissory note.  Mr Kent had not sought to rescind the Framework Agreement, and ultimately accepted that he could not rescind the promissory note separately.  However, he maintained a claim for damages for the tort of intimidation.  Leggatt J concluded that Mr Kent had made out that claim, so that "*to the extent that Mr Kent has suffered loss as a result of entering into the Framework Agreement and promissory note he has a claim for damages*" (§ 234); and "*any payment by Mr Kent under the promissory note would give rise to an equal and opposite liability of Sheikh Tahnoon so that the claim under the promissory note fails for circuity of action*" (§ 239(iv)).

133.   Mr Shulev cites the statement of the elements of the tort of intimidation in *Berezovsky v Abramovich* [2011] EWCA Civ 153:

> "(1) a threat by the defendant to do something unlawful or "illegitimate"; (2) the threat must be intended to coerce the claimant to take or refrain from taking some course of action; (3) the threat must in fact coerce the claimant to take such action; (4) loss or damage must be incurred by the claimant as a result" (§ 5)

134.   Mr Shulev submits that threats of violence undoubtedly can constitute intimidation, and the causation test for unlawful act duress and the tort of intimidation is the same.  As a result of the threats made on 16 June and 1 July 2021, Mr Shulev says, he has real prospects of success in recovering any damages due to Nexo pursuant to the Settlement

Agreement and all damages claimed under the Counterclaim as damages under the tort of intimidation.

135. There is, however, currently no pleaded claim for intimidation. It would need to be pleaded (in Particulars of Claim or a Counterclaim) as a cause of action against Nexo. It does not operate as a mere defence, though a claim for intimidation might be capable of operating as a defence by way of equitable set-off. Even though the facts underlying the proposed claim are pleaded in Mr Shulev's Defence and Counterclaim, it contains no claim for the tort of intimidation. Permission to amend would therefore be required.

136. If such a claim were advanced in the future, then it might give rise to a claim in damages corresponding to any loss which entry into the Settlement Agreement (and/or Release of Claims Agreement) had caused Mr Shulev to suffer. So far as the Bitmex Account claim is concerned, such loss might reflect the potential difference between the quantum of Nexo's claim under the Settlement Agreement and its alternative proprietary claim to the assets in the Bitmex Account: see § 130 above.

137. I do not consider it possible to conclude on a summary basis that Mr Shulev would have no realistic prospect of obtaining permission to amend and succeeding on this prospective claim.

### (5) Contemplated application to set aside the July 2022 Judgment

138. In his supplementary skeleton argument, Mr Shulev submits that the evidence set out in his fifth witness statement (see §§ 75-76 above) proves that the July 2022 Judgment was procured by Nexo through conscious and deliberate dishonesty in the concealment of the location and control of the Nine Assets and the real transferor of the Nexo Tokens. This evidence is, he submits, material (indeed central) to the July 2022 Judgment and only came about as a result of the search of Nexo's offices and related locations by the Bulgarian authorities on 12 January 2023 and the consequential seizure of a hardware ledger device now believed to be the Hardware Ledger.

139. Mr Shulev states that he intends to commence proceedings to rescind the July 2022 Judgment as having been procured by fraud, and he has eminent prospects of success in satisfying the test as set out recently by Leech J in *Tinkler v Esken* [2022] 1375 (Ch). Nexo has applied for an order that Mr Shulev deliver the Nine Assets by way of specific performance, under the threat of imprisonment, even though it has in fact been in control of the Nine Assets the whole time until they were seized by the Bulgarian authorities. Mr Shulev submits that Mr Trenchev, Nexo's Chief Executive Officer, has committed perjury in his written evidence before the court on at least twelve occasions (as detailed in Mr Shulev's fifth witness statement) in order to deceive the court and procure the relief Nexo seeks on this application.

140. Mr Shulev indicates that although an action to set aside a judgment for fraud is typically commenced by fresh proceedings, for which the court's permission is not required, it would be most efficient and in service of the overriding objective for these proceedings to be consolidated into the present pleadings. He accordingly seeks permission to amend for that purpose, as well as dismissal of Nexo's present application and the return of money paid on account of costs following the July 2022 Judgment.

141. Given the late stage at which this issue arose, Nexo has not had an opportunity to serve evidence in response to Mr Shulev's fifth witness statement, though (as noted earlier) Nexo elected to proceed with its application rather than seeking an adjournment. Nexo submits that:

   i) Mr Shulev's evidence about the email account from which the Nexo Token seed phrases were sent is not new: it was relied on when Mr Shulev sought permission unsuccessfully from the July 2022 Judgment. It does not prove anything in any event: given the sensitivity of seed phrase information, it might be natural to use an email account not directly referring to an individual's name.

   ii) The evidence that the Hardware Ledger was found at Nexo's offices does not prove that Mr Trenchev knew it was there. Nexo's instructions are that it genuinely believed Mr Shulev took the Hardware Ledger with him when he left Nexo in 2019.

   iii) In addition, control over the assets does not depend on possession of the Hardware Ledger, because knowledge of the seed phrases also suffices. Conversely, possession of the Ledger without its passcode does not give access to the assets.

   iv) It is unclear why Mr Shulev attributes so much importance to the Hardware Ledger now: he must have known that he had left it at Nexo, yet until his Defence and Counterclaim he had placed no reliance on that fact, even at the April 2022 hearing.

142. Nexo makes clear that it considers the raid on its offices in Bulgaria to have been wholly unjustified; that no finding of wrongdoing has been made; and that it will vehemently oppose any prosecution or other suggestion that it has committed any wrongdoing.

