# EXHIBIT 5

February 11, 2026

**VIA CM-ECF**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom G – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94120

Re:     *John Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH - JOINT DISCOVERY
        LETTER REGARDING ALLEGED DEFICIENCIES IN NEXO'S DOCUMENT
        COLLECTION AND PRODUCTION

Dear Judge Hixson:

The parties submit this joint letter setting forth each side's view as to the sufficiency of Nexo's document collection and production.  *See* Dkts. 62, 65, 66-1, 69. The parties have met and conferred in good faith prior to filing this letter, including by Zoom meeting and the exchange of letters and emails.

**Attestation**

Counsel for Plaintiff John Cress and Defendant Nexo Capital Inc. have met and conferred telephonically and in good faith to resolve the disputes set forth below.


Dated: February 11, 2026                    TAYLOR-COPELAND LAW

                                            By: /s/ James Taylor-Copeland

                                            Attorneys for Plaintiff


Date: February 11, 2026                     BAKER & MCKENZIE LLP

                                            By: /s/ Ian S. Shelton

                                            Attorneys for Defendant

**PLAINTIFF'S POSITION**. Cress requests relief following Nexo's admission that it destroyed critically relevant documents after receiving a demand letter in October 2021 and throughout this litigation, in violation of prior court orders (Dkts. 62, 65, 69). Cress seeks the following remedies at Nexo's expense: 1) An order that Nexo provide a certified response to his February 3 letter (**Ex. 6**) by February 20, 2026, 2) Leave to take a Rule 30(b)(6) deposition of Nexo by February 27, 2026 regarding its document collection, retention, search, and production; 3) A forensic examination of Nexo's systems and the custodians' electronic devices; 4) Leave to file for sanctions under F.R.C.P. 37(e).[1]

**Factual Background**. Nexo liquidated millions of dollars of Cress' assets in June 2021. Cress sent demand letters to Nexo on October 26 and November 29, 2021. Nexo retained Eversheds Sutherland—including its current counsel, Ian Shelton—to represent it in connection with those claims. After pre-litigation negotiations broke down, Cress filed his Complaint against Nexo on February 27, 2023. Four days later on March 1, 2023, Nexo began deleting all communications in its Slack Public and Private Channels by implementing automatic deletion protocols. Months earlier, Nexo implemented automatic deletion protocols of all Slack Direct Messages and its Managing Partners' emails. These deletions directly contravene the only data retention policy Nexo has produced in this litigation (from March 27, 2023), which requires Nexo's emails to be retained indefinitely and Slack communications be preserved for at least five years. The policy also requires litigation holds in response government investigations and litigation—precisely the circumstances present here.

Cress served his First Set of RFPs on Nexo on July 25, 2024. The Court ultimately ordered Nexo to produce responsive documents, and identified 14 custodians, 9 non-custodial sources and date ranges to be searched (January 1, 2017 to present). See Dkts. 62, 65, 69. Nexo then agreed that it would "substantially complete" its document production by August 31, 2025. Dkt. 70. It has not.

Cress first raised the issue of Nexo's inadequate document production in a September 9, 2025 letter which raised 17 specific discovery deficiencies, including: zero emails from Nexo's Managing Partners, Antoni Trenchev and Kosta Kantchev, almost no Slack communications, and extreme metadata issues. Despite Cress following up numerous times through email and letters, including on 9/15/25, 10/23/25, 1/14/26, and 2/3/26, Nexo delayed providing any substantive information to Cress for nearly five months, frequently ignoring emails, promising forthcoming responses only to delay weeks at a time, and generally refusing to speak on the phone to resolve any of the issues until late January 2026.[2]

Nexo's January 30 letter finally disclosed that Nexo destroyed all of Trenchev and Kantchev's emails and its Slack Direct Messages through auto-deletion policies implemented on December 4, 2022. Nexo also implemented auto-deletion policies for its Slack Public and Private Channels four days after Cress filed his lawsuit against Nexo. Rather than acknowledge and seek to remediate its destruction of critical documents and communications, Nexo continues its willful abstractions and delays. Cress now moves for relief to understand the exact nature and extent of Nexo's conduct.

**Discovery Deficiencies Requiring Court Intervention**. Nexo 1) deleted all of Trenchev and Kantchev's emails and all Slack Direct Messages in December 2022; 2) began deleting all its remaining Slack communications four days after Cress filed suit against Nexo; 3) refuses to search any of its custodians' electronic devices, despite admitting to deleting nearly all relevant email cloud data (for Trenchev and Kantchev) and Slack data (for all custodians); 4) refuses to describe what it did to search

---

[1] Cress anticipates raising the most serious issues in a single Rule 37 near the close of fact discovery. However, should this Court wish for Cress to raise any of these issues earlier, Cress is prepared to do so.

[2] Cress' meet and confer letters are attached as **Ex. 1** (9/9/25), **Ex. 2** (9/15/25), **Ex. 3** (10/23/25), **Ex. 4** (1/14/25), **Ex. 5** (Nexo's 1/30/26 letter admitting to implementing document-deletion policies) **Ex. 6** (2/3/26). *See also* **Ex. 7** (Email meet and confer correspondence).

for the missing data and documents; 5) refuses to identify any litigation holds it issued.[3]

**1. Nexo's Managing Partners' Deleted All Emails**. Nexo initially sought to keep Trenchev and Kantchev out of this litigation as custodians. Dkt. 64. It is now clear why. They deleted all their emails. On December 4, 2022, Trenchev and Kantchev implemented auto deletion policies for their emails older than 30 days, which continued even after the Court ordered Nexo to include them as custodians on February 19, 2025. Dkt. 64. Trenchev and Kantchev are among **the most critical witnesses in this case**, overseeing Nexo's operations and its Token sale. Trenchev signed Cress' OTC purchase agreements and has filed two declarations in this case attesting to relevant factual matters. Dkts. 19-1, 78-1. Kantchev managed NDS (the company that employed Nexo's VIP relationship managers) when Cress entered his loans in 2021. Dkt. 59-1. Trenchehv's and Katnchev's deletion of all of their emails is plainly sanctionable conduct. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 881 F.Supp.2d 1132 (2012) (spoliation sanctions appropriate where senior employee custodians failed to produce responsive emails).

**2. Nexo Began Deleting Its Most Important Internal Communications Four Days After Cress Filed His Lawsuit.** Slack was Nexo's primary internal communications channel for discussing the factual issues at the heart of this case, both in organized "channels" and private messages. These channels and private messages discussed Nexo's sale of NEXO Tokens in the US (described in an email referencing Trenchev's participation in a "USA slack channel"), Nexo's VIP customers, its liquidation relief program, and its OTC sales—all of which relate directly to Cress and his claims. Cress has uncovered numerous emails describing these Slack channels wherein Nexo's NEXO Token sales, VIP customers, and OTC sales are discussed, but Nexo has provided essentially no communications from Slack prior to 2023. Most significantly, Nexo has produced documents that expressly reference Slack communications about Cress himself but has deleted the underlying Slack messages. Cress will never know what Nexo said about him while he was a customer because Nexo willfully implemented these deletion policies just days after learning of Cress' lawsuit. This cannot be interpreted any other way—it is intentional destruction of relevant evidence. This is plainly sanctionable conduct. *Red Wolf Energy Trading, LLC v. BIA Capital Mgmt., LLC*, 626 F. Supp. 3d 478, 498 (D. Mass. 2022) (failure to produce Slack messages is sanctionable). Nexo's attempt to highlight its preservation of some of Hristov's emails rings hollow where it deleted *all* his Slack communications, including those involving Cress.

**3. Nexo Refuses to Search Any of Its Custodians Physical Devices.** Despite Nexo admitting to deleting the vast majority of its relevant cloud-data communications, Nexo continues to refuse to search a single physical device, including any of the company issued computers or the custodians' cell phones and personal computers. Rule 34 requires employees to search all devices and databases under their control—even personal devices—for responsive documents. *Oracle Am., Inc. v. ProCore Techs., Inc.*, 2025 U.S. Dist. LEXIS 144299, at *6-7 (N.D. Cal. July 28, 2025).

**4. Nexo Refuses to Identify the Specifics of Its Searches**. Cress requested Nexo specify what it did to search for documents dozens of times over a five-month period beginning in early September 2025. Nexo did not agree to a call to discuss these issues until January 22, 2026. On that call, Nexo agreed to finally provide additional information by January 28, 2025. Nexo waited until 7:33 PM on Friday, January 30, 2025 to first explain the reason for the missing documents: Nexo deleted all Trenchev and Kantchev's emails and nearly all Slack communications from all 14 custodians. Beyond that, Nexo has been unwilling to describe with specificity what it has done to search for these plainly missing documents and communications. Cress has raised these glaring issues repeatedly, including in his February 3, 2026 letter. For example, Cress has requested specifics about Nexo's email, Slack, and Google document systems and searches, and has identified numerous unresolved metadata deficiencies. Nexo refuses to

---

[3] Cress continues to meet and confer with Nexo on other issues raised in his letters, including extreme issues with metadata. He reserves the right to present those issues through a subsequent letter brief.

provide any additional specific information in response to Cress' inquiries. Cress thus requests the Court Order (1) Nexo to provide a certified response to the issues raised in Cress' February 3 letter and (2) a forensic examination of Nexo's systems and its custodians' devices, at Nexo's expense.

**5. Nexo Refuses to Provide Any Information About Litigation Holds**. Nexo's contention that it did not have a duty to preserve is further undermined by the fact that it has been under investigation for securities violations and unlawful lending almost constantly from 2020 to 2026. For example, Nexo acknowledges that federal US and California regulators began inquiring into Nexo's "Regulation D token offering" and lending practices as early as April 2020. Nexo was also in contact with the SEC and several other state regulators as early as summer 2021—when Nexo liquidated nearly all of Cress' assets. Nexo was also involved in class action litigation relating to its unlawful lending and liquidation practices even before Cress was liquidated in 2021. *See Jeong v. Nexo Financial LLC et al.*, Case No. 5:21-cv-2392 (Filed April 1, 2021);[4] Despite Cress' October 26, 2021 demand letter putting Nexo on notice of his threat of litigation, and Nexo's near-constant litigations and regulatory investigations from 2020 to present, Nexo has not identified a single litigation hold relating to any of its data, including its admittedly deleted emails and Slack communications. *See Weride Corp. v. Kun Huang*, 2020 U.S. Dist. LEXIS 72738 (N.D. Cal. Apr. 16, 2020) (granting terminating sanctions for destroying critical ESI even when "a party should reasonably know that evidence may be relevant to anticipated litigation.").

Nexo's serious and egregious destruction of the most critically relevant documents in this case warrants immediate Court intervention. Cress thus respectfully requests the relief requested above.

**NEXO'S POSITION**. Cress's premature letter brief was precipitated by a statement in Nexo's January 30, 2026 meet and confer letter concerning *retention periods* on certain categories of internal Nexo communications. Cress's unsubstantiated allegations of intentional "destruction" of evidence are baseless and inflammatory. Cress's letter brief unfairly seeks to impugn Nexo's character and motives without evidence, and to ignore Nexo's tremendous discovery efforts in this matter. Nexo had no reason to think these communications were relevant at the time Nexo received Cress's customer-specific demand letters in October and November 2021, or when he filed his lawsuit in February 2023.

Cress appears to argue that Nexo should have suspended, or never implemented, all retention periods company-wide in response to his demand letter focused on a handful of single-customer OTC transactions and liquidations between March and June 2021. His position misstates Nexo's preservation obligation. "'Document retention policies,' which are created in part to keep certain information from getting into the hands of others, . . . are common in business," and are lawful "under ordinary circumstances." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704 (2005). "The duty to preserve evidence does not extend to every bit of ESI in a defendant's possession, but is limited to evidence likely to be relevant to a claim or defense as to which litigation is reasonably foreseeable." *Best Label Co. v. Custom Label & Decal, LLC*, No. 19-CV-03051-SI (VKD), 2022 WL 1525301, at *4 (N.D. Cal. May 13, 2022). Issues related to preservation, relevance, and foreseeability are inherently fact-based, and cannot be decided based on the conclusory and shrill accusations in Cress's 2.5 page letter brief, while discovery regarding the same subject matter is still pending. Nexo's preservation obligation must be determined by the information known to Nexo in 2021 and 2023, not based on the broadened scope of Cress's Second Amended Complaint ("SAC") in 2025.

Nexo has gone to extraordinary lengths to comply with its discovery obligations in this case. Nexo has produced over 58,000 documents in response to Cress's requests and this Court's orders, spanning over

---

[4] Notably, Nexo's counsel in *Jeong*, Baker McKenzie and Eversheds Sutherland, is the same as in this case.

340,000 pages. 52,000 documents, or approximately 90%, were produced by August 31, 2025. Over 1,000 documents hit on Cress-specific identifiers, and over 8,000 documents hit on the name of Cress's relationship manager.[5] Nexo searched the records of 23 custodians and non-custodial sources, applied 100+ search terms selected by Cress, and manually reviewed every document hit because Cress objected to use of widely-accepted technology assisted review (TAR 2.0/CAL). Because Cress's allegations in his demand letters (**Exhibits 8 and 9)** and original complaint (Dkt. 1) were fraud allegations based on a VIP brochure and external communications with Cress's relationship manager, Nexo preserved and produced Cress-specific data, including voluminous Salesforce logs, chats, email correspondence, and transaction histories. Nexo's preservation included the complete email inbox of Cress's relationship manager. When Nexo received Cress's demand letter in October 2021, it gathered and preserved documents responsive to the then-existing allegations—*i.e.*, Cress's claims that he was defrauded based on the VIP brochure sent to Cress, and based on his external communications with Nexo. Cress uses hindsight to evaluate Nexo's document retention policies, but that is not the appropriate analysis. The scope of discovery today is not the same as it was in 2021 or 2023. Nexo is not required to preserve every document within the company, or suspend all retention policies, after being sued.

Cress's 2021 demand letters raised claims specific to *his transactions* and allegedly fraudulent conduct directed towards *him*. *See* **Exhibits 8 and 9**. Notably absent from his 2021 demand letters were any claims regarding securities fraud, theft, or RICO allegations that now appear in the SAC. Indeed, *the Nexo Token is not referenced at all* in either 2021 demand letter, and Cress's 2021 demand was limited to "payment of the value of his BTC and ETH" that was liquidated. **Exhibit 9** at 3. The letter also failed to identify categories of potentially relevant documents or make any demand for preservation. Based on the letters, Nexo took reasonable steps to identify and preserve documents related to Cress, his transactions, and his interactions with Nexo. Cress does not allege these documents were not preserved.

Nothing about Cress's 2021 demand letters put Nexo on notice that emails sent by Trenchev and Kantchev would be relevant to Cress's individual claims. Cress observes that Nexo applied a 30-day retention period to Trenchev's and Kantchev's emails beginning December 4, 2022. But Trenchev and Kantchev, directors of Nexo, had no personal information related to Cress's transactions in 2021.[6] To the extent that Cress argues Trenchev and Kantchev's communications from 2018 are relevant to the Nexo Token securities claims, Cress did not assert those claims until he filed his original complaint on February 27, 2023—months after the 30-day email retention policy was set. Nexo had no reason to believe, in December 2022, that Trenchev's and Kantchev's emails from the start of the company in 2018 were relevant to Cress's claims about OTC purchases and liquidations of BTC and ETH in March-June 2021. Additionally, Cress sought leave to expand this lawsuit and amend his pleadings to add new theft and RICO claims in September 2025, years after the retention policies were implemented. Dkt. 76.

---

[5] In contrast, Cress has produced only 892 documents, plus 170 documents in a "privilege" production that consist mostly of "withheld for privilege" slipsheets. Nexo's document collection efforts are described in its January 30, 2026 meet and confer letter, **Exhibit 5**. Nexo also sent responsive meet and confer letters to Cress on October 20, 2025 and January 9, 2026, **Exhibits 10 and 11**.

[6] Although Trenchev DocuSigned Cress's Cryptocurrency Purchase Agreement ("CPA"), he did so in his corporate capacity as a director of Nexo Capital. He had no communication with Cress beyond the DocuSign, which was produced. Cress did not allege breach of the CPA until his SAC in 2025. Contrary to Cress's arguments, Trenchev's limited-scope declarations in this case addressed lack of personal jurisdiction, authenticated documents in his corporate capacity, or justified Nexo's sealing or redaction requests. Dkt. 19-1, 78-1. The only relevance Cress identifies for Kantchev is his corporate title. Dkt. 59-1. The Court selected Trenchev and Kantchev as custodians over Nexo's objection on February 19, 2025. Dkt. 59-1, 65. Cress does not explain how their emails *after* this date are relevant to 2021 events.

Cress also complains that the default retention period for Slack channels was set to 60 days effective March 1, 2023. However, those Slack channels were internal, not customer-specific, and did not contain external communications with customers. From the beginning, Cress characterized this case as a fraud lawsuit predicated on the VIP brochure and external communications with his relationship manager. Inconsistently, he now claims that the "most critical" documents in the case were not communications to him, and the "most critical" witnesses were people who never spoke to him. Based on the substance of the 2021 demand letters and the February 2022 complaint, the scope of Nexo's preservation obligations was limited to Cress and his transactions—not all of Nexo's back-end communications about every Nexo Token sale, every VIP customer, or every OTC transaction within the entire company.

Regarding company-issued computers, as explained in its January 30 meet and confer letter, Nexo exported and searched all available email, Google Drive, and Slack data for all 23 individual custodians and non-custodial sources. Search of computers connected to the same exported databases would be duplicative and wasteful, particularly given Cress's focus on old data that would not exist on current computers. Nexo does not issue company phones. As for personal phones, computers, or email, Nexo does not have custody or control over them, does not have reason to believe they contain discoverable information, and does not have a legal right, under U.S. or stricter European privacy laws, to demand turnover of personal devices or data. *See Matthew Enter. v. Chrysler Grp. LLC*, No. 13-cv-04236-BLF, 2015 U.S. Dist. LEXIS 166553, at *10-14 (N.D. Cal. Dec. 10, 2015) (denying "motion to compel production from employees' personal email accounts" because employer had no "legal right" to data).

Finally, all of this is premature. Cress has served voluminous pending document preservation discovery, including 27 RFPs on February 4. Before serving these RFPs, on January 26, Cress served a 49-topic Rule 30(b)(6) notice, with at least 15 of those topics directed to document preservation. Nexo's responses to these document retention RFPs are not due yet, and the parties have already begun the meet and confer process to set the dates and location for the depositions of Nexo's percipient witnesses and 30(b)(6) designees (including Cress's document preservation topics) within the two-week window of March 23 through April 3.[7] Cress's proposal for "certified" meet and confer responses, or an accelerated, piecemeal 30(b)(6) deposition on document preservation in February—a month before the omnibus 30(b)(6) deposition—is unworkable and will undermine the Court's schedule. Between now and then, the parties are focused on completing discovery (including Cress's new document preservation discovery) and finishing depositions in advance of the expert witness and dispositive motion deadlines. As for Cress's demands for a forensic examination of Nexo's systems and leave to file a sanctions motion, they are based on no evidence beyond Nexo's letter discussing retention policies. If Cress believes there are grounds for sanctions after discovery is completed, and after Nexo's Rule 30(b)(6) deposition occurs in late March or early April, then he can seek appropriate relief at that time. The Court should deny the premature relief requested because Cress presents no evidentiary basis for an expedited deposition, forensic inspections, or sanctions. [8]

---

[7] Nexo disputes Cress's position that Nexo refused to identify the "specifics" of its searches, which Nexo described in three meet and confer letters. **Exhibits 5, 10, and 11.** The parties have not exhausted meet and confer efforts on document disputes. As for Cress's claim that Nexo's email or Slack retention policies between December 2, 2022 and March 1, 2023 "contravene" information in a later March 27, 2023 document, that contention will be addressed in discovery in the normal course.

[8] Cress draws the Court's attention to two unrelated lawsuits in California and the United Kingdom, and regulatory inquiries by the SEC and CDFPI in the United States. All of those disputes voluntarily resolved, many years ago, and none are relevant to Nexo's preservation obligations in this case.

# Exhibit 1

# Exhibit 1

# Taylor-Copeland Law, P.C.

501 W. Broadway, Suite 800
San Diego, CA 92101
(619) 734-8770
www.taylorcopelandlaw.com

James Taylor-Copeland | 619 734 8770 | james@taylorcopelandlaw.com

**By Electronic Mail**

**September 9, 2025**
Ian Shelton
Ian.Shelton@bakermckenzie.com
Matthew Rawlinson
Matthew.Rawlinson@bakermckenzie.com
John Treat
John.Treat@bakermckenzie.com
Stephanie Brown
Stephanie.Brown@bakermckenzie.com
Baker Mckenzie
10250 Constellation Blvd.
Los Angeles, CA 90067

> Re: ***Cress v. Nexo Capital Inc.***, **Case No. 3:23-cv-00882-TSH (N.D. Cal.) – Meet and Confer Letter regarding Nexo's August 31, 2025 Production of Documents**

**Counsel,**

We write to address the significant deficiencies in Nexo's recent document production and to seek your immediate cooperation in remedying these issues. As you know Nexo promised to make rolling document productions throughout the summer and "substantially complete" its productions by August 31, 2025. However, it is apparent that Nexo's productions are far from complete. Critical categories of responsive documents remain missing or were only partially produced. As you know, Plaintiff served his Requests seeking these documents over a year ago. Nexo agreed to produce some of these documents shortly thereafter, and the Court ordered their production of many additional categories in April 2025. Nearly five months later, Nexo still has not complied.

We are concerned that Nexo continues to withhold court-ordered material, and that certain representations made to us and to the Court regarding the availability of discovery may have been inaccurate. We detail below the most glaring deficiencies in Nexo's production and request that Nexo promptly produce the missing documents or confirm, after a diligent search, that they do not exist (with an explanation of what efforts were made to locate them). Given the seriousness of these issues we would like to meet and confer with you as soon as possible. If these issues are not fully resolved by **Friday, September 19, 2025**, Plaintiff will have no choice but to seek relief from the Court, including sanctions, for Nexo's failure to comply with its discovery obligations and the Court's Order. Our goal, however, is to resolve these matters without court intervention by obtaining complete responses and fully understanding Nexo's position on each issue.

**Outstanding Categories of Missing Documents and Communications:** We have identified numerous categories of documents that are plainly responsive and should have been produced, but are absent or incomplete in Nexo's production. These include, but are not limited to, the following:

1. **Communications with Regulators (RFP 17, 35, 45)**

Nexo has produced virtually no communications with the U.S. Securities and Exchange Commission (SEC) or with state or other regulators, even though our requests (and the Court's order) encompass these materials. All communications with the SEC, state securities agencies, and other regulatory or law enforcement bodies about the NEXO Token, the Earn Interest Product (EIP), or Nexo's lending platform are plainly relevant. For example, NEXO-0211144 indicates that Nexo was in direct communication with at least one state securities regulator (the Arkansas Securities Department) in 2021 regarding the NEXO Token, and that Nexo represented to that regulators that as early as 2020 the SEC had conducted a "formal investigation" of Nexo. Another document, NEXO-0215538, confirms Nexo was communicating with the SEC regarding its sale of the NEXO Token and its public representation that the token was "SEC compliant." These documents directly contradict Nexo's representation to the Court in our March 14, 2025 Joint Discovery Letter (Dkt. 66), that "the SEC and companion state investigations in the US related to the Earn Interest Product (EIP) [were] not at issue in this litigation."

It now appears that Nexo was, in fact, under extreme regulatory scrutiny regarding its token during 2020–2021. NEXO-0185918 (internal document describing that Nexo had been in communication with both state and federal regulators for years prior to 2022, including communications about the NEXO Token). However, Nexo has not produced its related communications or documents. This omission is extremely concerning. Please immediately produce all documents and communications relating to any SEC, state, or other regulatory inquiries or investigations involving Nexo, the NEXO Token, the EIP, or any related matter (including any subpoenas, agency correspondence, interview transcripts, and Nexo's responses and document productions). If Nexo contends that no further documents exist, explain how that conclusion was reached (including what sources were searched) and confirm whether Nexo is aware of such documents ever existing. If any responsive documents have been withheld or destroyed, we need to know that now.

2. **Antoni Trenchev's Emails and Communications (RFP 70)**

Nexo's production contains virtually no emails or communications to or from Antoni Trenchev, Nexo's co-founder and Managing Partner. This is a glaring omission. As you know, the Court has ordered Trenchev to produce every document and communication concerning any statement Trenchev made regarding the NEXO Token or LRP. (RFP 70). This should encompass hundreds or thousands of communications. Nexo has not produced a single one. For example, we located a demand letter sent to Mr. Trenchev by a Nexo customer regarding an improper liquidation. NEXO-137559. However, the email communication transmitting that letter to Mr. Trenchev (and any internal follow-up) has not been produced. We have located early Nexo investor communications sent to Mr. Trenchev in Hristov's files that are missing from Trenchev's files. NEXO-0047899. Nexo has publicly stated that Mr. Trenchev messaged other customers directly regarding sales of NEXO tokens. NEXO-0098794. Trenchev discussed the NEXO Token in a "USA slack channel." NEXO-0103303. Trenchev has similarly spoken at length, for years, about Nexo and the NEXO token, to investors, at presentations, and in marketing materials. All of these communications are

missing from Nexo's production. The examples above are only a small set of Trenchev-related communications that are missing; it raises serious concerns that Nexo (a) failed to adequately search Mr. Trenchev's email accounts or other communication channels or (b) intentionally deleted responsive emails and documents.

In addition, we know that Mr. Trenchev used at least the email addresses antoni@nexo.io and legal@nexo.io (and perhaps other accounts) during the relevant period. You previously represented that "Nexo collected all emails associated with all email addresses he has used during the relevant period." Did Nexo collect and search these email accounts and all others used by Trenchev? Please confirm whether Nexo has collected and searched all of Mr. Trenchev's email accounts (and any messaging apps or other platforms he used for Nexo business). If such searches were done, explain why virtually no emails to/from Mr. Trenchev have been produced. If searches were not done or were limited (for example, if one of his email accounts was omitted), that needs to be remedied immediately. In short, either there are significant missing documents that must be produced, or Nexo must clarify that Mr. Trenchev's communications were not preserved and why.

### 3. Kosta Kantchev's Emails and Communications

Similarly, we have received almost no communications to or from Kosta Kantchev (another Nexo co-founder and court-ordered custodian). Mr. Kantchev was Nexo's primary Managing Partner and owner, and was NDS' primary manager in 2021; one would expect numerous responsive communications from his files on topics, including the NEXO Token sales, the VIP Program, the Liquidation Relief Program, and Nexo's OTC desk. Mr. Kantchev oversaw every department relevant to Mr. Cress's claims, yet his presence in the production is minimal. Nexo needs to confirm that Mr. Kantchev's email and electronic records were thoroughly searched. If they were, it is hard to believe that essentially nothing responsive was found from such a high-level custodian, particularly where Nexo represented it searched more than 100,000 documents from Mr. Kantchev's files yet produced only about 1,000. If Mr. Kantchev's communications truly yielded no responsive documents, please confirm that and describe the searches conducted. If, on the other hand, Nexo did not search certain of his data sources (or if his data was not preserved), that is a serious issue that must be disclosed and addressed immediately.