143. It is clearly not possible to reach any clear view, on the present application, about the prospects of success of an application to set aside the July 2022 Judgment, though I should record that I am not persuaded that the evidence presently available demonstrates that Mr Trenchev gave knowingly untrue evidence about the Hardware Ledger. The question for present purposes would be whether Mr Shulev's new evidence might make it inappropriate to grant summary judgment in relation to the Bitmex Account (were I otherwise minded to do so).

144. I did not hear argument on the question of whether Mr Shulev's contemplated claim to set aside the judgment would, if successful, result in the setting aside of the July 2022 Judgment as a whole or only those parts of it which concerned the Nine Assets (in relation to which the allegedly fraudulent evidence was given). However, even if the whole judgment were liable to be set aside, there would have remained a question about whether that prospect constituted a further reason to refuse summary judgment, over and above the reasons set out in sections (D)(3)(b) and (4). That would depend on whether the setting aside of the July 2022 Judgment could affect Nexo's summary judgment application in relation to the Bitmex Account on the basis of either (a) the Settlement Agreement or (b) Nexo's ownership of the assets in the Bitmex Account.

145. As to the Settlement Agreement, even if the July 2022 Judgment were set aside, there is no reason to believe that the court would reach any different conclusion now about

Nexo's entitlement under § 4 of the Settlement Agreement from that referred to in section (D)(2) above.

146.  As to Nexo's underlying claim to own the assets in the Bitmex Account, in oral submissions counsel for Mr Shulev suggested that the Hardware Ledger evidence indicates that the court can no longer take Mr Trenchev's evidence at face value without scrutiny.   However, Mr Shulev has not suggested that Mr Trenchev's evidence in relation to the Bitmex Account was false, still less knowingly false, either in his fourth or his fifth witness statements or his submissions on the present application.  Rather, he states in his fourth witness statement that *"[m]y arguments were based on (i) the fact that it was me who had opened the Bitmex account in and around 16 May 2019, and (ii) my belief that at least some of the assets in the account could and should properly be traced back to my ownership on the basis of my unpaid entitlements of Nexo tokens from the ICO distribution that by now had vested"*.  Those points arguably do not call into question the veracity of Mr Trenchev's evidence about the nature of the Bitmex Account and the source of the assets contained in it, as summarised in §§ 23, 106 and 107 of the July 2022 Judgment.  In addition, the conclusions I reached in section (B) §§ 13-24 and in section (E) of the July 2022 Judgment were unpinned to a significant degree on documentary evidence (see e.g. §§ 17, 18, 19, 24 and 103 of that judgment).  In all the circumstances, I would have doubted that the new evidence about the Hardware Ledger provides a realistic prospective defence to the Bitmex Account claim or other compelling reason why that claim should proceed to trial.  However, I would still have considered it necessary for the quantum of that claim to proceed for trial, for the reasons discussed in § 130 above.

147.  Turning to the procedural question raised, I do not consider it appropriate to grant Mr Shulev permission to make an amendment that has not yet been formulated and on which I have not heard argument.  It will be for Mr Shulev and his advisers to choose whether to commence a free-standing action to set aside the July 2022 Judgment, and then to seek to consolidate it with the present action, or to seek permission to amend having served draft amended statements of case for consideration by Nexo.

### (6) Alleged reliance on Mr Hofmeyr QC's observations

148.  Mr Shulev states in his fourth witness statement:

> "167.2. Second, as a litigant in person I never understood that I could be liable to damages for any losses incurred following the hearing in front of Mr Hofmeyr KC and I took assurance from the Judge's remarks …
>
> "As I say, what Mr Shulev wants is to be certain that he is going to get the money that has been promised to him under this agreement. If he gets his money or at least the first instalment, he is entirely happy to release the account. The key thing is that one should not go ahead of the other so that a march can be stolen and that is as I see it."
>
> 167.3. Therefore, I really thought at that when even the Judge saw that the "march could be stolen" by my release of the Bitmex Account, then I should not be releasing it to protect my interests.

> If I had been warned that I could be liable for damages from that point onwards depending on the value of Bitcoin at the time, I would have released the Bitmex Account."

149.  However, the obligation in § 4 of the Settlement Agreement (unless it is set aside) to release the Bitmex Account was a freestanding obligation: see § 96 above.  Mr Shulev was therefore not entitled to retain the Bitmex Account in any event.  Even if he understood the judge's observations to mean that he could do so (and that he could do so even after Nexo offered to allow Mr Shulev to deduct the first instalment due to him from his delivery of the Nine Assets), the fact remains that Mr Shulev's failure to notify HDR in accordance with § 4 of the Settlement Agreement caused a loss.  As between Mr Shulev and Nexo it would seem appropriate for the loss to fall on Mr Shulev, since, even if unwittingly, he was the party in breach of contract.  It would not be fair for Nexo, as the innocent party (or, if relevant, its clients), to have to bear the loss.  I would therefore have rejected this strand of Mr Shulev's argument.

### (7) Quantum of Bitmex Account claim under Settlement Agreement

150.  Given my earlier conclusions, it is not strictly necessary to decide this matter.  However, as the point was argued before me, I set out below the conclusions I would have reached.

151.  Nexo claims damages by reference to the fall in value in the assets in the Bitmex Account between 8 July 2021 (allowing seven days from the joint instruction that should have been given to HDR on 1 July 2021) to 17 August 2022, when Nexo in fact received the assets.  The assets, which were bitcoin, fell from US$28,652,711 to US$20,825,420 during that period, a loss of US$7,827,291.