### 4. Plaintiff's Communications with Nexo Support (RFP 3)

Nexo has not produced all of Mr. Cress's communications with Nexo's customer support. This is a basic category of responsive documents – Mr. Cress's interactions with Nexo (such as support ticket emails or chats) are directly relevant to his claims. Yet Nexo has failed to produce any of Mr. Cress's communications via support ticket #432896. These communications are clearly referenced in Mr. Cress's production, e.g., CRESS-00000101, CRESS-00000104, CRESS-0000116, CRESS-00000162. Please produce all communications between Mr. Cress and Nexo's support team (including any internal support ticket records referencing Mr. Cress) or confirm that, after diligent search, Nexo was unable to locate all of Mr. Cress's support tickets (and explain why such records were not preserved or have been lost).

### 5. Lack of Internal Communications (Email, Slack, Telegram, etc.)

Across all custodians, Nexo's production contains *almost no internal communications* (whether by email or by internal messaging platforms such as Slack, Telegram, Riot/Matrix, or Confluence).

It strains credulity that a fintech company of Nexo's size operated with so little written communication among its team. By all accounts (including Nexo's own public statements and the documents we *have* seen), Nexo employees and executives communicated frequently via Slack and other chat applications, as well as email. For example, Nexo's OTC trading desk and finance teams coordinated daily on large transactions and "Liquidation Relief Program" decisions via Slack or similar channels – yet Nexo has produced virtually none of those discussions. Nexo's production also suggests that Nexo used an internal Confluence page or similar collaboration tools to discuss the Liquidation Relief Program (see NEXO-0134880; NEXO-0135493), but the communications or content from those tools have not been produced. We also know Nexo employees, including its managers and marketers, communicated via Slack about the NEXO token and the LRP. NEXO-0103303.

Likewise, aside from a handful of scattered emails, there are almost no internal emails discussing significant events (e.g. the Nexo Token sale, decisions about U.S. customers, responses to regulatory inquiries, VIP and LRP program, etc.). This absence suggests either a failure to collect from critical data repositories or possibly an intentional omission. We request that you confirm what *non-email* sources have been collected and searched for each custodian (e.g., Slack accounts, Telegram chats, Confluence pages, personal devices, etc.). If such sources were not searched or preserved, please explain why not. All responsive internal communications – whether via Slack, Telegram, text message, or any other medium – must be produced. If Nexo maintains that no such communications exist, please confirm that a diligent search was conducted and clarify why those records have been lost or deleted (which raises spoliation concerns).

### 6. Nexo's Analysis of the NEXO Token's Status

Nexo has not produced any of its internal or external legal analyses regarding whether the NEXO Token is or was a "security" under U.S. law. Request No. 35 specifically seeks all documents and communications about whether NEXO is a security, and Nexo agreed to produce these documents. Yet we have seen nothing like a legal memo, opinion letter, or email discussion of this issue. Nexo's production indicates that it shared these memos with third parties on multiple occasions, but the memos themselves do not appear to be included in the production. *See, e.g.*, NEXO-0141364. If Nexo obtained legal advice or conducted analyses on the regulatory status of the NEXO Token, those documents are responsive and must be produced (unless withheld as privileged, in which case they needed to be logged). Please either produce these documents or confirm if Nexo is withholding them on privilege or other grounds (and if so, they should be included on a privilege log).

### 7. Audit Reports, Attestations, and Financial Attestations

We have not seen any audit reports, attestation letters, or similar financial/accounting documents in Nexo's production, despite Nexo's public representations and internal documents confirming that such audits or attestations exist. For instance, Nexo (and Mr. Trenchev) have repeatedly suggested in public forums that Nexo's finances and NEXO Token holdings were subjected to audits or third-party attestations for transparency. Nexo marketed these audits as being "the first and only crypto lender to pass a real-time reserves audit." NEXO-02000057. Nexo appears to have used these audits in representations made to state regulators about the NEXO token, including regulators from Kentucky. NEXO-0199060. Likewise, Nexo's own documents purport to attach token sale audits that appear to be missing from Nexo's production. NEXO-0198761. Finally,

Nexo's internal documents suggest that it has performed audits, as they are "a legal requirement for entities registered in Switzerland." NEXO-0202058.

Our RFPs (e.g., RFP 36 and others) covered these materials, and the Court ordered their production. Yet Nexo has produced no audit reports or certifications whatsoever (internal or external). This is very troubling. We need to know: has Nexo conducted any internal audits, external audits, or independent accountings relating to the NEXO Token, its sale, or the proceeds therefrom? If so, all documents relating to those audits (reports, working papers, communications) must be produced. If Nexo's position is that it has *no* audits or attestation documents, please confirm that in writing and explain what efforts were made to locate them (and how that squares with Nexo's public and private statements claiming to have such audits). In any event, please also explain what searches have been done for documents responsive to RFPs seeking audits, financial statements, or attestations (such as RFP 111, 116, 117, and Court-ordered RFP 36), and why those searches have yielded nothing.

### 8. <u>Hristiyan Hristov's Emails (or Lack Thereof)</u>

It is clear that critical emails to or from Hristiyan Hristov (Plaintiff's VIP Relationship Manager) are missing from the production. Hristov was a key Nexo employee who directly handled Plaintiff's account and other large clients, and he is among the court-ordered custodians. However, dozens of emails directly between Hristov and Plaintiff are not included in his files. In addition, Hristov should have received certain automated system notifications regarding Plaintiff. We also would expect to see emails where Mr. Hristov forwarded client issues or discussed them with other Nexo personnel (for example, any communications he had with the trading team or management about Plaintiff's account). We have identified nothing of the sort. This suggests that either Hristov's emails were not properly collected (or have been deleted).

Compounding the concern, we discovered that some of Plaintiff's litigation documents from 2024 (i.e. documents generated in this lawsuit) somehow ended up in Mr. Hristov's custodial files. For example, NEXO-0136995 is a document from this litigation (dated 2024 or later) that appears in Hristov's data. This makes little sense because Mr. Hristov left Nexo in 2023 and presumably would not possess documents created after his departure, let alone litigation materials. The presence of that document in his files calls into question the integrity of Nexo's collection process and suggests that data from different sources or custodians may have been commingled or mis-designated.

We are also aware that account managers, such as Hristov, were issued company MacBooks. NEXO-0137920. Can you please confirm that Nexo imaged and searched Hristov's MacBook(s) and any other company-issued devices he used?

We request a thorough explanation: Were Mr. Hristov's email accounts and devices fully collected? If so, how is it possible that many relevant emails, including emails directly to, from, or regarding Plaintiff are missing? Also, how did a 2024 litigation document end up in his files?

### 9. <u>Minimal Production of Slack/Chat Communications</u>

As noted above, Nexo has produced very few Slack messages or other chat logs, and even fewer still from the 2021 period (ten total Slack communications from 2021). This is unacceptable given that Slack was used daily by Nexo's teams for vital operations relating to all VIP services and the

NEXO token. To be specific, Nexo's OTC trading teams, risk management personnel, account managers, marketers, and managers all used Slack (and likely Telegram, Confluence, SalesForce, and similar apps) to coordinate large trades, discuss LRP decisions and VIP customers, and discuss the NEXO token. For example:

- Nexo used Slack and SalesForce as a critical part of its Account Management (e.g., VIP Relationship Manager) workflow. NEXO-0145425. Nexo would discuss escalations from the "payments department for notable client behavior (withdrawals, deposits, repayments, exchanges). NEXO-0145425. All of these communications are relevant and responsive.
- Nexo tracked OTC, portfolio booster, and liquidation relief executions in Slack. NEXO-0141989.
- Nexo would elevate VIP service inquiries, such as OTC NEXO token purchases, and Liquidation Relief requests, to Slack channels. NEXO-0046405; NEXO-0048839; NEXO-0068703.
- Documents NEXO-0015277 suggest Nexo communicated frequently on Slack regarding the Liquidation Relief Program. Notably, in April 2021, Alexander Rakshiev mentions that "the March Liquidation Relief file has become too big," and he proceeded to Archive that file and create a new one. Nexo should have no issues accessing those files or archives in its custodians files, but has not produced any of them. Another document, e.g., NEXO-0015280, shows Nexo using Slack to discuss a customer's Liquidation Relief program on the same day Mr. Cress was liquidated by Nexo.
- Nexo confirms it has a dedicated Slack channel for OTC Processes (a relevant VIP service provided to Cress. NEXO-0139580. Other documents, e.g., NEXO-0134880 and NEXO-0135493, appear to be references to internal discussions (possibly on Confluence or Slack) about liquidation relief for customers. We have not seen the actual content of those discussions.
- Nexo represented that it used Slack channels and email communication "to communicate policies and procedures to all staff." NEXO-0093900. However, we have not seen a single communication to this effect.
- Nexo's internal documents even suggest they communicated with customers via Slack. NEXO-0137929. We have not seen these communications either.
- Nexo used Slack to discuss NEXO token related marketing campaigns. NEXO-0141634. These communications are missing from Nexo's production.

We are also aware Nexo employees, including custodians Trenchev and Hristova, discussed NEXO token sales to US investors through a "USA slack channel." NEXO-0103303. Every communication from this entire "USA slack channel" is responsive and has been ordered by the Court to be produced. (RFP 60, All communications by Nexo regarding NEXO or the LRP on Slack; RFP 70, All documents and communications concerning any statement made by Trenchev regarding the NEXO Token or the LRP). None of these plainly responsive communications from this Slack channel (or any communications from Trenchev) have been produced.

Additionally, Nexo's employees would have discussed Plaintiff's purchases and subsequent liquidations internally via Slack or other chats (in addition to email). For example, Nexo's internal documents discuss one customer who transacted millions of NEXO Tokens and hundreds of BTC in 2022 at levels similar to Mr. Cress. Concerningly, Nexo admits his main point of contact, Hristov, "conducted several OTC conversations that are not on record within the CRM system."

NEXO-0139009. Nexo discussed that these sales were apparent in the #nexo-movements channel in Slack, which closely monitors live clients who perform consecutive large sell orders of NEXO or move/initiate large TWAP orders through Nexo Pro. *Id*. However, we have seen almost no internal communications about Mr. Cress's transactions at all—in any system or communication channel used by Nexo.

We remind you that our RFPs (including RFP 60 and others) explicitly cover internal chat communications and social media posts. Nexo was ordered by the Court to search all non-custodial sources reasonably likely to contain responsive info, which would include enterprise chat platforms like Slack. Please confirm whether Nexo has collected data from Slack, Telegram, WhatsApp, Riot/Matrix, Confluence, or any other messaging/collaboration platform used by the 14 custodians (or other key employees) during the relevant period. If not, this is a serious oversight that needs immediate correction. We expect Nexo to conduct a comprehensive search of these sources and produce all responsive communications without further delay. If Nexo's position is that it no longer has these chat logs (for instance, if Slack messages were not retained or were deleted), that raises grave concerns about potential spoliation. If that is the case, please detail Nexo's retention policies for chat data and explain why these communications are unavailable. Simply put, the near-total absence of informal internal communications in the production is not credible; it needs to be addressed either by producing the documents or confirming (understanding the seriousness of such a representation) that none exist or could be recovered.

### 10. Limited Documentation of 2018–2020 NEXO Token Sales

Nexo's production is also deficient with respect to documents about the genesis of the NEXO Token and its early token sales. We requested, and the Court ordered, production of all documents concerning the offer and sale of NEXO Tokens, including communications with purchasers and marketing or promotional materials (RFPs 36, 37, 51, 52, 58, 69, etc.). Yet, we have received very few documents regarding Nexo's 2018 initial token sale and subsequent 2019–2020 sales of NEXO Tokens. For example, many documents, communications or agreements with investors who bought NEXO in 2018 (during the ICO/initial offering) have not been produced. NEXO-0215397 (NEXO purchase agreement with US investor without any communications regarding the sale); NEXO-0033173 (March 2018 ICO investor missing documents reflecting his token purchases or earlier communications about those purchases); NEXO-0028388 (lack of pre-2020 communications between NEXO ICO investor and Nexo); NEXO-0214733 (Nexo spreadsheet showing NEXO purchasers, e.g., US investors Russell Dargento and Dariush Askaripour, for whom there are no purchase contracts or communications); NEXO-0219542 (communications or agreements with advisors who were paid in NEXO tokes or purchased NEXO tokens for cash).

Documents reflecting **OTC sales of NEXO Tokens in 2019–2020** (aside from Plaintiff's) are almost non-existent. We know that Nexo continued to sell NEXO Tokens to various investors (including U.S. persons) after the initial ICO period; those transactions are highly relevant, yet documentation of them is largely missing. Likewise, internal discussions of marketing and marketing materials are largely absent. This is a major gap. By way of illustration, Nexo's response to Interrogatory No. 3 (asking for details of NEXO Token sales to U.S. persons) failed to mention any sales in 2020, presumably suggesting none occurred. However, we have located documents, e.g., NEXO-0214728, NEXO-0028242, NEXO-0026663, which show that Nexo did make NEXO Token sales to U.S. investors in 2018 and 2020. These sales were not disclosed in the interrogatory response. This discrepancy indicates that either Nexo's interrogatory response was incomplete or

Nexo has not produced the documents underlying those sales (or both). In addition, Nexo must supplement its Interrogatory responses to correct any inaccuracies (such as the omission of the 2018 and 2020 U.S. token sales, and any other token sales).

We also seek an explanation: if Nexo contends that no further documents exist for these token sales, please confirm that a diligent search was conducted and clarify what happened to such records. Given Nexo's business, it is hard to imagine that substantial sales of its flagship token would leave virtually no paper trail; if the trail has been lost or destroyed, that is a serious matter that needs to be explained.

### 11. <u>Missing Documents and Communications Regarding NEXO Token Due Diligence and Analysis, and Liquidation Relief Agreements</u>

Dozens of Nexo's responsive documents—if not more—are missing attachments and related communications. In one week of review, we have already identified more than sixty documents that are missing attachments and related communications (i.e., communications with missing attachments, or attachments with missing communications). These include liquidation relief agreements, documents and communications regarding Nexo's NEXO token due diligence/analysis, and attachments to responsive documents and communications generally.

Many LRAs are missing from Nexo's production, e.g., NEXO-0057304, NEXO-0062531.

Many other documents are missing related attachments or communications. For example, NEXO-0217044 is a "Coinbase ICO Questionnaire" that Nexo apparently filled out (likely as part of a listing or due diligence process with Coinbase). However, we have not seen the correspondence that presumably went along with this questionnaire – such as emails to or from Coinbase representatives, follow-up questions, or the outcome of that process. Nexo's documents and communications regarding due diligence of NEXO have been ordered by the Court (RFP 36). These due diligence communications that go along with the due diligence documents produced by Nexo should also be produced.

Likewise, another document, NEXO-0179739, appears related to communications with an exchange regarding the due diligence of the NEXO token. And NEXO-0133323 contains information about NEXO Token sales or distribution that appears to reference content not present in our production. These gaps suggest that Nexo has not produced complete communications with exchanges like Coinbase (or others such as Binance, Bitstamp, etc.) regarding due diligence and analyses of the NEXO Token. Such communications are responsive to, inter alia, RFP 36 (due diligence and analysis), RFP 58 (token sale exchanges) and RFP 69 (statements to purchasers or potential purchasers). Please produce all documents and communications between Nexo (or its agents) concerning these categories of the NEXO Token – including listing applications, due diligence questionnaires (with responses), emails or messages with exchange officials regarding Nexo's efforts to sell NEXO tokens, and any agreements or understandings reached. If Nexo believes it has already produced all such communications, we must disagree based on the clear references to missing material; we request that you double-check those sources and confirm whether additional documents exist. If certain communications are being withheld (for example, due to confidentiality or privilege, though privilege is unlikely here), let us know that as well.

### 12. <u>Social Media</u>

Nexo's production is missing many social media or online community communications. Nexo was active on platforms like Twitter/X, Facebook, Instagram, Telegram, YouTube, and many others. Nexo has produced almost no documents or communications from its Telegram and YouTube channels. Nexo was active on these channels for years, making public statements about the NEXO Token, the platform, and programs like the Liquidation Relief Program (LRP). RFP 60 specifically covers all such social media and chat room posts and communications by Nexo regarding the NEXO Token or the LRP, including on Twitter, Reddit, Riot.im/Matrix, Slack, Telegram, YouTube and Discord. To date, many of Nexo's posts and communications appear missing from Nexo's collection, and some of these platforms have not been searched at all.

This is particularly disturbing as Nexo appears to have deleted many responsive social media posts. For example, NEXO-0037650, is an email from Hristov regarding how the SEC's inquiry into XRP affects the NEXO Token, which includes a twitter link. That tweet has not been produced by Nexo and appears to have been deleted. Can you please clarify what Nexo has done to search these social media platforms? And please clarify why Nexo has not searched through and produced documents and communications from all its social media platforms? And should Nexo have any discussions or communications about deleting relevant and responsive materials from its social media, it should produce those documents and communications as well.

### 13. <u>**Google Documents and Online Repositories**</u>

Nexo's team utilized Google Docs or other cloud-based document services to collaborate on important documents, including documents regarding the LRP, e.g., NEXO-0023459, NEXO-0024190, NEXO-0025496, NEXO-0044908. However, we have been unable to locate any Google Docs (or Sheets, etc.) or other similar collaborative documents. If you have produced any such documents can you please identify them by bates number? We request that Nexo confirm whether it has searched for documents stored in Google Drive, Office 365 online, Confluence pages, or other cloud repositories used by the custodians. Documents from those sources should be collected in their native format and produced so that all changes to the document can be reviewed. If Nexo did not search those repositories, that must be done now.

### 14. <u>**Documents and Communications Regarding Plaintiff's Transactions**</u>

Another significant gap is the lack of internal communications about Plaintiff's OTC purchases and related transactions worth millions of dollars. Mr. Cress's dealings with Nexo were not in a vacuum; internally, multiple people at Nexo would have coordinated to execute his large purchase orders, manage the liquidity for that, and later handle the liquidation of his collateral. We expected to see emails or chat communications such as: instructions from Hristov to Nexo's trading desk to buy certain amounts of BTC/ETH/NEXO for Plaintiff's account, confirmations or reports from traders about the execution (including whether a Time-Weighted Average Price (TWAP) strategy or other method was used), and discussions about how to handle Plaintiff's account as it became distressed in June 2021. Instead, we have essentially nothing of this sort. No emails among Nexo's "OTC team" discussing Plaintiff's orders, no chat threads coordinating the timing of buys, and no internal debate about extending liquidation relief to Plaintiff. This is implausible. For example, NEXO-0145418 appears to be an internal file or reference related to a retail OTC trade, presumably documenting something about the execution, but we have not seen the actual communications around it.

RFPs 19, 20, 21, and 23 (among others) all seek these types of documents, and Nexo agreed to produce them. Nexo must produce any and all internal communications or records concerning: (a) the execution of Plaintiff's purchase orders (including trade tickets, communications with exchanges or liquidity providers, etc.), (b) any special accommodations or strategies used (such as TWAP or splitting the orders), (c) internal discussions about Plaintiff as a customer (e.g., any concerns raised about his size or U.S. status), and (d) deliberations or decisions about liquidating his collateral (including any consideration of giving him notice or relief). We have also been unable to locate critical documents concerning Nexo's liquidation of Plaintiff, including basic records reflecting any trade executions. If Nexo's position is that none of these records exist, it must provided a detailed explanation for why. For instance, is Nexo claiming that all coordination was done verbally and nothing was ever written down? Or that such records once existed but have been deleted? We need clarity and transparency on this point.

### 15. <u>Suspiciously Low Number of Emails or Communications From Custodians</u>

As you know, Nexo was ordered to search the files of fourteen custodians. Many of these custodians (including Trenchev, Kantchev, Hristova, Rosen, Shanov, Tom Stanev, Videlov, Tonkov, and Kostadinov) have nearly no email communications or any communications through any other company channels. Trenchev and Kantchev's lack of communications are discussed above. But the issue runs prevalently through nearly all Nexo's production.

Nexo has produced no more than 50 emails from Hristova, who has worked at Nexo for years, and ran point on many Nexo campaigns, including working on Nexo's investor relations campaigns, 2021 marketing, and its campaign regarding Nexo's SEC and state regulatory actions. For example, Hristova has worked directly with Mr. Trenchev and other Nexo employees on "Changes to Terms for NEXO Tokens in the U.S." NEXO-0103303. These internal communications have been ordered by the Court. (RFP 36, 59). Hristova has even commented directly on Mr. Cress's case in the media. NEXO-0017385. We have barely seen any internal communications to or from Ms. Hristova.

Rosen Angelov was Nexo's Community manager while Mr. Cress was a customer at Nexo. He communicated with NEXO token investors in the community and dividends paid to U.S. investors, such as Mr. Cress. CRESS-00000638. Rosen was directly involved with Mr. Cress's Nexo account and was requested to provide details of the liquidation relief program to Mr. Cress in June 2021. CRESS-00002106. We have barely seen any internal communications to or from Mr. Angelov.

Similar to those described above, Nexo has also failed to produce emails and communications to or from most of the other court-ordered custodians, including Shanov (direct marketing specialist), Tom Stanev (head of trading), Videlov (sales trader), Tonkov (trading operations manager), and Kostadinov (head of marketing). These are custodians that were involved in marketing the NEXO Token, marketing the VIP relationship program, and executing VIP services such as OTC transactions, LRPs, and Portfolio Boosters—yet we have almost no communications from any of these custodians.

We have not seen more than one hundred communications (and usually far fewer) from any of the above custodians, despite Nexo representing it would be searching through tens of thousands (if not hundreds of thousands) of each of their custodial files for responsive documents. Please explain

what you have done to search through these custodian's files, and why barely any communications exist from the custodians mentioned above.

### 16. <u>Inadequate Search of Nexo's Non-Custodial Sources</u>

Nexo's search of its non-custodial sources appears to be incomplete. After repeatedly representing that Nexo was required to search through millions of non-custodial source documents, Nexo has barely produced any.

For example, Nexo has identified 305,693 documents from its OPS source, and 5,998 documents from its OTC source however, has only produced two documents from these files. Many of these documents would refer to Nexo's OTC, LRP and Portfolio Booster services that it provides to its VIP customers. For example, Nexo's LRA notices were to be sent to "ops@nexo.io." Thus, Nexo's OPS source clearly contains relevant documents and communications. Nexo's production of just two out of 305,693 ops documents is completely inadequate. <u>Ops@nexo.io</u> was frequently involved in providing OTC transactions and liquidation relief for its customers, e.g., NEXO-0108900.

This example of Nexo's failure to search its non-custodial sources (along with Nexo's other glaring deficiencies in performing an adequate search of many of its custodians) puts the integrity of Nexo's other searches of non-custodial sources in question. More bluntly put, Nexo spent the better part of a year complaining that a search of its non-custodial sources (which it identified) would be extremely burdensome. However, it appears that at least for some of these sources, Nexo has hardly searched them at all. Please clarify what you have done to search these non-custodial sources, and please explain why Nexo has not produced documents from these sources.

### 17. <u>Document Metadata Issues</u>

Nearly ten thousand documents that Nexo has produced so far appear to have had its metadata altered around the same time – specifically, many files show a "Last Modified" timestamp of from March 2025 (e.g., 03/10/2025, 3/11/2025, 3/12/2025, 3/26/2025). This is true even for documents that were clearly created years earlier. Such uniform metadata suggests that the documents may have been mass-copied or exported on that date (perhaps in preparation for production), which overwrote the original metadata (creation dates, modification dates, author fields, etc.). Because of this, we currently cannot discern when many documents were actually created or last edited, which impairs our analysis and investigation into the authenticity of the production. This is a serious concern. We need Nexo to explain why the metadata for produced documents is showing modified dates. Has Nexo produced original files with intact metadata? If not, will Nexo agree to provide the original metadata for these documents (for example, in load files or metadata reports)?

### <u>Conclusion</u>

As the above list demonstrates, Nexo's production deficiencies are extensive and cut across every category of information relevant to this case. This is particularly troubling given that the Court's April 2025 Order compelled many of these materials. The current state of production is not defensible. We are also troubled by the possibility that some evidence may have been lost or destroyed. Through this letter we are giving Nexo one final opportunity to cure these issues without court intervention. We also seek to crystallize Nexo's position on each of these points – if Nexo

maintains that certain documents do not exist or cannot be found, we want that clearly stated in writing.

In light of the foregoing, we request that Nexo do the following:

1. Promptly produce all documents and communications responsive to the above-referenced categories and RFPs that have not yet been produced. We expect a supplemental production well before the September 19, 2025 deadline noted below, given the urgency.

2. For each category identified above, provide a written confirmation of whether Nexo has (a) produced all responsive documents after a diligent search, (b) is in the process of obtaining additional documents (with a timeline for production), or (c) asserts that no responsive documents exist. If responsive documents once existed but no longer exist (e.g., were deleted or lost), please state that and explain the circumstances surrounding their deletion.

3. Confirm the data sources and custodians searched. If any relevant source (such as Slack, company devices, personal devices, shared drives, etc.) was not searched or collected from, identify those and explain why. We may need to ask the Court for relief if key sources were left out of the collection.

We request that you provide the above information and produce all outstanding documents no later than Friday, September 19, 2025. If you need to confer about specific items or have questions about what we're looking for, we remain available to discuss – but given the history, we believe these categories are self-evidently within the scope of the case and the Court's order.

Our sincere hope is that Nexo will take this opportunity to cure the deficiencies and avoid the need for court intervention. However, please be advised that if Nexo does not substantially complete its production and provide the confirmations requested by the September 19 deadline, Plaintiff will proceed to seek all appropriate relief from the Court. This may include relief under Rule 37(b) for failure to obey the court's discovery order, as well as any further remedies the Court deems just (including evidentiary sanctions or even default if warranted). We would also seek remedies for any spoliation of evidence if it becomes apparent that relevant materials were destroyed or withheld. We genuinely prefer not to take that path, and would much rather receive the documents than spend time on sanctions motions. But we will not hesitate to protect Plaintiff's rights and ensure a fair process.

We ask that you respond in writing to each of the points above and confirm what additional production will be made, and when. Thank you for your prompt attention to these matters – we look forward to your response by the above date and to receiving the long overdue documents.