152.  Mr Shulev in his Defence takes issue with this approach, contending that:

i)  damages should be assessed not at 8 July 2021, but instead at either 17 September 2019, when the Bitmex Account was frozen, or the date on such damages are assessed;

ii)  in any event, the value of the assets in the Bitmex Account diminished as a result of Nexo's own failure to mitigate its losses by failing to agree that the US$14,286,912 worth of XBTZ19 bitcoin futures contracts set to expire on 27 December 2019 should be rolled over, with the result that those contracts lapsed and realised a loss of BTC 549.66845246. Nexo refused to authorise the execution of the roll over on 24 December 2019 after Mr Shulev had sent instructions to HDR that the roll over take place on 23 December 2019; Nexo could have continued to roll over the futures contracts even while the account was frozen, such that it would have avoided or mitigated the losses alleged; and

iii)  further or in any event, Nexo would have retained the assets in the Bitmex Account, which would have fluctuated accordingly.

153.  As to point (i) above, contractual damages for wrongful non-delivery of an asset for which there is a ready market (which would include bitcoin) are generally assessed as the market price on the date of expected delivery.  The rationale for that rule is that the claimant is entitled, and expected, to buy a replacement asset in the market; damages are therefore generally awarded on the presumed basis that he did so.  Similarly,

59

damages for wrongful delayed delivery are generally assessed as the difference between the market prices of the asset on the dates of expected and actual delivery: see *Gatoil International v Tradax Petroleum* [1985] 1 Lloyd's Rep 350, 367.  Mr Shulev has not put forward any good reason to depart from the general rule.

154.   Dealing specifically with the suggestion that the assets should be valued as at the date when they were originally frozen in September 2019, the Settlement Agreement (provided it remains on foot) compromised the parties' existing disputes and substituted new obligations including the § 4 obligation to release the Bitmex Account.  The date on which Mr Shulev breached that substitute obligation is therefore the relevant valuation date.

155.   As to point (ii), the alleged failure to mitigate preceded the breach of the Settlement Agreement and on that basis cannot be relevant.  In any event, there were commercial reasons for Nexo not to consent to the proposed rollover, as it explained in its letter of 24 December 2019 to HDR:

> "In our previous communications, we addressed on multiple occasions the need to roll over our future position in the Bitmex account with login georgi@nexo.io . In the meantime, as you could verify, we rolled over our entire corporate Dec 27 future position in Bitmex account otc@nexo.io to the June future contract.  Given your continuous silence on the roll-over issue, we took steps to roll over the position at a different venue, as the three days that you are now extending would not have been nearly sufficient to accommodate our trading strategy for almost a $15 mln. Roll-over. Moreover, please note that we execute our future-related trading in a fully automated manner through the deployment of efficiency-driven algorithms, which could not be substituted by your operations in case that we were to give our consent."

In addition, as explained by Nexo's solicitor in his witness statement in support of the present application, by rolling XBTZ19 future positions to XBTH20 (which expired on 27 March 2020) it would have been risking its own funds, and there was no guarantee that rolling the position would mitigate its loss, with the result that it cannot reasonably have been required to do so as a step in mitigation.  In the event, it felt obliged to replicate its future positions elsewhere due to only being given three days' notice of HDR's and Mr Shulev's willingness to roll the positions over.

156.   As to point (iii), Mr Shulev has adduced no evidence of what Nexo would have done with the assets.  In any event, I agree with Nexo that it is irrelevant.  In *Gatoil*, for example, the claimant claimed damages for delayed delivery of a cargo of oil that it intended to refine into petroleum products.  It could not prove that the delay in delivery had actually caused any delay to the sale of the refined products.  However, Bingham J held that that was irrelevant:

> "Mr. Rokison was right when he submitted that evidence of what [the claimant] actually did with any of these products was irrelevant and inadmissible (save, I would add, in so far as it might throw any light on the value of the goods on the

60

comparison dates). If goods are shown to be worth X on the day when they should have been delivered and a lesser sum, Y, on the date when they were delivered, the buyer has lost the difference between X and Y and it matters not what he would have done with the goods at any later time." (p. 367 rhc)

157. Mr Shulev submits that Nexo has failed to prove whether the Bitmex Account assets were (i) customer deposits, (ii) held as collateral for customer deposits (in which case ought to have been replaced), (iii) declared to its external auditors Armanino PLC for collateral audit purposes (in which case they ought to have been replaced) (iv) used for trading purposes (and using what strategies). I would be inclined to regard this as irrelevant. If the assets were customer deposits, then Nexo is entitled to recover from Mr Shulev on its customers' behalf the loss sustained by reason of Mr Shulev's wrongful failure to release them. If the assets belonged to Nexo, then the use it would have or did make of them is irrelevant as noted above.

158. Finally, Mr Shulev submits that the markets for cryptoassets present a case of extreme, arbitrary, and unnatural volatility. They are largely unregulated, secretive, and not fully understood. Mr Shulev refers to the House of Lords' decision in *Transfield Shipping Inc v Mercator Shipping Inc (The "Achilleas")* [2009] AC 61, in the context of a charterparty dispute, that a party in breach of contract is responsible only for losses arising in the ordinary course of things as opposed to unusual market volatility. He contends that the court should pause before finding that a party has assumed responsibility for damages resulting from them. Nexo's claim for loss of value of the Bitmex Account assets by Nexo, therefore, should be rejected as a point of principle, or considered after a full trial given the wide-ranging implications.