    Best regards,

*/s/James Taylor-Copeland*
James Taylor-Copeland
james@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101

**12**

# Exhibit 2

# Exhibit 2

# Taylor-Copeland Law, P.C.

501 W. Broadway, Suite 800
San Diego, CA 92101
(619) 734-8770
www.taylorcopelandlaw.com

James Taylor-Copeland | 619 734 8770 | james@taylorcopelandlaw.com

**By Electronic Mail**

**September 15, 2025**
Ian Shelton
Ian.Shelton@bakermckenzie.com
Matthew Rawlinson
Matthew.Rawlinson@bakermckenzie.com
John Treat
John.Treat@bakermckenzie.com
Stephanie Brown
Stephanie.Brown@bakermckenzie.com
Baker Mckenzie
10250 Constellation Blvd.
Los Angeles, CA 90067

> Re: ***Cress v. Nexo Capital Inc.***, **Case No. 3:23-cv-00882-TSH (N.D. Cal.) – Meet and Confer Letter regarding Nexo's September 12, 2025 Production of Documents**

**Counsel,**

We have reviewed Nexo's September 12, 2025 production and write to address the issues below. Once again, these issues raise serious concerns about the integrity of Nexo's document production, and we ask that Nexo address these issues promptly.

1. Nexo discusses documents and communications relating to a 2020 and 2021 SEC investigation into the NEXO token ICO. *See, e.g.*, NEXO-0227342. However, Nexo has not produced any of these documents and communications, which are plainly responsive (RFP 45). Can you please confirm that Nexo will produce these documents and provide a date certain by which it will make this production?

2. Nexo has produced SalesForce logs for other customers, e.g., NEXO-0225988. Nexo also has referenced internal documents showing databases containing granular details relating to customer account transactions (e.g., liquidations, LTV balances prior to liquidations, approval details, exchanger sell prices and costs). NEXO-0140611. Nexo has not produced these logs for Mr. Cress. Can you please confirm that Nexo will produce these logs and provide a date certain by which it will do so?

3. Nexo frequently refers to Armanino as its accounting firm and auditor to regulators, but continues to deny that it has any audits or accountings, e.g., NEXO-0229107. Even documents produced to regulators show otherwise. NEXO-0229094. Nexo also represented to regulators it has engaged other accounting firms. NEXO-0229107; NEXO-0225417. However, Nexo has asserted in this litigation that it does not have any audits or related documents. Can you please explain the reason for this discrepancy?

4. Nexo's letters with regulators frequently reference Bates numbers of spreadsheets and exhibit documents, e.g., NEXO-0226529. However, these Bates numbers are either not present in the document (such as for spreadsheets), or are disjoined such that it is difficult to understand which letters correspond to which exhibits. This also raises the issue of whether Nexo has indeed produced all documents sent to regulators. Can you please provide a way to decisively understand which letters correspond to which exhibits?

5. In Nexo's latest production, it frequently references a Liquidation Relief related settlement agreement between Zachary Rubin and Nexo. We also see reference to Mr. Rubin's lawyer, Justin Keller (Rimon Law) and Nexo. However, there are no communications between Mr. Rubin and Nexo, or Mr. Keller and Nexo, other than a few of Hristov's emails regarding Nexo's Liquidation Relief Program in June 2021. Can you please let us know why these communications have not been produced and provide a date certain by which we can expect to receive them?

6. Nexo appears to have attached and produced materials to regulators regarding its Grand Jury Subpoena regarding FTX, e.g., NEXO-0223231. However, these materials appear to be missing from Nexo's production. Please produce these attached materials.

7. Page 1 of NEXO-0229591 is blank. Can you please produce a complete version of this document?

8. NEXO-0226151, 152, 153, 154, 155, 156, 157, NEXO-0229449, and NEXO-0229504 are illegible. Can you please produce legible copies?

9. NEXO-0230922, NEXO-0229470, NEXO-0222932, NEXO-0228759, NEXO-0222936, NEXO-0226541, NEXO-0222943, NEXO-022981, NEXO-0222987, NEXO0223024, NEXO-0223064 all appear to have missing attachments. Could you please produce the attachments for these emails?

Best regards,

*/s/James Taylor-Copeland*
James Taylor-Copeland
james@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101

# Exhibit 3

# Exhibit 3

# Taylor-Copeland Law

501 W. Broadway, Suite 800
San Diego, CA 92101
(619) 734-8770
www.taylorcopelandlaw.com

Max Ambrose | 602 570 2656 | maxambrose@taylorcopelandlaw.com

**By Electronic Mail**

**October 23, 2025**
Ian Shelton
Ian.Shelton@bakermckenzie.com
Matthew Rawlinson
Matthew.Rawlinson@bakermckenzie.com
John Treat
John.Treat@bakermckenzie.com
Stephanie Brown
Stephanie.Brown@bakermckenzie.com
Baker Mckenzie
10250 Constellation Blvd.
Los Angeles, CA 90067

Re:     *John Cress v. Nexo Capital Inc.*, Case No. 3:23-CV-00882-TSH, Meet and Confer Letter Regarding Nexo's Document Search and Production

**Counsel,**

We write in response to your October 20, 2025 letter—received more than a month after our September 9 and 15 meet-and-confer letters. Despite this lengthy delay, your letter offers no substantive progress. It merely repeats Nexo's prior descriptions of its search process and vaguely claims to be "following up" on several categories, without confirming whether Nexo will actually produce the missing materials we identified—or when. Worse still, it entirely ignores multiple specific issues raised in our prior correspondence. While this letter reiterates the most pressing outstanding discovery issues with respect to Nexo's failure to adequately search for and produce documents and communications, we reserve all rights with respect to all issues raised in our earlier meet and confer letters.

This pattern of delay and evasion is obstructing discovery. We therefore demand clear, date-certain commitments—or a reasoned refusal—for each item below. Please confirm your availability to meet and confer this week so that we can finally move discovery forward.

## 1.     Communications With Regulators

Nexo's letter says only that it is "following up" on whether further communications regarding the 2020–2021 SEC investigation of the NEXO token exist and whether any other regulator communications exist.

That is not a position. Please confirm, by October 28, 2025, whether Nexo has searched for and produced (i) all communications with U.S. federal and state regulators concerning the NEXO token, Earn, liquidations, VIP/OTC practices, and related topics, and (ii) all productions made to regulators, with complete family integrity and a mapping of each cover letter to its exhibits. If any items are being withheld, identify the specific basis. Your confirmation should identify the Bates ranges for each regulator matter and the sources searched (including shared/legal mailboxes and Google Drive). We also request a date-certain (no later than November 4, 2025) for production of any additional materials related to the 2020–21 SEC investigation, which your own documents reference, and for any materials reflecting the Bulgarian investigation into Nexo, which is not reflected in your production at all.

In addition, we identified letters to regulators that appear to have attached materials about an FTX Grand Jury Subpoena (e.g., NEXO-0223231), but the materials are missing from your production. Your letter does not address this. Please produce those attachments (with complete parent-child families) or state with specificity why they cannot be produced—by October 28, 2025.

Regulatory correspondence in your production repeatedly references exhibits/spreadsheets by Bates, but those Bates references are often absent, disjoined, or do not align with families (e.g., NEXO-0226529). Your letter is silent on this. Please provide a cross-reference list mapping each letter to the specific Bates-labeled exhibit(s), or re-produce with corrected families—by October 28, 2025

## 2. Trenchev and Kantchev

Your letter "acknowledges" numerous hits referencing emails to/from Antoni Trenchev and Kosta Kantchev, but that is precisely the problem: these emails were not produced from Trenchev or Kantchev's own files—meaning they were deleted or never collected from the accounts those principals actually used. The Court ordered Nexo to search Trenchev's custodial files (i.e., the files he had or has access to), not a single narrow address. That obligation necessarily includes identifying all email addresses he used and searching them. *PlayUp, Inc. v. Mintas* 2024 U.S. Dist. LEXIS 136098, No. 2:21-cv-02129-GMN-NJK, 2024 U.S. Dist. LEXIS 136098 (D. Nev. Aug. 1, 2024) (collecting cases from the 9th Circuit and California District Courts). Your email states you will not search legal@nexo.io despite there being no dispute Mr. Trenchev controlled this email address and used it to send responsive communications. You also do not mention antoni@trenchev.com (or any similar variants), implying you have not and will not search them. Please confirm by October 28, 2025 that you will (1) identify all email addresses used by Trenchev and Kantchev during 2017-2025 (including role accounts), (2) identify mobile devices used by Trencehv and Kantchev, (3) collect and search them for the agreed terms, and (4) produce responsive documents (or certify after a reasonable search what no longer exists and why). If you refuse, we will promptly seek Court intervention, which may include a request for a forensic examination of Trenchev and Kantchev's files.

## 3. Missing Internal Communications (Including Hristov and Dinca)

Your response asserts you produced "over 50,000" documents and some Slack communications, but volume isn't the issue—missing communications are. Your contention that Plaintiff's pending Motion for Leave to Amend is based on these internal communications merely reinforces that critical documents are missing. For example, the emails reproduced at NEXO-0003645 include Hristov but are absent from Hristov's files; while the email chain at NEXO-0003604 includes Octavian Dinca but does not appear in Dinca's files. Please confirm by October 28, 2025 that you have run a completeness check for these chains across the custodians on the thread and re-produced the full family groups from the custodial source of each participant. If, after a reasonable search, you contend these items are not in the custodians' mail stores, please (a) identify the source from which they were produced, (b) describe any auto-deletion/archiving that would explain the gap, and (c) certify that no additional copies exist in the custodians' mailboxes or archives.

This is a critical issue as Nexo has not produced any internal emails or communications regarding Plaintiff's other two OTC purchases (or any other internal communications regarding Plaintiff). Moreover, as raised in our September 9 email, we are also aware that account managers, such as Hristov, were issued

company MacBooks. NEXO-0137920. You have not provided any response to our request that you confirm that Nexo imaged and searched Hristov's MacBook(s) and any other company-issued devices he used. You have similarly provided no response to our other questions regarding Hristov: Were Mr. Hristov's email accounts and devices fully collected? If so, how is it possible that many relevant emails, including emails directly to, from, or regarding Plaintiff are missing? Also, how did a 2024 litigation document end up in his files? To be clear, we are looking for direct responses to each of these questions.

**4.  Slack/Chat Communications**

Your letter also did not address our specific concerns regarding Slack. Stating that "Slack communications were included" and that you produced "at least 207 records" is facially insufficient for 14 custodians and non-custodial sources. Nor do you address our critical point that Nexo has produced ten total Slack communications from 2021 despite evidence suggesting Nexo used Slack as its primary source of communication between employees at this time to discuss VIP customers, OTC transactions, the liquidation relief program, NEXO token sales, policy and procedure communications, and NEXO token marketing-related communications. Nexo's policies also describe that Nexo communicated with them via Slack. We have not seen any of these communications. By October 28, 2025, please provide: (a) Slack plan/export type used and whether DMs and private channels were exported; (b) retention settings during the relevant period; (c) whether WhatsApp/Telegram/Signal or other messaging platforms were used for work communications by executives or VIP/OTC staff, and if so whether they were collected and searched; and (d) confirmation that Slack-linked attachments (Drive/Share links) were collected from the underlying repositories. Provide a date-certain plan to cure any gaps (no later than November 4, 2025).

**5.  Google Drive Documents**

Your generic statement that "Google Drive documents were included" does not allow us to tie Drive files to the emails and Slacks that reference them. Please (i) produce a Drive mapping that lists for each produced Drive file: file ID, owner, created/modified timestamps, and original path/folder; (ii) confirm that you captured version history sufficient to reflect contemporaneous content during the relevant period; and (iii) re-produce any email/Slack item with a Drive link as a complete family including the linked file (or a placeholder with the file's Bates ID if produced elsewhere) so the relationship is clear in the load files. Provide this mapping and any supplements by November 4, 2025.

**6.  Metadata (File Names, Types, and Accurate Dates)**

Our Sept. 15 letter identified categories of documents with missing or inaccurate metadata (no file name, no file type, and collected-date placeholders instead of creation dates). You appear to have ignored our identification of these categories entirely. We nevertheless attach as **Exhibit A**, a spreadsheet identifying the numerous documents with the most serious metadata issues. Please provide replacements containing proper metadata by October 28, 2025.

**7.  Rubin / Keller communications (Liquidation Relief settlement).**

Our Sept. 15 letter identified repeated references to a Liquidation Relief-related settlement with Zachary Rubin and communications with Justin Keller (Rimon Law), yet we have no emails or threads between Nexo and Rubin/Keller beyond a few Hristov communications in June 2021. Your Oct. 20 letter does not mention this at all. Please confirm whether Nexo will: (a) search for and produce all Rubin/Keller communications (including attachments and families), or (b) certify after a reasonable search that none exist—by October 28, 2025.

**8.  Cress support / Salesforce and related logs (including ticket #432896).**

Your letter says you are "following up" on ticket #432896 and whether any Salesforce log for Cress exists beyond what has been produced. That is not a position. Nexo has produced Salesforce-type logs for other customers (NEXO-0225988, NEXO-0205773) and internal references showing databases with the

3

granular fields we requested (NEXO-0140611). Please confirm whether Nexo will produce the full Cress logs (Salesforce and any successor/parallel systems), including fields reflecting LTV before/after liquidations, liquidation approvals, execution price/cost data, and OTC profit/spread fields, or certify that such logs do not exist—by October 28, 2025.

Concerningly, on September 27, 2025 you produced NEXO-0231341 which provides (what appears to be) the #432896 support ticket. However, your October 20, 2025 letter represents you remain unsure if this document produced nearly a month ago even "exists." Your response suggests that you have no idea about even the most basic constructs of your client's document search and production with respect to the most critically relevant documents—communications with Plaintiff about his account.

In addition, the document itself shows it was exported on November 14, 2023—before Nexo even filed its Motion to Dismiss FAC—but that Nexo waited years to produce this critical information. As you might understand, this severely calls into question the integrity of Nexo's document production and whether Nexo is acting in good faith. It is also extremely concerning that this file existed in the "Nexo Corporate Records" custodial database, but was absent in any of the files of the custodians you represented had relevant information to Plaintiff. This conduct is not only grounds for sanctions, but to greatly expand the scope of Plaintiff's discovery requests outside of the initial 14 custodians and 9 non-custodial sources.

**9.** **Hristov ↔ Cress emails; missing families.**

Stating "please identify missing documents by Bates" does not resolve that numerous threads appear incomplete and that multiple emails in our Sept. 15 list are missing attachments. Please search Hristov's mail store(s) for complete family groups and confirm family-level re-production by November 4, 2025.

**10.** **Cress transactions (OTC & liquidations).**

You state you are "following up" on whether additional responsive documents exist regarding OTC transactions or liquidations for Cress. Please confirm whether Nexo will produce: (i) OTC desk transaction logs showing internal acquisition price, customer price, spread/profit, time-weighted or other execution methodology; (ii) liquidation event logs (including any "liquidation tax/fee" fields); and (iii) oracle calculations showing LTV inputs and price sources used for each liquidation—by November 4, 2025.

**11.** **Replacement and completeness issues (illegible pages, blank page, missing attachments).**

Your letter says you are "following up" on items 7–9 from our Sept. 15 letter—i.e., the blank first page (NEXO-0229591), illegible pages (NEXO-0226151–157, NEXO-0229449, NEXO-0229504), and numerous emails with missing attachments (NEXO-0230922, 0229470, 0222932, 0228759, 0222936, 0226541, 0222943, 0222981, 0222987, 0223024, 0223064). Please re-produce complete, legible versions with full families by October 28, 2025, or confirm non-existence after a reasonable search.

In addition, Our September 9 letter identifies many other documents missing attachments or portions, with five specific examples. However, you have not yet done anything to follow up on these, despite our letter listing specific documents. Please confirm you will produce the missing documents described in our September 9 letter regarding NEXO-0217044, NEXO-0179739, and NEXO-0133323. For the missing LRAs, we anticipate sending you a larger list of these documents to ensure an efficient resolution.

**12.** **Audits, attestations, and Armanino / other accounting firms.**

You state Nexo is "not aware of" having obtained any third-party audit, and that "Armanino functionality" was a public "real-time attest" site that is no longer available. But Nexo's own documents refer to Armanino as Nexo's accounting firm and auditor and refer to other accounting firms (e.g., NEXO-0229107; 0229094; 0225417). Please reconcile this discrepancy and produce all communications with Armanino and other accounting firms, together with any attest reports/snapshots, instructions, or data

exports relied upon—by November 4, 2025. If you contend no audits/attests exist, please explain how the cited documents describe them and identify what you searched to reach that conclusion.

**13.    Analysis of the NEXO Token's Status**

You state that our contention that the production is missing some records of NEXO token related analyses of the security-status is false. However, you have failed to cite even a single document showing how this is false. We have provided clear examples of missing documents, e.g., NEXO-0141364. Please let us know where in Nexo's production we can find this missing memo, and please direct us to any other Bates numbers describing Nexo's analyses of whether the NEXO token was a security—particularly with respect to those shared with third parties.

**14.    Nexo Token Sales**

We do not understand why *some* documents, communications, or agreements with investors who bought NEXO in 2018 have been produced, while others are missing. For example, for a purchase agreement to have been signed and received by Nexo, there must necessarily be some communications between the parties which contained the document NEXO-0215397, NEXO-0033173. These agreements could not have *magically* appeared in Nexo's files, as you suggest. Other documents, e.g., NEXO-0219542, showing Nexo's initial 2018 ICO had U.S. participants, contain no communications relating to those sales. This is extremely concerning considering Nexo's document production reflects several NEXO token sales **directly to U.S. investors**, both in its 2018 ICO and subsequent OTC transactions (.e.g, NEXO-0214729, NEXO-0028242, NEXO-0026663), that Nexo failed to disclose under oath in its interrogatory responses and your representations to the Court. We implore you to supplement your Interrogatory responses to disclose all direct sales of NEXO tokens to US investors made at any time, yet you ignore this request. Please let us know (1) how Nexo has disclosed purchase agreements without any supporting communications about them, or containing them, (2) whether those communications exist, or have been deleted, (3) what Nexo has done to ensure its Interrogatory responses contain accurate information with respect to its NEXO token sales, and (4) whether Nexo will supplement its Interrogatory responses to contain the factual information reflecting its document production.

**15.    Social Media**

We are well-aware Nexo produced some of its social media posts. Your letters ignores every issue we raised with respect to those posts, such as why Nexo has barely produced any documents from Telegram or YouTube, and why Nexo appears to have deleted responsive social media posts. Please let us know (1) which social media databases Nexo has searched, (2) what you have done to search these databases, (3) whether Nexo had a policy with respect to deleting social media posts, and (4) whether Nexo searched for or produced documents relating to whether it has deleted social media posts.

**16.    Privilege log.**

You say Nexo is willing to meet and confer on timing. We propose simultaneous exchange of privilege logs by October 31, 2025. Please confirm.

**17.    Additional Issue**

We have identified a range of documents with hidden text, including NEXO-0138288, NEXO-0139301, NEXO-0147895, NEXO-0150967, NEXO-0167079, NEXO-0172407, NEXO-0215607. These documents contain text that when viewed in a text file, display text that is unavailable in the image or PDF file. At best, this suggests that Nexo has failed to accurately compile and produce its documents. At worst, this shows a sloppy attempt to hide evidence. Either way, should this conduct not be completely explained and rectified in Nexo's entire document production by November 4, 2025, we will have no choice but to involve the Court.

**18. Timing and next steps**

By October 28, 2025: Please provide (a) clear "will/will not produce" positions on Items 1–17; (b) a firm production schedule; and (c) confirmation on the privilege log exchange.

By November 7, 2025: Complete the productions and replacements identified above (or certify after a reasonable search that none exist and explain the steps taken).

Given the substantial deficiencies identified in our previous letter and above, we believe a Rule 30(b)(6) deposition limited to Nexo's efforts to identify, preserve, collect and produce documents in this matter is warranted. Please let us know if you will agree that Plaintiff may take the limited deposition outlined above and continue the remainder of the 30(b)(6) deposition to a mutually agreeable date after any remaining document production issues have been resolved.

If Nexo cannot commit to the above, we will seek Court intervention. We remain available to meet and confer to avoid motion practice.

Best regards,


*/s/Max Ambrose*
Max Ambrose
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101

Case 0:25-cv-62575-WPD Document 26-5 Entered on FLSD Docket 04/23/2026 Page 26 of 101

# Exhibit 4

# Exhibit 4

# Taylor-Copeland Law

501 W. Broadway, Suite 800
San Diego, CA 92101
(619) 734-8770
www.taylorcopelandlaw.com

Max Ambrose | 602 570 2656 | maxambrose@taylorcopelandlaw.com

**By Electronic Mail**

**January 14, 2026**
Ian Shelton
Ian.Shelton@bakermckenzie.com
Matthew Rawlinson
Matthew.Rawlinson@bakermckenzie.com
Kirsten Dooley
Kirsten.Dooley@bakermckenzie.com
Baker Mckenzie
10250 Constellation Blvd.
Los Angeles, CA 90067

      Re:    *John Cress v. Nexo Capital Inc.*, Case No. 3:23-CV-00882-TSH, Meet and Confer Letter Regarding Nexo's Document Search and Production

**Counsel,**

We write in response to Nexo's January 9, 2026, letter. While Nexo purports to have "addressed" a number of issues, its response comes only after months of delay and does not meaningfully cure the deficiencies repeatedly identified in Plaintiff's prior meet-and-confer correspondence. Instead, Nexo's letter leaves substantial gaps, avoids multiple dispositive questions we have repeatedly raised, and fails to provide the confirmations or certifications required by the Federal Rules and this Court's discovery orders. We summarize below (1) critical issues Nexo failed to address at all or addressed only evasively, and (2) clarifications required on topics Nexo claims it has agreed to address in part.

This letter is intended to narrow disputes and give Nexo one final opportunity to provide clear, complete, and date-certain positions before Court intervention becomes unavoidable. Given Nexo's dilatory conduct and failure to meaningfully cure these deficiencies despite repeated notice, Plaintiff has no choice but to present these issues to the Court promptly and therefore requests that Nexo provide any response no later than **January 20, 2025**.

1. **Issues Nexo Failed to Address Entirely**

   a. **Custodian Completeness (particularly Trenchev, Kantchev, Hristov, Dinca, and Hristova)**

1

Nexo still has not confirmed:

- Whether it identified and collected all email addresses used by Mr. Trenchev and Mr. Kantchev during the relevant period, including personal, legacy, or role-based accounts.

- Whether it searched legal@nexo.io, despite undisputed evidence that Mr. Trenchev controlled and used that account for responsive communications.

- Whether custodians' devices (including company-issued MacBooks and/or mobile devices used by Hristov and others) were imaged or otherwise searched.

- Why Nexo has produced almost no responsive communications for custodians with records spanning many years and hitting hundreds of thousands of search terms (i.e., far less than 100 communications from each of the custodians identified in Plaintiff's September 9, 2025 letter, including Trenchev, Kantchev, Hristova, Rosen, Shanov, Stanev, Videlov, Tonkov, and Kostadinov).

- What Nexo has done to search its non-custodial sources, and explain why Nexo has produced unbelievably low numbers of documents from these sources. For example, as raised in our initial letter, why Nexo has produced only two responsive documents from non-custodial sources with more than 300,000 search term hits on sources directly involved in providing OTC transactions and liquidation relief to its customers.

These issues also highlight the inconsistencies of your overall position that Plaintiff's October 23 letter "demand that…Nexo review all documents within the Company, without regard to the custodians, search terms, and review protocol that we previously negotiated." We have repeatedly and specifically requested information about documents that are plainly missing from Nexo's custodial records—and for months—Nexo has been unable to explain why or agree to take any action to remedy these critical flaws in Nexo's document search.

Nexo's failure to adequately search for and produce records from its Court-Ordered custodians stymes nearly every other issue we raise. For example, Nexo claims it has produced all of the 2018-2020 NEXO Token sale documents the agreed-upon search terms hit, but we still do not see how this is possible, as we have received nothing from Trenchev or Kantchev—who actively marketed and sold NEXO Tokens during this time. This is only one example of the critical flaws caused by Nexo's refusal to adequately search its Court-Ordered custodians—and to provide any explanation about what it has done to search its custodial records, and why these critical and apparent flaws remain.

In addition, Nexo does not explain how emails involving Trenchev, Kantchev, Hristov, or Dinca appear in other custodians' files but not in their own. Absent a certification or explanation (e.g., deletion, auto-archiving, retention policies), these omissions directly implicate completeness and potential spoliation.

### b. Missing Internal Communications / Thread Completeness

Nexo does not address our request that it:

- Run completeness checks across all participants on shared email chains.

- Re-produce complete family groups from the custodial source of each participant.

- Identify the source from which incomplete chains were produced when not from the relevant custodian.

### c. Slack and Other Internal Messaging Platforms

Nexo's generic statement that Slack communications were produced does not respond to our concerns. Nexo has not stated:

- What service level of Slack was employed to facilitate the export, such as Business+ or Enterprise.

- Were Private Channels, Public Channels, Direct Messages included in the export.

- Were Slack-based attachments subsequently downloaded using the exported JSON files and also subjected to the searches.

- What Slack retention or deletion setting were in place during 2018-2022.

- Whether WhatsApp, Telegram, Signal, or similar platforms were used for business communications and, if so, whether they were collected and searched.

- Why there are no communications from critically relevant slack channels disclosed in discovery discussing sales of NEXO tokens (e.g., the "USA slack channel." NEXO-0103303), Nexo's liquidation relief program, and Nexo's OTC desk trading (e.g., NEXO-0134880; NEXO-0135493).

### d. Google Drive / Cloud Documents

Nexo does not address requests for:

- Confirmation on whether Nexo searched for documents stored in Google Drive, Office 365 online, Confluence pages, or other cloud repositories used by the custodians.

- A Drive mapping identifying file ID, owner, path, and timestamps.

- Confirmation that version history sufficient to reflect contemporaneous content was captured.

- Family-level linkage between emails/Slack messages and referenced Drive files.

### e. Metadata Deficiencies

Nexo ignores our identification of widespread metadata defects, including missing filenames, file types, and creation dates, as well as placeholder "collection dates." It does not commit to re-producing documents with corrected metadata or explain why this cannot be done.

### f. Rubin / Keller Communications (Liquidation Relief)

Although Nexo references producing certain Rubin-related documents, it does not respond to our request that it:

- Search for and produce all Rubin/Keller communications, including attachments and families, or

- Certify after a reasonable search that no such communications exist and explain the steps taken.

### g. Salesforce and Support Logs Beyond Ticket #432896

Nexo does not address whether it will produce:

- Full Salesforce or successor-system logs for Cress.

- Fields reflecting LTV calculations, liquidation approvals, execution prices, or OTC spread/profit.

- An explanation for why Cress's logs appear materially different from logs produced for other customers.

- An explanation on how Nexo exported the Salesforce-based records, such as if they used the Data Export Service or through the creation of specific exports through the native report generation functionality.

- An explanation of how Nexo then subsequently staged and searched the Salesforce-based records, such as within a SQL database.

### h. OTC Transactions, Liquidations, and Oracle Data

Nexo does not substantively respond to requests for:

- Internal OTC desk transaction logs (including acquisition price, customer price, and profit).

- Liquidation event logs or liquidation-fee fields.

- Oracle inputs and calculations used to determine LTV and liquidation triggers.

### i. Hidden Text / Altered Documents

Nexo does not address the identified documents containing hidden or suppressed text, nor does it offer any explanation or remediation plan.