159. Had it been necessary to decide the point, I would not have accepted this submission. It does not feature in Mr Shulev's evidence, but was raised for the first time in his written submissions for the hearing. As a result, (a) it is unsupported by evidence and (b) Nexo did not have an opportunity to serve evidence in response to it. Based on the evidence before me, I would not accept Mr Shulev's submission in any event. Nexo's Particulars of Claim, supported by a statement of truth, proceed on the basis that there is an available market for Bitcoin and an ascertainable market value. Both Nexo's evidence in support of the application and Mr Shulev's evidence in response to it proceed on the same basis (hence, for example, Mr Shulev's point about the market value having risen between September 2019 and July 2021). There is no contrary evidence suggesting, for example, that the market value of Bitcoin cannot be reliably determined at any given date.

160. The fact that the market may be volatile and unregulated does not make it inappropriate to assess damages based on the ascertained market values on the relevant dates. *The "Achilleas"* does not, in my view, support the proposition that a party is not liable for losses arising in volatile market conditions. The facts there were that a vessel was redelivered late at the end of a charterparty, redelivery having been due by 2 May. The owners had, shortly before end of the charterparty, fixed a follow-on time charter with a new charterer at the new market rate of $39,500 a day, with the new charterer having the right to cancel if the vessel were not delivered by 8 May. The existing charterer was not told about the new fixture. Due to the redelivery delay, the owners were obliged to seek the new charterers' agreement to later delivery, in return for which they had to agree a reduced rate of $31,500 a day because the market had fallen sharply over the

intervening few days.  The majority of the arbitrators (upheld by the High Court and Court of Appeal) found the general understanding in the shipping market to be that a charterer who returned a vessel late was liable in damages only for the period of late delivery; however, the loss on the follow-on charter was recoverable as arising naturally from the breach of contract: it was damage that the charterers, at the time when the contract had been made, ought to have realised was not unlikely to result from the breach of contract caused by returning the vessel late.

161.   The House of Lords (Baroness Hale *dubitante*) allowed the appeal.

162.   The members of the House referred in some detail to *Victoria Laundry (Windsor) Ltd v Newman Industries Ltd* [1949] KB 528 and *C Czarnikow Ltd v Koufos (The Heron II)* [1969] 1 AC 350.  In *Victoria Laundry* the Court of Appeal had held (in summary) that for loss to be recoverable it must have been foreseeable that it was likely to result in the ordinary course of things.  As a result, the court there had not allowed recovery in full for the plaintiff's loss, by reason of the defendant's breach, of certain particularly lucrative dyeing contracts.  In *The Heron II*, damages based on market value were awarded to charterers for late delivery of a cargo of sugar.  As Lord Walker noted in *The Achilleas* (§ 72), the members of the House in *The Heron II* expressed different views about the degree of probability required for a loss to be recoverable.  However, Lord Reid in the lead judgment stated the test as being whether the loss in question was "*of a kind which the defendant, when he made the contract, ought to have realised was not unlikely to result from [the] breach*" (p.382-383), or "*whether, on the information available to the defendant when the contract was made, he should, or the reasonable man in his position would, have realised that such loss was sufficiently likely to result from the breach of contract to make it proper to hold that the loss flowed naturally from the breach or that loss of that kind should have been within his contemplation*" (p.385).  Lord Reid also said it was clear from decision in *Hadley v Baxendale* (1854) 9 Exch 341 that a type of damage which was plainly foreseeable as a real possibility, but which would only occur in a small minority of cases, could not be regarded as arising in the usual course of things or be supposed to have been in the contemplation of the parties (p.385).

163.   In *The Achilleas*, Lord Hoffman highlighted the uniformity of the understanding in the charterparty market that damages for late redelivery were based on the difference between the market rate and the charterparty rate, rather than the loss of any follow-on fixture (§ 10), and said that it was "*logical to found liability for damages upon the intention of the parties (objectively ascertained) because all contractual liability is voluntarily undertaken. It must be in principle wrong to hold someone liable for risks for which the people entering into such a contract in their particular market, would not reasonably be considered to have undertaken*" (§ 12). A party may not be liable for foreseeable losses where they are not of the type or kind for which he can be treated as having assumed responsibility (§ 21).

164.   Lord Hope's reasoning was to similar effect and, importantly, drew a distinction between market fluctuations on the one hand and the owner's particular arrangements with the new charterer on the other:

> "In this case it was within the parties' contemplation that an injury which would arise generally from late delivery would be loss of use at the market rate, as compared with the charter rate,

during the relevant period. This something that everybody who deals in the market knows about and can be expected to take into account. But the charterers could not be expected to know how, if, - as was not unlikely – there was a subsequent fixture, the owners would deal with any new charterers. This was something over which they had no control and, at the time of entering into the contract, was completely unpredictable. Nothing was known at that time about the terms on which any subsequent fixture might be entered into how short or long the period would be, for example, or what was to happen should the previous charter overrun and the owner be unable to meet the new commencement date. It is true that neither party had any control over the state of the market. But in the ordinary course of things rates in the market will fluctuate. So it can be presumed that the party in breach has assumed responsibility for any loss caused by delay which can be measured by comparing the charter rate with the market rate during that period. There can be no such presumption where the loss claimed is not the product of the market itself, which can be contemplated, but results from arrangements entered into between the owners and the new charterers, which cannot." (§ 34)