### j. Privilege Log Timing

Nexo does not respond to our proposal for a date-certain, simultaneous exchange of privilege logs. Plaintiff will produce his privilege log by January 15, 2026. Please let us know when we can expect Nexo's log.

### 2. Clarifications Required on Issues Nexo Claims It Has Addressed in Part

For the categories below, Nexo's letter references production or follow-up but lacks the specificity required to resolve the issue. Please provide written clarification on each item:

### a. Communications with Regulators

- Identify the specific regulatory matters affected by encrypted files.

- Confirm whether the encrypted files contain documents and communications relating to the SEC's 2020-2021 investigation of the NEXO Token, and if not, an explanation for why Nexo is not producing those documents and communications.

- Provide a date-certain for completion of production.

- Confirm whether full productions made to regulators (with family integrity) will be produced.

### b. "Narrow Requests" Listed in Nexo's Letter

For each listed item, please confirm:

- Whether production has already occurred (with Bates ranges), or

- The expected production date.

### c. Salesforce Export and Support Ticket #432896

- Confirm whether the CSV export represents the entirety of Cress's Salesforce data.

- Identify any parallel or successor systems searched.

### d. Replacement Documents

- Confirm whether Nexo will proactively identify defective documents once Bates numbers are provided.

- Explain how Nexo determined whether "better versions" exist.

### e. Social Media

Identify which platforms were searched, the date ranges, and any deletion or retention policies in effect.

### 3. Next Steps

Please provide written responses to the above issues by **Friday, January 20, 2025**, including clear and unambiguous "will/will not produce" positions and certifications where appropriate. Despite months of meet-and-confer efforts and repeated, detailed notice of specific deficiencies, Nexo has not meaningfully cured the core problems with its document search, collection, and production. These ongoing deficiencies are materially prejudicing Plaintiff's ability to complete discovery within the Court's schedule.

Absent prompt, substantive supplementation and clarification, Plaintiff will seek Court intervention. That relief will include a targeted Rule 30(b)(6) deposition concerning Nexo's document identification, preservation, collection, and production practices, as well as relief under Rule 37, including orders compelling production and appropriate sanctions based on Nexo's failure to comply with its discovery obligations despite extensive meet-and-confer efforts.

Plaintiff remains available to meet and confer promptly; however, given the history of delay and the lack of meaningful remediation to date, further informal discussions alone are unlikely to resolve these issues. Accordingly, Plaintiff intends to provide his portion of a Joint Letter Brief addressing the most pressing issues raised in this letter and Plaintiff's prior meet-and-confer correspondence regarding Nexo's

document search and production. Please provide Nexo's portion of the Joint Letter Brief within seven days of receipt, so the parties may present these issues to the Court in an efficient and orderly manner.

Best regards,

*/s/Max Ambrose*
Max Ambrose
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101

# Exhibit 5

# Exhibit 5



**Baker & McKenzie LLP**

800 Capitol Street, Suite 2100
Houston, TX 77002
United States

Tel: +1 713 427 5000
Fax: +1 713 427 5099
www.bakermckenzie.com

**Asia Pacific**
Bangkok
Beijing
Brisbane
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur*
Manila*
Melbourne
Seoul
Shanghai
Singapore
Sydney
Taipei
Tokyo
Yangon

**Europe, Middle East & Africa**
Abu Dhabi
Almaty
Amsterdam
Antwerp
Bahrain
Barcelona
Berlin
Brussels
Budapest
Cairo
Casablanca
Doha
Dubai
Dusseldorf
Frankfurt/Main
Geneva
Istanbul
Jeddah*
Johannesburg
Kyiv
London
Luxembourg
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh*
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

**The Americas**
Bogota
Brasilia**
Buenos Aires
Caracas
Chicago
Dallas
Guadalajara
Houston
Juarez
Lima
Los Angeles
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre**
Rio de Janeiro**
San Francisco
Santiago
Sao Paulo**
Tijuana
Toronto
Valencia
Washington, DC

* Associated Firm
** In cooperation with
Trench, Rossi e Watanabe
Advogados

January 30, 2026

James Taylor-Copeland
james@taylorcopelandlaw.com
Max Ambrose
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101

**Re:** ***Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH (N.D. Cal.)**

Dear Counsel:

We write in response to your draft letter brief and your January 28, 2026 email regarding Nexo's document production, including Nexo's most recent document production on January 27.

**Nexo's Document Collection and Review Protocol.** Given your general challenge to Nexo's document collection efforts, an overview of Nexo's tremendous effort in producing documents is appropriate. Nexo collected the email, Google Drive, and Slack data for the 14 custodial sources, and email for the nine non-custodial sources ordered by the Court, limited to the 2021-2022 date range ordered by the Court for the non-custodial sources, and applied Cress's 100+ search terms. Cress explicitly approved each and every one of those search terms, with the parties not reaching agreement on all search terms until July 1, 2025. Nexo assembled a large document review team at significant expense in summer 2025 to implement the parties' agreed document review and search term protocol. Nexo's document review and production over the summer was based on reviewing the documents that hit on the search terms that Cress selected. After the document hits on the review population were segregated, Nexo reviewed and produced responsive documents consistent with its RFP responses. This protocol was fair, reasonable, and proportional.

As to the 23 custodial and non-custodial sources, the data collected from Nexo include exports from Nexo's Google-based system as reflected in the following chart:

| Custodian[1] | Date Range Applied to Email and Drive Export | Email | Drive | Slack[2] |
|---|---|---|---|---|
| Angelov, Rosen Anatoliev | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Atanasova, Teodora Plamenova | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| bizdev.replies@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| Dinca, Octavian | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Hristov, Hristiyan Yordanov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Hristova, Magdalena Damyanova | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| investors@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| Kantchev, Kosta | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Kostadinov, Lyubcho Georgiev | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| kyc@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| ops@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| otc@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| payments@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| Rakshiev, Alexander Nikolaev | 1/1/2017 - 3/1/2025 | Yes | | Yes |
| Salesforce.bcc@nexo.com | 1/1/2017 - 3/1/2025 | Yes | | |
| salesvacationresponder@nexo.com | 1/1/2017 - 3/1/2025 | Yes | | |
| Shanov, Yordan Ivaylov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Stanev, Kaloyan Mariyanov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Stanev, Tom Mariyanov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| support@nexo.io | 2021-2022[3] | Yes | | |
| Tonkov, Edward Todorov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Trenchev, Antoni | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Videlov, Tsvetan Dimitrov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |

This raw exported data, without any search term limiters, was loaded into the NUIX Workstation platform for processing. For the individual custodians, the email pulls including all email aliases assigned to the individual within the Google system, including both the .com and .io versions of their emails. The 100+ agreed search terms were run within NUIX, the 2021-2022 date limiter adopted by the Court was applied to the non-custodial hits, and the hits were promoted to Relativity for manual review.

For the email export from the Google system, all available data during the relevant time period was extracted without regard to any retention periods that might have applied to the underlying data.

MacBooks or other company issued physical devices were not imaged or searched because the Google

---

[1] All exports included both the .io and .com aliases.
[2] Exported Slack data ranged from 8/9/2018 to 3/10/2025.
[3] Due to the huge amount of data at issue, the initial export of the support@nexo non-custodial source was limited to 2021-2022. For all other non-custodial sources, the 2021-2022 limiter adopted by the Court was applied after running search terms in NUIX and before promotion to Relativity.

Baker McKenzie.

system maintains the underlying data in the cloud, which can be exported and searched. Nexo does not issue company cell phones. Other than Slack, Nexo does not use messaging apps for company business. Nexo did not export or search the legal@nexo.io account because it was not a non-custodial source ordered by the Court for inclusion, and it was not Trenchev's email account.

During the manual review process over the summer, Nexo proposed using Technology Assisted Review 2.0 (TAR 2.0) and Continuous Active Learning (CAL) to expedite the review process. Because Cress refused, Nexo performed a manual review of every document that hit on the agreed search terms within Relativity.

There are two document review concepts that are relevant to some of your claims of deficiency— deduplication and email threading. Nexo applied both to its production, which is common practice.

We globally de-duplicated the data in NUIX at the family level, preserving all duplicate custodian and file path metadata. If multiple versions of a record exist, only one was promoted to Relativity for review and production.

We also email threaded. Email threading is a process that identifies relationships between emails, such as forwards, replies, and reply-all messages, and organizes them into a single conversation or thread. It extracts and normalizes email metadata to group related emails together, reducing the time and complexity of review. The process also identifies and retains inclusive emails, which contain unique content. Additionally, email threading can identify participants, attachments, and duplicate emails within a conversation. Again, this is a common practice. We note that most litigants complain when deduplication and email threading is *not* applied to the production, as it facilitates the review and production of documents, and it avoids a situation where exact duplicate emails are produced multiple times, or every email in a chain is separately produced, leading to exponentially more documents being produced with no additional substantive content.

Separate from this Relativity document review process, Nexo also searched its corporate records and produced specific documents or categories of "narrow" document requests to identify responsive documents. Thus, as stated in Nexo's prior meet and confer letters, Nexo remains willing to meet and confer regarding any request for a discrete responsive document or category of document that Cress claims to be missing from Nexo's production.

Based on these efforts, Nexo has produced an enormous volume of documents in this matter that far exceeds Cress's production:

1. Cress's Production:
    a. Total number of documents 892 plus 170 from 'Privilege Log' Production
    b. Total number of pages 13,658
    c. Bates ranges CRESS-00000001 - CRESS-00013658; CRESS-PRIV-00000407 - CRESS-PRIV-00000630

2. Nexo's Production:
    a. Total number of documents 54,166
    b. Total number of pages 247,500
    c. Bates ranges NEXO-0000001 - NEXO-0247500

3

Baker McKenzie.

**Communications with Regulators.** Nexo produced responsive documents regarding communications with U.S. regulators on September 12, 2025. In its January 27 production, Nexo's re-produced its communications with U.S. regulators to include encrypted documents where it was able to identify the passwords used to encrypt certain documents sent to the regulators. Nexo ordered that re-production of communications with U.S. regulators in an organized manner. For example, we attempted to order the productions to regulators after the corresponding cover letters. We attempted to group the regulator productions according to the regulator at issue (for example, by state). We also attempted to order the voluminous terms and conditions produced to certain regulators in an organized manner. Some of those documents were PDFs, which we produced as unencrypted TIFF images. Other documents were Excel spreadsheets, which we produced natively. The passwords for the Excel spreadsheets are in the following chart. The password format for encrypted documents is the last name of the recipient of the production cover letter, followed by an underscore, followed by the year the letter was sent.

On January 28, 2028, Nexo provided you with passwords for 20 encrypted regulator correspondence files that were produced in native format in the January 27 production.

You had asked whether any additional regulator correspondence remains unencrypted. Nexo has 10 remaining files that it was unable to open, related to productions served on Ohio, Washington, and Kentucky regulators, and the CFPB. Today, Nexo received passwords to open 9 of them, and Nexo will produce the following documents by early next week:

| Encrypted File Name | Description |
| --- | --- |
| NEXO 000001.xlsx | Ohio\Money Transmitter |
| NEXO 000002 - NEXO 000005.pdf | Ohio\Money Transmitter |
| NEXO 000020 -NEXO 000088.pdf | Washington\Washington DFI Securities Division\2022-04-29 Submission |
| NEXO 000090-NEXO 000108.pdf | Washington\Washington DFI Securities Division\2022-04-29 Submission |
| NEXO 000109 - NEXO 000123.pdf | Washington\Washington DFI Securities Division\2022-05 Submission |
| NEXO 100124.pdf | Washington\Washington DFI Securities Division\2022-05 Submission |
| NEXO 000013.pdf | Kentucky\2021-09-20 Response |
| NEXO 000090-NEXO 000103.pdf | Kentucky\2021-12-17 Response |
| NEXO 0000001.xlsx | CFPB |

For the single document served in the Kentucky inquiry on April 22, 2022 where we have not identified a working password (NEXO 000104.pdf), the Kentucky cover letter (which we produced) indicates that it is an organizational chart for the Nexo Group. Based on this description, the chart appears to be a duplicate of the organizational chart that Nexo has already produced to other regulators, several copies of which are already included in Nexo's January 27 production.

4

As for your inquiry regarding regulator correspondence concerning the 2026 CDFPI consent order, we are in active discussions with counsel who handled that matter for Nexo, and we will produce the regulator correspondence file as soon as we receive it. Initial documents related to that consent order will also be produced with the newly unencrypted files.

**Trenchev, Kantchev, other Individual Custodian Emails.** You raised the issue of low or no emails for certain individual custodians, particularly Trenchev and Kantchev. We confirmed that Trenchev and Kantchev had a 30-day retention period effective December 4, 2022, and all other individual custodians had no retention period while they worked at Nexo. We also confirmed that Nexo preserved Hristov's email after his departure from Nexo.

Regardless of the email retention period, Nexo exported all available emails for the custodial and non-custodial sources as reflected in the chart above and applied the review procedure above to the available data.

Aside from Trenchev and Kantchev, you raised the issue that certain emails appear in the inbox of some custodians but not others. Based on your description, we suspect that this is due to a combination of retention periods, de-duping, and email threading. Under our de-duping protocol, Nexo would only produce one version of an identical email that also appears in other custodian's inboxes. Under our email threading protocol, we would only produce the top email in a chain, unless one of the parties in the chain added new data like attachments mid-chain. This is a standard ESI production practice that is widely recognized as appropriate, not a deficiency.

**Slack Production.** You raised the issue of low or no Slack communications from 2021. We confirmed the following default workspace retention periods for Slack.

Public and Private Channels

| Retention Period | Effective Date |
|---|---|
| 60 days | 03-01-2023 |
| 180 days | 01-23-2024 |

Direct Messages

| Retention Period | Effective Date |
|---|---|
| 4 days | 12-04-2022 |
| 30 days | 12-07-2022 |
| 60 days | 02-09-2023 |
| 180 days | 01-23-2024 |

Slack also allows for channel-specific retention policies that can override default retention periods. Nexo exported all available Slack data for the custodial and non-custodial sources as reflected in the chart above and applied the review procedure above to the available data.

Regarding your inquiry about Slack subscription level, Nexo had a Business+ Plan until Summer 2025, and then it upgraded to Enterprise. The export of the Slack data used the "single user's channels and conversations" export setting.

5

**Baker McKenzie.**

**Google Drive.** You complain about the metadata associated with Google Drive documents. Nexo exported the Google Drive documents for each custodian using the export feature that Google provides to perform this function. We reviewed and produced those documents as described above.

Your letter brief refers to "file IDs, ownership, paths, and timestamps." We do not understand what standard metadata fields you claim are missing. Our understanding is that a Google Drive export does not include a full substantive path metadata, *i.e.*, we do not have a folder structure that may have existed in Google Drive. Furthermore, Cress has provided no "path" metadata for any record in his own production.

To our knowledge, there is no metadata specific to Google Drive; it would be standard file-level metadata that exists in all documents, regardless of source. Nexo produced file-level metadata for Google Drive documents.

**Metadata.** Your draft letter brief refers to widespread metadata defects, including missing filenames, file types, and creation dates, as well as placeholder "collection dates." This is inaccurate.

On October 21, 2025, we reproduced the below volumes to include File Name in the metadata load file, as well as branding on the production images.

09-09-2024
03-19-2025
07-09-2025
08-29-2025
09-12-2025
10-16-2025

New documents that Nexo produced on October 21 and 27, 2025 included File Name metadata in load file. To the extent available, Created, Modified, and Sent date metadata has been included in all productions.

In contrast, Cress has produced 1,062 documents, and none have included File Name or File Type metadata in the load file.

In general, Nexo is willing to cure alleged metadata deficiencies if the request is targeted, reasonable, and proportional. Please exercise some discretion in identifying alleged metadata deficiencies that are material to the case, and targeted to specific documents. Cress should be willing to reciprocally produce any metadata overlay that it demands of Nexo.

**January 28 Email.** Your January 28 email claims that Nexo's January 27 production is "disorganized." That is incorrect. Nexo's production is much more organized that Cress's production. The first 67 documents in the January 27 production consist of certain documents that Nexo stated it would produce in its January 9 meet and confer letter. The remainder of the production consists of the re-produced U.S. regulator correspondence including the encrypted files that Nexo was able to open, as described above. Nexo further organized the regulator production in state or regulator order.

You then state that Nexo has an obligation to identify the Bates numbers associated with a list of 12 different categories of documents. Nexo is not aware of any obligation to perform "Bates mapping" of responsive documents for Cress, and we note that Cress has never provided such Bates mapping of his own production to Nexo. Suffice it to say, however, that documents responsive to at least document categories 1, 3, 4, 6, 9, 10, and 11 appear in Nexo's January 27 production. For example, I noted in my January 28 email that item 1 on your list, the ICO investor spreadsheet, is included in the January 27 production as NEXO-0231931. Documents responsive to document categories 2, 5, 7, 8 and 12 appear in Nexo's earlier productions.

**Privilege Log and Completion of Document Production.** Nexo anticipates serving its privilege log by February 13. In connection with the finalization of the privilege log and QC of its production, Nexo anticipates making some final productions in February. We note that Cress recently produced additional documents in connection with the preparation of his own privilege log, and Cress appears to be working to address various deficiencies and produce missing documents identified in Nexo's January 9 meet and confer letter.

***

Because Nexo has addressed the issues raised in you draft letter brief regarding Nexo's document production, Nexo believes those arguments and demands are now moot. Nexo is willing to meet and confer to discuss this letter and any remaining issues.

Regards,

*/s/ Ian S. Shelton*

Ian S. Shelton

# Exhibit 6

# Exhibit 6

# Taylor-Copeland Law

501 W. Broadway, Suite 800
San Diego, CA  92101
(619) 734-8770
www.taylorcopelandlaw.com

Max Ambrose | 602 570 2656 | maxambrose@taylorcopelandlaw.com

**By Electronic Mail**

**February 3, 2026**
Ian Shelton
Ian.Shelton@bakermckenzie.com
Matthew Rawlinson
Matthew.Rawlinson@bakermckenzie.com
Kirsten Dooley
Kirsten.Dooley@bakermckenzie.com
Baker Mckenzie
10250 Constellation Blvd.
Los Angeles, CA 90067

Re:     *John Cress v. Nexo Capital Inc.*, Case No. 3:23-CV-00882-TSH, Meet and Confer Letter Regarding Nexo's Document Search and Production

**Counsel,**

We are in receipt of your letter dated January 30, 2026. While we are reviewing the production updates and some of the metadata issues, we write immediately to address the alarming admissions regarding Nexo's data retention policies that raise serious spoliation concerns. As you know, we requested information about Nexo's missing documents and document retention policies in our September 9, 2025 letter, less than ten days after receipt of Nexo's court-ordered document production on August 31, 2025.[1] Despite Plaintiff's many emails, letters, and requests for calls, Nexo has unilaterally delayed resolution of these serious discovery issues for nearly five months, refusing to identify the reasons for its missing data or provide any explanation, e.g., through its search practices and data retention policies.

Despite your letter failing to address almost all of our specific requests for more information, you now admit that Nexo implemented aggressive auto-deletion policies for its managing partners, Antoni Trenchev and Kosta Kantchev, as well as aggressive auto-deletion policies for all Slack communications.

---

[1] Plaintiff also requested information about Nexo's document retention policies, and Nexo agreed to produce that information on November 15, 2024. *See RFP 50*: "All documents reflecting your document destruction or retention policy during the Relevant Period, including with respect to email, text messages or other electronic media storage or devices." Nexo's Response: "Nexo will produce non-privileged, responsive documents." We have still not received these documents or an adequate explanation about why they were not produced.

1

Specifically, your letter states that Nexo instituted a 30-day retention period for Trenchev and Kanthev's emails, "no retention period," for the other custodians, a 4-day retention period for Slack Direct Messages, and a 60-day retention period for Slack Public and Private Channels.

We require immediate responses to the following issues to determine the extent of the data loss and to understand the extent of Nexo's sanctionable conduct under Rule 37(e). Plaintiff reserves all rights in connection with all the issues raised in any of his discovery meet and confer letters, including the letters dated September 9, 2025, September 15, 2025, October 23, 2025, January 14, 2026, and this February 3, 2026 letter.

Because of Nexo's serious willful delays in resolving these issues and near-certain spoliation of relevant evidence, Plaintiff will now move forward with seeking Court intervention. We will promptly provide an additional Joint Letter Brief describing Nexo's serious, severe, and sanctionable discovery abuses by Thursday, February 5, 2026. Should Nexo fully resolve any of these issues by fully and completely producing the documents and information sought, we can evaluate whether that narrows the dispute before the Court.

We will provide Nexo with one final chance to provide the court-ordered documents sought, or reasonable explanations for why they are missing, by **Monday, February 9, 2026**. Should Nexo be unwilling to do so, Plaintiff will immediately seek Court intervention on all remaining outstanding issues. Please also provide Nexo's insert to Plaintiff's Joint Letter Brief on **Monday, February 9, 2026**. Should Nexo fail to do so on time, Plaintiff will move forward with filing his brief, noting Nexo's refusal to make a good-faith effort to meet and confer and timely participate in discovery procedures.

**The Mechanics of the 30-Day Retention Period.** Your letter states that Trenchev and Kantchev were placed on a 30-day retention period effective December 4, 2022. We ask for the following clarification:

- Based on your letter we understand that the 30-day retention period placed on Trenchev and Kantchev's emails would result in the automatic deletion of all emails older than 30 days. Is that correct? If not, please describe what part of that understanding is not correct.
- What specific email accounts, databases, and systems were subject to this 30-day deletion policy?
- What retention period was in place for Trenchev and Kantchev's emails before December 4, 2022? For the avoidance of doubt, we are requesting all retention periods effective between January 1, 2017 and present.
- Based on your letter we understand that the 30-day retention policy remained in effect from December 4, 2022, to the present. Is that correct? If not, please identify all retention periods implemented between December 4, 2022 and the present.
- Please produce a single table identifying, for each system (Google Workspace/Gmail, Google Drive, Slack, Salesforce, backups/archives, other systems), the retention rule(s), the *effective date(s)* (including prior policies), whether retention is system-wide or per-custodian/channel, and the administrative change history (who changed the policy and when).
  - Please produce admin logs for Google Workspace and Slack that show: (a) retention policy changes; (b) deletion events attributable to retention; (c) export events (who ran the export, what settings, and when); and (d) any user-initiated deletions during relevant months.
- Did Nexo suspend the automatic deletion of Trenchev and Kantchev's emails at any time before or after December 4, 2022?
- Did Nexo utilize Google Vault? What retention period(s) were in place for Google Vault between January 1, 2017 and the present?

- Did Nexo utilize Google Vault or an equivalent preservation tool to place a "Legal Hold" on the accounts of Trenchev and Kantchev? If so, when?
- What techniques or tools did Nexo use to collect Google Workspace/Gmail and Google Drive? Did Nexo use Google Vault to collect Google Workspace/Gmail and Google Drive?
- Does Nexo believe that Trenchev or Kantchev's deleted emails are recoverable or does it believe they have been permanently deleted? What has Nexo done to search for these emails?
  - Please produce admin logs showing attempted restores or a certification that no backups/snapshots exist for a given time range.
- What was the business justification for applying a 30-day deletion policy exclusively to Kantchev and Trenchev?

**"No Retention" Policy for Individual Custodians**. Your letter describes that "all other induvial custodians had no retention period while they worked at Nexo." Can you please confirm that this means that the individual custodian emails would not have been subject to automatic deletion?

**Retention Policy for Non-Custodial Sources**. Your letter does not describe Nexo's document retention policy for its non-custodial sources. Can you please describe Nexo's document retention policies for non-custodial sources from January 1, 2017 to present?

**Slack Retention.** Your letter details the implementation of various retention periods for Slack Public and Private Channel and Direct Messages from December 4, 2022 through January 23, 2024. We ask for the following clarification:

- Based on your letter we understand that any messages older than the retention period in place at a given time would be automatically deleted. For example, on December 4, 2022, all direct messages more than four days old would be deleted? Is that correct? If not, please describe what part of that understanding is not correct.
- What retention period was in place for Slack Public and Private Channels before March 1, 2023? For the avoidance of doubt, we are requesting all retention periods effective between January 1, 2017, and the present. Please also confirm the 180 retention periods remain Nexo's most effective retention periods.
  - Did Nexo suspend the automatic deletion of Slack Public and Private Channels at any time, including after March 1, 2023?
- What retention period was in place for Slack Direct Messages before December 4, 2022? For the avoidance of doubt, we are requesting all retention periods effective between January 1, 2017, and December 4, 2022.
  - Did Nexo suspend the automatic deletion of Slack Direct Messages at any time after December 4, 2022?
- Did Nexo implement a "Legal Hold" feature that overrode any Slack retention settings? If so, when? What tool was used?
- Please produce Slack admin export(s), Slack audit logs, and retention change logs for the workspace(s) for January 1, 2017 to present. Please show if/when channel-level retention overrides were made. If Slack exports were created using a particular export type (e.g., "single user's channels and conversations"), please produce the exact export command/settings and any export logs or manifest files showing the export scope and date.
- Please explain why the export used the "single user's channels and conversations" setting instead of a workspace-level admin/compliance export or enterprise e-discovery export. Please produce a copy of the export settings.

**3**

**Litigation Hold Notices.** Your letter does not say whether Nexo suspended auto-deletion when it became aware that litigation was foreseeable or when it received regulatory inquiries.

- For each litigation hold or preservation notice issued from January 1, 2017 through the present, please provide:
    - The date(s) on which any litigation hold or preservation notice was first issued to Nexo employees, officers, or agents.
    - A list of recipients (custodians) who received said notice(s).
    - The categories of data and date ranges specified for preservation.
    - The instructions provided regarding the suspension of auto-delete or routine destruction policies for electronic systems.
- Please produce any litigation-hold notices, hold scope, custodian acknowledgments, and IT steps taken to preserve systems (including exceptions for Trenchev & Kantchev or other custodians).
- Please produce logs or admin entries showing that auto-deletion jobs were suspended, modified, or otherwise managed for relevant custodians/systems and the date those steps occurred.

**Deduplication Defense.** You attribute the low document counts for certain custodians to "deduplication and email threading." We find this surprising as the production is packed with duplicative documents. Nevertheless:

- We understand that a document's metadata should show all custodians where the document was located, regardless of de-duplication procedures. Can you please provide us with an overlay including this complete custodial metadata.
    - If your position is that this metadata does not exist, we request you produce the NUIX/processing deduplication map and email threading mapping: for each produced family/document, identify all custodians/paths that were deduped and the custodian chosen as the produced instance; provide thread-IDs and the rules applied for producing top-thread vs. inclusive emails.
- We further request that you identify the source of Nexo's 202 documents and communications regarding Cress (shown in the attached Spreadsheet) which Nexo has produced from its "Nexo Corporate Records" custodian.
- Finally, for all communications hitting on the term "Cress" and "603eec5faed77e2a0a166e27" (Cress' account number) we ask that you produce all duplicates and children.