165.    Lord Rodger said:

"The obligation of the charterers was to redeliver the vessel to the owners by midnight on 2 May. Therefore, the charterers are taken to have had in contemplation, at the time when they entered into the addendum, the loss which would generally happen in the ordinary course of things if the vessel were delivered some nine days late so that the owners missed the cancelling date for a follow-on fixture. Obviously, that would include loss suffered as a result of the owners not having been paid under the contract for the charterers' use of the vessel for the period after midnight on 2 May. So, as both sides agree, the owners had to be compensated for that loss by the payment of damages. But the parties would also have contemplated that, if the owners lost a fixture, they would then be in a position to enter the market for a substitute fixture. Of course, in some cases, the available market rate would be lower and, in some cases, higher, than the rate under the lost fixture. But the parties would reasonably contemplate that, for the most part, the availability of the market would protect the owners if they lost a fixture. That I understand to be the thinking which lies behind the dicta to the effect that the appropriate measure of damages for late redelivery of a vessel is the difference between the charter rate and the market rate if the market rate is higher than the charter rate for the period between the final terminal date and redelivery …" (§ 54)

At §§ 60 and 62 Lord Rodger concluded:

"60.  Returning to the present case, I am satisfied that, when they entered into the addendum in September 2003, neither party would reasonably have contemplated that an overrun of nine days would "in the ordinary course of things" cause the owners the kind of loss for which they claim damages. That loss was not the "ordinary consequence" of a breach of that kind. It occurred in this case only because of the extremely volatile market conditions which produced both the owners' initial (particularly lucrative) transaction, with a third party, and the subsequent pressure on the owners to accept a lower rate for that fixture. Back in September 2003, this loss could not have been reasonably foreseen as being likely to arise out of the delay in question. It was, accordingly, too remote to give rise to a claim for damages for breach of contract.

…

62.  … The delay which led to the breach of contract was caused by supervening circumstances over which the charterers had no control. The charterers' legitimate actions under their contract provide no commercial or legal justification for fixing them with liability for the owners' loss of profit, due to the effects of an "extremely volatile market" in relation to an arrangement with a third party about which the charterers knew nothing."

These statements indicate, in my view, that it was the effect of the extremely volatile market conditions on the particular arrangements that the owners had (unknown to the existing charterers) made with the new charterer, that fell outside the parties' reasonable contemplation.

166.   Lord Walker noted that the speeches in *The Heron II* indicated that the question is not merely one of probability but also of what the contracting parties must be taken to have had in mind, having regard to the nature and object of their business transaction (§ 78). He went on to state:

"… What mattered was whether the common intention of reasonable parties to a charterparty of this sort would have been that in the event of a relatively short delay in re-delivery an extraordinary loss, measured over the whole term of renewed fixture, was, in Lord Reid's words, "sufficiently likely to result from the breach of contract to make it proper to hold that the loss flowed naturally from the breach or that loss of that kind should have been within [the defaulting party's] contemplation". …" (§ 84)

"But it was contrary to the principle stated in the Victoria Laundry case, and reaffirmed in The Heron II , to suppose that the parties were contracting on the basis that the charterers would be liable for any loss, however large, occasioned by a delay in re-delivery in circumstances where the charterers had no

64

knowledge of, or control over, the new fixture entered into by the new owners." (§ 86)

Lord Walker also agreed with the reasons given by Lords Hoffman, Hope and Rodger. It appears to me that the factors leading to Lord Walker's conclusions were the combination of the extremely volatile market, with large changes occurring over a few days, and the owners' arrangements with the new charterer without the existing charterer's knowledge.

167. Baroness Hale preferred to rest her decision on the basis set out by Lord Rodger (rather than on notions of assumption of responsibility), which she expressed thus:

> "Loss of the type in question has to be "within the contemplation" of the parties at the time when the contract was made. It is not enough that it should be foreseeable if it is highly unlikely to happen. It would not then arise "in the usual course of things": see *The Heron II* [1969] 1 AC 350 , 385, per Lord Reid. So one answer to our question, given as I understand it by my noble and learned friend, Lord Rodger of Earlsferry, is that these parties would not have had this particular type of loss within their contemplation. They would expect that the owner would be able to find a use for his ship even if it was returned late. It was only because of the unusual volatility of the market at that particular time that this particular loss was suffered. It is one thing to say, as did the majority arbitrators, that missing dates for a subsequent fixture was within the parties' contemplation as "not unlikely". It is another thing to say that the "extremely volatile" conditions which brought about this particular loss were "not unlikely"." (§ 91)

168. Viewing these statements in the round, it is fair to say that the volatility of the market was a factor in the reasoning of Lord Rodger and Baroness Hale in particular, and to note that Lord Walker agreed *inter alia* with the speech of Lord Rodger.  However, it is clear, first, that *The Achilleas* concerned conditions of unusual volatility for the market in question, with a rise in the market followed by a sharp fall within a few days. Secondly, emphasis was placed on the effect which that volatility had on particular arrangements which the owners had made with the follow-on charterer without the existing charterer's knowledge, viz the fixing of the follow-on charter at the then current high market price followed by a substantial lowering of the price a few days later (due to the breach) by when the market had fallen sharply.  I do not go so far as to suggest that the reasoning in *The Achilleas* applies only when both of those features are present: it is unnecessary to do so.  However, I do not consider that *The Achilleas* supports the view that damages are irrecoverable, or should be restricted, in a case such as the present one where (a) the market is inherently volatile, (b) the fall occurs over a significant period of time (as in the present case, months rather than mere days), and (c) the loss does not arise from some particular arrangement made by the claimant (such as the follow-on charter in *The Achilleas*) but merely from the straightforward loss in value of an asset wrongfully detained by the defendant.  It is not unfair to say that a defendant who refuses to release an asset in a market known to be volatile (as Mr Shulev himself stated) should reasonably contemplate that substantial loss may occur in the ordinary course of things.

169. For these reasons, I would have accepted Nexo's case on the quantum of damages recoverable in respect of the Bitmex Account claim.