**Failure to Image Physical Devices.** Your letter states Nexo did not image MacBooks because "the Google system maintains the underlying data in the cloud." Nexo also claims it did not "issue company cell phones," but it is not relevant whether the custodian's cell phones were issued by the company or not. All devices under the possession, custody, and control of the custodians must be searched, particularly where the cloud data was subject to a deletion policy. If the cloud data is gone, it is possible that the *only* surviving copies of emails and other responsive documents would be in the local cache (OST/MBOX files) of the physical devices.

Does Nexo still possess the laptops and phones used by Trenchev, Kantchev, Hristov, and the other custodians in from 2017 to present? As you know, we have previously demanded that Nexo preserve this evidence. We renew our request that Nexo search all electronic devices for responsive documents for all 14 custodians.

**Google Drive Metadata.** Your letter states that "Nexo exported the Google Drive documents for each custodian using the export feature that Google provides to perform this function."

- Please describe in detail the export tool/method used and produce the raw export metadata for each Drive document (including Google file ID, parent IDs, owner, mimeType, created/modified timestamps, and any available folder/parent information).
- As we have previously raised, Google Drive stores the date a document was created along with the author, and the dates on which it was edited along with the editor. Our understanding is that this metadata should be easily accessible through an XML file. Your Drive production does not contain this information. If you are unwilling to remedy this, we will take the issue to the Court.

**Next Steps.** We expect a response to these inquiries by this Monday, February 9, 2026. We are also serving formal discovery requests targeting the specific issues concurrently with this letter. In addition to the requests above, please let us know Nexo's position on the following:

- Will Nexo agree to a third-party forensic examination of its systems (Google Workspace/Gmail, Google Drive, Slack, Salesforce, backups/archives, other systems) and electronic devices at Nexo's expense?
- Will Nexo agree to a 30b6 deposition regarding its document collection, retention, search and production by Friday, February 13, 2026?
- Will Nexo agree to identify all email accounts, databases, and devices it searched for each custodian?

If Nexo is unwilling or unable to resolve any of the issues raised here by **Monday, February 9, 2026**, we will seek immediate relief from the Court. We plan to provide you with our portion of a Joint Letter Brief shortly.

Best regards,

*/s/Max Ambrose*
Max Ambrose
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101

# Exhibit 7

# Exhibit 7

 **Outlook**

## Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

**From** James Taylor-Copeland <james@taylorcopelandlaw.com>

**Date** Thu 1/22/2026 11:49 AM

**To** Max Ambrose <maxambrose@taylorcopelandlaw.com>; Shelton, Ian <Ian.Shelton@bakermckenzie.com>

**Cc** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Dooley, Kirsten <Kirsten.Dooley@bakermckenzie.com>

Hi Ian,
Thanks for taking the time to meet today. Based on our conversation, we understand that Nexo will be making the document production outlined in its January 9 later early next week.

We further understand that Nexo intends to provide a follow up letter addressing the issues raised in our draft Joint Letter Brief early next week (including details regarding its document collection). We will hold off on filing our Joint Letter for the time being. However, if Nexo's letter does not substantively address the issues outlined in the draft Letter Brief, we will need to proceed with submitting any remaining issues to the Court promptly.

Thanks

James

Get Outlook for iOS

**From:** Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Sent:** Wednesday, January 21, 2026 2:48:26 PM
**To:** Shelton, Ian <Ian.Shelton@bakermckenzie.com>
**Cc:** James Taylor-Copeland <james@taylorcopelandlaw.com>; Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Dooley, Kirsten <Kirsten.Dooley@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Thanks, Ian.

We look forward to meeting tomorrow and hope Nexo comes prepared to meaningfully address the issues raised in our letters. However, just to be clear, none of your responses or actions has ever resolved a single one of our concerns that we have been raising since September 2025. The first time you ever addressed any of our concerns was a week ago, in your January 9 letter, and you have still not committed to any timeframe to resolve the narrow set of issues you addressed. Even though we requested you respond to our January 14 letter unambiguously by January 20, you still have not done so. We genuinely hope we can make substantive progress on resolving these issues tomorrow.

Best regards,

Max

On Wed, Jan 21, 2026 at 2:23 PM Shelton, Ian <Ian.Shelton@bakermckenzie.com> wrote:

Max,

I'll send an invite for the meet and confer.

Your position that you are going to file your portion of the letter brief the day after our meet and confer, before our call has even happened, and without discussing or considering our positions, is unreasonable and will not be appreciated by the Court. Your further position that you will inform the Court that Nexo is "unwilling to meet and confer on these issues" is patently false. We have sent multiple letters responding to you, which you have ignored, and we are offering to discuss these matters on a call tomorrow. We can discuss a reasonable schedule to finalize the letter brief on our call tomorrow.

**Ian Shelton**

Partner, Litigation

Baker & McKenzie LLP

800 Capitol, Suite 2100

Houston, Texas 77002

United States

Dir: +1 713 427 5029

Tel: +1 713 427 5000

ian.shelton@bakermckenzie.com



bakermckenzie.com | Facebook | LinkedIn | X

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakermckenzie.com/disclaimers for other important information concerning this message.

**From:** Max Ambrose <maxambrose@taylorcopelandlaw.com>

**Sent:** Wednesday, January 21, 2026 3:23 PM

**To:** Shelton, Ian <Ian.Shelton@bakermckenzie.com>

**Cc:** James Taylor-Copeland <james@taylorcopelandlaw.com>; Rawlinson, Matthew

<Matthew.Rawlinson@bakermckenzie.com>; Dooley, Kirsten <Kirsten.Dooley@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Ian,

Tomorrow at 10am PT works for us. Please come prepared to address each of our points and provide a written resolution to each.

Our JLB does not raise any new issues. Our August letters discuss that we would seek  Court intervention if the issues were not resolved promptly. Our October 23 letter discusses that your refusal to produce or explain missing documents will prompt us to seek Court intervention, including a forensic examination. You have ignored our clear requests for months, which is now prompting our requests to the Court, which you were on notice of for at least three months now.

The issue here is that Nexo's purported document review protocol has left dozens of outstanding issues, none of which you have addressed at all. We have requested this supplemental information from you for months now. We have set forth the supplemental information we request clearly and distinctly in all of our letters. Should you provide that information in writing, it may indeed moot many of the issues in our brief. However, you have refused to do so for months, despite our numerous requests.

We raised these issues over four months ago, and we remain at an impasse. The deadline for these issues to be resolved was August 31, 2025. If you are not willing to either 1) resolve these issues by Friday, January 23, or 2) brief these issues, we will file our portion of the JLB without you and inform the Court you are unwilling to meet and confer on these issues.

With respect to your January 9, 2026 letter regarding Plaintiff's production, you raised these issues less than two weeks ago on documents you have had for nearly a year. We are working through each of those issues and anticipate providing a response to your letter on January 30, 2026. We also disagree with your contention that we "started producing more documents" after receiving the letter. The reasons for those productions were clearly set forth in my January 15 production email, describing the production was largely in response to discovery you served after our initial productions, related to our rog responses, and in response to the Court's latest discovery Order.

Best regards,

Max

On Wed, Jan 21, 2026 at 10:55 AM Shelton, Ian <Ian.Shelton@bakermckenzie.com> wrote:

James and Max,

Nexo requests a telephonic meet and confer regarding your draft letter brief. Could you do 10a PT tomorrow?

Your draft letter brief raises new issues that were not addressed in the parties' prior meet and confer correspondence. In essence, based on vague and/or inaccurate allegations of deficiencies, you appear to request court-ordered explanations or certifications of Nexo's document collection protocol. We have never discussed that specific request on a call, and it is unclear how you can represent to the Court that you will provide a "declaration from an ESI expert regarding the shortcomings detailed herein" without first discussing the matter with Nexo. While Nexo has already described its document review protocol in its prior meet and confer correspondence (which you ignore), Nexo is willing to confer about whether it would be possible to provide supplemental information that will moot some or all of the issues in your draft letter brief.

If you are going down this route, however, it must be reciprocal. Your client has produced a suspiciously low number of documents in this matter, he and has never explained or certified his own document collection protocol, and certainly not in the granular manner that you appear to demand of Nexo. Nexo's January 9 letter identified many deficiencies in Mr. Cress's document production which you ignore. Indeed, after receiving that letter, you started producing more documents. During our meet and confer, we will expect to discuss whether Mr. Cress will provide a reciprocal disclosure regarding his document collection protocol. Please also let us know when we can expect a response to the specific issues raised in our January 9 letter. Your purported justification for the relief requested in your draft letter brief applies equally to Mr. Cress, who unlike Nexo, is only one custodian, yet has failed to produce responsive documents identified in Nexo's January 9 letter.

I look forward to discussing this matter. Nexo views your demand to file a letter brief this week as premature. If we reach impasse, we can discuss a reasonable briefing schedule. To the extent you persist in making unfounded allegations to the Court regarding the sufficiency of Nexo's document collection protocol, we will require sufficient time to submit evidence to the Court to rebut your unfounded allegations.

**Ian Shelton**

Partner, Litigation

Baker & McKenzie LLP

800 Capitol, Suite 2100

Houston, Texas 77002

United States

Dir: +1 713 427 5029

Tel: +1 713 427 5000

ian.shelton@bakermckenzie.com



bakermckenzie.com | Facebook | LinkedIn | X

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakermckenzie.com/disclaimers for other important information concerning this message.

---

**From:** Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Sent:** Friday, January 16, 2026 5:34 PM
**To:** Shelton, Ian <Ian.Shelton@bakermckenzie.com>
**Cc:** James Taylor-Copeland <james@taylorcopelandlaw.com>; Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Dooley, Kirsten <Kirsten.Dooley@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Ian,

Please find Plaintiff's joint-letter brief insert regarding Nexo's failure to produce court-ordered documents. We are generally available to meet and confer on these issues next week (as we have been over the past four months), but given Nexo's extensive delay and failure to address the issues in Plaintiff's 9/9/25, 9/15/25, 10/23/25 and 1/14/26 letters, and months of related email correspondence, we cannot delay further in submitting these issues to the Court. We intend to file our Joint Letter Brief next week.

We reserve all rights to make further changes, and the JLB is not intended to set forth all issues with Nexo's search and production. We also reserve all rights to address Nexo's remaining shortcomings through subsequent letters.

Please find our JLB exhibits A, B, C, and E. We will compile and provide the parties' remaining Ex. D meet and confer email correspondence shortly.

Best regards,

Max

On Wed, Jan 14, 2026 at 5:53 PM Max Ambrose <maxambrose@taylorcopelandlaw.com> wrote:

Ian,

Please find Plaintiff's Meet and Confer Letter regarding Nexo's Document Search and Production.

Best regards,

Max

On Wed, Jan 7, 2026 at 8:24 PM Shelton, Ian <Ian.Shelton@bakermckenzie.com> wrote:

James,

We will get it to you by Friday.

Thank you,

Ian

**Ian Shelton**

Partner, Litigation

Baker & McKenzie LLP

800 Capitol, Suite 2100

Houston, Texas 77002

United States

Dir: +1 713 427 5029

Tel: +1 713 427 5000

ian.shelton@bakermckenzie.com



[bakermckenzie.com](http://bakermckenzie.com) | [Facebook](http://facebook.com) | [LinkedIn](http://linkedin.com) | [X](http://x.com)

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit [www.bakermckenzie.com/disclaimers](http://www.bakermckenzie.com/disclaimers) for other important information concerning this message.

---

**From:** James Taylor-Copeland <[james@taylorcopelandlaw.com](mailto:james@taylorcopelandlaw.com)>
**Sent:** Tuesday, January 6, 2026 5:52 PM
**To:** Shelton, Ian <[Ian.Shelton@bakermckenzie.com](mailto:Ian.Shelton@bakermckenzie.com)>; Max Ambrose <[maxambrose@taylorcopelandlaw.com](mailto:maxambrose@taylorcopelandlaw.com)>
**Cc:** Rawlinson, Matthew <[Matthew.Rawlinson@bakermckenzie.com](mailto:Matthew.Rawlinson@bakermckenzie.com)>; Dooley, Kirsten <[Kirsten.Dooley@bakermckenzie.com](mailto:Kirsten.Dooley@bakermckenzie.com)>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,

Following up on Nexo's response to our meet and confer letters. As you know, we've now been waiting almost three months for a substantive response.

Best regards

James

**From:** James Taylor-Copeland <[james@taylorcopelandlaw.com](mailto:james@taylorcopelandlaw.com)>
**Date:** Monday, December 29, 2025 at 9:32 AM
**To:** Shelton, Ian <[Ian.Shelton@bakermckenzie.com](mailto:Ian.Shelton@bakermckenzie.com)>, Max Ambrose <[maxambrose@taylorcopelandlaw.com](mailto:maxambrose@taylorcopelandlaw.com)>
**Cc:** Rawlinson, Matthew <[Matthew.Rawlinson@bakermckenzie.com](mailto:Matthew.Rawlinson@bakermckenzie.com)>, Dooley, Kirsten <[Kirsten.Dooley@bakermckenzie.com](mailto:Kirsten.Dooley@bakermckenzie.com)>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Thanks, Ian. That's fine, but I do hope that you are able to get us a substantive response to our meet and confer letters early next week. As I noted in my earlier emails, we've been waiting months for a response.

We will plan to get back to you on the depositions early next week as well.

Enjoy your vacation.

James

---

**From:** Shelton, Ian <Ian.Shelton@bakermckenzie.com>
**Sent:** Monday, December 29, 2025 7:40 AM
**To:** James Taylor-Copeland <james@taylorcopelandlaw.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Dooley, Kirsten <Kirsten.Dooley@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

James,

As a follow up, we haven't quite finalized the meet and confer response yet and I'm on a family vacation this week. I'll be back in next Monday. I would greatly appreciate the courtesy if we could pause case activity until next week. We can attend to any outstanding issues in the new year. Thanks in advance and hope you and Max are having a nice holiday.

Best,

Ian

**Ian Shelton**

Partner, Litigation

Baker & McKenzie LLP
800 Capitol, Suite 2100
Houston, Texas 77002
United States

Dir: <u>+1 713 427 5029</u>

Tel: <u>+1 713 427 5000</u>

<u>ian.shelton@bakermckenzie.com</u>

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit <u>www.bakermckenzie.com/disclaimers</u> for other important information concerning this message.

---

**From:** Shelton, Ian
**Sent:** Monday, December 22, 2025 12:17:01 PM
**To:** James Taylor-Copeland <<u>james@taylorcopelandlaw.com</u>>; Max Ambrose <<u>maxambrose@taylorcopelandlaw.com</u>>
**Cc:** Rawlinson, Matthew <<u>Matthew.Rawlinson@bakermckenzie.com</u>>; Dooley, Kirsten <<u>Kirsten.Dooley@bakermckenzie.com</u>>
**Subject:** RE: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

James,

As a follow up, we plan to get you that meet and confer letter response tomorrow. Thank you, Ian

**Ian Shelton**
Partner, Litigation
Baker & McKenzie LLP
800 Capitol, Suite 2100
Houston, Texas 77002
United States
Dir: +1 713 427 5029
Tel: +1 713 427 5000
<u>ian.shelton@bakermckenzie.com</u>



<u>bakermckenzie.com</u> | <u>Facebook</u> | <u>LinkedIn</u> | <u>X</u>

**From:** Shelton, Ian <<u>ian.shelton@bakermckenzie.com</u>>
**Sent:** Saturday, December 13, 2025 1:58 AM
**To:** James Taylor-Copeland <<u>james@taylorcopelandlaw.com</u>>; Max Ambrose <<u>maxambrose@taylorcopelandlaw.com</u>>
**Cc:** Rawlinson, Matthew <<u>Matthew.Rawlinson@bakermckenzie.com</u>>; Dooley, Kirsten

<Kirsten.Dooley@bakermckenzie.com>

**Subject:** RE: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

James,

Thanks for the call this afternoon.

As we discussed, regarding your meet and confer letters, we have been diligently working with our client and will be providing our written responses next week. We intend to engage in a meaningful meet and confer with you to resolve any outstanding issues.

Regarding depositions, Nexo agrees to table the depositions of Kantchev and Atanasova until after all the other depositions are taken, at which time we will meet and confer, and with both sides reserving all rights and objections. As to Stanev, he is no longer working at Nexo so we are not in a position to produce him for deposition. We agree to produce, on a mutually agreeable schedule, Dinca, Tonkov, Kostadinov, Hristov, Trenchev, and the 30b6. As we discussed, could you please share a draft initial proposed depo schedule, for discussion purposes, and your 30b6 topics? After we get those, we can meet and confer on the schedule.

Finally, for service and all future correspondence between us, can you please remove John and Stephanie and add Kirsten Dooley (copied here)?

Thanks,
Ian

**Ian Shelton**
Partner, Litigation
Baker & McKenzie LLP
800 Capitol, Suite 2100
Houston, Texas 77002
United States
Dir: +1 713 427 5029
Tel: +1 713 427 5000
ian.shelton@bakermckenzie.com



bakermckenzie.com | Facebook | LinkedIn | X

**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Sent:** Thursday, December 11, 2025 5:31 PM
**To:** Shelton, Ian <ian.shelton@bakermckenzie.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <matthew.rawlinson@bakermckenzie.com>; Treat, John <john.treat@bakermckenzie.com>; Brown, Stephanie <stephanie.brown@bakermckenzie.com>

**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,

I write to follow up on the outstanding issues. As you know, we have been waiting several months for a response to our letters identifying deficiencies in Nexo's production. Please advise by the end of the week when we can expect a substantive response. If we do not hear from you, we will have no choice but to raise these matters with the Court.

Given the number and seriousness of the deficiencies outlined in our correspondence, we do not believe the Court will look favorably upon Nexo's failure to cure any of the issues or to engage in a meaningful meet-and-confer process.

Can you also please provide us with Nexo's response regarding the depositions?

Best regards

James

---

**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Sent:** Friday, December 5, 2025 7:50 AM
**To:** Shelton, Ian <ian.shelton@bakermckenzie.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <matthew.rawlinson@bakermckenzie.com>; Treat, John <john.treat@bakermckenzie.com>; Brown, Stephanie <stephanie.brown@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,
I write to follow up on our November 24 meet and confer call.
**Document Production.** During our last call, you indicated that Nexo intended to respond to the issues raised in Plaintiff's meet and confer letters regarding deficiencies in Nexo's document search and production. We have not yet received that response. Please provide a date certain by which we can expect it. If a response is not forthcoming, please provide your availability for a meet and confer next week so we can narrow the disputes before seeking judicial intervention.
**Depositions.** We understand your proposal to be that Nexo would produce Trenchev, Hristov, Dinca, Tonkov, Stanev, Kostandinov, and a 30(b)(6) witness in exchange for Plaintiff waiving the depositions of Kantchev and Atanasova. We cannot agree to that condition at this juncture.
We are not willing to waive the depositions of Kantchev and Atanasova before we have taken a single deposition or resolved the outstanding document production issues. However, in the interest of moving forward, we propose proceeding with the undisputed depositions in March/April first. Once those are concluded, the parties can meet and confer regarding whether testimony from Kantchev and Atanasova remains necessary.
Please confirm if this staged approach is agreeable. We are available for a call if you wish to discuss further.
Thanks

James


**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Date:** Tuesday, November 11, 2025 at 10:33 AM
**To:** Shelton, Ian <ian.shelton@bakermckenzie.com>, Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <matthew.rawlinson@bakermckenzie.com>, Treat, John <john.treat@bakermckenzie.com>, Brown, Stephanie <stephanie.brown@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,

Can you please let me know whether Nexo intends to address any of the issues raised in our letter. If we do not hear back from you this week, we will have no choice but to assume that it does not and proceed with raising the issues with the Court.

Can you also please get back to us regarding the availability of deponents. Given the extension, we anticipate taking most of our depositions in February and early March. However, we reserve the right to take depositions before then, especially if Nexo does not address the issues raised in our meet and confer letters.

Thanks

James

---

**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Sent:** Wednesday, November 5, 2025 8:16 PM
**To:** Shelton, Ian <Ian.Shelton@bakermckenzie.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Treat, John <John.Treat@bakermckenzie.com>; Brown, Stephanie <Stephanie.Brown@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,
It has now been almost two weeks and we have not received any response to our letter or our request for availability of deponents. Can you please provide us with your availability for a meet and confer call.

Best regards

James

**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Date:** Thursday, October 23, 2025 at 6:42 PM

**To:** Shelton, Ian <ian.shelton@bakermckenzie.com>, Max Ambrose
<maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>, Treat, John
<John.Treat@bakermckenzie.com>, Brown, Stephanie
<Stephanie.Brown@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31
document production

Hi Ian,

Please find our response to your October 20 letter attached. As you know, the Court requires
a telephonic meet and confer before any discovery issues may be submitted. Given the
seriousness and number of deficiencies identified, we believe it is imperative to hold that
discussion promptly. Please confirm your availability early next week. We are available from
8-12 PT Monday-Wednesday.

We also request the general availability of the following individuals and the locations where
Nexo proposes to make them available for deposition. We would like to coordinate with you
to begin scheduling depositions. The list below is not exhaustive.

Further, as detailed in our letter, Plaintiff believes that a Rule 30(b)(6) deposition limited to
Nexo's efforts to identify, preserve, collect, and produce documents is both necessary and
warranted. Please advise whether Nexo will agree to proceed with this limited deposition
now, with the remainder of the 30(b)(6) deposition to follow on a mutually agreeable date
once document production issues are resolved. We ask that you provide your position on this
before our call next week.

**Proposed deponents:**

- Trenchev
- Kantchev
- Hristov
- Dinca
- Tonkov
- Stanev
- Kostadinov
- Atanasova

Thanks

James

---

**From:** Shelton, Ian <ian.shelton@bakermckenzie.com>
**Sent:** Monday, October 20, 2025 10:53 PM
**To:** James Taylor-Copeland <james@taylorcopelandlaw.com>; Max Ambrose
<maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Treat, John
<John.Treat@bakermckenzie.com>; Brown, Stephanie <Stephanie.Brown@bakermckenzie.com>
**Subject:** RE: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document
production

James,

Please see the attached letter.

**Ian Shelton**

Partner, Litigation

Baker & McKenzie LLP

800 Capitol, Suite 2100

Houston, Texas 77002

United States

Dir: +1 713 427 5029

Tel: +1 713 427 5000

ian.shelton@bakermckenzie.com



bakermckenzie.com | Facebook | LinkedIn | X

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakermckenzie.com/disclaimers for other important information concerning this message.

**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Sent:** Monday, October 20, 2025 7:58 PM
**To:** Shelton, Ian <ian.shelton@bakermckenzie.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Treat, John <John.Treat@bakermckenzie.com>; Brown, Stephanie <Stephanie.Brown@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,
We cannot wait any longer for Nexo to provide the response it has now been promising for over a month. Are you available to have a call tomorrow so that we can discuss how to efficiently present these issues to the Court.

Best regards

James

On Mon, Oct 13, 2025 at 11:49 AM James Taylor-Copeland <james@taylorcopelandlaw.com> wrote:

> Hi Ian,
> I'm following up again regarding our meet and confer letters. We sent these to you over a month ago, and despite your repeated assurances that a response was forthcoming, we have yet to receive one.

As you know, these letters identify numerous critical deficiencies in Nexo's document production. Under our Joint Stipulation, Nexo's production was to be substantially completed by the end of August. Not only did Nexo fail to meet that deadline, but it has since declined to engage in any substantive meet and confer regarding that failure.

As we noted in our letters, we would prefer to resolve these issues without burdening the Court. However, if Nexo does not provide a substantive response within the next few days, we will have no choice but to raise these issues with the Court and inform the Court of Nexo's refusal to participate in a meaningful effort to resolve these matters informally.

Thanks

James

---

**From:** Shelton, Ian <ian.shelton@bakermckenzie.com>
**Sent:** Tuesday, October 7, 2025 3:11 PM
**To:** James Taylor-Copeland <james@taylorcopelandlaw.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Treat, John <John.Treat@bakermckenzie.com>; Brown, Stephanie <Stephanie.Brown@bakermckenzie.com>
**Subject:** RE: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

James,

Your urgency in pushing forward discovery disputes ignores the fact that you recently filed, near the end of discovery, a motion for leave to amend to double the number of claims and triple the amount in controversy, and have greatly expanded the factual scope of the case to "fees" issues that your client has known about since the beginning of the litigation (as reflected in his own document production) but waited to raise until now for strategic purposes. Your new claims include civil RICO, the most notoriously complex (and most frequently abused) claim in civil litigation. Our sealing response is due today and our opposition to your motion for leave to amend is due next Tuesday. Your requests for responses to discovery need to take into consideration the burden, delay, and diversion of resources caused by your most recent filing.

I don't understand your email below and your reference to a Motion that you want to file today. You shared your portion of a joint letter brief regarding your RFPs, and we proposed the compromises below in an effort to moot the dispute. You said you are considering our proposal but had some other questions. I understood we would meet and confer, and you would modify your portion of the joint letter brief to omit the RFPs where we reached compromise and identify the remaining issues where we don't agree.

We are still waiting on your position on our proposed compromises. Regarding your specific questions, #3 was raised in your September 9 meet and confer letter. We are working on our response to your September 9 and 15 letters and hope to get it out in the next day or so. As to #1 and #2, you appear to request interrogatory-like responses to your RFPs, which is not required by the Rule and not something that your own client has done.

Please let us know your position on our proposed compromises. If you don't agree, please send us a revised portion of your letter brief, identifying the remaining issues in dispute (if any), so that we can prepare a response. Your letter brief should address our proposed compromises if you don't agree to them.

**Ian Shelton**
Partner, Litigation
Baker & McKenzie LLP
800 Capitol, Suite 2100
Houston, Texas 77002
United States
Dir: +1 713 427 5029
Tel: +1 713 427 5000
ian.shelton@bakermckenzie.com



bakermckenzie.com | Facebook | LinkedIn | X

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakermckenzie.com/disclaimers for other important information concerning this message.

**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Sent:** Monday, October 6, 2025 4:29 PM
**To:** Shelton, Ian <ian.shelton@bakermckenzie.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Treat, John <John.Treat@bakermckenzie.com>; Brown, Stephanie <Stephanie.Brown@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,
Do you plan to provide a response on these issues? If not, we would like to proceed with filing our Motion tomorrow.

Thanks

James

Get Outlook for iOS

**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Sent:** Monday, September 29, 2025 10:54:07 AM
**To:** Shelton, Ian <Ian.Shelton@bakermckenzie.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>

**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Treat, John <John.Treat@bakermckenzie.com>; Brown, Stephanie <Stephanie.Brown@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,
We are considering your proposal below. As an initial matter, can you please confirm that, pursuant to this proposal, Nexo would be willing to amend its responses to RFPS 232, 233, 234, 235, 236, 237 (Plaintiff's OTC Transactions) and 184, 185, 186, 219, 239 (LRP) to state that it has performed a diligent and reasonable search and inquiry and produced all responsive documents?