## (E) NEXO'S CLAIMS TO THE 9 ASSETS

170. Nexo submits that it is entitled to the relief sought in relation to these assets essentially by reason of the conclusions I reached in the July 2022 Judgment.  It argues as follows:

   i) I held in the July 2022 Judgment (§ 59) that Mr Shulev was obliged under clause 3 of the Settlement Agreement to comply with Nexo's email request of 2.03pm on 1 July 2021 by providing Nexo with the means to access and use the requested Nine Assets.

   ii) Nexo now seeks an order that Mr Shulev must perform that obligation by transferring the Nine Assets to Nexo.  As reflected in the July 2022 Judgment, Nexo agreed that Mr Shulev could deduct or retain the first instalment of the settlement payment, although strictly the obligation to pay the first instalment of the settlement payment arises only after the transfer.

   iii) In his Defence (§§ 8 to 10), Mr Shulev contends that he was not obliged to transfer the Nine Assets because he did not possess or control them.  However, I considered and rejected that argument (July 2022 Judgment §§ 88-93), finding that the Nine Assets "*represent assets belonging to Nexo, to which Mr Shulev had access or control*".  That finding was based on compelling evidence: as well as witness evidence from Nexo, there were blockchain records showing that some of the Nine Assets were (and still are) at a blockchain address controlled by Mr Shulev and used by him to make other transfers.

   iv) Mr Shulev sought permission to appeal the finding on the grounds that I was wrong and also that the issue of control should not have been decided without hearing oral and/or expert evidence. The Court of Appeal refused permission. Males LJ said:

   > "The question whether [Mr Shulev] had control of the nine assets was within the scope of the issues ordered to be determined. It was not suggested by [Mr Shulev] that this issue could not be determined fairly because disclosure or oral evidence (including expert evidence) was required. Accordingly the judge was entitled to reach a conclusion on the evidence before him, which is what he did. The judge gave reasons for his decision and an appeal on this question of fact would not have any real prospect of success."

   v) Mr Shulev is therefore precluded by issue estoppel from now denying that he is in control of the Nine Assets.

   vi) In any case, Mr Shulev clearly *is* in control of the Nine Assets, for the reasons I gave.

   vii) In his witness statement for the present application, Mr Shulev complains that he was "*ambushed by Nexo with the language of the Settlement Agreement,*

*Release of Claims Agreement, and Confidentiality Agreement*", that he was misled as to the effect of the Settlement Agreement, that he was "*put under a great deal of pressure not only to prepare for the forthcoming High Court hearing as a litigant in person, but also increasing pressure applied directly by Nexo to sign a settlement agreement*", and that "*various emails and calls from Nexo were also typically accompanied by subtle threats towards me and my then 8-months pregnant fiancée*".  Nexo observes that Mr Shulev makes much of the fact that he was unrepresented, but that seems to have been a deliberate choice on his part.  He instructed Stephenson Harwood until shortly before the July 2021 hearing and Squire Patton Boggs from shortly after the April 2022 hearing.

viii)   In any event, if the purpose of that evidence is to support an argument that clause 3 of the Settlement Agreement should not be enforced because of duress or misrepresentation, then that argument is also not open to Mr Shulev, because:

a)   Neither duress nor misrepresentation, nor any other ground for avoidance or non-enforcement, is pleaded in the Defence in response to Nexo's claims under the Settlement Agreement (see §§ 121-123 above);

b)   I specifically held in the July 2022 Judgment that Mr Shulev was obliged under clause 3 of the Settlement Agreement to provide Nexo with the means to access and use the requested Nine Assets. Mr Shulev is precluded by issue estoppel from disputing the enforceability of that obligation; and

c)   Mr Shulev is issue estopped from advancing any such argument (see §§ 126-128 above).

ix)   Nexo in any case denies any duress or misrepresentation.

171.   Nexo submits that the new evidence about the Hardware Ledger, and about the *fill5645@protonmail.com* email account used to send the seed phrases for the Nexo Tokens received by Nexo on 1 July 2021, makes no difference to questions of liability for the reasons summarised in § 141 above.

172.   As to remedy, Nexo accepts that there is now a triable issue about who currently has control over the Nine Assets, apart from the two BNB assets that do not appear to have been transferred out of the wallet that previously contained the Nine Assets (see § 74 above).  Nexo therefore now seeks an order for specific performance in relation to the two BNB assets and damages in respect of the other seven assets.  It seeks specific performance on the basis that damages would not be an adequate remedy in circumstances where Mr Shulev would be likely to be unable to pay them.  Damages are not regarded as an adequate remedy if "*the chances of a judgment being satisfied cannot be rated as other than questionable*" or "*there are reasonable grounds for apprehending that an award of damages would go unsatisfied*": see *Gravelor Shipping Ltd v GTLK Asia M5 Ltd* [2023] EWHC 131 (Comm) §§ 99-110; Chitty on Contracts (34th ed.) Vol 1 § 30-023; *Liberty Mercian Ltd v Cuddy Civil Engineering Ltd* [2013] EWHC 4110 (TCC).