Moreover, we note that Nexo's proposal does not appear to address the following issues raised over a month ago during our meet and confer. Can you please provide us with Nexo's position regarding these RFPs ASAP.

1. RFPs 107-109 requested Nexo's most granular historical price data. During out meet and confers, you represented that Nexo does not maintain historical records of price data, but used Coinmarketcap Pro as the pricing oracle for the Nexo platform. If this is the case, Nexo should amend its responses to so state. Can you please confirm it will do so and provide a date certain? We also ask that Nexo amend this and all responses which indicate it does not possess responsive documents to (1) confirm that it has conducted a diligent and reasonable search and inquiry and (2) state whether it is aware of such documents ever having existed. Please let us know as soon as possible whether Nexo will do so.

1. RFPs 114-115 requested documents showing Nexo's assets and liabilities from March 2021 to October 2021. You represented that Nexo does not have this data, but rather has only a single unaudited financial statement for the year 2021. Please confirm that is the case and amend your responses to so state.
2. You have still not told us what you have done to search for Nexo's audits, attestations, and accountings requested by RFPs 111, 116, 117, and ordered by the Court in RFP 36. As you know, Nexo and Trenchev have publicly represented that Nexo has performed internal audits of its finances and NEXO token sales. Could you please explain what Nexo has done to search for these documents, and why Nexo was unable to find these documents.

We are happy to make ourselves availalbe for a call to discuss any of these issues, but we do need to understand Nexo's position in the next few days so that we can submit any remaining issues to the Court.

Thanks

James

---

**From:** Shelton, Ian <Ian.Shelton@bakermckenzie.com>
**Sent:** Friday, September 26, 2025 4:40 PM

**To:** James Taylor-Copeland <james@taylorcopelandlaw.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Treat, John <John.Treat@bakermckenzie.com>; Brown, Stephanie <Stephanie.Brown@bakermckenzie.com>
**Subject:** RE: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

James and Max,

Regarding Plaintiff's RFP letter brief, Nexo makes the following proposals regarding the RFPs addressed in your letter that Nexo hopes will moot the dispute. Please let us know if you wish to further discuss.

| RFPs | Plaintiff's Category in Letter | Nexo Proposal |
|---|---|---|
| 232, 233, 234, 235, 236, 237 | Cress's OTC Transactions | Regarding 232-237, Nexo has already produced or will produce responsive documents regarding Cress's own OTC transactions. We are in the process of following up with Nexo regarding these specific RFPs to see if any further responsive documents exist. |
| 112, 113, 176, 177, 178, 192, 201, 202, 203, 247 | Exchange-Related RFPs | Regarding 112 and 113, for those U.S. customers who directly purchased Nexo Tokens from Nexo, Nexo proposes to produce documents sufficient to show the Nexo Token transactions associated with those customers.<br><br>Regarding 176-178, 192 and 202, these RFPs address Nexo Token sales on crypto exchanges. Nexo proposes tabling these RFPs until the Court issues a ruling on the letter brief regarding Cress's Rog 12.<br><br>Regarding 201 and 203, Nexo stands on its objections. However, will you consider whether this proposal might moot these RFPs? |

| 184, 185, 186, 219, 239 | LRP-Related RFPs | Regarding 184-186, 219 and 239, Nexo has already produced executed LRAs signed by its U.S. customers, and it has already produced responsive documents using the agreed LRP/LRA search terms across the agreed custodians. |
| 230, 238 | Nexo's Liquidation Calculations | Regarding 230 and 238, Nexo proposes to produce documents sufficient to substantiate Nexo's response to Interrogatory No. 7 regarding how LTV was calculated. |
| 250 | Efforts to Ensure Nexo Purchasers Were Not Underwriters | Regarding 250, Nexo proposes to produce documents sufficient to show Nexo's efforts to verify that the U.S. customers to whom it directly sold Nexo Tokens were not statutory underwriters. |

Regarding your meet and confer letters about Nexo's document production sent on September 9 and 15, we are preparing our responses and will get you our letter next week.

**Ian Shelton**
Partner, Litigation
Baker & McKenzie LLP
800 Capitol, Suite 2100
Houston, Texas 77002
United States
Dir: +1 713 427 5029
Tel: +1 713 427 5000
ian.shelton@bakermckenzie.com



bakermckenzie.com | Facebook | LinkedIn | X

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakermckenzie.com/disclaimers for other important information concerning this message.

**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Sent:** Thursday, September 25, 2025 10:47 AM
**To:** Shelton, Ian <Ian.Shelton@bakermckenzie.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Treat, John <John.Treat@bakermckenzie.com>; Brown, Stephanie <Stephanie.Brown@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,
I'm following up regarding our Joint Letter on Plaintiff's RFPs and the two meet and confer letters we have sent you regarding Nexo's production. Can you please let us know when we can expect a response on these issues.

With respect to the Joint Letter, if Nexo cannot provide its position shortly, we will have no choice but to submit our position to the Court and note that Nexo has not provided its position more than a month later.

With respect to the issues raised in our meet and confer letters, we need to know if Nexo is willing to address those issues. Otherwise, we would like to present them to the Court.

Best regards

James

**From:** James Taylor-Copeland <james@taylorcopelandlaw.com>
**Sent:** Wednesday, September 17, 2025 1:20 PM
**To:** Shelton, Ian <Ian.Shelton@bakermckenzie.com>; Max Ambrose <maxambrose@taylorcopelandlaw.com>
**Cc:** Rawlinson, Matthew <Matthew.Rawlinson@bakermckenzie.com>; Treat, John <John.Treat@bakermckenzie.com>; Brown, Stephanie <Stephanie.Brown@bakermckenzie.com>
**Subject:** Re: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Hi Ian,
While we have always been very generous in extending extensions to Nexo, October 10 is fine.

With respect to submitting disputes to the Court, can you please provide us Nexo's position and/or revisions with respect to the joint letter regarding Plaintiff's RFPs this week? That letter was provided to you nearly a month ago and it is unclear what is causing the delay.

We also need to get to the bottom of the many deficiencies in Nexo's production ASAP. Can you please let us know when we can expect a response to our meet and confer letters?

Thanks

James

Get [Outlook for iOS](#)

---

**From:** Shelton, Ian <[Ian.Shelton@bakermckenzie.com](mailto:Ian.Shelton@bakermckenzie.com)>
**Sent:** Wednesday, September 17, 2025 1:12:58 PM
**To:** Max Ambrose <[maxambrose@taylorcopelandlaw.com](mailto:maxambrose@taylorcopelandlaw.com)>
**Cc:** Rawlinson, Matthew <[Matthew.Rawlinson@bakermckenzie.com](mailto:Matthew.Rawlinson@bakermckenzie.com)>; Treat, John <[John.Treat@bakermckenzie.com](mailto:John.Treat@bakermckenzie.com)>; Brown, Stephanie <[Stephanie.Brown@bakermckenzie.com](mailto:Stephanie.Brown@bakermckenzie.com)>; James Taylor-Copeland <[james@taylorcopelandlaw.com](mailto:james@taylorcopelandlaw.com)>
**Subject:** RE: [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Max,

Those RFAs were served nearly a month ago on August 26. Is there a reason why you need five more weeks from today to respond to them? Mr. Cress does not have a remotely similar discovery burden compared to Nexo. We think October 10 is more reasonable, as it will give us time to submit any disputes to the Court. Could we agree to that deadline as a compromise?

**Ian Shelton**
Partner, Litigation
Baker & McKenzie LLP
800 Capitol, Suite 2100
Houston, Texas 77002
United States
Dir: +1 713 427 5029
Tel: +1 713 427 5000
[ian.shelton@bakermckenzie.com](mailto:ian.shelton@bakermckenzie.com)



[bakermckenzie.com](#) | [Facebook](#) | [LinkedIn](#) | [X](#)

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit [www.bakermckenzie.com/disclaimers](#) for other important information concerning this message.

**From:** Max Ambrose <[maxambrose@taylorcopelandlaw.com](mailto:maxambrose@taylorcopelandlaw.com)>
**Sent:** Wednesday, September 17, 2025 10:38 AM
**To:** Shelton, Ian <[Ian.Shelton@bakermckenzie.com](mailto:Ian.Shelton@bakermckenzie.com)>
**Cc:** Rawlinson, Matthew <[Matthew.Rawlinson@bakermckenzie.com](mailto:Matthew.Rawlinson@bakermckenzie.com)>; Treat, John <[John.Treat@bakermckenzie.com](mailto:John.Treat@bakermckenzie.com)>; Brown, Stephanie <[Stephanie.Brown@bakermckenzie.com](mailto:Stephanie.Brown@bakermckenzie.com)>; James Taylor-Copeland <[james@taylorcopelandlaw.com](mailto:james@taylorcopelandlaw.com)>
**Subject:** [EXTERNAL] Re: Meet and Confer letter re deficiencies in Nexo's August 31 document production

Ian, following up here for the fourth time.

Could you please let us know whether Nexo agrees to extend Plaintiff's deadline to respond to Nexo's set one RFAs to October 25, 2025?

On Mon, Sep 15, 2025 at 4:16 PM Max Ambrose <maxambrose@taylorcopelandlaw.com> wrote:

> Ian,
>
> Please find a follow-up letter regarding Nexo's September 12 document production.
>
> Could you please also let us know whether Nexo agrees to extend Plaintiff's deadline to respond to Nexo's set one RFAs to October 25, 2025?
>
> Thanks,
>
> Max
>
> On Tue, Sep 9, 2025 at 8:17 PM Max Ambrose <maxambrose@taylorcopelandlaw.com> wrote:
>
>> Hi Ian,
>>
>> Please see the attached letter. We hope to have a response from you on these issues promptly.
>>
>> Best regards,
>>
>> Max
>> --
>> Taylor-Copeland Law
>> maxambrose@taylorcopelandlaw.com
>> 501 W. Broadway Suite 800
>> San Diego, CA 92101
>> Phone: (602) 570-2656
>> www.taylorcopelandlaw.com
>
>
> --
> Taylor-Copeland Law
> maxambrose@taylorcopelandlaw.com
> 501 W. Broadway Suite 800
> San Diego, CA 92101
> Phone: (602) 570-2656
> www.taylorcopelandlaw.com

--

Taylor-Copeland Law
maxambrose@taylorcopelandlaw.com
501 W. Broadway Suite 800
San Diego, CA 92101
Phone: (602) 570-2656
www.taylorcopelandlaw.com


--
James Taylor-Copeland
Law Offices of James Taylor-Copeland
Phone: (619) 734-8770
Email: James@TaylorCopelandLaw.com
Web: www.TaylorCopelandLaw.com


--

Taylor-Copeland Law

maxambrose@taylorcopelandlaw.com

501 W. Broadway Suite 800

San Diego, CA 92101

Phone: (602) 570-2656

www.taylorcopelandlaw.com


--

Taylor-Copeland Law

maxambrose@taylorcopelandlaw.com

501 W. Broadway Suite 800

San Diego, CA 92101

Phone: (602) 570-2656

www.taylorcopelandlaw.com

--

Taylor-Copeland Law

maxambrose@taylorcopelandlaw.com

501 W. Broadway Suite 800

San Diego, CA 92101

Phone: (602) 570-2656

www.taylorcopelandlaw.com


--

Taylor-Copeland Law

maxambrose@taylorcopelandlaw.com

501 W. Broadway Suite 800

San Diego, CA 92101

Phone: (602) 570-2656

www.taylorcopelandlaw.com

EXHIBIT 8



October 26, 2021

Via Email
Michael Bahar, Esq.
Eversheds Sutherland
700 6th Street N.W.
Washington, D.C. 20001

**Re: John Cress**

Dear Michael:

We represent a longtime Nexo customer, John Cress, in connection with analyzing the substantial losses that he has suffered from using Nexo's services. In our assessment, as discussed in some detail below, Nexo is obligated to compensate Mr. Cress for his cognizable losses. I write to you because Mr. Cress is a resident of California, and his issues set forth below implicate broader issues with the Nexo platform of the sort raised under California law in our firm's pending class action against Nexo. If someone else at or representing Nexo is better situated to address our complaint regarding Mr. Cress, please let us know.

On March 3, 2021, Mr. Cress began a series of deposits to his Nexo wallet, amounting to 249.916738 BTC and 250 ETH, to earn interest on his crypto-assets. (Exhibit 1.) On March 15, Nexo employee Hristiyan Hristov contacted Mr. Cress and stated that Mr. Cress's account had grown to the point that he was eligible for Nexo's "VIP Relationship Program." Mr. Hristov also informed Mr. Cress that he would be Mr. Cress's "dedicated relationship manager." At that point, Mr. Cress had not borrowed on Nexo's platform, and he did not respond to Mr. Hristov.

On March 17, however, Mr. Hristov again reached out to Mr. Cress, further advertising the benefits of the VIP program and attaching a brochure describing the program to "spark your interest." The contents of the brochure did spark Mr. Cress's interest, and on March 26, in reliance on Nexo's representations regarding the VIP program, Mr. Cress borrowed approximately $5.4 million loan collateralized by his crypto-assets, and came to borrow approximately $7.45 million more through loans on March 30, April 14, and April 30. Mr. Cress proceeded to suffer losses, as explained below, as a result of this borrowing.

Nexo's VIP program brochure, and Mr. Hristov's communications regarding that program, contained multiple false and misleading representations and omissions that, in violation of California law, fraudulently induced Mr. Cress into thus borrowing against his crypto-assets. Nexo promised, for example, that as a VIP, Mr. Cress (1) would "get a response from the support team in 2 hours, 24/7"; (2) would receive a "dedicated relationship manager" and "direct phone number availability"; and (3) could utilize certain "OTC services," including Nexo's "[l]iquidation relief program," which it represented was a "service in the event of a market crash to recover your liquidated assets," and Nexo's "zero cost loan," which it represented involved "no risk of liquidation."

As Mr. Cress would later discover, none of these things were true. Instead, Nexo engaged in an unlawful "scheme," which encompasses its "lending process," to "steer" customers with large accounts such as Mr. Cress into loans and programs that were "lucrative" to Nexo with the promise of special benefits, when in fact Nexo provided sub-standard service and programs that increased the likelihood of customer liquidations. *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig.*, 601 F. Supp. 2d 1201, 1220 (S.D. Cal. 2009) (denying motion to dismiss claim premised on similar allegations).

*First*, contrary to Nexo's representations about responsiveness, Mr. Cress in fact had to wait days, even weeks, to receive responses regarding his inquiries about Nexo's services and his account at critical periods in the market. Indeed, on May 28, Mr. Cress initiated a customer service ticket requesting that Nexo work with him to protect his collateral in times of market volatility. Nexo responded on May 29 that his request had been referred to Mr. Cress's "account manager." On June 10, almost *two weeks* after he had initiated contact, Mr. Cress wrote to Mr. Hristov that despite "trying very hard to reach someone at Nexo for help protecting my assets," he had been waiting 12 days for a response despite being in a "serious situation" on his multimillion dollar account.

*Second*, contrary to Nexo's representations about access to customer service, although assigned as Mr. Cress's relationship manager, Mr. Hristov was frequently unavailable. And when he was available, he misled Mr. Cress regarding Nexo's financial products. On March 23, Mr. Hristov told Mr. Cress: "You will be earning 5% annually on the Bitcoin which you used as collateral." This was false—Mr. Cress did not earn interest on crypto assets posted as collateral for his loans, and relied upon this false representation when deciding whether to borrow from Nexo. Mr. Hristov also made false and misleading statements and omissions when Mr. Cress proposed that he enter into a swap of BTC to USDC to stabilize his assets before swapping back to BTC in the event prices stabilized as a "temporary measure to get through a drop in BTC price this weekend." Mr. Hristov failed to inform Mr. Cress that such a plan was not possible under the "collateral swap" feature that Mr. Hristov offered him. Instead, on June 11, Mr. Cress told Mr. Hristov to disregard his request to engage in a collateral swap because he had learned elsewhere that Nexo would *not* in fact allow him to swap directly back to BTC as he desired—noting that "[t]his service is not at all what it sounds like." Indeed, even now, Nexo misrepresents to consumers on its website that its collateral swap feature allows you to "revert your portfolio back to its original crypto mix when the market is down to maximize your holdings," when in fact Nexo does *not* permit users to completely swap back to collateral that Nexo has assigned a lower loan-to-value ratio. Such misrepresentations thus implicate California's laws meant to protect consumers more broadly than even the impact on Mr. Cress individually.

*Third*, contrary to Nexo's representations regarding its liquidation relief program, on June 21 and 22, Mr. Cress was substantially liquidated of his remaining BTC, in turn forcing him to sell off BTC to repay his loan. Nexo had initially represented to Mr. Cress he would be able to "recover [his] liquidated assets" as part of its VIP program's liquidation relief service, and on June 22, Mr. Cress wrote to Mr. Hristov that Nexo had instructed him to utilize the "liquidation relief" program. The same day, Nexo customer support informed Mr. Cress that the "liquidation relief" program was simply taking out a loan to repurchase liquidated assets up to a certain loan-to-value ratio. This is *not* a "relief" program that allows one to "recover" their liquidated assets, as had been falsely represented to Mr. Cress—and to all of Nexo's VIP program participants.

Michael Danai, Esq.
October 26, 2021
Page 3 of 6

And although Nexo initially purported in advertisements it sent to Mr. Cress that its zero-cost loan program involved "no risk of liquidation," it later disclosed to him that under that program, in the event collateral either dropped below the "safeguard price" or exceeded the "cash-out" price, Nexo would "*retain the collateral*."

Mr. Cress suffered significant losses as a result of Nexo's repeated and fundamental misrepresentations and omissions. As a result of Nexo's delays in responding to Mr. Cress, for example, he could not timely determine whether he should maintain his loan-to-value ratio to avoid liquidation by attempting to sell assets outside of Nexo and posting additional collateral, whether Nexo would accept pledges of other assets, or whether Nexo would allow him to engage in swaps on the terms he had proposed to Mr. Hristov. Just as fundamental, but for Nexo's representations regarding its VIP program and ability to earn interest on collateral, Mr. Cress never would have even agreed to borrow money from Nexo in the first place.

The damages that Mr. Cress is entitled to recover for Nexo's foregoing misconduct is the current value of the assets, cited above, that he lost as a result of Nexo having fraudulently induced him to borrow against those assets. That is, but for Nexo's misrepresentations and omissions, Mr. Cress would not have borrowed against those assets and instead would retain their value today. That value, which of course varies from day to day, is now approximately $17 million. In causing these losses, moreover, Nexo has acted in ways that implicate California statutes that operate to protect all customers in Mr. Cress's position who have suffered similar losses from this same misconduct.

*First*, Nexo's representations to Mr. Cress about its VIP program violated California Financial Code § 22161, under the California Financing Law that governs Nexo's lending activities and its California state lending license. Section 22161 provides that, among other things, one shall not "[k]nowingly misrepresent, circumvent, or conceal, through subterfuge or device, any material aspect or information regarding a transaction to which the person is a party," and that one shall not "[a]dvertise, print, display, publish, distribute, or broadcast . . . in any manner, any statement or representation with regard to the business subject to the provisions of this division . . . that is false, misleading, or deceptive, or that omits material information that is necessary to make the statements not false, misleading, or deceptive, or in the case of a licensee, that refers to the supervision of the business by the state or any department or official of the state." Mr. Cress is entitled to full restitution for Nexo's violations of Section 22161. *See, e.g.*, *De La Torre v. CashCall, Inc.*, 422 P.3d 1004, 1012, 1021 (Cal. 2018) (explaining that violations of the California Financing Law may be remedied with an order requiring the defendant to pay restitution, as well as an order enjoining the challenged conduct).

*Second*, Nexo's deceptive misconduct violated California's Business and Professions Code §§ 17200 & 17500, which respectively prohibit "unfair, deceptive, untrue or misleading advertising" and provide that one may not "induce the public to enter into any obligation" through any "untrue or misleading" statement. Indeed, as shown, "members of the public" would "likely" be "deceived" by Nexo's representations regarding its VIP program. *Veera v. Banana Republic, LLC*, 211 Cal. Rptr. 3d 769, 775 (Ct. App. 2016) ("The UCL and the FAL prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.")

Michael Danai, Esq.
October 26, 2021
Page 4 of 6

(alterations and internal quotations omitted). Mr. Cress is likewise entitled to restitution for Nexo's violations of Sections 17200 and 17500. *See id.*

*Third,* Nexo's misconduct constitutes fraudulent inducement of contract. Nexo both knowingly misrepresented and failed to disclose material terms of its VIP program and related services with the intent to induce Mr. Cress to borrow from Nexo. Mr. Cress justifiably relied upon those representations and was foreseeably damaged. *See* 5 Witkin, Summary of Cal. Law, 11th *Torts* § 890 (2021) (describing elements of claim). "[W]hen a party has been induced by fraud or mistake to enter into a contract, the party may have the contract set aside and seek restitution of those benefits lost to him by the transaction." *Merced Cty. Mut. Fire Ins. Co. v. State of California*, 233 Cal. App. 3d 765, 771 (Ct. App. 1991). This is the basis for Mr. Cress to recover the value of the assets that he posted for his borrowing.

Nexo caused Mr. Cress to suffer the lost profits that he would have earned absent Nexo's fraudulent inducement and liquidation of his assets. *See* Cal. Civ. Code § 3333 ("For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."); § 1709 ("One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."); § 3343 ("Where the defrauded party has been induced by reason of the fraud to sell or otherwise part with the property in question, an amount which will compensate him for profits or other gains which might reasonably have been earned by use of the property had he retained it."); *see, e.g.*, *Strebel v. Brenlar Invs., Inc.*, 37 Cal. Rptr. 3d 699, 706 (Ct. App. 2006) ("The amount by which the value of Strebel's former home appreciated after the fraudulently induced sale was a reasonable measure of his damages.").

In sum, Mr. Cress demands payment of his approximately $17 million in damages. Please respond to this demand no later than October 28, 2021, or Mr. Cress will be forced to take all actions available to him to protect his rights. The foregoing is not intended to be a complete recitation of all applicable law and/or facts, and shall not be deemed to constitute a waiver or relinquishment of any of our client's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

Sincerely,

ROCHE FREEDMAN LLP

*/s/ Edward Normand*
Kyle W. Roche
Edward Normand
Alex Potter
ROCHE FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016

encl.