173.   Dealing first with the effect of clause 3 of the Settlement Agreement, the issues that Mr Hofmeyr QC directed for determination included the true construction and effect of

clauses 3, 4, 8 and 11 of the Settlement Agreement and whether they had been complied with or breached.  At §§ 59, 93 and 118 of the July 2022 Judgment I stated:

"59.      [In response to Mr Shulev's argument that Mr Shulev was entitled to the first instalment before releasing the Bitmex Account]  However, clause 3 makes clear that the relevant order of events is first for Mr Shulev to transfer the requested Assets to Nexo, and then for Nexo to pay the first instalment.  As I conclude later, Mr Shulev has not yet transferred all of the requested Assets.  In any event, clause 4 is in my view a freestanding obligation.  The dispute has been settled by the Settlement Agreement, on terms that among other things require Mr Shulev to renounce any claimed interest in the Account.  That was and is the case regardless of whether either party has complied with other obligations arising under the Settlement Agreement, including clause 3.  That view is reinforced by the statement in clause 12 that the Settlement Agreement is in full and final settlement of any claims between the parties (except for claims for breach of the agreement itself or the Confidentiality or Release of Claims Agreements).  Moreover, it can hardly be the case that Mr Shulev can, by failing to effect timely transfer of the requested Assets, delay the required notification to HDR under clause 4 and hence Nexo's ability to get access to the Account."

"93.      I do not accept Mr Shulev's seemingly revised case on this point [whether the Nine Assets were within Mr Shulev's control], and I accept Mr Trenchev's evidence that the nine cryptocurrency values represent assets belonging to Nexo, to which Mr Shulev had access or control.  Nexo was and remains entitled to request those values, or the necessary access to and/or control over them, from Mr Shulev pursuant to clause 3 of the Settlement Agreement.  Such a request was contained in Mr Trenchev's email of 2.03pm (UK time) on 1 July 2021, and Mr Shulev is obliged to comply with it by providing Nexo with the means to access and use those cryptocurrency values, subject to deduction of the value of the first instalment due to Mr Shulev under clause 2 of the Settlement Agreement.

"118.    For the reasons set out above, I conclude that:

i)      pursuant to clause 4 of the Settlement Agreement, Mr Shulev and Nexo are jointly obliged, and have been since the Settlement Agreement was signed, to inform HDR that the Account will be released to Nexo and that Mr Shulev waives any rights and claims as to its operational, legal and beneficial ownership and the assets within it;

ii)     under clause 3 of the Settlement Agreement, it remains necessary for Mr Shulev to transfer to Nexo the nine cryptoassets listed in Mr Trenchev's email of 14.03 (2.03pm)

68

> UK time in order to be entitled to the first instalment provided for in clause 2 of the Settlement Agreement, provided that Mr Shulev may obtain payment of the first instalment by deducting it from the assets transferred;
>
> …"

174. Mr Shulev submits that the conclusion I reached about clause 3 was merely a conditional one, namely that in order for him to become entitled to the first instalment due under clause 2, he needed to transfer the assets Nexo had requested (i.e. the Nine Assets, in addition to the Nexo Tokens which had already been received by Nexo on 1 July 2021).  Nexo submits that I concluded that clause 3 contained, in effect, a freestanding obligation on Mr Shulev to transfer the requested assets.

175. Though the point seems to me finely balanced, I consider that Mr Shulev is correct. The contrast between the conclusions reached in § 118, at the end of the July 2022 Judgment, in relation to clauses 4 and 3 is notable.  In relation to clause 4 I concluded that Mr Shulev was obliged to give the relevant notification about the Bitmex Account. In relation to clause 3 I concluded only that it remained necessary for him to transfer the requested assets in order to be entitled to the instalment.

176. Had there been full argument and a conclusion about whether clause 3 positively obliged Mr Shulev to transfer the requested assets, I would expect there to be have been consideration of *inter alia* the opening wording of clause 2 – "*Upon the acceptance of the terms set forth herein and the digital signing by the Parties of this Agreement via DocuSign, which will be deemed legally binding, Mr Shulev will undertake the actions below*" – and whether the "*actions below*" included the transfer by Mr Shulev of requested assets pursuant to clause 3.  There would also have been debate about whether the parties could have intended that Mr Shulev could simply decide to forego the money otherwise due to him under clause 2 and retain the requested assets.  As it is, no such points feature in the July 2022 Judgment.  In my view, read in context, the statements in §§ 59 and 93 go no further than to indicate that the Nine Assets fell within the scope of the assets that Nexo could request pursuant to clause 3, so that Mr Shulev would be required to transfer them in order to earn the first instalment.

177. I would nonetheless be currently inclined to the view that Nexo has a good argument, bearing in mind the considerations referred to in § 176 above, that clause 3 <u>does</u> have the effect for which it contends.  However, the point (as distinct from Nexo's issue estoppel contention) was not the subject of full argument before me on the present occasion either.  In those circumstances, and reinforced by the fact that there are other reasons to decline to grant summary judgment in relation to the Nine Assets in any event (see below), I do not consider it appropriate to resolve the clause 3 issue on a summary basis now.

178. Turning to the question of whether Mr Shulev had or has control over the Nine Assets (or any of them), I accept Nexo's submission that I did hold in the July 2022 Judgment that he had such control, and that that was a necessary conclusion.  I reached that conclusion in §§ 88-93 of the July 2022 Judgment, culminating in my statement in § 93 that *"I do not accept Mr Shulev's seemingly revised case on this point, and I accept Mr Trenchev's evidence that the nine cryptocurrency values represent assets belonging to Nexo, to which Mr Shulev had access or control"*.  That conclusion was necessary in

69

order to decide whether or not Mr Shulev had complied with the clause 3 pre-condition (putting it at its lowest) to entitlement to the first instalment.