# EXHIBIT 1

nexo_transactions3321-42021

| Transaction | Type | Currency | Amount | USD Equivalent | Details | Outstanding Loan | Date / Time |
|---|---|---|---|---|---|---|---|
| NXTzO3pwcBbje | Interest | ETH | 0.0334917 | $73.55 | approved / ETH Interest Earned | $11,902,658.50 | 4/20/21 1:00 |
| NXTePzZHOPWTU | Interest | BTC | 0.01522938 | $854.29 | approved / BTC Interest Earned | $11,902,658.50 | 4/20/21 1:00 |
| NXTcyGy1u6KK0 | Interest | USD | -1950.39 | $1,950.39 | approved / Interest | $11,902,658.50 | 4/20/21 0:00 |
| NXTNNcfPGAlm1 | Interest | ETH | 0.03348722 | $74.91 | approved / ETH Interest Earned | $11,900,708.11 | 4/19/21 1:00 |
| NXTPhxHUjWdlm | Interest | BTC | 0.01522734 | $860.96 | approved / BTC Interest Earned | $11,900,708.11 | 4/19/21 1:00 |
| NXTp6Ua9PJJ1F | Interest | USD | -1950.07 | $1,950.07 | approved / Interest | $11,900,708.11 | 4/19/21 0:00 |
| NXTLgoHtFChUu | Interest | ETH | 0.03348275 | $80.47 | approved / ETH Interest Earned | $11,898,758.04 | 4/18/21 1:00 |
| NXTH6hm0tAb0V | Interest | BTC | 0.01522531 | $933.03 | approved / BTC Interest Earned | $11,898,758.04 | 4/18/21 1:00 |
| NXTPKRxGth7m4 | Interest | USD | -1949.75 | $1,949.75 | approved / Interest | $11,898,758.04 | 4/18/21 0:00 |
| NXT629xYFWYzH | Interest | ETH | 0.03347827 | $81.25 | approved / ETH Interest Earned | $11,896,808.29 | 4/17/21 1:00 |
| NXTYzjZzStGiC | Interest | BTC | 0.01143019 | $705.04 | approved / BTC Interest Earned | $11,896,808.29 | 4/17/21 1:00 |
| NXT7R6T0yw3o8 | Interest | USD | -1949.44 | $1,949.44 | approved / Interest | $11,896,808.29 | 4/17/21 0:00 |
| NXTC0AXXHgF4c | Deposit | BTC | 28.37799999 | $1,724,803.43 | approved / b7a2967911157672 ff3a9449965ef739f3507ded5feec2338cea63a1ec2f524b | $11,894,858.85 | 4/16/21 12:38 |
| NXTGI8TE8akE8 | Deposit | NEXO | 91715.01059 | $337,150.25 | approved / 0x5785a90fc2238fe89256044db3504f26bdea0b10fc622a0e28010e5bbfc68116 | $11,894,858.85 | 4/16/21 11:43 |
| NXTgHbZ4JBAjE | Interest | ETH | 0.0334738 | $84.79 | approved / ETH Interest Earned | $11,894,858.85 | 4/16/21 1:00 |
| NXTJbpsSGcpTt | Interest | BTC | 0.01142866 | $724.54 | approved / BTC Interest Earned | $11,894,858.85 | 4/16/21 1:00 |
| NXTT5VhKwEPMA | Interest | USD | -1949.12 | $1,949.12 | approved / Interest | $11,894,858.85 | 4/16/21 0:00 |
| NXTgwi39Dh0Zj | Interest | ETH | 0.03346932 | $81.32 | approved / ETH Interest Earned | $11,892,909.73 | 4/15/21 1:00 |
| NXTfJZLUzaN9f | Interest | BTC | 0.01142714 | $719.55 | approved / BTC Interest Earned | $11,892,909.73 | 4/15/21 1:00 |
| NXTWrmA77cGuZ | Interest | USD | -1948.8 | $1,948.80 | approved / Interest | $11,892,909.73 | 4/15/21 0:00 |
| NXTVLnRXvMkpV | Withdrawal | USDTERC | -2150000 | $2,153,169.10 | approved / USDT withdrawal | $11,890,960.93 | 4/14/21 18:22 |
| NXT9ACIohyc14 | Deposit | USDTERC | 2150000 | $2,150,509.55 | approved / | $11,890,960.93 | 4/14/21 17:49 |
| NXT1rAMXd9WJ9 | WithdrawalCredit | USD | -2150509.55 | $2,150,509.55 | approved / JOHN THOMAS CRESS | $11,890,960.93 | 4/14/21 8:12 |
| NXTPXRYfFEtQy | TransferOut | BTC | -22.3488335 | $1,431,948.68 | approved / Transfer from Savings Wallet to Credit Line Wallet | $9,740,451.38 | 4/14/21 8:12 |
| NXTnDikmrKGYn | TransferOut | NEXO | -530190 | $1,820,273.76 | approved / Transfer from Savings Wallet to Credit Line Wallet | $9,740,451.38 | 4/14/21 8:12 |
| NXTYB6dUMzlhr | Interest | ETH | 0.03346485 | $76.57 | approved / ETH Interest Earned | $9,740,451.38 | 4/14/21 1:00 |
| NXTNJrR8C4flQ | Interest | BTC | 0.01441282 | $913.12 | approved / BTC Interest Earned | $9,740,451.38 | 4/14/21 1:00 |
| NXT4c7kq5ts4N | Interest | USD | -1596.09 | $1,596.09 | approved / Interest | $9,740,451.38 | 4/14/21 0:00 |
| NXTOcW7VrMJio | Interest | BTC | 0.01441089 | $865.94 | approved / BTC Interest Earned | $9,738,855.29 | 4/13/21 1:00 |
| NXT4TgS16ZOCE | Interest | ETH | 0.03346038 | $71.97 | approved / ETH Interest Earned | $9,738,855.29 | 4/13/21 1:00 |
| NXTw1E1HsfRva | Interest | USD | -1595.83 | $1,595.83 | approved / Interest | $9,738,855.29 | 4/13/21 0:00 |
| NXTip3YWh5tzg | Interest | BTC | 0.01440896 | $867.37 | approved / BTC Interest Earned | $9,737,259.46 | 4/12/21 1:00 |
| NXTOC2s978m2C | Interest | ETH | 0.0334559 | $71.86 | approved / ETH Interest Earned | $9,737,259.46 | 4/12/21 1:00 |
| NXTl63OFAd1aL | Interest | USD | -1595.57 | $1,595.57 | approved / Interest | $9,737,259.46 | 4/12/21 0:00 |
| NXTBQSt50eK3L | Interest | ETH | 0.03345143 | $70.77 | approved / ETH Interest Earned | $9,735,663.89 | 4/11/21 1:00 |
| NXTGo40uW8QkR | Interest | BTC | 0.01440704 | $852.68 | approved / BTC Interest Earned | $9,735,663.89 | 4/11/21 1:00 |
| NXTJNiCLy1W5L | Interest | USD | -1595.31 | $1,595.31 | approved / Interest | $9,735,663.89 | 4/11/21 0:00 |
| NXTjdPFBLy53C | Interest | ETH | 0.03344696 | $69.23 | approved / ETH Interest Earned | $9,734,068.58 | 4/10/21 1:00 |
| NXTc6Kv4s0VUS | Interest | BTC | 0.01440511 | $838.44 | approved / BTC Interest Earned | $9,734,068.58 | 4/10/21 1:00 |
| NXTPXHk0Ilp8l | Interest | USD | -1595.04 | $1,595.04 | approved / Interest | $9,734,068.58 | 4/10/21 0:00 |
| NXTAvoSCz2cQA | Interest | BTC | 0.01440319 | $834.44 | approved / BTC Interest Earned | $9,732,473.54 | 4/9/21 1:00 |
| NXTqtgykk7wTN | Interest | ETH | 0.03344249 | $69.29 | approved / ETH Interest Earned | $9,732,473.54 | 4/9/21 1:00 |
| NXT50hX7eZZM4 | Interest | USD | -1594.78 | $1,594.78 | approved / Interest | $9,732,473.54 | 4/9/21 0:00 |
| NXT0Zwma9ubUI | Interest | BTC | 0.01440126 | $814.54 | approved / BTC Interest Earned | $9,730,878.76 | 4/8/21 1:00 |
| NXT4jMG0Jqoc2 | Interest | ETH | 0.03343802 | $67.25 | approved / ETH Interest Earned | $9,730,878.76 | 4/8/21 1:00 |
| NXT5oJv3N2fdY | Interest | USD | -1594.52 | $1,594.52 | approved / Interest | $9,730,878.76 | 4/8/21 0:00 |
| NXTuziHzXcvkQ | Interest | BTC | 0.01439934 | $836.73 | approved / BTC Interest Earned | $9,729,284.24 | 4/7/21 1:00 |
| NXT11gbB1DnVz | Interest | ETH | 0.03343355 | $70.84 | approved / ETH Interest Earned | $9,729,284.24 | 4/7/21 1:00 |
| NXT2ouuXHGC9X | Interest | USD | -1594.26 | $1,594.26 | approved / Interest | $9,729,284.24 | 4/7/21 0:00 |
| NXTnaFCMNLnTX | Interest | BTC | 0.01439741 | $849.20 | approved / BTC Interest Earned | $9,727,689.98 | 4/6/21 1:00 |
| NXTBeOhquOawG | Interest | ETH | 0.03342908 | $70.78 | approved / ETH Interest Earned | $9,727,689.98 | 4/6/21 1:00 |
| NXTpcEOUN0NJI | Interest | USD | -1594 | $1,594.00 | approved / Interest | $9,727,689.98 | 4/6/21 0:00 |
| NXTdVHtFD2alU | Interest | BTC | 0.01439549 | $843.53 | approved / BTC Interest Earned | $9,726,095.98 | 4/5/21 1:00 |
| NXT5zLk8xAw53 | Interest | ETH | 0.03342461 | $69.63 | approved / ETH Interest Earned | $9,726,095.98 | 4/5/21 1:00 |
| NXT9C2cFfJ6RK | Interest | USD | -1593.74 | $1,593.74 | approved / Interest | $9,726,095.98 | 4/5/21 0:00 |
| NXT5WgiWNRN6L | Interest | ETH | 0.03342015 | $68.62 | approved / ETH Interest Earned | $9,724,502.24 | 4/4/21 1:00 |
| NXTdl2zjir310 | Interest | BTC | 0.01439356 | $836.53 | approved / BTC Interest Earned | $9,724,502.24 | 4/4/21 1:00 |
| NXTVQtGSRf2Eq | Interest | USD | -1593.48 | $1,593.48 | approved / Interest | $9,724,502.24 | 4/4/21 0:00 |
| NXTRrgKXCay3p | Interest | BTC | 0.00806636 | $478.16 | approved / BTC Interest Earned | $9,722,908.76 | 4/3/21 1:00 |
| NXTQ0kvE5SfWL | Interest | USD | -1593.22 | $1,593.22 | approved / Interest | $9,722,908.76 | 4/3/21 0:00 |
| NXT4jyaEumIBd | Deposit | ETH | 100 | $206,167.87 | approved / 0x5382b81744b9507db89e63f39ea722d ff8fa2b23550699baa4bcdf1462f2d01b | $9,721,315.54 | 4/2/21 19:46 |
| NXToGNNHUlqLQ | Deposit | ETH | 100 | $206,664.15 | approved / 0x26b72f5178832b9e0ae89a1c1f93d9ba2c685649c82aec0b9a93ad8bd808a650 | $9,721,315.54 | 4/2/21 19:05 |
| NXTBcGESoy6C7 | Deposit | ETH | 40 | $82,730.73 | approved / 0x555d9c2b6428914ea2fd3ad4e09472fca6eed873358da6d84871f1c85d8ad1f3 | $9,721,315.54 | 4/2/21 18:27 |
| NXTrSC5OFAkEA | Deposit | ETH | 10 | $20,009.27 | approved / 0x6f70881308e6298debdd6274fa72b6d06499bb8a08234481e2dfcdbc526c6051 | $9,721,315.54 | 4/2/21 10:57 |
| NXTrvxbkSfTBH | Deposit | BTC | 47.32269999 | $2,833,586.79 | approved / 8d29caf16a940b0f4cec168f2b4e37850f60a6c263e7afc8afc7399181119fa1 | $9,721,315.54 | 4/2/21 7:49 |
| NXTMMAHx2O1od | Interest | BTC | 0.00806528 | $478.41 | approved / BTC Interest Earned | $9,721,315.54 | 4/2/21 1:00 |

1

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NXTO4pt0hknt4 | Interest | USD | -1592.95 | $1,592.95 | approved / Interest | $9,721,315.54 | 4/2/21 0:00 |
| NXT0ufjD05HwU | Deposit | NEXO | 530190 | $1,454,380.62 | approved / 0xd2c4ab30a4fba9bfb2d6771dee4f37ec51e0b2dc67007da8c387b2cdcc705633 | $9,719,722.59 | 4/1/21 15:16 |
| NXTWZJodfc6hQ | Interest | BTC | 0.00727531 | $428.48 | approved / BTC Interest Earned | $9,719,722.59 | 4/1/21 1:00 |
| NXTm9gOiGtHqP | Interest | USD | -2402.34 | $2,402.34 | approved / Interest | $9,719,722.59 | 4/1/21 0:00 |
| NXTGSxQZUmcdd | Interest | BTC | 0.00727443 | $428.50 | approved / BTC Interest Earned | $9,717,320.25 | 3/31/21 1:00 |
| NXTqq7MyDl0ts | Interest | USD | -2401.74 | $2,401.74 | approved / Interest | $9,717,320.25 | 3/31/21 0:00 |
| NXTIfkJv0Ijof | Withdrawal | USDTERC | -4299900 | $4,300,695.48 | approved / USDT withdrawal | $9,714,918.51 | 3/30/21 20:23 |
| NXTLhGqRjMpS7 | Withdrawal | USDTERC | -100 | $100.02 | approved / USDT withdrawal | $9,714,918.51 | 3/30/21 20:12 |
| NXTsvdNgyTpte | Deposit | USDTERC | 4300000 | $4,300,920.20 | approved / | $9,714,918.51 | 3/30/21 20:10 |
| NXTNWLhmPxB2d | WithdrawalCredit | USD | -4300920.2 | $4,300,920.20 | approved / JOHN THOMAS CRESS | $9,714,918.51 | 3/30/21 20:10 |
| NXTICctu22YAS | TransferOut | BTC | -97.07749817 | $5,739,983.94 | approved / Transfer from Savings Wallet to Credit Line Wallet | $5,413,998.31 | 3/30/21 20:10 |
| NXT8su61e7vIH | TransferOut | NEXO | -481878.1134 | $1,344,530.05 | approved / Transfer from Savings Wallet to Credit Line Wallet | $5,413,998.31 | 3/30/21 20:10 |
| NXTyoGnyQmUGe | Interest | BTC | 0.01897983 | $1,097.22 | approved / BTC Interest Earned | $5,413,998.31 | 3/30/21 1:00 |
| NXT5GALVdWbxi | Interest | USD | -1338.13 | $1,338.13 | approved / Interest | $5,413,998.31 | 3/30/21 0:00 |
| NXTP8Dy7WfNA5 | Interest | BTC | 0.01897754 | $1,058.18 | approved / BTC Interest Earned | $5,412,660.18 | 3/29/21 1:00 |
| NXT93TFdsCOk2 | Interest | USD | -1337.8 | $1,337.80 | approved / Interest | $5,412,660.18 | 3/29/21 0:00 |
| NXTbnemVy7zan | Interest | BTC | 0.00999864 | $559.73 | approved / BTC Interest Earned | $5,411,322.38 | 3/28/21 1:00 |
| NXThB9LaMbIro | Interest | USD | -1337.47 | $1,337.47 | approved / Interest | $5,411,322.38 | 3/28/21 0:00 |
| NXT265PkaQhDg | Deposit | BTC | 74.441 | $4,201,320.15 | approved / 2e142d0bd26290424d51d0b4c53c0372790f677149b1336e714601b32ddc993b | $5,409,984.91 | 3/27/21 23:58 |
| NXTRb1ygHQwSE | Deposit | NEXO | 481878.1134 | $1,189,641.89 | approved / 0x1fa4fb757eb8d014ced42655df9cfb6df2c6a80da6e587a80b0427250be026a4 | $5,409,984.91 | 3/27/21 20:33 |
| NXTj6IuTtHuTd | Interest | USD | -1787.71 | $1,787.71 | approved / Interest | $5,409,984.91 | 3/27/21 0:00 |
| NXT5DH9JXSZOe | Withdrawal | USDTERC | -5399900 | $5,406,919.87 | approved / USDT withdrawal | $5,408,197.20 | 3/26/21 21:05 |
| NXTvQQvQAoksG | Withdrawal | USDTERC | -100 | $100.17 | approved / USDT withdrawal | $5,408,197.20 | 3/26/21 20:48 |
| NXTxkIXVeAcP1 | Deposit | USDTERC | 5400000 | $5,408,197.20 | approved / | $5,408,197.20 | 3/26/21 20:45 |
| NXT5fiAz35clf | WithdrawalCredit | USD | -5408197.2 | $5,408,197.20 | approved / JOHN THOMAS CRESS | $5,408,197.20 | 3/26/21 20:38 |
| NXTTLzN6fAzQU | TransferOut | BTC | -167.2870862 | $9,013,662.00 | approved / Transfer from Savings Wallet to Credit Line Wallet | $0.00 | 3/26/21 20:38 |
| NXTXVOqWp7CXl | Deposit | BTC | 20 | $1,077,550.75 | approved / 6d10fac29574f70b174d1a0b16dbc9b5b7337ad23a34f50d5e7ed1003011713b | $0.00 | 3/26/21 20:26 |
| NXTifY9Qie9mC | Deposit | BTC | 20 | $1,081,189.91 | approved / 994209da3cc8abd4b582a6706749b3e689276ba476c5a1665872a6ae15222fe3 | $0.00 | 3/26/21 19:06 |
| NXTKONkNIWKdg | Deposit | BTC | 10 | $538,026.57 | approved / d577ba3657c12f7f87002d9f6c37e740181c1c644bc14a88686e1645dab1d140 | $0.00 | 3/26/21 18:14 |
| NXTx0BfkeiKqH | Deposit | BTC | 10 | $531,952.58 | approved / 9ed3ae3200780f3d767d4ce70bd64a03526d3444ad2676f9df5bc0717f13d708 | $0.00 | 3/26/21 8:38 |
| NXT0ApcsYefbx | Deposit | BTC | 10 | $528,934.10 | approved / 67a2578739f66a99c34e832e715c1caaee2c512210d4080dc4c36ea02acc7848 | $0.00 | 3/26/21 7:28 |
| NXTPaYEAJ3SFq | Deposit | BTC | 10 | $528,903.18 | approved / 01538c4906e5c136dc4e9974bea9e9db68073c6efad535bb ff65f0818bfa5af9 | $0.00 | 3/26/21 6:11 |
| NXTCE6zu9uZ7X | Deposit | BTC | 10 | $525,578.31 | approved / 1c9bd5cadd8d8a0b0219ecb7e61ec9c8dcfcaf76ebb5929b9894a7fc8c654613 | $0.00 | 3/26/21 5:36 |
| NXTrAPH4NrXmv | Deposit | BTC | 10 | $522,480.21 | approved / f4732dc88835c250fd0db75d695ea5e60df008cb0587481f2720070fecb55af6 | $0.00 | 3/26/21 4:19 |
| NXTFJ7UrVZxol | Deposit | BTC | 10 | $518,467.68 | approved / ea9dd83636bc3a5a80c7d9af78fbe822655577e971886 ffb2d80ceb6503d74b7 | $0.00 | 3/26/21 3:45 |
| NXThwImMR3YGY | Deposit | BTC | 10 | $524,200.90 | approved / a0ebd06d685364e3310ef7fb6178836c83ac4da1c3c4747e118c9d06f0210906 | $0.00 | 3/26/21 2:23 |
| NXTpkmyc4Mf8A | Interest | BTC | 0.01291458 | $667.80 | approved / BTC Interest Earned | $0.00 | 3/26/21 1:00 |
| NXT1WnfY9WaSY | Deposit | BTC | 10 | $520,063.39 | approved / 65e6ecfc60ad0901788cfbcd090adbf6d48094d8be16987a8d4cefa583095a80 | $0.00 | 3/26/21 0:26 |
| NXTfDi7F7EdOA | Interest | BTC | 0.0129132 | $681.44 | approved / BTC Interest Earned | $0.00 | 3/25/21 1:00 |
| NXTRX42cDlaNp | Interest | BTC | 0.01291181 | $706.78 | approved / BTC Interest Earned | $0.00 | 3/24/21 1:00 |
| NXTpRs7YVMcdd | Interest | BTC | 0.01291042 | $703.99 | approved / BTC Interest Earned | $0.00 | 3/23/21 1:00 |
| NXTwuoykgTta7 | Interest | BTC | 0.01290903 | $742.57 | approved / BTC Interest Earned | $0.00 | 3/22/21 1:00 |
| NXTZpcU7wzvs5 | Interest | BTC | 0.01290765 | $752.69 | approved / BTC Interest Earned | $0.00 | 3/21/21 1:00 |
| NXTTYfIDfgMp9 | Interest | BTC | 0.01290626 | $753.04 | approved / BTC Interest Earned | $0.00 | 3/20/21 1:00 |
| NXTZU6twAxwQ1 | Interest | BTC | 0.01290487 | $746.69 | approved / BTC Interest Earned | $0.00 | 3/19/21 1:00 |
| NXTz9R7uYThhE | Interest | BTC | 0.01290349 | $759.64 | approved / BTC Interest Earned | $0.00 | 3/18/21 1:00 |
| NXTXP9uaGcXRt | Interest | BTC | 0.0129021 | $730.25 | approved / BTC Interest Earned | $0.00 | 3/17/21 1:00 |
| NXTzwTjxZifkX | Interest | BTC | 0.01290071 | $721.22 | approved / BTC Interest Earned | $0.00 | 3/16/21 1:00 |
| NXTbBZZQ5Fy7y | Interest | BTC | 0.01289933 | $765.56 | approved / BTC Interest Earned | $0.00 | 3/15/21 1:00 |
| NXTQGcOgDAW34 | Interest | BTC | 0.01289794 | $789.92 | approved / BTC Interest Earned | $0.00 | 3/14/21 1:00 |
| NXTWKcCIQikML | Interest | BTC | 0.01289656 | $739.73 | approved / BTC Interest Earned | $0.00 | 3/13/21 1:00 |
| NXT1cIRL3KnXK | Interest | BTC | 0.01289517 | $745.38 | approved / BTC Interest Earned | $0.00 | 3/12/21 1:00 |
| NXT2g7dvANTjC | Withdrawal | BTC | -0.41326742 | $23,884.47 | approved / BTC withdrawal | $0.00 | 3/11/21 23:16 |
| NXT6erjkb9nOo | Interest | BTC | 0.01293819 | $724.58 | approved / BTC Interest Earned | $0.00 | 3/11/21 1:00 |
| NXTmifE9KwGXl | Interest | BTC | 0.0129368 | $709.06 | approved / BTC Interest Earned | $0.00 | 3/10/21 1:00 |
| NXTU3T62hP6Hp | Interest | BTC | 0.01293541 | $676.19 | approved / BTC Interest Earned | $0.00 | 3/9/21 1:00 |
| NXTzXkje8Qheo | Interest | BTC | 0.01293402 | $662.56 | approved / BTC Interest Earned | $0.00 | 3/8/21 1:00 |
| NXTcSnzq9D6UX | Interest | BTC | 0.01293263 | $632.67 | approved / BTC Interest Earned | $0.00 | 3/7/21 1:00 |
| NXTDkJ3rKDOQP | Interest | BTC | 0.01185676 | $580.22 | approved / BTC Interest Earned | $0.00 | 3/6/21 1:00 |
| NXTM3FF1yxMvO | Deposit | BTC | 10 | $484,115.81 | approved / 6b861e65ab79d053994e1b88ccd5ef3f87cd93e8fae86312dc8a0cdacd6e7c58 | $0.00 | 3/5/21 1:02 |
| NXTLJOsrY8KWr | Interest | BTC | 0.00672814 | $326.75 | approved / BTC Interest Earned | $0.00 | 3/5/21 1:00 |
| NXTMlrfGovWgu | Deposit | BTC | 10 | $480,343.46 | approved / f57c176c7da0a368fa72a9c5b087f1bb612763d9c317b ffbc97af61a6c305caa | $0.00 | 3/4/21 20:38 |
| NXTM1RXDgsM4C | Deposit | BTC | 10 | $491,605.45 | approved / 12aaeaccc22c31950bec2e6c096ed594162321de0f97c864bcb3409ba9645e57 | $0.00 | 3/4/21 16:29 |
| NXTKzRnJY4XCa | Deposit | BTC | 10 | $500,966.71 | approved / 676f80fdbe6e35e4f1b34d83f073741fa3639f74b42f229111b047a4b16d7d88 | $0.00 | 3/4/21 9:06 |
| NXTj1Rp49uhed | Deposit | BTC | 10 | $501,770.09 | approved / 4c46046ab76689f3b487bf8a40bce23efa8368d58773cef26982d943ab877ac2 | $0.00 | 3/4/21 4:38 |
| NXTahY8LsQxuk | Deposit | BTC | 10 | $514,712.27 | approved / 9a8cb197b67c88d5190138f33b11e606d1c859f07d0331fc7c0bc23d007f86b9 | $0.00 | 3/4/21 3:30 |
| NXTQmBSxTgL91 | Deposit | BTC | 10 | $506,987.21 | approved / 6d20aa682d8e592fd9c6f257a4b20cbe1c440c84bb88b64d09b8b931a167758b | $0.00 | 3/3/21 23:59 |
| NXTdDBPe8UY3T | Deposit | BTC | 20 | $1,033,139.66 | approved / e1ff525dca702f9b5b742cc088e39df75a52222b1430f17601c698fe601ec837 | $0.00 | 3/3/21 13:35 |

2

| NXT2hSjETYxGT | Deposit | BTC | 10 | $516,705.28 | approved / e99f09f30e1a81788cdcb91e648db3fef89d8c2c15c07afe7f74f8d778915769 | $0.00 | 3/3/21 12:16 |
|---|---|---|---|---|---|---|---|
| NXT68bYLQecIi | Deposit | BTC | 9 | $463,177.11 | approved / 00319f7d4967ea54509f41074eb5179b27 ffd3d40f3194589ed004d065e25472 | $0.00 | 3/3/21 11:05 |
| NXTv0rU0Caf5i | Deposit | BTC | 5 | $253,275.84 | approved / 53a2d7ff075ad768f08b4e78c2bcde3da4c5c8f625a6ae9bed2d9015cd7da078 | $0.00 | 3/3/21 9:35 |
| NXTfJ0tmcUavJ | Deposit | BTC | 5 | $246,946.57 | approved / b0f48acc51e4e1c480b7b62da3f3307b962c49de929d4333cba1a6e84da0dd54 | $0.00 | 3/3/21 7:17 |
| NXTMEaCkfyTom | Deposit | BTC | 0.00000547 | $0.27 | approved / db02bc47912fc39a82e55319abddb29b8dc936c7da557d65e26556c0303c8f8e | $0.00 | 3/3/21 6:01 |
| NXTmhd2dH2INN | Deposit | BTC | 1 | $48,757.52 | approved / 5963dc69f75ea9f19208c0302a77eea5154fc6fd77bb8cae7f406a3b37d614a5 | $0.00 | 3/3/21 5:01 |
| NXTKevTX4w9SU | Deposit | BTC | 0.33 | $16,090.73 | approved / 806569fa41dec99fadb2796e8027a19e77139cb10983874816c1e61fd71b ff83 | $0.00 | 3/3/21 3:26 |

Case 0:25-cv-62575-WPD Document 26 Entered on FLSD 02/11/2026 Page 16 of 4

EXHIBIT 9



ROCHE
FREEDMAN

November 29, 2021

Via Email
Michael Bahar, Esq.
Eversheds Sutherland
700 6th Street N.W.
Washington, D.C. 20001

**Re: John Cress**

Dear Michael:

We write further to our October 26 letter and November 10 call to address certain issues that you and Mr. Shelton raised in response to Mr. Cress's demand.

*First*, Mr. Cress is entitled to his losses from Nexo's fraudulent inducement of his loans—namely, the value of his posted cryptoassets prior that he then lost from the borrowing. The question is whether "the misrepresentation is an immediate cause of [a plaintiff's] conduct, which alters his legal relations, and when, absent such representation, he would not in all reasonable probability, have entered into the contract or other transaction." *Naeyaert v. Kimberly-Clark Corp.*, No. EDCV1700950JAKJPRX, 2018 WL 6380749, at *6 (C.D. Cal. Sept. 28, 2018). A "consumer's allegation that she would not have bought the product but for the misrepresentation . . . is sufficient to allege causation . . . [and] to allege economic injury." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 965–66 (9th Cir. 2018); *see also Hawkins v. Kroger Co.*, 906 F.3d 763, 768 (9th Cir. 2018) (same).

Accordingly, Mr. Cress is entitled to the value of the cryptoassets that he deposited onto Nexo's platform prior to taking out the loans that Nexo fraudulently induced him to make and that caused his loss of those assets. Those cryptoassets were approximately 249.916738 BTC and 250 ETH. At the time of our October 26 letter, those assets were valued at approximately $17 million. As of today, they are valued at approximately $15.6 million ($58,097.83 per BTC for a total of $14,519,620.2 in BTC, and $4,421.42 per ETH for a total of $1,105,355 in ETH). Mr. Cress is entitled to these damages both as a matter of restitution (if he were not entitled to the cryptoassets themselves, as addressed just below) and lost profits.

In addition, Mr. Cress is entitled to the restitution of BTC and ETH as such. *See* Cal. Bus. & Prof. Code § 17203 ("The court may make such orders or judgments . . . to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."); *see, e.g.*, *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 840 (N.D. Cal. 2020) ("[R]estitution under the UCL must restore the status quo by returning to the plaintiff's funds taken from him or benefits in which the plaintiff has an ownership interest.") (quotations omitted). That is, "restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003)); *see also Rave Wonderland, Inc. v. City Lingerie, Inc.*, No. CV 19-4546-RSWL-MRW, 2019 WL 6792808, at *3 (C.D. Cal. Sept. 11, 2019) ("The object of restitution is to restore the status quo by returning to the plaintiff funds

in which he or she has an ownership interest."); *Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*, No. 2:17-CV-01515-KJM-AC, 2020 WL 3893395, at *6 (E.D. Cal. July 10, 2020) ("The California Supreme Court has held that restitution under the UCL is limited to either 'money or property that defendants took directly from plaintiff' or 'money or property in which [plaintiff] has a vested interest.'"). Indeed, the "most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty [in fixing the amount of damages] which his own wrong has created." *Buell-Wilson v. Ford Motor Co.*, 73 Cal. Rptr. 3d 277, 309–10 (Ct. App.), *as modified on denial of reh'g* (Apr. 10, 2008), *review granted and opinion superseded,* 187 P.3d 887 (Cal. 2008).