179. However, Mr Shulev in my view has a realistic prospect, sufficient to make summary judgment inappropriate, of persuading the court that the new evidence about the Hardware Ledger amounts to special circumstances such that the court at trial would not be bound by my earlier finding. If, as appears to be the case, the Hardware Ledger remained with Nexo, that would contradict the case set out in § 6(d)(v) of Nexo's Reply, and mean that Mr Shulev retained control over the Nine Assets only if he had the seed phrases. The landscape would thus have significantly shifted from the position as it appeared at the time of the April 2022 hearing, due to new material that has become available, viz the new information from the Bulgarian prosecutor about the location of the Hardware Ledger. These would arguably be special circumstances in the sense contemplated at p.109 of *Arnold*, quoted in § 83 above.

180. In addition, the July 2022 Judgment did not specifically make findings about whether or not <u>Nexo</u> retained any control over the Nine Assets. It might be said that the July 2022 Judgment proceeded on the assumption that Nexo did not, but that is not the same as a specific finding of the kind that might ground an issue estoppel. True it is that possession of the Hardware Ledger would give access to the assets only if Nexo also had the passcode for the Hardware Ledger, as to which there is currently no evidence before me. However, that is a potential avenue of enquiry for trial. If Nexo did in fact have access to the Ledger, even if unwittingly, that might (I put it no higher) be relevant to the question of whether any failure by Mr Shulev to comply with an obligation under clause 3 of the Settlement Agreement should be regarded as causative of loss to Nexo.

181. For these reasons, I do not consider it appropriate to grant summary judgment in relation to the Nine Assets. The matter will have to proceed to trial.

### (F) MR SHULEV'S COUNTERCLAIMS AGAISNT NEXO

182. Mr Shulev has pleaded counterclaims against Nexo, Mr Kantchev and Mr Trenchev. As at the date of the hearing before me, Mr Kantchev and Mr Trenchev had not yet served Defences to Counterclaim. However, Nexo seeks summary judgment insofar as the counterclaims are brought against it.

### (1) Claims relating to Founder Tokens

183. Mr Shulev contends that Nexo is liable in damages for breach of a contractual obligation to cause 37,990,400 Nexo tokens to vest in him (Counterclaim §§ 58–61). This reflects a complaint that was raised in the course of the settlement negotiations, and in Mr Shulev's witness statement of 6 November 2020.

184. Nexo submits that the claim is that it was settled by the Settlement Agreement, clause 12 of which provided for a settlement of "*any and all claims each Party may have against the other*".

185. Nexo adds that, as set out in the July 2022 Judgment, Mr Shulev transferred 45,232,012 Nexo tokens *to* Nexo at Nexo's request; which is hard to square with Mr Shulev's assertion of a contractual right to receive 37,990,400 tokens *from* Nexo. That particular point, however, may be complicated by the new evidence about control over the

Hardware Ledger (discussed above) and its potential to link to control over the Nexo Tokens.

186.   As Nexo submits, this counterclaim would be barred by clause 12 of the Settlement Agreement, subject to any argument having a realistic prospect of success that the Settlement Agreement can be impugned on the grounds of misrepresentation.  For the reasons given in section (D)(3)(b) above, I have come to the conclusion that that issue must proceed to trial.  As a result, it is not appropriate to rule against this part of Mr Shulev's Counterclaim on a summary basis.  It too will have to proceed to trial.

### (2) Alleged unlawful means conspiracy

187.   Mr Shulev contends that Nexo conspired with Mr Kantchev and Mr Trenchev to deprive Mr Shulev of "*his rightful ownership of 33.92% of the Nexo group and corresponding share of the Founder Tokens*".  Damages in excess of US$1bn are claimed.

188.   As Nexo points out, the allegation that Nexo conspired to deprive Mr Shulev of Nexo tokens appears to add nothing to the claim for breach of contract discussed above.

189.   The alleged conspiracy to deprive Mr Shulev of his ownership rights in the Nexo group is said to comprise on two elements: the "*termination conspiracy*" (Counterclaim section J1) and the "*Nine Assets conspiracy*" (Counterclaim section J2).

190.   The "*Nine Assets conspiracy*" is summarised in § 57 of the Counterclaim as follows:

> "The Claimant, Mr Trenchev, and Mr Kantchev claimed and continue to claim that the Nine Assets are within Mr Shulev's control and or possession falsely in furtherance of their conspiracy to deprive Mr Shulev of his rightful ownership of the Nexo group".

191.   Nexo submits that that case is not open to Mr Shulev because it is inconsistent with the finding in the July 2022 Judgment that the Nine Assets are indeed within Mr Shulev's control.  However, I have concluded above that all issues about control of the Nine Assets should proceed to trial.

192.   The "*termination conspiracy*" relates to Mr Shulev's termination as a director of Nexo on 13 September 2019.  However, there is no allegation that the board acted unlawfully in that and it is unclear what unlawful act Nexo is alleged to have committed in relation to the termination or how it amounted to a conspiracy.  Moreover, it is presently unclear on what basis it is said that the termination of Mr Shulev as a director had the effect of depriving him of his ownership interest (if any) in the Nexo group.  However, in circumstances where the claim as a whole is proceeding to trial, and the claim as a whole involves complex interlocking facts, I do not consider it appropriate to deal summarily with this part of it.

193.   Any claim by Mr Shulev against Nexo in connection with his ownership rights in the group was arguably settled in July 2021 by the Settlement Agreement and/or the Release of Claims Agreement.  However, as noted earlier, the issues regarding the validity of those agreements must proceed to trial.

## (G) CONCLUSION

194.    For all these reasons, I decline to grant summary judgment or to strike out any part of Mr Shulev's Defence and Counterclaim.  Mr Shulev has a realistic prospect of succeeding in relation to at least some parts of his case, and (if necessary) the complex interlocking facts underlying the dispute as a whole constitute a compelling reason not to grant summary judgment as to, or strike out, individual parts of Mr Shulev's case.