*Second*, if Mr. Cress were not entitled to the entire value of those assets that he lost as a result of being induced to take out loans at all, he is entitled to what he lost as a direct result of Nexo's misrepresentations and omissions regarding the VIP program themselves. That is, "it is not necessary to allege and prove the plaintiff would not have entered the transaction but for the misrepresentation. Such but-for causation is only one of the 'innumerable' ways of establishing standing . . . . Economic injury sufficient to support UCL standing exists where the plaintiff surrender[ed] in a transaction more, or acquire[d] less than he or she otherwise would have." *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1134 (N.D. Cal. 2014) (internal citation omitted) (alterations in original) (finding "a UCL claim is stated when the plaintiff, as a result of a defendant's misrepresentation, did not receive what he or she had bargained for"). Our October 26 letter outlines, for example, that due to Nexo's unresponsiveness Mr. Cress was unable to make decisions regarding how to protect his assets, such as whether he had to post additional collateral at a critical time prior to his liquidation. On May 23, 2021, for example, Mr. Cress emailed Mr. Hristov requesting to discuss how the liquidation relief program would operate to protect his assets in a "[f]lash crash scenario" and received no response. Nexo thus induced his forbearance from taking those protective actions and is liable for his losses. *See Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 174 (2003) ("California law has long recognized the principle that induced forbearance can be the basis for tort liability.").

*Third*, Nexo's citations to market factors are unavailing, because Nexo's acts were substantial factors in causing Mr. Cress's injury. "To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct. A plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision. A plaintiff may do so by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 685 (N.D. Cal. 2021) (internal citation omitted). Plaintiffs "need not prove the misrepresentation or omission was the 'only,' 'sole,' 'predominant,' or 'decisive' cause of the injury-causing conduct. Rather, they may show that the misrepresentation or omission was a substantial factor in their decision-making process." *In re Big Heart Pet Brands Litig.*, 2019 WL 8266869, at *14 (N.D. Cal. Oct. 4, 2019); *see also Tran v. Sioux Honey Ass'n*, 2020 WL 905571, at *4 (C.D. Cal. Feb. 24, 2020) (under "the FAL, CLRA, and UCL, a Plaintiff need show only that a misrepresentation played a substantial part, and so had been a substantial factor, in influencing his [or her] decision"); *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1092–93 (N.D. Cal. 2019) (applying substantial factor test to UCL claim).

Michael Banar, Esq.
November 29, 2021
Page 3 of 3

     *Fourth*, any loss Mr. Cress suffered due to market factors was also not an "intervening cause" relieving Nexo of liability for his injury. "To qualify as a superseding cause so as to relieve the defendant from liability for the plaintiff's injuries, both the intervening act and the results of that act must not be foreseeable." *Chanda v. Fed. Home Loans Corp.*, 215 Cal. App. 4th 746, 755–56 (2013); *see also Cooper v. Tokyo Elec. Power Co., Inc.*, 166 F. Supp. 3d 1103, 1119–20 (S.D. Cal. 2015), *aff'd,* 860 F.3d 1193 (9th Cir. 2017) (a "superseding cause must be something more than a subsequent act in a chain of causation: It must be an act that was not reasonably foreseeable at the time of the defendant's negligent conduct.").

     In sum, Mr. Cress demands payment of the value of his BTC and ETH at the time of resolution (approximately $15.6 million presently), or preferably the return of his BTC and ETH. Please respond to this demand no later than December 17 or Mr. Cress will be forced to take all actions available to him to protect his rights. The foregoing is not intended to be a complete recitation of all applicable law and/or facts, and shall not be deemed to constitute a waiver or relinquishment of any of our client's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

Sincerely,

ROCHE FREEDMAN LLP

*/s/ Edward Normand*
Kyle W. Roche
Edward Normand
Alex Potter
ROCHE FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016

EXHIBIT 10



**Baker & McKenzie LLP**

800 Capitol Street, Suite 2100
Houston, TX 77002
United States

Tel: +1 713 427 5000
Fax: +1 713 427 5099
www.bakermckenzie.com

**Asia Pacific**
Bangkok
Beijing
Brisbane
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur*
Manila*
Melbourne
Seoul
Shanghai
Singapore
Sydney
Taipei
Tokyo
Yangon

**Europe, Middle East
& Africa**
Abu Dhabi
Almaty
Amsterdam
Antwerp
Bahrain
Barcelona
Berlin
Brussels
Budapest
Cairo
Casablanca
Doha
Dubai
Dusseldorf
Frankfurt/Main
Geneva
Istanbul
Jeddah*
Johannesburg
Kyiv
London
Luxembourg
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh*
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

**The Americas**
Bogota
Brasilia**
Buenos Aires
Caracas
Chicago
Dallas
Guadalajara
Houston
Juarez
Lima
Los Angeles
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre**
Rio de Janeiro**
San Francisco
Santiago
Sao Paulo**
Tijuana
Toronto
Valencia
Washington, DC

* Associated Firm
** In cooperation with
Trench, Rossi e Watanabe
Advogados

October 20, 2025

James Taylor-Copeland
james@taylorcopelandlaw.com
Max Ambrose
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101

**Re:**      *Cress v. Nexo Capital Inc.*, **Case No. 3:23-cv-00882-TSH (N.D. Cal.)**

Dear Counsel:

We write in response to your September 9 and 15, 2025 meet and confer letters regarding Nexo's document production.

Cress's position ignores Nexo's substantial efforts to produce documents, the parties' prior agreement regarding search terms, and the asymmetrical nature of document production in this matter. At incredible burden and expense, Nexo has, to date, produced 53,593 documents consisting of over 231,564 pages. Consistent with the document production schedule in the parties' stipulation to modify the scheduling order (Dkt. 71), Nexo's August 29, 2025 production alone was 45,990 documents consisting of over 205,256 pages. In contrast, Cress has produced a paltry 844 documents in total, and he still refuses to produce the documents that are the subject of Nexo's pending letter brief regarding its own RFPs (Dkt. 77).

The parties engaged in lengthy negotiations to arrive at mutually acceptable (but still incredibly burdensome) search terms for Nexo's document review. Nexo collected the email, shared drive, and Slack data for the 14 custodial sources, and email for the 9 non-custodial sources ordered by the Court, limited to the 2021-2022 date range ordered by the Court for the non-custodial sources, and applied Cress's 100+ search terms. **Cress explicitly approved each and every one of those search terms**, with the parties not reaching agreement on all search terms until July 1, 2025. **Nexo's document review and production over the summer was based on reviewing the documents that hit on the search terms that Cress selected.** After the document hits on the review population were segregated, Nexo reviewed and produced responsive documents consistent with its RFP responses.

In responding to the issues raised in your letters, Nexo's general approach is the following: if Cress contends that a discrete and ascertainable category of responsive documents is missing from the production, Nexo is willing to follow up, as explained below. However, particularly as to broad requests seeking "all documents" concerning broad categories of communications, Nexo is not willing to revisit the agreed search terms negotiated by the parties and implemented by Nexo at incredible burden and

expense over the summer, culminating in the production of 45,990 documents on August 29. Nexo is also not willing to revisit the Court's orders setting the date range limit for non-custodial sources, or to expand beyond the (already burdensome) 23 custodial and non-custodial sources approved by the Court.

Contrary to the apparent position in your letter, the Court did not order the collection and review of every document that has been generated within Nexo since its creation in 2018. On the contrary, for the broad requests, the Court limited the review to 23 custodians and non-custodial sources. The Court further limited the non-custodial sources to a 2021-2022 data set. The parties further limited the review to the agreed-upon search terms. Nexo exported the email, drive data, and Slack of the individual custodians, and the email of the non-custodial sources, and Nexo ran the search terms agreed to by Cress. After segregating the hit population, Nexo reviewed and produced for responsiveness. This protocol was fair, reasonable, and proportional.

Nexo's responses to your inquiries are below. To the extent that Nexo agrees to investigate whether further responsive documents exist, it is not intended to be an acknowledgement that such documents do, in fact, exist.

**Communications with Regulators.** Nexo produced responsive documents regarding communications with regulators on September 12. We are following up regarding whether any further responsive documents regarding a 2020-2021 SEC investigation about the Nexo Token exist. We are also following up to identify whether any further responsive communications with regulators exist.

**Trenchev Emails and Communications.** Cress's argument boils down to speculation that more Trenchev documents should have been produced. Trenchev was one of the 14 custodial sources that was part of the document review, and Nexo exported his email, drive data, and Slack. As explained above, Nexo applied the agreed search terms to the agreed sources and produced responsive documents consistent with its RFP responses. As to your reference to the legal@nexo.io email account, that account was not included as a non-custodial source, and was not approved by the Court. Nexo's production hits on many documents containing Trenchev's email address.

**Kantchev's Emails and Communications.** Like the Trenchev documents, Cress's argument boils down to speculation that more Kantchev documents should have been produced. Kantchev was one of the 14 custodial sources that was part of the document review, and Nexo exported his email, drive data, and Slack. As explained above, Nexo applied the agreed search terms to the agreed sources and produced responsive documents consistent with its RFP responses. You appear to acknowledge that Nexo produced "only about 1,000" documents from Kantchev, which alone exceeds the number of documents from Cress's entire production. Nexo's production hits on many documents containing Kantchev's email address.

**Cress's Communications with Nexo Support.** Cress argues that Nexo has failed to produce any of Mr. Cress's communications via support ticket #432896. We are following up regarding whether further responsive documents exist as to this support ticket, despite Cress's acknowledgment that he is already in possession of, and presumably has already produced, these documents.

2

**Nexo Internal Communications.** Cress claims that Nexo's production contains almost no internal communications. That is incorrect. Nexo produced over 50,000 documents in this matter, and the sources included Slack data. As to your point about data sources, Nexo collected the email, shared drive, and Slack data of the 14 custodial sources, and the email of the 9 non-custodial sources.

**Nexo's Analysis of the Nexo Token's Status.** Cress's contention that Nexo has not produced documents regarding the security status of the Nexo Token is false. Please review Nexo's production. Regarding your point about a privilege log, Nexo is willing to meet and confer concerning a mutually agreeable date for simultaneous exchange of logs.

**Audit Reports, Attestations, and Financial Attestations.** We are not aware of Nexo having obtained any third-party audit from an accounting firm, including from Armanino. As for attestations, the Armanino functionality was a real-time attest service that was provided on-demand through a public website that is no longer available. In general, Nexo applied the agreed search terms to the agreed custodians and produced responsive documents consistent with its RFP responses. If Cress is seeking a specific type of internal financial document, please identify what you are looking for (subject matter and time period) with specificity. We are willing to meet and confer regarding targeted requests for internal financial documents that are relevant.

**Hristov Emails.** Hristov's email, shared drive, and Slack was included in the document collection and review. The only specific identified deficiency is that certain emails between Hristov and Cress are allegedly missing. Cress presumably produced these emails. However, we are willing to follow up if you identify the alleged missing documents by Bates number. We are also confused by your contention that you don't see emails where Hristov internally discussed matters related to Cress; those emails are the basis of your current motion for leave to amend.

**Slack/Chat Communications.** Slack communications for the individual custodians were included in the document collection. Nexo applied the agreed search terms to the agreed custodians and produced responsive documents consistent with its RFP responses. Nexo produced at least 207 records from its Slack collection.

**2018-2020 Nexo Token Sales.** Nexo applied the agreed search terms to the agreed custodians and produced responsive documents consistent with its RFP responses. Your cite a large number of documents in your letter showing that Nexo produced responsive documents regarding 2018-2020 Nexo Token Sales. Your claims of deficiency appear based on the contention that the 23 custodial and non-custodial sources approved by the Court, in reality, include every document generated within Nexo since its creation. That is not what this Court ordered. If you have follow up requests for specific documents, please identify them.

**Alleged Missing Documents.** You claim that "more than sixty" documents out of Nexo's 50,000+ document production are missing portions. Please provide a targeted list of any such documents by Bates number, and we are willing to follow up.

**Social Media.** Nexo made a large production of its social media posts, which were extracted by third-party service provider "Page Vault." You can identify those documents by searching the term "Page Vault" in Nexo's production.

3

**Baker McKenzie.**

**Google Documents.** Google Drive documents for each individual custodian were included in the document collection.

**Cress's Transactions.** Nexo has produced documents regarding Cress's transactions. We are following up regarding whether we can identify any further responsive documents related to Cress's OTC transactions or liquidations.

**Alleged "Low Number of Emails" from Custodians or Non-Custodial Sources.** Despite Nexo having produced over 50,000 documents, and Cress producing less than 1,000, you generally claim that there are a "low number" of emails from individual custodians and non-custodial sources. Nexo applied the agreed search terms to the agreed custodians and produced responsive documents consistent with its RFP responses.

**Metadata.** Your generic reference to metadata issues is unhelpful. We note that Cress's metadata for many documents also appears incomplete. If the metadata of a particular document is relevant to some material point, please identify the document by Bates number and we can follow up.

**Salesforce Log.** We are following up to determine whether any Salesforce log for Cress exists that has not been produced already.

**Replacement Documents.** Items 7, 8 and 9 in your September 15 letter ask for complete, legible, or missing documents. We are following up to determine whether we have better or complete copies for the documents you identify by Bates number.

Nexo remains willing to meet and confer regarding these issues.

Regards,

Ian S. Shelton

4

EXHIBIT 11



**Baker & McKenzie LLP**

800 Capitol Street, Suite 2100
Houston, TX 77002
United States

Tel: +1 713 427 5000
Fax: +1 713 427 5099
www.bakermckenzie.com

**Asia Pacific**
Bangkok
Beijing
Brisbane
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur*
Manila*
Melbourne
Seoul
Shanghai
Singapore
Sydney
Taipei
Tokyo
Yangon

**Europe, Middle East & Africa**
Abu Dhabi
Almaty
Amsterdam
Antwerp
Bahrain
Barcelona
Berlin
Brussels
Budapest
Cairo
Casablanca
Doha
Dubai
Dusseldorf
Frankfurt/Main
Geneva
Istanbul
Jeddah*
Johannesburg
Kyiv
London
Luxembourg
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh*
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

**The Americas**
Bogota
Brasilia**
Buenos Aires
Caracas
Chicago
Dallas
Guadalajara
Houston
Juarez
Lima
Los Angeles
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre**
Rio de Janeiro**
San Francisco
Santiago
Sao Paulo**
Tijuana
Toronto
Valencia
Washington, DC

* Associated Firm
** In cooperation with
Trench, Rossi e Watanabe
Advogados

January 9, 2026

James Taylor-Copeland
james@taylorcopelandlaw.com
Max Ambrose
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101

**Re:** *Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH (N.D. Cal.)

Dear Counsel:

We write in response to your September 9 and 15, and October 23, 2025 meet and confer letters regarding Nexo's document production. We also write to meet and confer regarding the sufficiency of Cress's document production. It would be most efficient for us to meet and confer to resolve outstanding issues with respect to the productions of both sides.

### NEXO'S DOCUMENT PRODUCTION

As Nexo explained in its October 23 letter, the parties engaged in lengthy negotiations to arrive at mutually acceptable search terms for Nexo's document review. Nexo collected the email, shared drive, and Slack data for the 14 custodial sources, and email for the 9 non-custodial sources ordered by the Court, limited to the 2021-2022 date range ordered by the Court for the non-custodial sources, and applied Cress's 100+ search terms. Cress explicitly approved each and every one of those search terms, with the parties not reaching agreement on all search terms until July 1, 2025. Nexo assembled a large document review team at significant expense over the summer to implement the parties' agreed document review and search term protocol. Nexo's document review and production over the summer was based on reviewing the documents that hit on the search terms that Cress selected. After the document hits on the review population were segregated, Nexo reviewed and produced responsive documents consistent with its RFP responses. This protocol was fair, reasonable, and proportional.

Nexo generally adheres to the distinction made in its October 23 letter, which is relevant to proportionality and burden. Cress's RFPs generally fall into one of two categories— narrow requests and broad requests. Narrow requests seek a discrete and ascertainable category of targeted documents that Nexo can reasonably search for and produce from Nexo's general corporate records without search terms or unreasonable burden. In other words, it's a narrow request for a specific document or subset of similar documents that Nexo can identify without a document search and review process. In contrast, broad requests seek "all documents" concerning broad categories of communications. Broad

Baker McKenzie.

requests require custodians, search terms, document review teams, and the search protocol that the parties laboriously negotiated over last summer.

Your October 23 letter does not acknowledge or address this critical distinction between narrow and broad requests. In particular, your October 23 letter treats all Cress RFPs as equivalent and appears to demand that, for broad requests, Nexo review all documents within the Company, without regard to the custodians, search terms, and review protocol that we previously negotiated. As a general matter, for narrow requests, Nexo is willing to follow up and look for specific documents or categories of documents that Cress claims to be missing. However, for the broad requests, with the exceptions noted below, Nexo is not willing revisit the Court's orders setting the date range limit for non-custodial sources, to expand beyond the 23 custodial and non-custodial sources approved by the Court, or to expand beyond the 100+ search terms the parties already negotiated and agreed upon other the summer.

Nexo's responses to your inquiries are below. To the extent that Nexo agrees to investigate whether further responsive documents exist, it is not intended to be an acknowledgement that such documents do, in fact, exist.

### Cress's Narrow Requests

We have worked with Nexo to follow up regarding your narrow requests for documents. Nexo agrees to produce, or has already produced, the documents listed in the chart below. To the extent you wish to meet and confer about obtaining additional documents, please consider whether those requests can be formulated as narrow requests. Thank you for your patience while we followed up on these issues.

| 1 | Nexo will produce a spreadsheet of Nexo Token ICO sales including the purchase information and the identities and nationalities of the purchasers |
|---|---|
| 2 | Nexo will produce policies, practices, and procedures with respect to identifying the location of its customers, including Cress |
| 3 | Nexo will produce documents sufficient to show all wallet addresses which sent or received BTC, ETH, NEXO, USDC, USDT related to Cress transactions |
| 4 | Nexo will produce documents sufficient to show how Nexo accounted for Nexo Token ICO proceeds in comparison to post-ICO proceeds |
| 5 | Nexo will produce third party exchange transaction information for Cress's OTC purchases and liquidations |
| 6 | Nexo will produce documents sufficient to show any incentive policies applicable to Hristov |
| 7 | Nexo will produce Hristov's employment contract |
| 8 | Nexo will produce date-relevant versions of responsive Nexo website articles |
| 9 | Nexo will produce correspondence with regulators concerning the FTX subpoena |
| 10 | Nexo will produce non-privileged communications regarding the Zachary Rubin settlement |
| 11 | Nexo will produce a full export of Cress's Salesforce records in native CSV format and a screenshot of Cress's Nexo account bio page |
| 12 | Nexo will produce communications regarding support ticket #432896 |

**Communications with Regulators.** Nexo produced responsive documents regarding communications with regulators on September 12. You raised concerns that Nexo's production of correspondence with regulators is incomplete and does not contain the full document productions

provided to regulators. We have determined that certain documents in this category were encrypted and were not included in the September 12 production because we did not have the passwords for the files necessary to open and process the documents. We believe that we have now identified the relevant passwords and are working with our ESI team to complete the production of this document category.

**2018-2020 Nexo Token Sales.** Nexo has produced documents regarding 2018-2020 Nexo Token Sales through the protocol of applying the agreed search terms to the 23 custodial and non-custodial sources approved by the Court. If you have a narrow request for a certain type of additional data related to 2018-2020 Nexo Token Sales, Nexo is willing to further inquire into whether production is possible.

**Audit Reports, Attestations, and Financial Attestations.** Similarly, with respect to audit reports, Nexo applied the agreed search terms to the agreed custodians and produced responsive documents consistent with its RFP responses. We seem to have a difference of opinion as to the meaning of the term "audit" – Nexo understands it to be a formal report by a third-party auditor, while Cress appears to define it as any internal financial report, including those prepared by Nexo itself. Nexo wishes to avoid disputes regarding this category. If Cress is seeking a specific type of internal financial document, please identify what you are looking for (subject matter and time period) with specificity. We are willing to meet and confer regarding targeted requests for internal financial documents that are relevant. Please let us know what you want as far as internal Nexo financial reports, in the form of a narrow request, and we can further inquire into whether production is possible.

**Social Media.** Nexo made a large production of its social media posts, which were extracted by third-party service provider "Page Vault." You can identify those documents by searching the term "Page Vault" in Nexo's production. Nexo is willing to meet and confer about the production of additional social media posts that you claim to be missing. However, most if not all of Nexo's social media posts or videos should be publicly available on the platforms and equally accessible to Cress.

**Replacement Documents.** You raise issue with the quality of certain documents in the production. Nexo is willing to produce better quality documents if better versions are available to Nexo. To expedite the process, please send a complete list of Bates numbers of documents where you want Nexo to replace the document. Nexo will replace them or explain why it is unable to do so.

**Cress's Broad Requests**

As to your broad requests for "all documents" related to various subject matters, Nexo's general position is that Nexo applied the agreed search terms to the agreed custodians and produced responsive documents consistent with its RFP responses. Nexo has produced over 50,000 documents in this matter, and has agreed above to produce even more. Cress's generic contention that there should be more documents from Trenchev, Kantchev, Hristov, Slack, and Nexo internal communications appears to incorrectly assume that Nexo had an obligation to search beyond the terms agreed by the parties and beyond the 23 custodians and non-custodial sources approved by the Court.

In an effort to avoid further disputes regarding this issue, Nexo is willing to meet and confer to apply new and very targeted search terms to identify any discrete documents that Cress claims to be missing from the production. Those search terms would be applied to the existing database of 23 custodians and non-custodial sources. Regarding your inquiry about the document collection, Nexo collected both

3

**Baker McKenzie.**

the .io and .com versions of the email addresses of the individual custodians. As to your reference to the legal@nexo.io email account, that account was not included as a non-custodial source, and was not approved by the Court. Nexo remains willing to meet and confer regarding these issues.

**CRESS'S DOCUMENT PRODUCTION**

Nexo's document requests seek discrete categories of documents from one custodian. Cress has produced only approximately 844 documents. Nexo seeks to meet and confer regarding the following deficiencies in Cress's document production.

**1.** <u>**Communications To/From Nexo**</u>

It does not appear that Cress has produced his full set of communications with Nexo. For example, Nexo produced NEXO-0003613, an email chain between Cress and Hristiyan Hristov dated August 10-17, 2021, that does not appear to be in Cress's production. Please confirm that Cress has produced each and every document in his personal email, social media, messaging apps, or other repositories that hit on the term "Nexo."

**2.** <u>**Cress's Communications re: Nexo and Cryptocurrency**</u>

Cress has agreed to produce, his texts, Telegrams, emails, and other messages that relate to Nexo and his cryptocurrency investments. A review of Cress's production reveals holes and missing documents. *See* CRESS-00013155 at 13165 (Cress did not produce the chat message where he was supposedly removed from the "whale chat"); CRESS-00012453 at 12455 (Cress sent an unproduced "bad review" on Telegram); CRESS-00012489 at 12492 (Cress posted a link to an article in the "Nexo telegram" that does not appear to have been produced). Please confirm that Cress will produce these communications.

Cress has admitted that, at times, he was a member of a "whale chat," which may or may not be different from a "Nexo Telegram chat," of which he was also a member. Nexo has identified two different multi-member chats as produced by Cress: Group Name 1127480027 and Group Name 1264305535. Please confirm that these are the "whale chat" and the "Nexo Telegram chat," or if not, what they are.

Nexo's review of Cress's production indicates that there are many types of chats or communications that Nexo cannot determine whether Cress has produced from the face of the document:

- In CRESS-00001910, Cress was invited to join a private Discord chat. Did he join this chat? If so, was it produced?
- CRESS-00002426 and CRESS-00002429 appear to be a partial Telegram chat with GSR. Please produce the entire chat with GSR, and all communications with GSR related to Cress's sale of his Nexo Tokens.
- In CRESS-00012520, Cress notes that he sent a video to David Lindenbaum "in telegram." Please produce the full set of Cress's Telegram messages with Mr. Lindenbaum and all other Telegram messages that are responsive to Nexo's RFPs.

4

Baker
McKenzie.

- In CRESS-00012838, Cress relays a text he received from a "Nexo user." Please produce the full set of text messages that are responsive to Nexo's RFPs.
- In CRESS-00012850, Cress discusses an "Advanced Crypto Asset Trading Group" Facebook group that he joined. None of the messages or posts from this group have been produced.
- In CRESS-00012908, Cress mentions another Nexo user "advocating his one good will favor" with Nexo on Cress's behalf. These messages were not produced.
- In CRESS-00013103 and CRESS-00013118, Cress mentions that he sent emails regarding Nexo to "Ace." These emails do not appear to have been produced.

Please confirm that Cress produced these documents, and if not, what steps Cress will take to ensure that all responsive documents are produced.

### 3. Tax Documents and Communications

The Court's October 31, 2025 discovery order compelled Cress to respond to Nexo RFP 132, which seeks "All documents related to your tax treatment of your NEXO Token transactions in 2021." Cress repeatedly mentioned his use of Token Tax, including uploading his data from Nexo onto Token Tax. *See, e.g.*, CRESS-00001197, CRESS-00001335, CRESS-00001703, CRESS-00002154, CRESS-00002198, CRESS-00012649. Please confirm when Cress will make a complete production responsive to RFP 132.

### 4. Missing Documents

Several of Cress's documents indicate on their face that other responsive documents exist but do not appear to have been produced by Cress, which indicates an incomplete collection effort:
- CRESS-00000052 and CRESS-00001386 refer to the Source of Funds Declaration that Cress submitted to Nexo. It does not appear that Cress produced this document.
- CRESS-00000001, CRESS-00000027, CRESS-00000034, CRESS-00000077, CRESS-00000254, and CRESS-00001760 refer to Cress's OTC transactions, where Cress sent USDT to Nexo's OTC Vault. It does not appear that Cress has produced all of the automated confirmation emails that he received from Nexo. *See, e.g.*, CRESS-00000692, at 703 ("I sent my tokens to Nexo's deposit address").
- In CRESS-00012486 and CRESS-00012489, Cress discussed chats regarding cryptocurrency investments with "BitcoLoan support" (12486) and "[t]he founder of Vectorspace" (12489). These chats were not produced.

### 5. Missing Attachments

Many of Cress's documents are missing attachments, since the document has no "family." *See, e.g.*, CRESS-00000025, CRESS-00000050, CRESS-00001189, CRESS-00001366, CRESS-00001368.

### 6. Incomplete Documents & Metadata

Nearly all of Cress's documents are missing key information and/or metadata that impair Nexo's review of the production. CRESS-00001385 and CRESS-00001389 appear to be empty documents. CRESS-00002698, CRESS-00002699, CRESS-00002700, CRESS-00002701, and CRESS-00002702

5

**Baker McKenzie.**

say that they were produced in native format, but there is no native document. Of these, CRESS-00001385 and CRESS-00001389 are of particular importance, because they appear to be Cress's Accredited Investor Certificate and the CSV download from Coinbase that Cress sent to Nexo. Please reproduce these documents.

Many of the text and Telegram messages as produced do not include the recipient's name and/or phone number. For example, CRESS-00013175 appears to be some type of message, but with no recipient name or phone number. Similarly, many of Cress's messages—for example, CRESS-00012407, CRESS-00012420, CRESS-00012445, CRESS-00012475, and CRESS-00012481, among many more—are all missing the recipient's phone number. Please reproduce all text and other messages with full information and metadata, including the recipient's name and phone number.

Please promptly let us know Cress's positions on these issues.

Regards,

*/s/ Ian S. Shelton*

Ian S. Shelton

6